**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
Docket Report

---

**2384CV00930 Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 04/19/2023 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | |
| **DESCRIPTION:** | Fraud, Business Torts , etc. | | |
| **CASE DISPOSITION DATE:** | 01/08/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 01/08/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

---

| PARTIES |
|---|

| **Plaintiff**<br>Mcmanus, For Herself And The Class, Karen | **Attorney** 215620<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 04/19/2023 |
|---|---|
| | **Attorney** 549049<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 04/19/2023 |
| | **Attorney** 663866<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 04/19/2023 |
| **Defendant**<br>Tufts Medical Center, Inc.<br>800 Washington Street<br>Boston, MA 02111 | **Attorney** 649407<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 05/22/2023 |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
**Docket Report**

| | FINANCIAL DETAILS | | | | |
|---|---|---|---|---|---|
| **Date** | **Fees/Fines/Costs/Charge** | **Assessed** | **Paid** | **Dismissed** | **Balance** |
| 04/19/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39316 Date: 04/19/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 04/19/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 39316 Date: 04/19/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 04/19/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 39316 Date: 04/19/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| 04/19/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39316 Date: 04/19/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 04/19/2023 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 39316 Date: 04/19/2023 | 5.00 | 5.00 | 0.00 | 0.00 |
| | **Total** | **520.00** | **520.00** | **0.00** | **0.00** |

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|------|-----|-------------|-------|
| 04/19/2023 | 1 | Complaint electronically filed. | |
| 04/19/2023 | 2 | Civil action cover sheet filed. | |
| 04/19/2023 | 3 | Plaintiff Karen Mcmanus, For Herself And The Class's Motion to app spec process server | |
| 04/19/2023 | | Attorney appearance<br>On this date Edward F Haber, Esq. added for Plaintiff Karen Mcmanus, For Herself And The Class | |
| 04/19/2023 | | Attorney appearance<br>On this date Patrick Vallely, Esq. added for Plaintiff Karen Mcmanus, For Herself And The Class | |
| 04/24/2023 | | Endorsement on Motion to Appoint Special Process Server (#3.0): ALLOWED<br>(dated 4/20/2023) Notice sent via email 4/24/2023 | Krupp |
| 04/24/2023 | 4 | General correspondence regarding NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1"<br>This matter has been accepted into the Suffolk Business Litigation Session.<br>It has been assigned to BLS1.<br>(dated 4/20/2023) notice sent via email 4/24/23 | Salinger |
| 05/02/2023 | 5 | Service Returned for<br><br>Applies To: Tufts Medical Center, Inc. (Defendant) | |
| 05/22/2023 | 6 | Notice of Removal to the United States District Court filed by<br><br>Defendant (US Dist. # 23cv-11090)<br><br>Applies To: Tufts Medical Center, Inc. (Defendant) | |
| 05/22/2023 | | Attorney appearance<br>On this date James Hefferan Rollinson, Esq. added for Defendant Tufts Medical Center, Inc. | |
| 05/22/2023 | | REMOVED to the U.S. District Court<br>Of Massachusetts | |
| 05/22/2023 | | Case transferred to another court. | |
| 08/17/2023 | | Defendant Tufts Medical Center, Inc.'s Notice of Motion to Dismiss | |
| 10/11/2023 | 7 | Defendant Tufts Medical Center, Inc.'s Request for<br>LEAVE OF COURT TO EXCEED THE PAGE LIMIT FOR ITS REPLY<br>MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS<br>(UNOPPOSED REQUEST PURSUANT TO RULE 9(A)(6)) | |
| 10/26/2023 | | Remanded to the Superior Court from the U.S. District Court.<br><br>ACTION RETURN TO COURT ACCORDINGLY<br><br>See P#14 Notice Sent 10/26/2023 | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
**Docket Report**

| 10/26/2023 | 8 | Notice of Removal to the United States District Court filed by |
|---|---|---|
| | | Applies To: Tufts Medical Center, Inc. (Defendant) |
| 10/26/2023 | 9 | Corporate Disclosure Statement filed |
| | | Applies To: Tufts Medical Center, Inc. (Defendant) |
| 10/26/2023 | 10 | Plaintiff, Defendant Karen Mcmanus, For Herself And The Class, Tufts Medical Center, Inc.'s Joint Motion for Entry Of Schedule Regarding Motion To Remand And To Extend Time For Defendant to Respond To The Complaint |
| | | ELECTRONIC ORDER entered granting motion. (Burroughs, J., USD) entered 5/22/2023 |
| 10/26/2023 | 11 | Plaintiff Karen Mcmanus, For Herself And The Class's Motion to Remand |
| | | ELECTRONIC ORDER entered granting motion. (Burroughs, J., USD) entered 7/18/2023 |
| 10/26/2023 | 12 | Karen Mcmanus, For Herself And The Class's Memorandum in support of Motion To Remand |
| 10/26/2023 | 13 | Defendant Tufts Medical Center, Inc.'s Response to Plaintiff's Motion To Remand |
| 10/26/2023 | 14 | General correspondence regarding Certified Order Of Remand In accordance with the court's electronic order entered on July 18, 2023 granting plaintiff's motion to remand, it is hereby ordered that this case be REMANDED to Suffolk County Superior Court for further proceedings. (Burroughs, J., USD) entered 7/18/2023 |
| 10/26/2023 | 15 | General correspondence regarding Certified Docket Entries Received |
| 10/31/2023 | 16 | Defendant Tufts Medical Center, Inc.'s Motion to dismiss Plaintiff's complaint |
| 10/31/2023 | 17 | Tufts Medical Center, Inc.'s Memorandum in support of motion to dismiss Plaintiff's complaint |
| 10/31/2023 | 18 | Declaration of Elizabeth A. Scully |
| 10/31/2023 | 19 | Opposition to Defendant's motion to dismiss filed by Karen Mcmanus, For Herself And The Class |
| 10/31/2023 | | Exhibits/Appendix |
| 10/31/2023 | 20 | Reply/Sur-reply |
| | | Defendant's Reply Memorandum in Support of its Motion to Dismiss Plaintiff's Complaint |
| 10/31/2023 | | Exhibits/Appendix |
| 10/31/2023 | | Defendant's Superior Court Rule 9A Notice of Filing |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 11/14/2023 | | Endorsement on Motion for Leave of Court to Exceed the Page Limit for its Reply Memorandum in Support of its Motion to Dismiss (#7.0): DENIED (Dated: 11/13/23) Notice sent 11/16/23 | Kazanjian |
| 11/17/2023 | 21 | Proposed Filings/Orders<br><br>Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases | |
| 01/25/2024 | | Endorsement on Submission of Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases (#21.0): ALLOWED<br>This case shall be stayed pending decision of the Vita appeals. Within 14 days of the decision in the Vita appeals, the parties shall notify the Court and provide three dates in the following 60 days when they would be available for a Rule 16 Conference with the Court.<br>(Dated: 1/24/24)  Notice Sent 1/25/24 | Krupp |
| 12/05/2024 | 22 | Plaintiff Karen Mcmanus, For Herself And The Class's Notice of Supreme Judicial Court Decision in Vita v. New England Baptist Hospital | |
| 12/05/2024 | 23 | Defendant Tufts Medical Center, Inc.'s Notice of Supreme Judicial Court Decision in Vita v. New England Baptist Hospital | |
| 12/12/2024 | 24 | Amended: and Jury Trial Demanded amended complaint filed by Karen Mcmanus, For Herself And The Class | |
| 01/02/2025 | 25 | Defendant Tufts Medical Center, Inc.'s Notice of Removal<br><br>(U.S. Dist. #24-cv-10008) | |
| 01/02/2025 | | Exhibits/Appendix | |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff:  Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff:  Patrick Vallely, Esq. pvallely@shulaw.com<br>Plaintiff:  Edward F Haber, Esq. ehaber@shulaw.com<br>Defendant:  James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Sent On: 01/06/2025 13:14:47 | |
| 01/08/2025 | | REMOVED to the U.S. District Court Of Massachusetts | |
| 01/08/2025 | | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| Karen McManus, | **SUPERIOR COURT DEPARTMENT** |
| For herself and the Class, | **OF THE TRIAL COURT** |
| | **BUSINESS LITIGATION SESSION** |
| v. | |
| | CIVIL ACTION NO. _23-0930_ |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Karen McManus ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1.      Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Tufts Medical Center, Inc. ("Tufts Medical Center"). Specifically, Tufts Medical Center aided in the interception of communications between Plaintiff and other Class Members (defined below) and Tufts Medical Center through a website maintained by Tufts Medical Center (the "Tufts Medical Center Website").

2.      Tufts Medical Center aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with Tufts Medical Center by injecting hidden code into the Tufts Medical Center Website. That hidden code enabled Google, Facebook, and other third parties to secretly listen to the contents of healthcare consumers' communications with Tufts Medical Center. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use

the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3.    Healthcare consumers' wire communications with Tufts Medical Center were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent. Tufts Medical Center did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of individual communications with Tufts Medical Center, nor did Tufts Medical Center seek or obtain their consent for such interception. On the contrary, Tufts Medical Center deceptively told (and continues to tell) healthcare consumers, through their published online privacy policy, that any information collected about their activities on the Tufts Medical Center Website would be collected only on an "aggregate" and "anonymous" basis. In reality, Tufts Medical Center facilitated the interception of communications between healthcare consumers and Tufts Medical Center in a manner that permitted third parties such as Google and Facebook to ascertain the consumers' identity and then use that intercepted information for their own commercial purposes, including serving individualized advertising based on the contents of the individuals' communications with Tufts Medical Center.

4.    The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an

unlawful interception occurs when any one of the following pieces of information is intercepted or recorded:

     a.   the identity of the parties to the communication;

     b.   the existence of the communication; **or**

     c.   any part of the contents, substance, purport, or meaning of the communication.

5.     The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6.     Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7.     Moreover, although this case concerns communications between healthcare consumers and healthcare providers, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on the nature of the relationship between Plaintiff and Tufts Medical Center. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8.    The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9.    Tufts Medical Center aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with Tufts Medical Center through the Tufts Medical Center. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act on her own behalf and for all other Massachusetts residents who accessed the Tufts Medical Center Website.

## PARTIES

10.    Plaintiff is a resident of Walpole, Massachusetts. Plaintiff is a patient of Tufts Medical Center. Plaintiff regularly uses the Tufts Medical Center Website to (i) obtain information about Tufts Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal.

11.    Defendant Tufts Medical Center, Inc. is a corporation that operates in Boston, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Boston, Massachusetts. Tufts Medical Center maintains and controls the content of the Tufts Medical Center Website.

## JURISDICTION

12.    The exercise of personal jurisdiction over Tufts Medical Center is proper according to M.G.L. c. 223 § 3 because, among other things, Tufts Medical Center is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of Tufts Medical Center's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### Tufts Medical Center and Its Website

13.    Tufts Medical Center operates a hospital and full-service medical center in Boston, Massachusetts. Tufts Medical Center offers inpatient and outpatient care to residents near Boston and surrounding communities. Tufts Medical Center provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care.

14.    Tufts Medical Center maintains the Tufts Medical Center Website for its hospital and outpatient facilities, found at https://www.tuftsmedicalcenter.org/. Through that website, healthcare consumers can obtain information about the services Tufts Medical Center provides, including information about doctors, services, and treatments provided by Tufts Medical Center for particular medical conditions.

15.    The Tufts Medical Center Website is designed for communications with healthcare consumers. The website includes the following functions:

(a)    The Tufts Medical Center Website provides general information about Tufts Medical Center.

(b)    The Tufts Medical Center Website provides information about healthcare services provided at Tufts Medical Center, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Stroke Center," and "Psychiatry," among many others.

(c)    The Tufts Medical Center Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, and location.

(d)    The Tufts Medical Center Website permits healthcare consumers to access and pay bills online.

(e)    The Tufts Medical Center Website lets healthcare consumers access their private medical information online through the myTuftsMed Patient Portal.

16.    Because the Tufts Medical Center Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors,

5

specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

### Reasonable Expectations of Users of the Tufts Medical Center Website

17.     Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Tufts Medical Center Website.

18.     Users of healthcare-related websites such as the Tufts Medical Center Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Tufts Medical Center will not share with third parties their communications with Tufts Medical Center without their consent.

19.     The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Tufts Medical Center from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20.     Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Tufts Medical Center, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21.     The expectations and understanding of users of the Tufts Medical Center Website are informed by what Tufts Medical Center tells them about how it handles their personal information.

22.     The Tufts Medical Center Website Privacy Policy begins by promising, generally, that "Patients' and other visitors' privacy and security is a top priority at Tufts Medical Center." It then continues, near the outset of the policy, to state (emphasis added):

> All visitors use the Tufts Medical Center websites **anonymously**. **We do not collect any identifiable information unless you specifically provide us with that information** voluntarily through our forms such as request appointment forms, e-newsletter sign-ups, clinical trial enrollment, etc.... .... Tufts Medical Center does not and **will never sell or rent any identifiable information to third party vendors**.

23.     These statements are false. As described more fully below, website users do not access the Tufts Medical Center anonymously. Instead, Tufts Medical Center injected hidden code into its website that permitted Facebook, Google, and other third parties to intercept communications between website users and Tufts Medical Center and, critically, to associate those intercepted communications with the real-world identities of those individuals. That is, the communications that Google and Facebook intercepted are **not** "anonymous."

24.     Moreover, as described more fully below, Tufts Medical Center bartered website users' "identifiable information" and the content of their communications with Tufts Medical Center to third parties in exchange for valuable services provided by those third parties, including website analytics and targeted advertising.

25.     Although the same policy later discusses "cookies" and "tracking pixels," the statements regarding those technologies do not negate Tufts Medical Center's deceptive promises that website users browse the website "anonymously" and that Tufts Medical Center does not provide identifiable information to third parties. Instead, the policy states, concerning tracking pixels: "They [the tracking pixels] do not provide us with any personally identifiable information," again reinforcing the promise of anonymity when, in fact, the tracking pixels are designed to associate a website user's communications with Tufts Medical Center to the user's real-world identity.

26.    In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Tufts Medical Center's deceptive statements on the Tufts Medical Center Website. The interceptions of website users' communications with Tufts Medical Center were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

27.    Plaintiff describes in this complaint various tracking technologies implemented on the Tufts Medical Center Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with Tufts Medical Center. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Tufts Medical Center and the purposes for which interceptions are made.

28.    Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

29.    Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

30.    Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

31.     Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

32.     Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

33.     Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

34.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

35.     Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

36.    Google maintains detailed profiles on individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

37.    Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

38.    One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

39.    Another way Google collects information to build its detailed profiles on individuals is through its "Doubleclick" and "Google Ads" tags. Doubleclick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired Doubleclick in 2007 and now operates it as an advertising division of Google. Google's advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then

associates the data collected through the advertising tags with particular individuals to serve targeted advertising on the individual and measure the efficacy of Google's advertising campaigns.

40.    In summary, with respect to Google, although Google Analytics and Doublclick/Google Ads tags are distinct products with distinct purposes (Google Analytics is used to analyze website user behavior, and Doubleclick/Google Ads tags are used to optimize and track the effectiveness of advertising), they both function similarly. They both intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and Doubleclick/Google Ads tags, and Google can and does use those intercepted communications for its own commercial purposes.

### Website Tracking Technologies on the Tufts Medical Center Website

41.    Tufts Medical Center has injected hidden code into the Tufts Medical Center Website that permitted third parties to contemporaneously intercept healthcare consumers' communications with Tufts Medical Center. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with Tufts Medical Center with the website user's Facebook profile.

42.    These tracking technologies transmitted to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Tufts Medical Center, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

43.    Tufts Medical Center has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

44.    Before describing how such technologies work, it is important to first define some basic technological terms.

45.    A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

46.    An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Tufts Medical Center, as of the time of this complaint, is 99.83.180.191. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

47.    A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Tufts Medical Center Website is https://www.tuftsmedicalcenter.org. URLs also often point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the Tufts Medical Center Website has a page specifically about the Tufts Medical Center Department of Obstetrics and Gynecology; that page's URL is https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview.

48.    A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one

way to associate particular communications between website users and Tufts Medical Center with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

49.     **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

50.     With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Tufts Medical Center) inserts into its website hidden code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

51.     The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

52.     When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information

to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.tuftsmedicalcenter.org/patient-care-services/ Departments-and-Services/Obstetrics-and-Gynecology/Overview); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

53.     When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with Tufts Medical Center to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

54.     The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of

14

intercepting and transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

55.      The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Tufts Medical Center contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

56.      The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup article (including attachments published with the article) singled out Tufts Medical Center as one of the nation's largest hospitals that used Meta Pixel in this fashion. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[4] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

57.      Tufts Medical Center appears to have removed Meta Pixel from its website in mid-June 2022, around the same time as the Markup Article (although the article was published June 16,

---

[3] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[4] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

2022, the Markup indicated that it contacted hospitals featured in the article prior to publication for their comments). Although it removed Meta Pixel, Tufts Medical Center continued after that time to inject other hidden tracking technologies into its website that intercepted healthcare consumers' communications with Tufts Medical Center in a similar fashion, including Google Analytics.

### Tufts Medical Center's Use of Tracking Technologies on the Tufts Medical Center Website

58.     Tufts Medical Center has used various tracking technologies across the Tufts Medical Center Website. Tufts Medical Center has injected several tracking technologies into the code of all, or almost all, of the pages within the Tufts Medical Center Website. For example, on nearly every page of the Tufts Medical Center Website, Tufts Medical Center has injected hidden code that loads Google Analytics. It appears to have injected hidden Meta Pixel code into most pages on the Tufts Medical Center Website before having removed Meta Pixel in mid-June 2022.

59.     The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

60.     Below is an image of the main landing page for the Tufts Medical Center Website:



61.     When a user loads the main landing page for the Tufts Medical Center Website, the webpage caused the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then caused the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

62.     The image below depicts the landing page for the Tufts Medical Center on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



63.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code caused the user's web browser to intercept and transmit to Google when a small file was loaded from Google's servers:

× Headers   Payload   Preview   Response   Initiator   »

▼ Query String Parameters     view source     view URL-encoded

v: 1

_v: j99

aip: 1

a: 636516736

t: pageview

_s: 1

dl: https://www.tuftsmedicalcenter.org/

ul: en-us

de: UTF-8

dt: Tufts Medical Center | Boston Hospital and Academic
Medical Center

sd: 24-bit

sr: 1920x1080

vp: 1339x979

je: 0

_u: QCCAgAABAAAAAAAAC~

jid:

gjid:

cid: 815584837.1679685730

tid: UA-5578028-1

_gid: 1131827353.1679685730

gtm: 45He33m0n71TTLN4K

z: 1538772411

64.     Among the information intercepted and transmitted to Google contemporaneously
with the communications between the website user and the Tufts Medical Center Website are:

(a)     The URL of the webpage visited (the text after the letters "dl," which includes the text
        "https://www.tuftsmedicalcenter.org"); and

(b)     The title of the webpage (after the letters "dt," which includes "Tufts Medical Center
        | Boston Hospital and Academic Medical Center").

65.     The other information Google has intercepted includes data about the user's web
browser configuration (including screen resolution, device information, and browser settings); a
unique identifier for the particular user visiting the website (which enables Google to track that

individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Tufts Medical Center).

66.     Tufts Medical Center also has placed Doubleclick/Google Ads tags on most webpages on its website that interecepted similar information to Google Analytics, although, as discussed above, the primary purpose of these other tags—from the perspective of the website owner—is advertising instead of website analytics. The contents of the communication that Doubleclick/Google Ads tags intercept and transmit to Google, via hidden JavaScript code, however, is similar to Google Analytics. For example, below is the information that hidden Doubleclick/Google Ads code intercepted on the main landing page of the Tufts Medical Center Website (with highlighting added):

That is, hidden Doubleclick/Google Ads code intercepts the URL visited, the name of the webpage visited, various information on the user's computer and browser configuration, and additional identifiers that can be used to confirm the identity of the individual whose communication with Tufts Medical Center is intercepted.

67.    Notably, when the hidden code for Google Analytics or Doubleclick/Google Ads causes the website user's web browser to intercept the contents of communications between the website user and the Tufts Medical Center Website and contemporaneously transmit those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address and/or other persistent identifiers to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). That is, the technology was designed specifically so that the communications are not intercepted anonymously or only in the aggregate; instead, the interceptions are designed to be individualized and non-anonymous. After Google associates the website user's communications with Tufts Medical Center with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

68.    Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Tufts Medical Center Website are the same.

69.     The same landing page for the Tufts Medical Center Website also included hidden Meta Pixel code before Tufts Medical Center removed Meta Pixel from its website in mid-June 2022. The hidden code caused the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Tufts Medical Center Website. Below is an example of the contents of the communication between the website user and Tufts Medical Center, which the hidden Meta Pixel code intercepted and transmitted to Facebook:



70. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Tufts Medical Center Website, including the URL of the webpage visited and the title of the webpage, and additionally, more detailed contents describing the webpage. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with Tufts Medical Center's advertising account with Facebook.

71. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and Tufts Medical Center to serve personalized advertising to the website user in the future.

72. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

73. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user. This allowed Facebook to track that individual across the Tufts Medical Center Website and further confirm that individual's real-world identity.

74. Tufts Medical Center configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare

consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

75.    The Tufts Medical Center Website contains numerous subpages for specific "Patient Care and Services." For example, the Tufts Medical Center Website contains a page entitled "Obstetrics and Gynecology," designed to inform the website user about OB/GYN services Tufts Medical Center offers. By visiting this webpage, a user communicates that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with Tufts Medical Center by visiting this particular webpage, Tufts Medical Center caused the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:



76.     The graphic below presents the contents of the communication between the website
user and Tufts Medical Center that were secretly intercepted and transmitted to Google when the
above page loaded as a result of the Google Analytics JavaScript code that Tufts Medical Center
secretly injected into the website (with highlighting added):

```
▼ Query String Parameters      view source     view URL-encoded
    v: 1
    _v: j99
    aip: 1
    a: 1002877562
    t: pageview
    _s: 1
    dl: https://www.tuftsmedicalcenter.org/patient-care-serv
    ices/Departments-and-Services/Obstetrics-and-Gynecology/
    Overview
    ul: en-us
    de: UTF-8
    dt: Obstetrics & Gynecology | Tufts Medical Center
    sd: 24-bit
    sr: 1920x1080
    vp: 1339x979
    je: 0
    _u: QCCAgAABAAAAAAAAAC~
    jid:
    gjid:
    cid: 815584837.1679685730
    tid: UA-5578028-1
    _gid: 1131827353.1679685730
    gtm: 45He33m0n71TTLN4K
    z: 704906163
```

77.     As reflected in the above screenshot, the code injected into the Tufts Medical Center
Website caused the user's browser to contemporaneously intercept and transmit to Google the fact
that the website user is visiting an "Obstetrics & Gynecology" webpage on the Tufts Medical Center
Website—information that Google retains and can use for its own commercial purposes, and because
Google retains it, can be accessible by third parties by subpoena or otherwise.

78.     As shown on the screen capture of the webpage itself, the Obstetrics and Gynecology webpage contains a button through which a healthcare consumer can "Request an Appointment." When an individual clicks that button, the individual communicates to Tufts Medical Center that the individual is seeking obstetrics and gynecology care and is a patient or prospective patient of Tufts Medical Center. When the user clicks that button, hidden Google Analytics code that Tufts Medical Center injected into its website permitted Google to intercept the communication. The contents of the communication that were intercepted via hidden Google Analytics code is depicted below:



```
X  Headers   Payload   Preview   Response   Initiator   Timing
▼ Query String Parameters   view source   view URL-encoded
    v: 1
    _v: j99
    a: 406680217
    t: event
    ni: 0
    _s: 1
    dl: https://www.tuftsmedicalcenter.org/patient-care-services/D
    epartments-and-Services/Obstetrics-and-Gynecology/Overview
    ul: en-us
    de: UTF-8
    dt: Obstetrics & Gynecology | Tufts Medical Center
    sd: 24-bit
    sr: 1920x1080
    vp: 1339x979
    je: 0
    ec: How can we help you today?
    ea: REQUEST AN APPOINTMENT
    el: /patient-care-services/Departments-and-Services/Obstetrics
    -and-Gynecology/Overview
    _u: SCCAAAABAAAAACAAAC~
    jid:
    gjid:
    cid: 815584837.1679685730
    tid: UA-5578028-1
    _gid: 1131827353.1679685730
    gtm: 45He33m0n71TTLN4K
    z: 1581868186
```

Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information. That is, Google intercepted the fact that the healthcare consumer has

26

clicked a "REQUEST AN APPOINTMENT" button on the Obstetrics & Gynecology webpage of

Tufts Medical Center, information Google can then use for its own commercial purposes.

79.    The same webpage contained hidden code that intercepted the user's communication

with Tufts Medical Center and transmitted the same information to Facebook before the removal of

Meta Pixel from the Tufts Medical Center Website in June 2022. The contents of the communication

intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:

× Headers   Payload   Preview   Response   Initiator   Timing   »

▼ Form Data    view source    view URL-encoded
    id: 899431063472882
    ev: Microdata
    dl: https://www.tuftsmedicalcenter.org/patient-care-service
    s/departments-and-services/obstetrics-and-gynecology/overv
    iew
    rl:
    if: false
    ts: 1598237810086
    cd[DataLayer]: []
    cd[Meta]: {"title":"\n\tObstetrics and Gynecology in Boston
    | Tufts Medical Center\n","meta:keywords":"obstetrics, gyn
    ecology, women, obgyn, gyn, ob, delivery, pregnancy, obgyn
    boston","meta:description":"Tufts Medical Center's Obstetr
    ics and Gynecology experts offer renowned care from checku
    ps and deliveries to surgery. Learn more and request an ap
    pointment today."}
    cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.
    org/ui/images/logo-tufts-medical-center-fb-share.png","og:
    image:secure_url":"https://www.tuftsmedicalcenter.org/ui/i
    mages/logo-tufts-medical-center-fb-share.png","og:image:ty
    pe":"image/png","og:image:width":"200","og:image:heigh
    t":"200","og:title":"Obstetrics and Gynecology in Boston |
    Tufts Medical Center","og:description":"Tufts Medical Cent
    er's Obstetrics and Gynecology experts offer renowned care
    from checkups and deliveries to surgery. Learn more and re
    quest an appointment today."}
    cd[Schema.org]: []

As depicted above, Tufts Medical Center aids the secret interception and transmission to Facebook

of the contents of the communication between the website user and Tufts Medical Center, including

that the user is visiting an "Obstetrics and Gynecology" webpage on the Tufts Medical Center Website, with further keywords describing the substance of the webpage, including "obgyn," "delivery," and "pregnancy," information that Facebook retains and can use for commercial purposes.

80.     The Tufts Medical Center Website contains dozens of similar pages on particular medical specialties and practices that Tufts Medical Center offers. For each such page, the Tufts Medical Center Website has aided Google and Facebook's secret interception of the contents of communications with Tufts Medical Center, similar to the above Obstetrics and Gynecology example, including whenever a healthcare consumer communicates through the "Request an Appointment" feature, which is included on each such page.

81.     When a user clicks the "Request an Appointment" button from any page on the website, the user is taken to a separate page to fill in information to request an appointment. If a user clicks the "Request an Appointment" button from the page for a particular specialty, that specialty will be pre-filled into the form on the Request-an-Appointment page. The screenshot below shows the Request-an-Appointment webpage after one clicks the Request-an-Appointment on the Obstetrics and Gynecology page discussed above:



82.    When a user visits the Request an Appointment page, regardless of how the user arrives there, Tufts Medical Center has facilitated the interception and transmission to Google of that appointment request via hidden Google Analytics code Tufts Medical Center has injected into its website. The contents of the communication intercepted are depicted below (with highlighting added):

   ×  Headers  Payload  Preview  Response  Initiator  Timing

▼ Query String Parameters   view source   view URL-encoded

   v: 1

   _v: j99

   aip: 1

   a: 46354474

   t: pageview

   _s: 1

   dl: https://www.tuftsmedicalcenter.org/RequestAppointment?dpt=
   79657121-3b33-449f-87e3-af8862b087c6&p=

   ul: en-us

   de: UTF-8

   dt: Request an Appointment at Tufts Medical Center

   sd: 24-bit

   sr: 1920x1080

   vp: 1339x979

   je: 0

   _u: QCCAgAABAAAAAAAAC~

   jid:

   gjid:

   cid: 815584837.1679685730

   tid: UA-5578028-1

   _gid: 1131827353.1679685730

   gtm: 45He33m0n71TTLN4K

   z: 235840303

Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that

intercepted similar information. That is, the intercepted communication reveals that the individual is

requesting an appointment at Tufts Medical Center—information Google can then use for its own

commercial purposes, including serving targeted advertising to that same individual.

     83.    When a user fills out the form to request an appointment and submits it, Tufts Medical

Center has also assisted in interception and transmission to Google of that communication via hidden

Google Analytics code. The contents intercepted are depicted below (with highlighting added):

✕  Headers   Payload   Preview   Response   Initiator   Timing

▼ Query String Parameters      view source      view URL-encoded

  v: 1
  _v: j99
  a: 2061879966
  t: event
  ni: 0
  _s: 1
  dl: https://www.tuftsmedicalcenter.org/RequestAppointment?subm
      itted=1&dcFormReturn=1&formSuccess=1&specialty=OB%2fGYN
  ul: en-us
  de: UTF-8
  dt: Request an Appointment at Tufts Medical Center
  sd: 24-bit
  sr: 1920x1080
  vp: 1339x979
  je: 0
  ec: Request an Appointment
  ea: form submit - validated
  el: OB/GYN
  _u: QCCAAAABAAAAACAAAC~
  jid:
  gjid:
  cid: 815584837.1679685730
  tid: UA-5578028-1
  _gid: 1131827353.1679685730
  gtm: 45He33m0n71TTLN4K
  z: 1387949042

As shown above, Google has intercepted the communication that the user has submitted a "form" to "Request an Appointment" for an "OB/GYN" doctor. Google can then use that information for its own purposes, including by serving targeted advertising on separate websites to the same individual.

84.     Before mid-June 2022, Tufts Medical Center injected into its Request an Appointment page hidden Meta Pixel code that permitted Facebook to intercept communications on that page. The

contents of the communication intercepted and transmitted to Facebook when a healthcare consumer

accesses the Request an Appointment page are depicted below:



Facebook can then use this intercepted communication for its own commercial purposes, including

serving targeted advertising to the same individual based on the contents of the intercepted

communication. Like Google Analytics, the hidden Meta Pixel code also intercepted the

communication through which a user submitted the form to request an appointment.

85.    The Tufts Medical Center Website also includes a search function that permits an

individual to search for medical or other information relevant to them. Healthcare consumers often

enter search terms that reveal private health information about themselves, for example, when an

individual uses the search function for particular symptoms, conditions, or medical specialties offered

by Tufts Medical Center. When individuals have used the search function, Tufts Medical Center has

aided in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."



86.     When a user performed this search on the Tufts Medical Center Website, and the results page then loads, the Google Analytics code was activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code has intercepted and transmitted to Google (with highlighting added):

| X | Headers | Payload | Preview | Response | Initiator | Timing |

▼ Query String Parameters     view source     view URL-encoded

v: 1
_v: j99
aip: 1
a: 979511353
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/search?q=pregnant&
parent_id=&type=page
ul: en-us
de: UTF-8
dt: Tufts Medical Center | SearchPage
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 267185854

As reflected in the above screenshot, the hidden Google Analytics code caused the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes.

87.    The Tufts Medical Center Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to Tufts Medical Center that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:



88.     When a user visits the Find-A-Doctor page, hidden Google Analytics code intercepts the communication. Depicted below are the contents of the user's communication with the Tufts Medical Center Website intercepted and transmitted to Google via hidden Google Analytics Code, which intercept that the user is searching for a Tufts Medical Center doctor (with highlighting added):

x    Headers    Payload    Preview    Response    Initiator    Timing

▼ **Query String Parameters**        view source        view URL-encoded

v: 1
_v: j99
aip: 1
a: 407189896
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/PhysicianDirectory/
Search
ul: en-us
de: UTF-8
dt: Find A Doctor in Boston | Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 1577261897

That is, Google Analytics code permitted Google to intercept that the individual is looking to "Find a Doctor" at "Tufts Medical Center," information that Google can then use for its own commercial purposes. Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information.

89.    Before the removal of Meta Pixel in June 2022, communications on the Find-A-Doctor function were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Below is a

36

screenshot of the contents of the communication intercepted through Meta Pixel code on the same

Find-a-Doctor page (with highlighting added);

× Headers    Payload    Preview    Response    Initiator    »

▼ Form Data    view source    view URL-encoded

id: 899431063472882
ev: Microdata
dl: https://www.tuftsmedicalcenter.org/PhysicianDirectory/Search
rl:
if: false
ts: 1598230640043
cd[DataLayer]: []
cd[Meta]: {"title":"\n\tFind A Doctor in Boston | Tufts
Medical Center\n","meta:keywords":"Find a doctor bosto
n, find a pediatrician boston, find a specialist bosto
n","meta:description":"Are you looking for a doctor in
Boston? Look no further than Tufts Medical Center and
Floating Hospital for Children, hospitals that are hom
e to expert doctors in a range of specialties."}
cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcen
ter.org/ui/images/logo-tufts-medical-center-fb-share.p
ng","og:image:secure_url":"https://www.tuftsmedicalcen
ter.org/ui/images/logo-tufts-medical-center-fb-share.p
ng","og:image:type":"image/png","og:image:width":"20
0","og:image:height":"200","og:title":"Find A Doctor i
n Boston","og:description":"Are you looking for a doct
or in Boston? Look no further than Tufts Medical Cente
r and Floating Hospital for Children, hospitals that a
re home to expert doctors in a range of specialties.
"}

90.    The Tufts Medical Center Website also contains a section permitting patients to pay

bills they received from Tufts Medical Center. The "Paying Your Bill" page of the Tufts Medical

Center Website is depicted below:



91.    When a user visits this page, the user communicates that the user is an individual who has received medical services from Tufts Medical Center. Tufts Medical Center has facilitated Google's interception of that communication with Tufts Medical Center via hidden Google Analytics code. The contents of the communication intercepted by and transmitted to Google are depicted below (with highlighting added):

X    Headers    Payload    Preview    Response    Initiator    Timing

▼ **Query String Parameters**    view source    view URL-encoded

v: 1

_v: j99

aip: 1

a: 830328579

t: pageview

_s: 1

dl: https://www.tuftsmedicalcenter.org/patient-care-services/
Billing-and-Insurance

ul: en-us

de: UTF-8

dt: Paying Your Bill at Tufts Medical Center

sd: 24-bit

sr: 1920x1080

vp: 1339x979

je: 0

_u: QCCAgAABAAAAAAAAAC~

jid:

gjid:

cid: 815584837.1679685730

tid: UA-5578028-1

_gid: 1131827353.1679685730

gtm: 45He33m0n71TTLN4K

z: 1328266876

As reflected in the above screenshot, hidden Google Analytics code intercepted that the user is visiting the "Paying Your Bill at Tufts Medical Center." Google retains such intercepted communications and may use them for its own commercial purposes. Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information.

92.    Before removing Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its bill payment webpage that permitted Facebook to intercept communications on the webpage. The content of the communications intercepted and transmitted to Facebook are depicted below (with highlighting added):

×  Headers    Payload    Preview    Response    Initiator    »

▼ Form Data      view source      view URL-encoded

  id: 899431063472882

  ev: Microdata

  dl: https://www.tuftsmedicalcenter.org/patient-care-servi
  ces/Billing-and-Insurance

  rl:

  if: false

  ts: 1599068031335

  cd[DataLayer]: []

  cd[Meta]: {"title":"\n\tPaying Your Bill at Tufts Medical
  Center\n","meta:keywords":"billing, insurance, payment,
  cost","meta:description":"Tufts Medical Center staff wan
  t to make billing and insurance as easy for you as possi
  ble. Learn about our process for medical payments."}

  cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcent
  er.org/ui/images/logo-tufts-medical-center-fb-share.pn
  g","og:image:secure_url":"https://www.tuftsmedicalcente
  r.org/ui/images/logo-tufts-medical-center-fb-share.pn
  g","og:image:type":"image/png","og:image:width":"200","o
  g:image:height":"200","og:title":"Paying Your Bill at Tu
  fts Medical Center","og:description":"Tufts Medical Cent
  er staff want to make billing and insurance as easy for
  you as possible. Learn about our process for medical pay
  ments."}

  cd[Schema.org]: []

  cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.or
  g/web/20200902173348/http://schema.org\",\n\"@type\":
  \"LocalBusiness\",\n\"address\": {\n\"@type\": \"PostalA
  ddress\",\n\"addressLocality\": \"Boston\",\n\"addressRe
  gion\": \"MA\",\n\"postalCode\":\"02111\",\n\"streetAddr

Facebook could then use the intercepted communications concerning bill payment for commercial purposes, including serving targeted advertising to the same individual based on the contents of the intercepted communication.

93.     Tufts Medical Center also had a feature on its website that permits patients to request their medical records through the website. By visiting this feature, a website user communicates to Tufts Medical Center that the user is a patient of Tufts Medical Center. Below is a screenshot of the webpage through which a patient may request medical records from Tufts Medical Center:



94.     When an individual would visit this page, hidden Google Analytics code that Tufts Medical Center injected into its website secretly intercepted the contents of the individual's communications with Tufts Medical Center. The contents intercepted and transmitted to Google are depicted below (with highlighting added):

X   Headers   Payload   Preview   Response   Initiator   Timing

▼ Query String Parameters      view source      view URL-encoded

    v: 1
    _v: j99
    aip: 1
    a: 1201104250
    t: pageview
    _s: 1
    dl: https://www.tuftsmedicalcenter.org/patient-care-services/
    Patient-Rights/Request-Your-Medical-Record
    ul: en-us
    de: UTF-8
    dt: Request Your Medical Record from Tufts Medical Center
    sd: 24-bit
    sr: 1920x1080
    vp: 1339x979
    je: 0
    _u: QCCAgAABAAAAgAAAAC~
    jid:
    gjid:
    cid: 815584837.1679685730
    tid: UA-5578028-1
    _gid: 1131827353.1679685730
    gtm: 45He33m0n71TTLN4K
    z: 1373719858

That is, the fact that the website user is requesting medical records from Tufts Medical Center is intercepted and transmitted to Google. Tufts Medical Center injected similar Doubleclick/Google Ads code into the same webpage that cintercepted similar contents of the communications. Between the two tracking technologies, Google could retain and use the contents of the intercepted communications for its own commercial purposes.

95.    Before the removal of Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its medical records request form that

permitted Facebook to intercept communications on that form. The content of the communications

intercepted and transmitted to Facebook are depicted below (with highlighting added):

×  Headers   Payload   Preview   Response   Initiator   Timing   »

▼ Form Data        view source        view URL-encoded

    id: 899431063472882

    ev: Microdata

    dl: https://www.tuftsmedicalcenter.org/patient-care-servic
    es/Patient-Rights/Request-Your-Medical-Record

    rl:

    if: false

    ts: 1595540398133

    cd[DataLayer]: []

    cd[Meta]: {"title":"\n\tRequest Your Medical Record from T
    ufts Medical Center\n","meta:keywords":"Patient rights, h
    ealth information, request your medical record","meta:des
    cription":"We make it easy to request your medical record
    from Tufts Medical Center. Learn about our process for re
    leasing your information to you."}

    cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcente
    r.org/ui/images/logo-tufts-medical-center-fb-share.pn
    g","og:image:secure_url":"https://www.tuftsmedicalcenter.
    org/ui/images/logo-tufts-medical-center-fb-share.png","o
    g:image:type":"image/png","og:image:width":"200","og:imag
    e:height":"200","og:title":"Request Your Medical Record f
    rom Tufts Medical Center","og:description":"We make it ea
    sy to request your medical record from Tufts Medical Cent
    er. Learn about our process for releasing your informatio
    n to you."}

    cd[Schema.org]: []

    cd[JSON-LD]: ["{\n \"@context\": \"https://web.archive.org/
    web/20200723213952/http://schema.org\",\n\"@type\": \"Loc
    alBusiness\",\n\"address\": {\n\"@type\": \"PostalAddress
    \",\n\"addressLocality\": \"Boston\",\n\"addressRegion\":

Facebook could then use the intercepted communications concerning medical records for commercial

purposes, including serving targeted advertising to the same individual based on the contents of the

intercepted communication.

96.     In addition to Google and Facebook, Tufts Medical Center enables or has, during the class period, enabled communications between healthcare consumers and Tufts Medical Center to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a)     **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functioned similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with Tufts Medical Center through the Tufts Medical Center Website, including the URL and title of each page visited.

(b)     **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden Javascript code that Tufts Medical Center injected into some pages on the Tufts Medical Center Website caused the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Tufts Medical Center Website. LinkedIn could then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

(c)     **Marchex.io.** Marchex.io is known primarily for its call analytics but also offers website tracking. During the class period, Tufts Medical Center inserted Marchex.io pixels that analyzed activity on the Tufts Medical Center Website. Marchex operated through hidden code that intercepted communications between website users and Tufts Medical Center, including the identity of the user visiting the website, which is revealed through the user's IP address.

### The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary

97.     The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Tufts Medical Center Website's operation. The Tufts Medical Center Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

98.     Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example,

a website can contain links to its Facebook profile or invite website users to interact with Tufts Medical Center via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

99.    Moreover, even if Tufts Medical Center wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Tufts Medical Center (i) to keep secret from its website users the use of these non-anonymized tracking technologies; (ii) to falsely and deceptively claim that Tufts Medical Center does not share the communications with others, including healthcare consumers identities when it does; or (iii) to claim that Tufts Medical Center maintains the privacy of those communications via anonymization when it does not.

## Class Action Allegations

100.    Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.tuftsmedicalcenter.org within three years prior to the date of the filing of this initial complaint in this action.

101.    This action is properly maintainable as a class action.

102.    The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

103.    Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a)    Whether communications between Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were wire communications under the Massachusetts Wiretap Act;

(b)    Whether Tufts Medical Center inserted tracking technologies into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel;

(c)     Whether the tracking technologies inserted into the hidden code of the Tufts Medical Center Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d)     Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website;

(e)     Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f)     Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Tufts Medical Center;

(g)     If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

104.    Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Tufts Medical Center Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

105.    Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

106.    A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

107.    Tufts Medical Center has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

108.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

109.    The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

110.    An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were wire communications under the Massachusetts Wiretap Act.

111.    The tracking technologies inserted into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the Tufts Medical Center Website; (ii) Class Members' web browsers used to access the Tufts Medical Center Website; (iii) Tufts Medical Center's own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the Tufts Medical Center Website.

112.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

113.    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Tufts Medical Center.

114.    Class Members' communications between the Class Members and Tufts Medical Center were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

115.    Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Tufts Medical Center's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

     a.     Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

     b.     Awarding damages (including statutory damages) to Plaintiff and Class Members;

     c.     Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

     d.     Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 19, 2023                Respectfully submitted,

                                /s/ Michelle H. Blauner
                                SHAPIRO HABER & URMY LLP
                                Edward F. Haber (BBO #215620)
                                Michelle H. Blauner (BBO #549049)
                                Patrick J. Vallely (BBO #663866)
                                One Boston Place
                                Suite 2600
                                Boston, MA 02108
                                (617) 439-3939 – Telephone
                                (617) 439-0134 – Facsimile
                                ehaber@shulaw.com
                                mblauner@shulaw.com
                                pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

Date Filed 4/19 023 11:07 AM
Superior Court - Suffolk
Docket Number

| CIVIL ACTION COVER SHEET | DOCKET NO(S) **B.L.S.** | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Karen McManus | Tufts Medical Center, Inc. |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number | ATTORNEY (if known) |
|---|---|
| Michelle Blauner (BBO #548049) Shapiro Haber & Urmy LLP One Boston Place, Suite 2600 Boston, MA 02108 | |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? _____
(B)☑Yes ☐No

# BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this class action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the defendants aided in the interception of communications between Plaintiff and other Class Members and a website maintained by Tufts Medical Center, Inc.. These communications were intercepted by Google, Facebook (now known as "Meta"), and other companies that provide so-called "tracking software." Class Members' communications with the Tufts Medical Center Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the Tufts Medical Center Website or any page within that website.

Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. Tufts Medical Center, Inc. aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the Tufts Medical Center Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Tufts Medical Center Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods. Signature of Attorney of Record  /s/ Michelle H. Blauner _____

I HEREBY ATTEST AND CERTIFY ON
**January 8, 2025** THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: _Margaret M Buckley_
Asst. Clerk

# CIVIL ACTION COVER SHEET
## INSTRUCTIONS

### SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

| | |
|---|---|
| **A.1** claims relating to the governance and conduct of internal of entities | **E.1** claims involving breaches of contract or fiduciary, fraud, misrepresentation business torts or other violations involving business relationships |
| **A2.** claims relating to employment agreements | |
| **A3.** claims relating to liability of shareholders, directors, officers, partners etc. | **F.1** claims under the U.C.C. involving complex issues |
| | **G.1** claims arising from transactions with banks, investment bankers |
| **B.1** shareholder derivative claims | |
| **B.2** claims relating to or arising out of securities transactions | **H.1** claims for violation of antitrust or other trade regulation laws |
| | **H.2** claims of unfair trade practices involving complex issues |
| **C.1** claims involving mergers, consolidation, sales of assets, issuance of debt, equity and like interests | **I.1** malpractice claims by business enterprises against professionals |
| **D.1** claims to determine the use or status of, or claims involving, intellectual property | **J.1** claims by or against a business enterprise to which a government entity is a party |
| **D.2** claims to determine the use or status of, or claims involving, confidential, property or trade secret information | **K.1** other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues |
| **D.3** claims to determine the use or status, or claims involving restrictive covenants | |

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| | | * | |
| BD3 | Restrictive covenants | (B) | Yes    No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, in the face sheet a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCU-RATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A special tracking order shall be created by the presiding justice of the Business Litigation Session at the Initial Rule 16 Conference.

Date Filed 4/19/2023 11:07 AM
Superior Court - Suffolk
Docket Number

NOTIFY

3

# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| Karen McManus,<br><br>    For herself and the Class,<br><br>       v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>    Defendant. | **SUPERIOR COURT DEPARTMENT**<br>**OF THE TRIAL COURT**<br>**BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-0930 BLS1<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S MOTION TO APPOINT SPECIAL PROCESS SERVER

Pursuant to Mass. R. Civ. P. 4(c), Plaintiff hereby moves for an Order appointing Suvalle,

Jodrey & Associates, Inc., 1 Devonshire Pl., Boston, MA 02109, a disinterested third party in this

matter, as special process server for service of all process in this action within the Commonwealth

of Massachusetts, for all purposes contemplated by Mass. R. Civ. P. 4.

Dated: April 19, 2023                    Respectfully submitted,

I HEREBY ATTEST AND CERTIFY ON
January 18, 2025 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

    John E. Powers, III
      Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:

4/24/23    Asst. Clerk

/s/ Michelle H. Blauner
**SHAPIRO HABER & URMY LLP**
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
mblauner@shulaw.com
pvallely@shulaw.com

1

4

**NOTIFY**

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: **2384CV00930-BLS1**

Case:   McManus v. Tufts Medical Center, Inc.

## NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS1**.

Hereafter, as shown above, all parties must include the initials "**BLS1**" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process within the time limitation of Mass. R. Civ. P. 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the appropriate BLS Session Clerk at Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel.  Before the Rule 16 Conference, counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Project on Discovery (counsel are directed to www.mass.gov/superior-court-business-litigation-session for description of the Project).  Counsel may indicate their respective client's participation by completing, filing, and serving the attached form.  If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated:  April 20, 2023

/s/ Kenneth W. Salinger

_____

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

Notice Sent to Kier and Raphson 4/20/23

January 8, 2025
I HEREBY ATTEST AND CERTIFY ON _____ THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: _____
Asst. Clerk

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: _____

Case: _____

      As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

      If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) Yes, _____ is willing to participate in the Discovery Project.
                              (Party's Name)

Case Name _____

Docket Number CIVIL DOCKET#: _____

Counsel For_____      Date_____

Firm Name and Address:

_____

_____

_____

Please complete this form and return it to:

    Assistant Clerk - BLS1    **OR**    Assistant Clerk - BLS2
    BLS1, Room 1309                    BLS2, Room 1017
    3 Pemberton Square             3 Pemberton Square
    Boston, MA 02108                Boston, MA 02108

-2-

| **Summons** | CIVIL DOCKET NO.<br>2384CV00930 - BLS 1 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

CASE NAME:

KAREN MCMANUS,
            For herself and the class,
                                            Plaintiff(s)

            vs.

TUFTS MEDICAL CENTER, INC.
                                            Defendant(s)

Michael Joseph Donovan          Clerk of Courts
Suffolk                         County
COURT NAME & ADDRESS:
SUPERIOR CIVIL COURT
SUFFOLK COUNTY COURTHOUSE
THREE PEMBERTON SQ. 12th Floor
BOSTON, MASSACHUSETTS 02108

THIS SUMMONS IS DIRECTED TO TUFTS MEDICAL CENTER, INC. (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _____ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, _____ Court (address), by mail or in person **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20 ____ . (Seal)

Clerk-Magistrate _____
                  Michael Joseph Donovan

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

Dated: _____

Signature: _____

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____ Asst. Clerk

**N.B.  TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date: _____

rev. 1/2019

APRIL 26, 2023

# RETURN OF SERVICE

*I this day SERVED the within named*          TUFTS MEDICAL CENTER
                                              C/O ZACHARY REDMOND, REGISTERED AGENT

*by delivering to*                            *BETH HARUBIN, LEGAL DEPT., 11:30AM*

        X   *in hand*

No.  800 WASHINGTON ST
*in the city/town of* BOSTON, *an attested copy of the Summons; Complaint; Plaintiff's Motion to Appoint Special Process Server; Notice of Acceptance into the Business Litigation Session; Allowed Plaintiff's Motion to Appoint Special Process Server.*

*Service and travel*      $ 99

*John Rymaszewski*
_____
Process Server/

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> TUFTS MEDICAL CENTER, INC., <br><br> Defendant. | Case No.: 23-11090 <br><br> [Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930] <br><br> DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1) |

## NOTICE OF REMOVAL

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Karen McManus:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions Tufts Medical Center, Inc. ("Tufts MC") has taken in connection with pursuing that directive. Tufts MC therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pages 9 and 10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, Tufts MC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:23-cv-11090    Document 1    Filed 05/16/23    Page 2 of 18

## <u>NATURE OF THE CASE</u>

1.      Tufts MC is a Massachusetts non-profit charitable corporation that offers a full range of medical services and operates in Boston, Massachusetts and the surrounding area.

2.      On April 19, 2023, Plaintiff Karen McManus filed a complaint against Tufts MC, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2384CV00930.

3.      Plaintiff served Tufts MC with the Complaint, effective on April 26, 2023.

4.      Plaintiff's Complaint purports to challenge Tufts MC's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See generally* Complaint ("Compl."); *id.* at ¶¶ 108-15.

5.      Tufts MC operates the Tufts MC public website, found at https://www.Tufts MCmedicalcenter.org/, that provides information to the public about Tufts MC's health care services and contains a link to access its secure patient portal and electronic medical records contained within the portal. *Id.* at ¶¶ 13-16.

6.      Plaintiff alleges she is a Tufts MC patient and that she uses Tufts MC's website to "(i) obtain information about [Tufts MC] doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal." *Id.* at ¶ 10.

7.      Tufts MC offers inpatient and outpatient care to residents near Boston and other surrounding communities, including providing healthcare across a number of various specialties. *Id.* at ¶ 13. Among other alleged functions, the Tufts MC website provides information about doctors and allows healthcare consumers to access private medical information online through the myTuftsMed Patient Portal. *Id.* at ¶¶ 14-15.

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930

8.      Plaintiff alleges that the Facebook[1] or Meta Pixel, allegedly used on the Tufts MC website transmitted private health information to Facebook. *Id.* at ¶¶ 42, 72-73.[2]

9.      Plaintiff also alleges that Google Analytics, allegedly used on the Tufts MC website, "collect[s] the IP addresses of Website users and track their activity on the Website, including communications about private medical information." *Id.* at ¶¶ 40, 43.

10.     Plaintiff contends that Tufts MC intercepted and transmitted communications between healthcare consumers and Tufts MC without the consumer's knowledge and consent. *Id.* at ¶ 96.

11.     Plaintiff does not assert that Tufts MC discloses names, social security numbers, diagnoses, birthdates, or comparable information to the third parties.

## BASIS FOR REMOVAL

12.     Tufts MC removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office ..." *Id.* § 1442(a)(1).

13.     The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants can remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged

---

[1] Facebook rebranded itself as Meta in 2021.
[2] The Meta Pixel, however, was not used on the myTuftsMed Patient Portal.

3

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930    Case 1:23-cv-11090   Document 1   Filed 05/16/23   Page 4 of 18

conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant

can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022);

*see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008)

(proper removal under federal officer removal statute).[3]

14.    Since at least 2004, the federal government – through executive order, legislation,

and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to

develop a nationwide infrastructure for health information technology. It has incentivized and

directed providers who participate in the Medicare and Medicaid program (like Tufts MC) to offer

patients online access to their records, and to optimize patient engagement with their medical

information. The federal government has also modeled the behavior it wants to see; it has created

a portal for Medicare beneficiaries and worked with the same third-party services, with the same

"source code," at issue in this case.

15.    Tufts MC has dutifully assisted and followed the federal government's direction in

this effort. In so doing, it has acted within the penumbra of federal action and office. Given this,

and the Supreme Court's directive that the federal officer removal statute must be broadly

construed, and because this suit challenges this federally-directed conduct, the requirements of the

federal removal statute are satisfied.

---

[3] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any
act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51,
125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given
this requirement a broad reading and held that no causal link is required." *Moore v. Elec. Boat
Corp.*, 25 F.4th 30, 35 (1st Cir. 2022).

### *The Meaningful Use Program*

*President Bush Establishes the Position of National Health Information Technology Coordinator*

16.    In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("ONC"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

17.    Through the Executive Order, President Bush further ordered the ONC to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

### *The ONC Makes Access to Online Health Care Records a National Priority*

18.    From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

19.    But years later, when the percentage of Americans accessing their health information online remained low, the ONC reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics.*" (*Id.* (emphasis added).) *See also, e.g.,* Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center,* AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 68 of 485
Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930    Case 1:23-cv-11090    Document 1    Filed 05/16/23    Page 6 of 18

physicians reported having EHRs that allowed patient access to records. Despite this, the architects

of the MU rules have set the high bar for patient EHR access and communication.").

*Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

20.      In 2009, Congress codified the ONC in the Health Information Technology for

Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009).[4] At that time, Congress

allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and

promote the electronic exchange and use of health information for each individual in the United

States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

21.      As with President Bush's Executive Order, Congress tasked the ONC with a series

of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan

(developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect

to each of the following: "(i) [t]he electronic exchange and use of health information and the

enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of

health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A)

(Strategic plan).

22.      Congress further codified a series of incentive payments for the Department of

Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services,

to make to health care providers for their adoption of health information technology, including

through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and

meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health*

---

[4] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

*Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES.

SERV. Apr. 27, 2009) (discussing various financial incentives).

23.    As the Congressional Research Service explained at the time: "Beginning in 2011,

the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt

and use certified EHRs. Those incentive payments are phased out over time and replaced by

financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

<u>The ONC Makes Online Access to Health Information a Key Component of the Meaningful
Use Regulations</u>

24.    The following year, , the Department of Health and Human Services adopted the

Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR

MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health

Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final

regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way

is one piece of a broader HIT infrastructure needed to reform the health care system and improve

health care quality, efficiency, and patient safety." *Id.*, 44321.

25.    One central component of the meaningful use regulations was the ability for

patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning

in 2014, provide patients with the ability *to view online*, download, and transmit information about

a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL

COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz,

The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals

attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit]

VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will

attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

26.    The regulations required health care providers to attest to the ONC and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

*The ONC Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*

27.    To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

28.    The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3.

8

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:23-cv-11090    Document 1    Filed 05/16/23    Page 9 of 18

Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use.*" *Id.*

29.     The ONC subsequently issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

30.     The ONC has also specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly"; "how a patient portal helps achieve meaningful use requirements"; and how a provider can "actively promote and facilitate portal use." THE OFFICE OF THE NAT'L.COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at: https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

31.     The ONC has also published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2015-2020,* available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to

help digitize health information and healthcare." THE OFFICE OF THE NAT'L COORDINATOR FOR

HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan*

*2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-

10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic

Plan").

32.    In addition to this guidance, CMS has created its own portal, offering a model for

private providers to follow. To optimize individual engagement with the portal, CMS relies on

third-party marketers, like Google and Facebook. By working with over two dozen third-party

servicers, CMS is able to provide users with the information most relevant to them. *See generally*

Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that

Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies

of those websites," and that any information users "provide to register on Facebook is voluntarily

contributed and isn't maintained by" CMS).

*Tufts MC Makes a Patient Portal Available Online to Tufts MC Patients in Direct Furtherance
of this Federal Mission*

33.    The myTuftsMed Patient Portal is a tool created and promoted by Tufts MC for its

patients' use as a direct result of the federal initiative to make health care records available to

patients online. Since establishing the patient portal, Tufts MC has continually met the Meaningful

Use criteria, and has thus received incentive payments from the federal government. If necessary,

Tufts MC is prepared to submit a declaration supporting its participation in the Meaningful Use

program.

*Tufts MC Is A "Person" Within § 1442(a)(1)*

34.    By the plain terms of the statute, removal is permitted by "any person acting under

that officer." 42 U.S.C. § 1442(a)(1).

10

35.     While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

36.     Tufts MC is a non-profit charitable corporation with its main campus in Massachusetts, Compl. ¶ 11, and since the federal officer statute is to be broadly construed, Tufts MC qualifies as a person under that statute.[5]

### *Tufts MC is Effectively Acting Under a Federal Officer*

37.     This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

38.     Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising Tufts MC's actions in the Meaningful Use

---

[5] Although in other contexts, Tufts may not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

program in order to meet the federal government's national priority of interoperable health information technology.

39.     First, Tufts MC (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

40.     Second, in the absence of Tufts MC's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

41.     Third, the government has specified how to best enhance patient engagement, including through patient portals. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

42.     Finally, the government has created an office dedicated to this endeavor and has closely monitored the work of private entities (like Tufts MC). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Tufts MC and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

43.     In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL

12

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 75 of 485

Date Filed 5/16/2023 12:58 PM
Superior Court - Suffolk
Docket Number 2384CV00930    Case 1:23-cv-11090    Document 1    Filed 05/16/23    Page 13 of 18

4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

44.    In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of plaintiffs' personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g., id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide. *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in UPMC, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

13

Date Filed 5/16/2023 12:36 PM
Superior Court - Suffolk
Docket Number 2384CV00930

### *Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

45.     Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, the "for or relating to" requirement under § 1442(a)(1) is liberally construed and constitutes a lower burden than even a "causal connection." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (overturning a district court that imposed a "strict causal connection" though "§ 1442(a)(1) requires [] only that the charged conduct *relate to* an act under color of federal office). Moreover, any single claim is independently sufficient to satisfy the "for or relating to" requirement under § 1442(a)(1). *Moore*, 25 F.4th at 35 (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)). In fact,

46.     Plaintiff's Complaint directly challenges Tufts MC's website analytics practices, which help drive patients to Tufts MC's websites.

47.     Plaintiff's Complaint also generally targets Tufts MC's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

48.     The entire point of using the third-party services is to direct traffic to, and increase engagement with, Tufts MC websites as it is designed to communicate with healthcare consumers. *See, e.g.*, Compl. ¶ 15. Indeed, Plaintiff acknowledges that the Meta Pixel and Google Analytics are analytics tools "designed to track a user's actions on the website." *Id.* at ¶ 39.

### *Tufts MC Raises Colorable Federal Defenses to Plaintiff's Claims*

49.     The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar, merely requiring that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v.*

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930

*Cal.,* 489 U.S. 121, 129-30 (1989); *Moore*, 25 F.4th at 37 (a "colorable federal defense" need not

be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made

solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations

omitted); *accord. Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The

question is not whether a defendant's claimed defense is meritorious, but only whether a colorable

claim to such a defense has been made.")

     50.    Defendant intends to assert several defenses, but by way of illustration and not

limitation, there is at least one colorable federal defense to the claims at issue here that satisfies

this requirement. In response to Plaintiff's repeated claims that "private health information" and

health related communications were disclosed, Compl. ¶ 42, Tufts MC will argue that the

information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the

purview of protected health information as defined by the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA"). The Northern District of California has already held in an

analogous case against numerous health care providers challenging alleged disclosures on the

Internet through routine website traffic. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D.

Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to

satisfy this element's low bar.

     51.    Because each of the requirements of the removal statute are satisfied, removal to

this Court is proper.

<b>PROCEDURAL REQUIREMENTS FOR REMOVAL</b>

     52.    Tufts MC likewise satisfies all of the procedural requirements under 28 U.S.C.

§ 1446.

15

53.    Tufts MC is filing this Notice of Removal within twenty (20) days of its receipt of the Complaint by "service," which is well within the thirty (30) day deadline under 28 U.S.C. § 1446.

54.    Tufts MC files this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

55.    Tufts MC has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Complaint.

56.    Upon filing this notice, Tufts MC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

As set forth above, Plaintiff's Complaint directly challenges practices and procedures Tufts MC has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE**, Tufts MC respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

[SIGNATURE BLOCK FOLLOWS ON THE NEXT PAGE]

16

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 79 of 485

Date Filed 5/16/2023 12:56 PM
Superior Court - Suffolk
Docket Number 2384CV00930    Case 1:23-cv-11090    Document 1    Filed 05/16/23    Page 17 of 18

Dated: May 16, 2023

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: _____
Asst. Clerk

17

kg

# COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION** |
| Plaintiff, | CIVIL ACTION NO. 2384CV00930-BLS1 |
| v. | |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

## DEFENDANT'S NOTICE OF MOTION TO DISMISS

Pursuant to Superior Court Rule 9E, Defendant Tufts Medical Center, Inc. ("Tufts MC") hereby provides notice that on August 17, 2023, it served upon Plaintiff Karen McManus ("Plaintiff") its Motion to Dismiss.

1

Dated: August 17, 2023

Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst Clerk

2

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 17, 2023 copies of the foregoing Notice of Motion to

Dismiss was transmitted electronically via email to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

*/s/ James H. Rollinson* _____

*Attorney for Defendant Tufts MC*

*10·16*

NOTIFY

7

*(handwritten vertical left margin: Jason H. Kaanjian J.)*

*(handwritten vertical left margin: 11-13-23 Denied. Jason H. Kaanjian J.)*

# COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br>    kg<br><br>                               Plaintiff,<br><br>               v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>                             Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION**<br><br>CIVIL ACTION NO. 2384CV00930-BLS1 |

## DEFENDANT TUFTS MEDICAL CENTER, INC.'S UNOPPOSED REQUEST PURSUANT TO RULE 9(A)(6) FOR LEAVE OF COURT TO EXCEED THE PAGE LIMIT FOR ITS REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Tufts Medical Center, Inc., ("Tufts MC") hereby requests pursuant to Superior Court Rule 9A(a)(6), leave of court to file a 12-page Reply Memorandum in support of its Motion to Dismiss. In support of this Request, Tufts MC states the following:

1. On August 17, 2023, Tufts MC served its Motion to Dismiss and supporting Memorandum of Law on Plaintiff and filed a Notice of Motion with the Court. Dkt. 8.

2. Due to the complexities of this case, on August 18, 2023, the parties conferred pursuant to Superior Court Rule 9C and agreed to the following briefing schedule:

   **September 15, 2023:**    Plaintiff's Opposition to Tufts MC's Motion to Dismiss due

   **October 13, 2023:**    Deadline for Tufts MC to file its 9A Motion to Dismiss

3. On October 10, 2023, the parties again conferred pursuant to Superior Court Rule 9C. On October 11, 2023, Plaintiff agreed to provide Tufts MC with an additional seven

pages for its Reply Memorandum in Support of its Motion to Dismiss, for a total of 12

pages.

4.  Plaintiff does not oppose this request.

WHEREFORE, Tufts MC respectfully requests that this Court grant it leave to file a 12-

page Reply Memorandum in support of its Motion to Dismiss (not counting the caption, title, and

signature block). Tufts MC will endeavor to keep the reply brief as concise as possible.

Dated: October 11, 2023

Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant Tufts MC*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2023 copies of the foregoing memorandum were

transmitted electronically via email to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

/s/ *James H. Rollinson*
_____

*Attorney for Defendant Tufts MC*

8

*Suffolk   Superior   Civil   Court*

IN THE UNITED STATES DISTRICT COURT FOR    *2384 CV 00930*
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated, | Case No.: 23-11090 |
| | [Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930] |
| Plaintiff, | |
| v. | DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1) |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

## NOTICE OF REMOVAL

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Karen McManus:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions Tufts Medical Center, Inc. ("Tufts MC") has taken in connection with pursuing that directive. Tufts MC therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pages 9 and 10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, Tufts MC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 2 6 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

3

## NATURE OF THE CASE

1.      Tufts MC is a Massachusetts non-profit charitable corporation that offers a full range of medical services and operates in Boston, Massachusetts and the surrounding area.

2.      On April 19, 2023, Plaintiff Karen McManus filed a complaint against Tufts MC, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2384CV00930.

3.      Plaintiff served Tufts MC with the Complaint, effective on April 26, 2023.

4.      Plaintiff's Complaint purports to challenge Tufts MC's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See generally* Complaint ("Compl."); *id.* at ¶¶ 108-15.

5.      Tufts MC operates the Tufts MC public website, found at https://www.Tufts MCmedicalcenter.org/, that provides information to the public about Tufts MC's health care services and contains a link to access its secure patient portal and electronic medical records contained within the portal. *Id.* at ¶¶ 13-16.

6.      Plaintiff alleges she is a Tufts MC patient and that she uses Tufts MC's website to "(i) obtain information about [Tufts MC] doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal." *Id.* at ¶ 10.

7.      Tufts MC offers inpatient and outpatient care to residents near Boston and other surrounding communities, including providing healthcare across a number of various specialties. *Id.* at ¶ 13. Among other alleged functions, the Tufts MC website provides information about doctors and allows healthcare consumers to access private medical information online through the myTuftsMed Patient Portal. *Id.* at ¶¶ 14-15.

8.      Plaintiff alleges that the Facebook[1] or Meta Pixel, allegedly used on the Tufts MC website transmitted private health information to Facebook. *Id.* at ¶¶ 42, 72-73.[2]

9.      Plaintiff also alleges that Google Analytics, allegedly used on the Tufts MC website, "collect[s] the IP addresses of Website users and track their activity on the Website, including communications about private medical information." *Id.* at ¶¶ 40, 43.

10.     Plaintiff contends that Tufts MC intercepted and transmitted communications between healthcare consumers and Tufts MC without the consumer's knowledge and consent. *Id.* at ¶ 96.

11.     Plaintiff does not assert that Tufts MC discloses names, social security numbers, diagnoses, birthdates, or comparable information to the third parties.

## BASIS FOR REMOVAL

12.     Tufts MC removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office ..." *Id.* § 1442(a)(1).

13.     The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants can remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged

---

[1] Facebook rebranded itself as Meta in 2021.
[2] The Meta Pixel, however, was not used on the myTuftsMed Patient Portal.

conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.,* 25 F.4th 30, 34 (1st Cir. 2022); *see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[3]

14.     Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid program (like Tufts MC) to offer patients online access to their records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

15.     Tufts MC has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

---

[3] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given this requirement a broad reading and held that no causal link is required." *Moore v. Elec. Boat Corp.,* 25 F.4th 30, 35 (1st Cir. 2022).

***The Meaningful Use Program***

<u>*President Bush Establishes the Position of National Health Information Technology Coordinator*</u>

16.     In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("ONC"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

17.     Through the Executive Order, President Bush further ordered the ONC to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

<u>*The ONC Makes Access to Online Health Care Records a National Priority*</u>

18.     From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

19.     But years later, when the percentage of Americans accessing their health information online remained low, the ONC reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics.*" (*Id.* (emphasis added).) *See also, e.g.,* Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of

5

physicians reported having EHRs that allowed patient access to records. Despite this, the architects

of the MU rules have set the high bar for patient EHR access and communication.").

*Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

20.     In 2009, Congress codified the ONC in the Health Information Technology for

Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009).[4] At that time, Congress

allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and

promote the electronic exchange and use of health information for each individual in the United

States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

21.     As with President Bush's Executive Order, Congress tasked the ONC with a series

of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan

(developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect

to each of the following: "(i) [t]he electronic exchange and use of health information and the

enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of

health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A)

(Strategic plan).

22.     Congress further codified a series of incentive payments for the Department of

Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services,

to make to health care providers for their adoption of health information technology, including

through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and

meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health*

---

[4] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

*Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

23.     As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

### *The ONC Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

24.     The following year, , the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, 44321.

25.     One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability *to view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will

7

9

attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

26.     The regulations required health care providers to attest to the ONC and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

### The ONC Directs Healthcare Providers to Make Patient Portals Available to their Patients Online

27.     To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

28.     The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3.

Implement proactive, engaging portal features. 4. Implement the portal with a systematic process.
5. *Actively promote and facilitate portal use.*" *Id.*

29.     The ONC subsequently issued a "Patient Engagement Playbook," which was
described as "a tool for clinicians, health care practice staff, hospital administrators, and others
who want to leverage health IT – particularly electronic health records (EHR) patient portals – to
engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH
INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

30.     The ONC has also specified how providers can optimize such portals, explaining
that they "must be engaging and user-friendly"; "how a patient portal helps achieve meaningful
use requirements"; and how a provider can "actively promote and facilitate portal use." THE
OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *How to Optimize
Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013),
available at:

https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengag
ement.pdf.

31.     The ONC has also published guidance for private providers to follow, including
through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were
to "collaborate with . . . private stakeholders to . . . build a culture of electronic health
information access and use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH
INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2015-2020*,
available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf
(emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying:
"Federal, state, and local governments, along with the private sector, have worked together to

help digitize health information and healthcare." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

32.     In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

### *Tufts MC Makes a Patient Portal Available Online to Tufts MC Patients in Direct Furtherance of this Federal Mission*

33.     The myTuftsMed Patient Portal is a tool created and promoted by Tufts MC for its patients' use as a direct result of the federal initiative to make health care records available to patients online. Since establishing the patient portal, Tufts MC has continually met the Meaningful Use criteria, and has thus received incentive payments from the federal government. If necessary, Tufts MC is prepared to submit a declaration supporting its participation in the Meaningful Use program.

### *Tufts MC Is A "Person" Within § 1442(a)(1)*

34.     By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

35.     While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

36.     Tufts MC is a non-profit charitable corporation with its main campus in Massachusetts, Compl. ¶ 11, and since the federal officer statute is to be broadly construed, Tufts MC qualifies as a person under that statute.[5]

### Tufts MC is Effectively Acting Under a Federal Officer

37.     This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

38.     Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising Tufts MC's actions in the Meaningful Use

---

[5] Although in other contexts, Tufts may not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

program in order to meet the federal government's national priority of interoperable health information technology.

39. First, Tufts MC (along with many other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

40. Second, in the absence of Tufts MC's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

41. Third, the government has specified how to best enhance patient engagement, including through patient portals. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

42. Finally, the government has created an office dedicated to this endeavor and has closely monitored the work of private entities (like Tufts MC). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use program's incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Tufts MC and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

43. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL

4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

44.     In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of plaintiffs' personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g., id.* at *6 ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria."). The *UPMC* court also emphasized that "it is not necessary that the complained of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide. *Id.* at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in UPMC, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

### *Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

45.     Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, the "for or relating to" requirement under § 1442(a)(1) is liberally construed and constitutes a lower burden than even a "causal connection." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (overturning a district court that imposed a "strict causal connection" though "§ 1442(a)(1) requires [] only that the charged conduct *relate to* an act under color of federal office). Moreover, any single claim is independently sufficient to satisfy the "for or relating to" requirement under § 1442(a)(1). *Moore*, 25 F.4th at 35 (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)). In fact,

46.     Plaintiff's Complaint directly challenges Tufts MC's website analytics practices, which help drive patients to Tufts MC's websites.

47.     Plaintiff's Complaint also generally targets Tufts MC's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

48.     The entire point of using the third-party services is to direct traffic to, and increase engagement with, Tufts MC websites as it is designed to communicate with healthcare consumers. *See, e.g.*, Compl. ¶ 15. Indeed, Plaintiff acknowledges that the Meta Pixel and Google Analytics are analytics tools "designed to track a user's actions on the website." *Id.* at ¶ 39.

### *Tufts MC Raises Colorable Federal Defenses to Plaintiff's Claims*

49.     The final requirement for removal under 42 U.S.C. § 1442(a)(1) is a low bar, merely requiring that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v.*

*Cal.,* 489 U.S. 121, 129-30 (1989); *Moore,* 25 F.4th at 37 (a "colorable federal defense" need not be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations omitted); *accord. Bahrs v. Hughes Aircraft Co.,* 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

50.     Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfies this requirement. In response to Plaintiff's repeated claims that "private health information" and health related communications were disclosed, Compl. ¶ 42, Tufts MC will argue that the information purportedly disclosed (*i.e.,* IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). The Northern District of California has already held in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith v. Facebook,* 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

51.     Because each of the requirements of the removal statute are satisfied, removal to this Court is proper.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

52.     Tufts MC likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

15

17

53.    Tufts MC is filing this Notice of Removal within twenty (20) days of its receipt of the Complaint by "service," which is well within the thirty (30) day deadline under 28 U.S.C. § 1446.

54.    Tufts MC files this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

55.    Tufts MC has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Complaint.

56.    Upon filing this notice, Tufts MC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

As set forth above, Plaintiff's Complaint directly challenges practices and procedures Tufts MC has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE**, Tufts MC respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

[SIGNATURE BLOCK FOLLOWS ON THE NEXT PAGE]

Dated: May 16, 2023

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

19

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2023 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

*/s/ James H. Rollinson*
*One of the attorneys for defendant*

9

*Suffolk Superior Civil Court*     2384 CV00930

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>           Defendant. | Case No.: 23-11090 |

> SUFFOLK SUPERIOR COURT
> CIVIL CLERK'S OFFICE
> FILED
>
> OCT 2 6 2023
>
> JOHN E. POWERS, III
> ACTING CLERK MAGISTRATE

## TUFTS MEDICAL CENTER, INC.'S
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, Defendant Tufts Medical Center, Inc., by and through its undersigned counsel of record, hereby certifies that it is a wholly-owned subsidiary of Tufts Medical Center Parent, Inc., a Massachusetts charitable corporation. There are no other parent corporations or publicly held corporations that own ten (10%) or more of its stock.

Dated: May 16, 2023

               Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

87

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

2

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2023 copies of the foregoing notice of removal were

served on the following by regular mail and email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

*/s/ James H. Rollinson*
*One of the attorneys for defendants*

*10*

*Suffolk Superior Civil Court*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

*2384CV00930*

KAREN MCMANUS, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

                    Plaintiff,

v.

TUFTS MEDICAL CENTER, INC.,

                    Defendant.

Case No.: 1:23-CV-11090

[Trial Court of Massachusetts, The Superior
Court, Suffolk County, Docket No.
2384CV00930]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 26 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**JOINT MOTION FOR ENTRY OF SCHEDULE REGARDING MOTION TO REMAND
AND TO EXTEND TIME FOR DEFEENDANT TO RESPOND TO THE COMPLAINT**

Plaintiff Karen McManus ("Plaintiff") and Defendant Tufts Medical Center, Inc.
("Defendant" or "Tufts MC") (together the "Parties"), jointly move this Court to enter a scheduling
order for the briefing of Motion to Remand this action, as set forth below. The Parties also move this
Court to order that the Defendant's time to move, plead, answer or otherwise respond to the Complaint
in the above referenced action shall be extended until 30 days after the Court rules on the forthcoming
Motion to Remand.

The above action was initially filed in the Massachusetts state court, in the Civil Litigation
Section of the Suffolk Superior Court. Tufts MC timely removed this action to this Court on May 16,
2023. (Dkt. No. 1.) Plaintiff will be filing a Motion to Remand her case by the statutory deadline for
filing her Motion to Remand on or before June 15, 2023.

Accordingly, the Parties respectfully move this Court to establish the following dates for the briefing and response deadlines of the Motion to Remand, as well as Defendant's deadline to respond to Plaintiff's Complaint.

1. Plaintiff will file her Motion to Remand on or before June 15, 2023.

2. Defendant will file its Opposition to the Motion to Remand on or before July 17, 2023.

3. Plaintiff shall file her reply in support of her Motion to Remand by July 31, 2023.

4. Defendant shall file its response to Plaintiff's Complaint thirty days after the Court rules on the Motion to Remand.

Dated: May 19, 2023

Respectfully submitted,

*/s/ Edward F. Haber*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
**BAKER & HOSTETLER LLP**
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | Case No.: 1:23-CV-11090<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930] |

**[PROPOSED] ORDER ON JOINT MOTION FOR ENTRY OF SCHEDULE REGARDING MOTION TO REMAND AND TO EXTEND TIME FOR DEFEENDANT TO RESPOND TO THE COMPLAINT**

Pending before the Court in the above-captioned matter is Plaintiff Karen McManus ("Plaintiff") and Defendant Tufts Medical Center, Inc. ("Defendant" or "Tufts MC") (together the "Parties"), joint motion for the Court to enter a scheduling order for the briefing of Motion to Remand this action, as set forth below. The Parties also move this Court to order that the Defendant's time to move, plead, answer or otherwise respond to the Complaint in the above referenced action shall be extended until 30 days after the Court rules on the forthcoming Motion to Remand.

Upon consideration of the Parties' joint motion, and for good cause, the Court hereby GRANTS the Parties joint Motion and enters the following scheduling order:

1. Plaintiff will file her Motion to Remand on or before June 15, 2023.

2. Defendant will file its Opposition to the Motion to Remand on or before July 17, 2023.

3. Plaintiff shall file her reply in support of her Motion to Remand by July 31, 2023.

4. Defendant shall file its response to Plaintiff's Complaint thirty days after the Court rules on the Motion to Remand.

SO ORDERED.

Entered this _____ day of _____ 20223.

_____
HON. ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

Suffolk Superior Civil Court

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

2384CV00930

|  |  |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                              Plaintiff,<br><br>                    v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>                              Defendant. | Case No.: 1:23-CV-11090<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 2 6 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**ORDER ON JOINT MOTION FOR ENTRY OF SCHEDULE REGARDING MOTION TO REMAND AND TO EXTEND TIME FOR DEFEENDANT TO RESPOND TO THE COMPLAINT**

Pending before the Court in the above-captioned matter is Plaintiff Karen McManus ("Plaintiff") and Defendant Tufts Medical Center, Inc. ("Defendant" or "Tufts MC") (together the "Parties"), joint motion for the Court to enter a scheduling order for the briefing of Motion to Remand this action, as set forth below. The Parties also move this Court to order that the Defendant's time to move, plead, answer or otherwise respond to the Complaint in the above referenced action shall be extended until 30 days after the Court rules on the forthcoming Motion to Remand.

Upon consideration of the Parties' joint motion, and for good cause, the Court hereby GRANTS the Parties joint Motion and enters the following scheduling order:

1. Plaintiff will file her Motion to Remand on or before June 15, 2023.

2. Defendant will file its Opposition to the Motion to Remand on or before July 17, 2023.

3. Plaintiff shall file her reply in support of her Motion to Remand by July 31, 2023.

4. Defendant shall file its response to Plaintiff's Complaint thirty days after the Court rules on the Motion to Remand.

SO ORDERED.

Entered this _____22nd_____ day of ____May____ 20223.

<br>

_____
HON. ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

*Suffolk Superior Civil Court*

*2384 CV 00930*

*11*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Karen McManus, | |
| For herself and the Class, | Case No.: 1:23-CV-11090 |
| v. | **JURY TRIAL DEMANDED** |
| Tufts Medical Center, Inc. | |
| Defendant. | |

## PLAINTIFF'S MOTION TO REMAND

Pursuant to 28 U.S.C. § 1447(c), Plaintiff respectfully moves this Court to remand this action

to the Massachusetts Superior Court, for the reasons stated in the accompanying Memorandum of

Law in Support of Plaintiff's Motion to Remand.

Dated: June 15, 2023

/s/ *Patrick J. Vallely*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 26 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

1

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

      Counsel for Plaintiff certifies that they conferred with counsel for Defendant on June 14, 2023 and attempted in good faith to reach agreement on this motion. Defendant opposes the relief requested in this motion.

Dated: June 15, 2023

                                 */s/ Patrick J. Vallely*
                                  Patrick J. Vallely

## CERTIFICATE OF SERVICE

      I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: June 15, 2023

                                   */s/ Patrick J. Vallely*
                                  Patrick J. Vallely

2

*13*

*Suffolk Superior Civil Court*

# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

*2384CV00930.*

|  |  |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>        Plaintiff,<br><br>   v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>        Defendant. | Case No.: 23-CV-11090-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 26 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## DEFENDANT TUFTS MEDICAL CENTER, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO REMAND

Defendant Tufts Medical Center, Inc. ("Tufts MC") is aware of this Court's July 13, 2023, Memorandum and Order in *Doe et al v. UMass Memorial Health Care, Inc.*, regarding plaintiff's Motion to Remand ("Remand Order"). Case No. 22-CV-12022; Case No. 23-CV-40154; Case No. 23-CV-10113. In light of the Remand Order, Tufts MC will not be filing an opposition to the Plaintiff's pending motion to remand in this matter.

Dated: July 17, 2023

Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

226

## CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2023 copies of the foregoing were transmitted electronically via CM/ECF System to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson

*Attorney for Defendant Tufts MC*

*12*

*Suffolk Superior Civil Court*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

*2384 CV00 930*

| | |
|---|---|
| Karen McManus, | |
| For herself and the Class, | Case No.: 1:23-CV-11090 |
| v. | **JURY TRIAL DEMANDED** |
| Tufts Medical Center, Inc. | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. Burke
Asst. Clerk

Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 2 6 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

# Table of Contents

                                                                                                            Page

I.    Factual Background .................................................................................................3

I.    Argument.................................................................................................................4

      A.    Tufts MC Did Not Act Under a Federal Officer When It Aided the Secret
            Interception of Communications Between Consumers and Tufts MC.........................5

            1.    Private Parties Who Comply with Federal Law to Advance a
                  Stated Regulatory Objective Do Not Act under a Federal Officer...................5

            2.    The Laws, Regulations, and Regulatory Guidance upon Which
                  Tufts MC Relies Do Not Support Its Claim of Federal Officer
                  Status.............................................................................................................9

      B.    Tufts MC's Secret Use of Tracking Technologies Does Not Relate to Any
            Act Performed Under Color of Federal Officer..............................................................13

      C.    Tufts MC Asserts No Colorable Federal Defense.........................................................17

II.   Conclusion.............................................................................................................20

i

### Table of Authorities

Page

**Cases**

*Beltran v. Cedars-Sinai Health Sys.,*
    2023 U.S. Dist. LEXIS 90987 (C.D. Cal. May 24, 2023) ................................................... 2, 8

*Browne v. Cedars-Sinai Health Sys.,*
    2023 U.S. Dist. LEXIS 73143 (C.D. Cal. Apr. 26, 2023) ................................................. 2, 8

*Crouch v. Saint Agnes Med. Ctr.,*
    2023 U.S. Dist. LEXIS 68801 (E.D. Cal. Apr. 19, 2023) ................................................. 2, 8

*Davis v. Hoag Mem'l Hosp. Presbyterian,*
    2023 U.S. Dist. LEXIS 81178 (C.D. Cal. May 8, 2023) ........................................................3

*Doe v. Cape Cod Health Care,*
    No. 1:23-cv-10080, ECF 10 (D. Mass. Jan. 25, 2023) ...................................................... 2, 7

*Doe v. Cedars-Sinai Health Sys.,*
    2023 U.S. Dist. LEXIS 71443 (C.D. Cal. Apr. 24, 2023) ................................................. 2, 8

*Doe v. Hoag Mem'l Presbyterian Hosp.,*
    2023 U.S. Dist. LEXIS 77443 (C.D. Cal. May 2, 2023) .................................................. 2, 8

*Doe v. ProMedica Health Sys.,*
    2020 U.S. Dist. LEXIS 244916 (N.D. Ohio Oct. 30, 2020).......................................... 3, 9, 16

*Doe v. Torrance Mem'l Med. Ctr.,*
    2023 U.S. Dist. LEXIS 64619 (C.D. Cal. Apr. 12, 2023) ................................................ 2, 8

*Doe v. UPMC,*
    2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) .......................................3, 9, 16, 18

*Estate of Maglioli v. Alliance HC Holdings LLC,*
    16 F.4th 393 (3d Cir. 2021) ...................................................................................................7

*Gladstone, Realtors v. Village of Bellwood,*
    441 U. S. 91 (1979) ............................................................................................................17

*Graves v. 3M Co.,*
    17 F.4th 764 (8th Cir. 2021) ...............................................................................................15

*Heard v. Torrance Mem'l Med. Ctr.,*
    2023 U.S. Dist. LEXIS 42196 (C.D. Cal. Mar. 13, 2023)................................................ 2, 8

*Hilbert v. Aeroquip, Inc.,*
    486 F. Supp. 2d 135 (D. Mass. 2007).................................................................................12

*Holdren v. Buffalo Pumps, Inc.,*
    614 F. Supp. 2d 129 (D. Mass. 2009) ........................................................................ 13, 17

*Kennedy v. Heath Optiones, Inc.,*
    329 F. Supp. 2d 1314 (S.D. Fl. 2004) ........................................................................ 16

*Lake v. Ohana Military Cmtys., LLC,*
    14 F.4th 993 (9th Cir. 2021) ........................................................................ 15

*Massachusetts v. Exxon Mobil Corp.,*
    462 F. Supp. 3d 31 (D. Mass. 2020) ........................................................................ 14

*Mayor & City Council of Baltimore v. BP P.L.C.,*
    31 F.4th 178 (4th Cir. 2022) ........................................................................ 14

*McKnight v. Surgical Assocs. of Myrtle Beach LLC,*
    2011 U.S. Dist. LEXIS 133989 (D.S.C. Nov. 18, 2011) ........................................................................ 16

*Mesa v. California,*
    489 U.S. 121 (1989) ........................................................................ 17

*Mohr v. Trs. of the Univ. of Pa.,*
    2023 U.S. Dist. LEXIS 69766 (E.D. Pa. Apr. 20, 2023) ........................................................................ 2, 8

*Moore v. Elec. Boat Corp.,*
    25 F.4th 30 (1st Cir. 2022) ........................................................................ 4, 6

*Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.,*
    647 Fed Appx. 619 (6th Cir. 2016) ........................................................................ 6, 7

*Port of Corpus Christi Auth. Of Nueces Cnty. v. Port of Corpus Christi L.P.,*
    57 F.4th 432 (5th Cir. 2023) ........................................................................ 7

*Quinto v. Regents of the Univ. of Cal.,*
    2023 U.S. Dist. LEXIS 17263 (N.D. Cal. Feb. 1, 2023) ........................................................................ 2, 8, 9, 11

*Rhode Island v. Shell Oil Prods. Co.,*
    979 F.3d 50 (1st Cir. 2020) ........................................................................ 14

*Smith v. Facebook, Inc.,*
    262 F. Supp. 3d 943 (N.D. Cal. 2017) ........................................................................ 19

*W. Va. State Univ. Bd. Of Governors v. Dow Chem. Co.,*
    23 F.4th 288 (4th Cir. 2022) ........................................................................ 7

*Watson v. Philip Morris Cos.,*
    551 U.S. 142 (2007) ........................................................................ 5

**Statutes**

123 Stat. 115.................................................................................................................................10

28 U.S.C. § 1442.....................................................................................................................1, 4, 5

M.G.L. c. 272 § 99................................................................................................................ 4, 19

U.S. Const. Art. I § 8............................................................................................................... 5, 6

U.S. Const. Art. III § 2.................................................................................................................17

**Regulations**

42 C.F.R. § 495.2–495.370........................................................................................................11

*Incentives for the Use of Health Information Technology*, Exec. Order 13335 (Apr. 27, 2004)...........................9

ONC, *Federal Health Information Technology Strategic Plan 2015-2020* ..........................................................10

Plaintiff Karen McManus ("Plaintiff") asserts a single state-law claim under the Massachusetts Wiretap Act, G.L. c. 272, § 99 ("MWA") against Tufts Medical Center ("Tufts MC"). The crux of Plaintiff's claim is that Tufts MC aided in the secret interception of Plaintiff's wire communications with Tufts MC through the Tufts MC Website. Specifically, Plaintiff alleges Tufts MC failed to disclose to healthcare consumers that it injected into its website hidden code for so-called "tracking technologies," including Google Analytics and Meta Pixel. These technologies assisted Google, Facebook, and other third parties in secretly intercepting Plaintiff's communications with Tufts MC.

Plaintiff filed her action in the Massachusetts Superior Court. Tufts MC filed a notice of removal ("Notice") pursuant to 28 U.S.C. § 1442(a)(1) (the "Federal Officer Removal Statute" or the "Removal Statute"), which permits the removal of state-law claims against federal officers or those acting under them in certain circumstances. Tufts MC's arguments for removal fail for several reasons.

*First*, Tufts MC fails to plausibly allege that it acted "under" a federal officer, as the Federal Officer Removal Statute requires. To satisfy this element, Tufts MC must show the government enlisted it to perform a basic government task—a function the government would itself have been required to perform. Conduct that merely complies with regulations or responds to regulatory incentives does not support removal. Tufts MC identifies no basic governmental task the government enlisted Tufts MC to perform. The laws, regulations, and guidance Tufts MC cites reflect classic regulation of commerce, which provides no basis for removal.

*Second*, Tufts MC fails to show that the conduct giving rise to liability—its failure to disclose to healthcare consumers its use of hidden tracking technologies on its website—relates to any government tasks it was enlisted to perform. Tufts MC does not allege the United States directed it to conceal the tracking technologies (because the government directed no such thing).

*Third*, to invoke the Federal Officer Removal Statute, Tufts MC must assert a colorable federal defense to Plaintiff's claim that they violated the MWA. This requirement derives from Article III of

1

the Constitution, which constrains Congress's ability to confer jurisdiction on federal courts. Tufts MC asserts no colorable federal defense. The only purported federal defense that Tufts MC asserts is that the communications Tufts MC helped Google, Facebook, and other third parties intercept are not protected under the Health Information Portability and Accountability Act ("HIPAA"). That is a red herring. Plaintiff asserts no claim under HIPAA, and whether or not the intercepted communications contained HIPAA-protected information is immaterial to Plaintiff's claim.

In the first six months of this year, **eleven** federal district judges, including Judge Stearns in this District, have **rejected** the removal pursuant to the Federal Officer Removal Statute of cases involving tracking technologies similar to this one and ordered the cases remanded to state court. *Doe v. Cape Cod Health Care,* No. 1:23-cv-10080, ECF 10 (D. Mass. Jan. 25, 2023) (Stearns, D.J.) (Ex. A hereto) ("*Cape Cod Health*"); *Doe v. BJC Health Sys.,* 2023 U.S. Dist. LEXIS 13954 (E.D. Mo. Jan. 10, 2023); *Quinto v. Regents of the Univ. of Cal.,* 2023 U.S. Dist. LEXIS 17263 (N.D. Cal. Feb. 1, 2023); *Heard v. Torrance Mem'l Med. Ctr.,* 2023 U.S. Dist. LEXIS 42196 (C.D. Cal. Mar. 13, 2023); *Doe v. Torrance Mem'l Med. Ctr.,* 2023 U.S. Dist. LEXIS 64619 (C.D. Cal. Apr. 12, 2023); *Crouch v. Saint Agnes Med. Ctr.,* 2023 U.S. Dist. LEXIS 68801 (E.D. Cal. Apr. 19, 2023); *Mohr v. Trs. of the Univ. of Pa.,* 2023 U.S. Dist. LEXIS 69766 (E.D. Pa. Apr. 20, 2023); *Doe v. Cedars-Sinai Health Sys.,* 2023 U.S. Dist. LEXIS 71443 (C.D. Cal. Apr. 24, 2023); *Browne v. Cedars-Sinai Health Sys.,* 2023 U.S. Dist. LEXIS 73143 (C.D. Cal. Apr. 26, 2023); *Doe v. Hoag Mem'l Presbyterian Hosp.,* 2023 U.S. Dist. LEXIS 77443 (C.D. Cal. May 2, 2023); *Beltran v. Cedars-Sinai Health Sys.,* 2023 U.S. Dist. LEXIS 90987 (C.D. Cal. May 24, 2023).

Indeed, removal of such tracking technology cases is so groundless that in another similar case, a court, *sua sponte*, issued an order to show cause why sanctions should not issue against the defendant's counsel, Baker & Hostetler LLP, who also represent Tufts MC here, because the firm "lacks an objectively reasonable basis for seeking removal," given the repeated decisions rejecting

removal of wiretap claims against hospitals relating to tracking technologies. *Davis v. Hoag Mem'l Hosp. Presbyterian*, 2023 U.S. Dist. LEXIS 81178 (C.D. Cal. May 8, 2023).

In contrast, there are only two decisions, both from 2020, on which Tufts MC relies, that denied remand in similar cases—*Doe v. UPMC*, 2020 U.S. Dist. LEXIS 136077 (W.D. Pa. July 31, 2020) ("*UPMC*"), and *Doe v. ProMedica Health Sys.*, 2020 U.S. Dist. LEXIS 244916 (N.D. Ohio Oct. 30, 2020) ("*ProMedica*"). Simply put, they were wrongly decided. As *Quinto* explained in discussing the two decisions: "These cases entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which would permit removal to federal court in circumstances far beyond anything Congress intended." 2023 U.S. Dist. LEXIS 17263, at *8 (citation omitted).

The Court should remand this action to the Massachusetts Superior Court.

## I.    FACTUAL BACKGROUND

Tufts MC aided Google, Facebook, and other companies in secretly intercepting consumers' communications with Tufts MC by injecting hidden code into the Tufts MC Website. That hidden code enabled third parties to surreptitiously record healthcare consumers' communications with Tufts MC. Third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals and use the contents of those communications for their own commercial purposes, such as serving individually targeted advertising to those individuals. *E.g.*, Complaint ¶¶ 1–2.

Tufts MC did not disclose to consumers that it helps third parties such as Google and Facebook to intercept communications with Tufts MC, nor did Tufts MC seek or obtain their consent. Tufts MC instead falsely told consumers that they could browse the Tufts MC Website "anonymously" and that Tufts MC does "not collect any identifiable information" or share such information with third parties. *Id.* ¶¶ 3, 17–26.

3

Plaintiff asserts a single claim under the MWA, G.L. c. 272 § 99. The claim derives from the statutorily defined term "interception," which means "to **secretly** hear, **secretly** record, or aid another to **secretly** hear or **secretly** record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by **all parties** to [the] communication...." *Id.* § 99(B)(4) (emphasis added). Plaintiff's claims do not challenge the **use** of tracking technology generally; instead, the **secret** use of such technologies runs afoul of the Act.[1]

## I.   ARGUMENT.

The Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), provides:

> A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States...:
>
> (1) The United States or any agency thereof of any officer (or **any person acting under that officer**) of the United States or of any agency thereof... **for or relating to any act under color of such office**....

(emphasis added). Removal by a private party under this provision requires that Tufts MC plausibly allege each of three elements: "(1) [it was] 'acting under a federal officer's authority,'... (2)...the charged conduct was carried out 'for or relating to' the asserted official authority..., **and** (3) [it] 'will assert a colorable federal defense to the suit.'" *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (citations omitted) (emphasis added). The failure to allege **any one** of the elements defeats removal. Here, Tufts MC does not adequately plead **any** of those requirements.

---

[1] The Massachusetts Superior Court upheld a similar claim against a hospital system under the MWA for the secret use of tracking technologies. *Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651, Decision Allowing in Part and Denying In Part Motion to Dismiss (Mass. Super. Ct. Nov. 20, 2020) (Ex. B hereto) ("motion is DENIED as to Counts I and II... for the reasons stated on the record at the hearing"), citing *Doe v. Partners Healthcare Sys., Inc.*, No. 1984CV01651, Transcript of R. 12 Hearing Before the Hon. Brian Davis, at pp. 14, 32, 34 (Mass. Super. Ct. Nov. 10, 2020) (Ex. C hereto).

**A.    Tufts MC Did Not Act Under a Federal Officer When It Aided the Secret Interception of Communications Between Consumers and Tufts MC**

      1.    <u>Private Parties Who Comply with Federal Law to Advance a Stated Regulatory Objective Do Not Act under a Federal Officer.</u>

For Tufts MC's removal to have been proper, it must have been "acting under [a federal] officer." 28 U.S.C. § 1442(a)(1). Although the language is broad, the Supreme Court has explained, the "language is not limitless." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In *Watson*, the Supreme Court evaluated Philip Morris's contention that claims relating to the marketing of "light" cigarettes concerned conduct for which Philip Morris was "acting under" a federal officer because it used a government test to measure the nicotine content of cigarettes. In rejecting this contention, the Supreme Court distinguished between private parties that assist the United States to "fulfill…basic government tasks," in which case removal may be proper, and private parties that are "simply complying with [federal] law," which does not support removal. Put another way, it is not enough that a private party acts to advance a federal **regulatory** objective. Of course, whenever Congress exercises its power to "regulate…commerce," U.S. Const. Art. I § 8. cl. 3, it has some objective—for example, to improve the functioning of the market or to protect the rights of market participants. Advancing such commerce-regulating objectives by responding to regulatory incentives is not "acting under" a federal officer. Instead, the private party must, in essence, be acting "on the Government's agency's behalf." *Watson*, 551 U.S. at 152, 156. This distinction—between responding to regulatory incentives and the performance of "basic government tasks" on the government's "behalf"—is the critical distinction upon which this element of the removal statute turns.

The classic example of a private party performing "basic government tasks" is where the government enlists a company to produce an item the United States would otherwise be obligated to produce. For example, the United States has a constitutional obligation to "maintain a Navy," *see* U.S.

*14*

*Suffolk Superior Civil Court*     *2384CV00930*

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

Karen McManus
Plaintiff

v.

Tufts Medical Center, Inc.
Defendants



Certified to be a true and
correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: _____
Deputy Clerk

Date: 10/17/2023

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 2 6 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## **ORDER OF REMAND**

Burroughs, DJ

In accordance with this Court's Order dated July 18, 2023, granting the plaintiff's motion to remand, it is hereby ordered that this case be REMANDED to Suffolk County Superior Court for further proceedings.

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025 , THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
DATED: July 18, 2023 BY: _____
Asst. Clerk

BY THE COURT,

/s/ Caetlin McManus

Deputy Clerk

*Suffolk Superior Civil Court*

# United States District Court
# District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:23−cv−11090−ADB

CLOSED,REMAND

*23 − 930*

*15*

McManus v. Tufts Medical Center, Inc.
Assigned to: Judge Allison D. Burroughs
Case in other court:  Suffolk Superior Court, 2384CV00930
Cause: 28:1442 Notice of Removal

Date Filed: 05/16/2023
Date Terminated: 07/18/2023
Jury Demand: Both
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Karen McManus**
*on behalf of herself and all others
similarly situated*

represented by   **Michelle H. Blauner**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617−439−3939
Email: mblauner@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS a FULL TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: *Mariany M Burco*
*Asst Clerk*

Certified to be a true and
correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: _____
Deputy Clerk

Date: 10/17/2023

**Patrick J. Vallely**
Shapiro Haber & Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
617−439−3939
Email: pvallely@shulaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Tufts Medical Center, Inc.**

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 2 6 2023

JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

represented by   **James H. Rollinson**
Baker & Hostetler LLP
1900 East 9th Street
Cleveland, OH 44114
216−861−7075
Fax: 216−696−0740
Email: jrollinson@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 05/16/2023 | 1 | NOTICE OF REMOVAL by Tufts Medical Center, Inc. ( Filing fee: $ 402, receipt number AMADC−9857316 Fee Status: Filing Fee paid) (Attachments: # 1 EXHIBIT 1, # 2 EXHIBIT 2, # 3 EXHIBIT 3, # 4 EXHIBIT 3A, # 5 EXHIBIT 4, # 6 EXHIBIT 5, # 7 CIVIL COVER SHEET)(Rollinson, James) Modified on 5/16/2023: corrected docket text (Kelly, Danielle). (Entered: 05/16/2023) |
| 05/16/2023 | 2 | CORPORATE DISCLOSURE STATEMENT by Tufts Medical Center, Inc. identifying Corporate Parent Tufts Medical Center Parent, Inc. for Tufts Medical Center, Inc... (Rollinson, James) (Entered: 05/16/2023) |
| 05/16/2023 | 3 | **ELECTRONIC NOTICE TO COUNSEL:** Counsel shall complete and file in PDF format a Local Category Form. The form can be found on the court's website under Resources/Forms. Counsel will use the event under Other Documents − Civil Cover Sheet & Category Sheet. (Kelly, Danielle) (Entered: 05/16/2023) |
| 05/16/2023 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Finn, Mary) (Entered: 05/16/2023) |
| 05/16/2023 | 5 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (Kelly, Danielle) (Entered: 05/16/2023) |
| 05/19/2023 | 6 | Joint MOTION for Order to enter schedule regarding motion to remand and to extend time for defendant to respond to the complaint by Tufts Medical Center, Inc.. (Attachments: # 1 Text of Proposed Order PROPOSED ORDER)(Rollinson, James) (Entered: 05/19/2023) |
| 05/22/2023 | 7 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 6 Motion for Order setting schedule for filing Motion to Remand and for filing response to complaint. (Folan, Karen) (Entered: 05/22/2023) |
| 06/15/2023 | 8 | MOTION to Remand to State Court by Karen McManus.(Vallely, Patrick) (Entered: 06/15/2023) |
| 06/15/2023 | 9 | MEMORANDUM in Support re 8 MOTION to Remand to State Court filed by Karen McManus. (Attachments: # 1 Exhibit A − Cape Cod Decision, # 2 Exhibit B − Partners Decision, # 3 Exhibit C − Partners Rule 12 Hearing Transcript)(Vallely, Patrick) (Entered: 06/15/2023) |
| 07/17/2023 | 10 | RESPONSE to Motion re 8 MOTION to Remand to State Court filed by Tufts Medical Center, Inc.. (Rollinson, James) (Entered: 07/17/2023) |
| 07/18/2023 | 11 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Plaintiff's motion to remand, [ECF No. 8 ], is GRANTED as unopposed, see [ECF No. 10 ], and this matter is remanded to state court for further proceedings. (McManus, Caetlin) (Entered: 07/18/2023) |
| 07/18/2023 | 12 | Judge Allison D. Burroughs: ORDER entered. ORDER OF REMAND to the State Court. (McManus, Caetlin) (Entered: 07/18/2023) |

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| KAREN MCMANUS,<br><br>For herself and the Class,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT<br>OF THE TRIAL COURT<br>BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2834-CV-000930-BLS1 |

## <u>TABLE OF CONTENTS OF EXHIBITS TO PLAINTIFF'S<br>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

| <u>Exhibit</u> | <u>Description</u> | <u>Page</u> |
|---|---|---|
| A | *Doe v. Partners Healthcare System, Inc.,* No. 1984CV01651-BLS1 (Mass. Super. Ct.), Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint (Oct. 18, 2019) | P1 |
| B | *Doe v. Partners Healthcare System, Inc.,* No. 1984CV01651-BLS1 (Mass. Super. Ct.), Order on Motion to Dismiss (Dec. 7, 2020) | P22 |
| C | *Doe v. Partners Healthcare System, Inc.,* No. 1984CV01651-BLS1 (Mass. Super. Ct.), Transcript from Rule 12 Hearing Before the Honorable Brian A. Davis (Nov. 20, 2020) | P27 |
| D | *Doe v. Medstar Health, Inc.,* No. 24-c-20-000591 (Md. Cir. Ct.), Memorandum Opinion (Aug. 5, 2020) | P116 |
| E | *Doe v. Sutter Health,* No. 34-2019-00258072 (Cal. Super. Ct.), Minute Order (June 9, 2022) | P123 |
| F | *Doe v. Bon Secours Mercy Health*, No. A2002633 (Ohio Ct. Common Pleas), Decision and Entry Granting in Part and Denying in Part Defendant's Motion to Dismiss (Nov. 23, 2021) | P139 |
| G | *Doe v. University Hospitals Health System, Inc.,* No. CV-20-933357 (Ohio Ct. Common Pleas), Opinion and Order (Nov. 16, 2020) | P152 |
| H | *Marquis v. Google, Inc.,* No. 11-2808-BLS1 (Mass. Super. Ct.), Memorandum Of Decision and Order on Defendant Google Inc.'s Motion to Dismiss (Jan. 17, 2012) | P163 |

Exhibit A

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

---

JOHN DOE AND JANE DOE,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

        Plaintiff,

   v.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM,
HEALTH INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

        Defendants.

---

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

2019 OCT 18 P 2: 44

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals")[1] move under Massachusetts Rule of Civil Procedure 12(b)(6) ("Rule 12") to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. Plaintiffs have filed a 111-

---

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

page, 419-paragraph First Amended Complaint ("FAC"), replete with graphics, flowcharts, links to YouTube videos, snippets of code, and digressions from academic articles.[2]  In fact, Plaintiffs spend 73 pages before even trying to allege a single cause of action against the Hospitals, inveighing against Google, Facebook, a hodgepodge of lesser-known companies, and the way the Internet generally functions.  (Indeed, Plaintiffs' counsel, Simmons Hanly Conroy, sues these non-profit hospitals after suffering dismissal of a similar suit against Facebook itself, and a group of other hospitals, in California.)  With this bulk of extraneous material, Plaintiffs seek to obscure their fundamental failings and proceed into costly class discovery, threatening non-profit hospitals with millions in damages.  They cannot do so.  Even assuming all their factual allegations to be true, the FAC does not "raise a right to relief above the speculative level."  Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (adopting the Fed. R. Civ. P. 12 standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007)).  To the contrary, a close examination of the allegations and the law compels dismissal.

## I.    SUMMARY OF ARGUMENT

Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99 ("Wiretap Act").  To the contrary, the FAC and referenced documents show that the Hospitals extensively disclosed what everyone already knows – that websites in 2019 use third-party cookies.  Further, the actions that Plaintiffs describe in their FAC do not amount to "interception" at all.

---

[2] To say Plaintiffs' initial filings are voluminous is an understatement.  Plaintiffs have filed: (i) two complaints, the first was fifty pages and 218 paragraphs, and the second is over one hundred pages and four hundred paragraphs (without any change in the underlying facts); (ii) two motions for preliminary injunction and memoranda in support; and (iii) two affidavits by their expert, totaling over one-hundred pages.

#70392032_v1

Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy" as required to recover under G.L c. 214, § 1B ("Invasion of Privacy"). The Hospitals' disclosures, incorporated by reference in the FAC, amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients. To sustain such a claim, the Court would have to create a new fiduciary duty under Massachusetts law. Members of the public engaging with general informational websites is certainly not compelling grounds upon which to build such a duty.

Lastly, Plaintiffs fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are non-profit, charitable institutions and by offering publicly-available informational websites they are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally-cognizable injury.

## II.    FACTUAL ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE

### A.    The Hospitals' Non-Profit Status Is Subject to Judicial Notice

Plaintiffs accuse the Hospitals of violating patient privacy for economic gain. Plaintiffs are wrong. The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. The Hospitals' non-profit status is a fact subject to judicial notice. That status is a "fact that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Mass. G. Evid., § 201(b). For example, the Secretary

of the Commonwealth maintains records of the status of non-profit (and for profit) corporations,[3] and the Office of the Attorney General maintains a registry of non-profit entities in the state.[4] The Hospitals' non-profit status is listed on each of these sources. Therefore, the Court can take judicial notice of that non-profit status, even at this stage. Mass. G. Evid., § 201(c) ("A court may take judicial notice at any stage of the proceeding, whether requested or not[.]").

### B.    Hospital Website Disclosures Incorporated By Reference

The FAC cites continuously to websites maintained by the Hospitals. These include massgeneral.org, brighamandwomens.org, and dana-farber.org (the "Informational Websites"). The FAC not only references these websites, but provides multiple screenshots. Therefore, the disclosures made on each of these sites is incorporated by reference and subject to the Court's notice on this Motion. See, e.g., Martin v. Lefkowitz, 93-7454, 1994 Mass. Super. LEXIS 37, at *6 (Aug. 3, 1994) (granting motion to dismiss after giving defendants the benefit of documents incorporated by reference into the complaint).

### 1.    The Hospitals' Websites' Disclosures Make Clear Their Informational Nature

The Informational Websites each provide disclaimers about the nature of the websites themselves. For example, MGH states on its Informational Website: "Disclaimer: The Massachusetts General Hospital website is intended to provide general educational information and to help users more easily access information about health care services at Mass General."

---

[3] SEC. OF THE COMMONWEALTH OF MASS., CORPORATIONS DIV., SEARCH FOR A BUSINESS ENTITY, http://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx (last visited Sept. 10, 2019).

[4] OFFICE OF THE MASS. ATT'Y GEN., NON-PROFITS & CHARITIES DOCUMENT SEARCH, http://www.charities.ago.state.ma.us/charities/ (last visited Sept. 10, 2019).

4

TERMS OF USE, https://www.massgeneral.org/notices/terms-of-use.aspx (last visited Sept. 10, 2019).

Brigham and Women's Hospital's Informational Website states:

> The Brigham and Women's Hospital (BWH) web site is intended to provide general educational information and to help users arrange more easily for health care services...This site is not an attempt to practice medicine or provide specific medical advice . . . . Use of programs on the BWH site does not establish a doctor-patient relationship.

DISCLAIMER, https://www.brighamandwomens.org/about-bwh/disclaimer (last visited Sept. 10, 2019).

DFCI's Informational Website states:

> The Dana-Farber Cancer Institute website is intended to provide general information about the Institute, its care and research programs, and about cancer and related diseases. This site also provides links to health information that may be written by Dana-Farber staff or by outside providers, and access (links) to some external websites for your convenience . . . . This site is not an attempt to practice medicine or provide specific medical advice, nor does the use of the site establish a doctor-patient relationship.

LEGAL STATMENTS, https://www.dana-farber.org/legal-statements/ (last visited Sept. 10, 2019).

### 2.    The Informational Websites Make Any Necessary Privacy Disclosures

On any fair reading, the Informational Websites disclose an active web environment, with data being gathered automatically and subject to analysis, potentially with the help of third parties.

For example, MGH affirmatively states:

> The Mass General websites use "cookies", tracking pixels and related technologies. Cookies are small data files that a website can transfer to your computer. Examples of information we collect include how often someone visits our site and what they do while on our site. We use this information in the aggregate to understand how our visitors as a group use different resources and to help us improve our site. We also collect information about the activity of individual website users. This information may be used to target related Mass General advertisements to you on other third-party sites.

WEBSITE PRIVACY POLICY, https://www.massgeneral.org/notices/privacy/websiteprivacy.aspx (last visited Sept. 10, 2019). Similarly, the BWH privacy policy discloses:

> The Brigham and Women's website[s] use web analytics, tag management services, and remarketing tools provided by Google, Inc. ("Google") and other third parties to collect certain information relating to your use of the website. Google Analytics uses "cookies", which are text files placed on your computer, and tags (such as tracking codes and event codes) to help us analyze how users use different resources and to help us improve our site. This information may also be used to target related Brigham and Women's Hospital advertisements to you on other third-party sites.

WEBSITE CONTENT AND PRIVACY POLICY, https://www.brighamandwomens.org/about-bwh/privacy (last visited Sept. 10, 2019). Both provide a link to opt out of interest-based advertising.

Likewise, DFCI discloses the use of cookies "to track traffic coming to our site." DANA-FARBER WEBSITE PRIVACY STATEMENT, https://www.dana-farber.org/privacy-policy/ (last visited Sept. 10, 2019). Thus, the Hospitals' Informational Website policies clearly disclose the use of cookies and other tracking tools.

### C.     The First Amended Complaint Is Overstuffed with Irrelevant Red Herrings

The First Amended Complaint starts with a quote from a speech by an executive of one of the Hospitals. In this quote, she is discussing the values of the organization, and promoting privacy. In that context, she states that "[t]he trust and the confidence that you place in your potential or existing health care provider is sacred." *FAC*, Ex. 1.[5] The Hospitals, of course, stand by that quote and act accordingly. But the First Amended Complaint does not say what legal relevance this quote has and, without offering any support to the contrary, misappropriates and weaponizes it against well-meaning Hospitals.

---

[5] All "¶" references are to the FAC unless otherwise noted.

6

#70392032_v1

As an initial matter, Plaintiffs patently misstate the purpose and functionality of the Informational Websites. The Informational Websites are sources of information about the Hospitals, recent medical news and research, events, and other health-related issues.[6] Plaintiffs attempt to augment this reality with phrases like "the precise content of the patient's communication" (¶¶ 12, 14, 16), implying the false narrative that visitors are able to communicate directly with medical professionals through the Informational Websites as opposed to the reality that visitors are merely navigating through publicly-available materials. Plaintiffs contend, for example, that the Informational Websites "are designed for patient communications, including . . . signing up [for] and signing in to a personal patient portal" (¶ 30), and that clicking a link from each of the Informational Websites is all that is required to sign up and sign in (¶¶ 103-11). This clever wordplay obscures the fact that the Informational Websites merely provide a link to a separate website, where one may sign up or sign in – a fact that Plaintiffs concede later in the FAC. See ¶ 146 (belatedly referencing a "specific webpage within [a Partners] website that contained the Patient Portal log-in").[7]

The FAC also generally maintains the fiction that every person who visits the Informational Websites is, in fact, a patient. ¶¶ 29-30. The websites on their face make clear that their purpose

---

[6] While the Hospitals respect that, for the purposes of a Motion to Dismiss, they must accept all well-pled allegations as true, it is notable that Plaintiffs misrepresent the functionality of the Informational Websites (see, e.g., ¶ 30), which only provide visitors with *information about* actions such as payment and accessing the patient portal, not the ability to complete those tasks. In fact, the Informational Websites direct visitors to Hospital personnel and/or a separate online resource for direct communications with doctors and other functions related to their actual medical care or records.

[7] Although Partners need not respond to the contention in ¶ 146 that any action taken by that separate website – which is used for a distinct purpose from the Informational Websites and against which Plaintiffs raise **no** allegations – was related to the instant suit (in fact, it was not), it is absurd to suggest that the Informational Websites be treated the same as a patient login portal.

7

is to provide information to the public at large – for example, providing a history of the institutions, the offerings at each facility, and information about various health issues, among other content. Further, those websites expressly disclaim the creation of a patient relationship, and there is nothing unique about a patient's interaction with any of the Informational Websites as compared to that of a member of the public at large. Critically, Plaintiffs do not allege (nor could they) that the Hospitals know whether the visitors to their Informational Websites are patients, medical professionals, medical students, employees, or other members of the public.

The FAC spends dozens of pages describing the general business practices of third parties not named as defendants in this action, only vaguely relating these practices to the instant claims. Plaintiffs never explain how the Hospitals would be liable for the business model of these third parties. For example, Plaintiffs speculate that Facebook may have tools that allow it to scrape appointment request forms from the Hospitals' websites, but admit "Plaintiff is without knowledge whether Mass General and Partners have actually implemented form-scraping functionality." ¶ 123.

Further, Plaintiffs surmise that Facebook and Google cookies may be synched up in a nefarious tracking scheme on the Hospitals' respective websites, but admit that without further discovery, "it is impossible to know whether and how much data is disclosed to Facebook through this method." ¶ 176. Without any supporting facts, Plaintiffs allege that tag manager tools are deployed as "invisible tracking" (¶¶ 63-64); then, they concede, in the following paragraph, that tag managers improve website functionality (¶ 65). The continuing implication is that Plaintiffs need to engage in full-scale discovery to determine whether there is any merit to their claims against the Hospitals; but, the reality is that Plaintiffs want to start a fishing expedition targeting

these non-defendant third parties, without sufficiently alleging that it would result in any liability against the Hospitals.

### D.    Almost Nothing in The FAC is Actually About Plaintiffs

By contrast, John Doe and Jane Doe, the supposed parties in interest, barely appear in their own FAC. Fewer than a dozen of the 419 paragraphs concern John Doe or Jane Doe, as opposed to the countless allegations that if "a patient" were to do this or that, the Informational Websites would respond in such and such a way. ¶ 25. Plaintiffs make no allegations about the privacy settings they deployed on their own Internet browsers, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

The FAC alleges in a conclusory fashion that "Defendants disclosed Plaintiffs John Doe's and Jane Doe's communications, including patient status and personally identifiable information associated with these communications to third parties," and were, thereby, compensated "in the form of enhanced marketing services." ¶¶ 294-95. Plaintiffs do not identify what "personally identifiable information" was disclosed to third-parties, and deliberately use the term "compensate" to create the misleading impression that the Hospitals received money in connection with the allegations in the FAC. But, Plaintiffs stop short of actually making any such allegation. There is no allegation, nor could there be one in good faith, that any of the Hospitals received financial remuneration in connection with the operation of their Informational Websites.

The FAC does not allege with whom John Doe's or Jane Doe's information was shared, by which Hospital, or for what purpose. FAC Paragraphs 95-101 criticize browser fingerprinting, in general, but the FAC does not allege that John Doe's or Jane Doe's browser was fingerprinted. Long sections of the FAC concern appointment schedulers and how the Informational Websites can be searched ("queries"), but neither John Doe nor Jane Doe alleges that they used the appointment scheduler or made any queries on the website. The FAC discourses at length on

alleged inadequacies, gaps, or lacunae in the online disclosures but does not allege that John Doe or Jane Doe read or relied on any of them.

Nor does the FAC allege any facts specific to John Doe or Jane Doe to demonstrate any damage from or consequence of the alleged sharing of "personally identifiable information". The FAC relies on academic musings about the economic value of personal information, ¶ 227, but does not allege that John Doe or Jane Doe were ever looking to sell their personal information or were somehow thwarted by the Hospitals in those (hypothetical) efforts. See, e.g., Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (dismissing claim for "value" of personal information involved in a data security breach). Like their pseudonyms, John Doe and Jane Doe are ciphers in this suit, which is first, last, and only about the desire by Plaintiffs' counsel to make money suing non-profit hospitals.

## III.   LEGAL ANALYSIS

### A.   Plaintiffs State No Claim Under The Wiretap Act

Under the Massachusetts Wiretap Act, it is unlawful to intercept, disclose, or use intercepted oral or wire communications. Mass. Gen. Laws ch. 272, § 99. The critical limiting term in the statute is "interception," expressly defined to mean "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Id., § 99(B)(4) (emphasis added). There was nothing secret about any of the Hospitals using third-party cookies to track activity. Each of them disclosed that fact in their respective privacy policies posted on their websites. Under § 99(C)(1), a recording made pursuant to public notice is not secret, and hence not a violation. See, e.g., Glik v. Cunniffe,

655 F.3d 78, 87-88 (1st Cir. 2011) (finding "actual knowledge" does not require that there be any explicit acknowledgment of or reference to the fact of the recording).[8]

Even apart from the specific privacy policies, it is common knowledge that cookies "are part of routine Internet functioning and can easily be blocked." See In re Facebook Internet Tracking Litig., 263 F. Supp. 3d 836, 846-847 (N.D. Cal. 2017) (dismissing privacy claims, and noting that "websites routinely embed content from third-party servers in the form of videos, images, and other media, as well as through their use of analytics tools, advertising networks, code libraries and other utilities"). There, the Court noted that the Plaintiffs did not "have a reasonable expectation of privacy in the URLs of the pages they visit," in part because they "could have taken steps to keep their browsing histories private." Id. at 846.

For almost two decades, the plaintiffs' bar has been trying to cash in on hyper-technical claims surrounding cookies, and for almost two decades the courts consistently have rebuffed these efforts. See, e.g., In re DoubleClick Privacy Litig., 154 F. Supp. 2d 497 (S.D.N.Y. 2001) (dismissing claims against ad network for using cookies to target advertisements). Indeed, the DoubleClick court's legal decision and reasoning has withstood the test of time. It noted that the Internet is predicated on sharing information between computers: "The Internet is accurately described as a 'network of networks.' Computer networks are interconnected individual computers that share information. Anytime two or more computer networks connect, they form an 'internet.'" Id. at 501. DoubleClick provided website advertisements for its clients, promising

---

[8] Plaintiffs make much of the standard of consent under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). However, that is not the applicable law. Plaintiffs did not and cannot sue under it. See, e.g., Miller v. Nichols, 586 F.3d 53, 59-60 (1st Cir. 2009), cert. denied, 559 U.S. 1008 (2010) (refusing to create a private cause of action since one did not already exist for a HIPAA violation); Padilla-Ruiz v. United States, 593 F. App'x 1, 4 (1st Cir. 2015) (affirming District Court decision that HIPAA does not create a private right of action).

11

#70392032_v1

that it "will place their banner advertisements in front of viewers who match their demographic targets," and "creat[ing] value for its customers in large part by building detailed profiles of Internet users and using them to target clients' advertisements." Id. at 502. Critical to the DoubleClick court's analysis in dismissing plaintiffs' complaint with prejudice was the fact that "users can easily and at no cost prevent DoubleClick from collecting information from them." Id. at 504. Thus, at least as a general matter, website visitors understand that third-party cookies are part of virtually any website.

Further, the actions that the Plaintiffs allege do not amount to "interception" of any communication at all. The FAC first describes the GET request, by which a web user asks to see a page (¶ 56); then, describes the POST request, by which a web user can send form information (¶ 57); and finally, alleges that the Hospital servers, in response to these requests, send commands to the web user's browser (¶ 58). Allegedly, these commands tell the browser to redirect the GET or POST information to a third party. Even if this were true, it would not constitute the "interception" of any communication. See, e.g., In re Facebook Internet Tracking Litig., 263 F. Supp. 3d at 844 (dismissing Wiretap Act claim).

Here, as in In re Facebook, Plaintiffs allege several communications, but none is intercepted. In the first, the user sends a GET or POST request to the web server. The web server sends instructions back. The third party is not a part of these communications. Then, following directions, the web user's browser sends information to the third party. Dismissing the Wiretap Act claim, the court held that "[t]he fact that a user's web browser automatically sends the same information to both parties does not establish that one party intercepted the user's communication with the other." Id. at 844.

12

A contrary conclusion would subject almost all websites to catastrophic potential liability pursuant to the liquidated damages available under the Wiretap Act. Further, the Wiretap Act is a criminal statute; and Plaintiffs' interpretation of that statute would criminalize basic Internet functionality (which has been recognized by courts in the United States for nearly twenty years). See, e.g., Flemings v. Contributory Ret. Appeal Bd., 431 Mass. 374, 375-76 (2000) ("If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results").

**B.     Plaintiffs State No Claim For Invasion of Privacy**

To sustain a claim for invasion of privacy, "the invasion must be both unreasonable and substantial or serious." Nelson v. Salem State Coll., 446 Mass. 525, 536 (2006). Relevant to the analysis is the "location, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay v. McMahon, 468 Mass. 379, 383 (2014). In this case, to the extent that anything can be gleaned from the FAC concerning John Doe and Jane Doe specifically, the "intrusion" is nothing more than placing standard cookies files on their browsers; the frequency and duration is minimal; and, the underlying purpose is to help with retargeting, ¶ 220, which is a standard advertising practice. As a matter of law, even if what Plaintiffs say is true, it is not an actionable invasion of privacy. Cf., Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514 (1991) (finding that scattered telephone calls over a period of years from stock brokerage firm advertising sale of securities, which did not disrupt daily routine, did not constitute an actionable invasion of privacy). Moreover, courts in other jurisdictions assessing allegations similar to those made by Plaintiffs have concluded that disclosure of unique device identifier data, personal data, and geolocation information (including physical addresses) does not constitute "an egregious breach of social norms" but rather "routine commercial behavior." See

13

In re iPhone App. Litig., 844 F. Supp. 2d 1040, 103 (N.D. Cal. 2012) (citing Folgelstrom v. Lamps

Plus, Inc., 195 Cal. Rptr. 4th 986, 992 (Cal. Ct. App. 2001)).

The FAC's perpetual reference to the health care context does not help them avoid

dismissal. See, e.g., Kelley v. CVS Pharmacy, Inc., No. CIV.A. 98-0897-BLS2, 2007 WL

2781163 (Mass. Super. Aug. 24, 2007) (Gants, J.). In Kelley, the plaintiff obtained prescription

drugs from defendant CVS to help with his diabetes. CVS, in conjunction with defendant Merck

& Co, Inc., sent Kelley a letter promoting the use of high cholesterol medication. The plaintiff

sued CVS, Merck, and a third-party mailing company used to coordinate the promotion for

invasion of privacy. The Suffolk County Superior Court found that plaintiff had no actionable

claim under Massachusetts law for invasion of privacy:

> Even if this Court were to assume that it would constitute a substantial or
> serious interference with Kelley's privacy for CVS to reveal the medication
> he was prescribed or his diagnosis of diabetes, there is no evidence that CVS
> did so here. CVS did not even provide Kelley's name to Merck. It provided
> his name, address, and date of birth to Elensys, and directed Elensys to send
> him the letter described above, but it did not reveal to Elensys his
> prescription or medical diagnosis. Nor could anyone from Elensys
> determine what his prescription or medical diagnosis was from the fact that
> this particular letter was sent to him because Elensys never was informed of
> the criteria that CVS used to determine which of its customers would
> receive this letter.

Id. at *2. The Kelley court found that "[t]he limited dissemination of this information falls well

below the threshold of a substantial or serious interference with privacy." Id. at *3. The court

went on to note that there was "plainly nothing improper" about a pharmacy using its own records

to do targeted, knowledge-based outreach, and it "[could] not imagine any good reason" to prohibit

pharmacies from doing so in conjunction with third parties. Id.

In contrast, here, neither John Doe nor Jane Doe even allege any specific targeted

communication that they received (Kelley at least provided the court a letter). Neither John Doe

nor Jane Doe allege what information was supposedly breached (diabetic condition for Kelley).

14

#70392032_v1

P15

Nor do Plaintiffs say to whom that information was allegedly provided (Kelley specifically named multiple recipients). Kelley fell short in his drive to prove an actionable violation of Massachusetts law, and lost his case on summary judgment – John Doe and Jane Doe do not even get so far as pleading the requisite facts, and their invasion of privacy claim should be dismissed at the pleading stage.

Nothing about the online, cookie context changes these common sense standards. See, e.g., Smith v. Facebook, 262 F. Supp.3d 943 (N.D. Cal 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) (dismissing claim for invasion of privacy). In Smith, the plaintiffs[9] sought to sue the social media company and a series of hospitals. Those hospitals, Smith alleged, had websites that incorporated Facebook plug-ins. Therefore, Smith claimed, the hospitals were impermissibly disclosing confidential health care information to Facebook, i.e., the fact that a certain website user may be browsing pages associated with a certain medical condition. The court dismissed the action on a variety of grounds, including for failure to state a privacy claim. As the Smith court told this same Plaintiffs' counsel, utilizing cookie-generated information that includes "general health information that is accessible to the public at large" is not an invasion of privacy. Id. at 955.

More generally, Plaintiffs constantly use the term "personally identifiable information" in their allegations, yet in an effort to obfuscate those allegations, they leave this term undefined. See discussion supra, at Part I.D. By contrast, G.L. c. 93H, § 1, defines "personal information" as a resident's first name and last name or first initial and last name in combination with any 1 or more of the following data elements that relate to such resident:

---

[9] Plaintiffs in Smith were represented by Simmons Hanley Conroy, lead Plaintiffs' counsel in this case. Apparently, after unsuccessfully pursuing the likes of Facebook and Google, Plaintiffs' counsel has trained their sights on non-profit hospitals that simply utilize Facebook and Google technology.

15

#70392032_v1

(a) Social Security number;

(b) [D]river's license number or state-issued identification card number; or

(c) [F]inancial account number, or credit or debit card number, with or without any required security code, access code, personal identification number or password, that would permit access to a resident's financial account[.]

Plaintiff does not allege that any "personal information," so defined, is at issue in connection with these Informational Websites.

### C.    Plaintiffs State No Claim for Breach of Fiduciary Duty

"To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach." Estate of Moulton v. Puopolo, 467 Mass. 478, 492 (2014). Here, Plaintiffs allege that the Hospitals breached some unprecedented, unsupported duty by claiming obliquely that the Hospitals "owe Plaintiffs ... a fiduciary duty of confidentiality in the data and content of communications between [the Hospitals] and the Plaintiffs []." ¶ 349. No Massachusetts court has ever imposed such a duty on a hospital owing to a patient, nor any other type of fiduciary duty. See, e.g., Doe v. Boston Med. Ctr., 88 Mass. App. Ct. 289, 289 (2015) (evaluating hospital on negligence standard, and not from a fiduciary perspective, in connection with claims made by a patient relating to an assault that occurred during patient's stay at hospital).

Under Massachusetts law, a fiduciary duty only "arises out of a unique or intimate one-to-one relationship[.]" Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005) (finding no fiduciary relationship between a diocese and the parishioner of a diocesan church); cf. Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim"). Thus, for certain purposes, Massachusetts law recognizes a fiduciary duty as between physicians and their patients. See, Korper v. Weinstein, 57 Mass. App. Ct. 433, 437 (2003). No

16

#70392032_v1

Massachusetts court has extended this fiduciary duty to hospitals, and certainly not in this factual context.

Plaintiffs allege that they used websites available to the general public. The use of public websites does not create a "unique or intimate one-on-one relationship" between users and the website operator. Further, each of the websites disclaims the offering of advice and/or creation of a physician-patient relationship. Dismissal at the Rule 12 stage is appropriate. See Smith v. Massimiano, 414 Mass. 81, 85 (1993) (noting that the viability of a legal theory should be tested on Rule 12 rather than waiting until summary judgment).

**D.    Plaintiffs State No Claim Under Chapter 93A**

Chapter 93A makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). This proscription "must be read to apply to those acts or practices which are perpetrated in a business context." Hubert v. Melrose-Wakefield Hosp., 40 Mass. App. Ct. 172, 175-76 (1996). Plaintiffs cannot assert a c. 93A claim against the Hospitals because none of these charitable institutions were acting in a business context when Plaintiffs voluntarily engaged with their websites, and, accordingly, the Hospitals were not engaged in "trade or commerce" within the meaning of c. 93A.

The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. See discussion, supra, Part II.A. Through the operation of their websites, the Hospitals were engaged in incidental activities necessary to meet their charitable purpose—i.e., providing information regarding health care services and increasing educational opportunities and awareness of health care related issues. Furthermore, the Hospitals did not seek to profit from maintaining their websites or from providing information about their institutions to the Plaintiffs. Therefore, c. 93A does not apply as a matter of law. See All Seasons Servs., Inc. v. Comm'r of Health and Hosps. of Boston, 416 Mass. 269, 271-72 (1993) (declining to extend c. 93A to a non-profit

17

hospital that did not seek to profit from a contract with a food service company because providing food services was incidental to primary hospital activity); Hubert, 40 Mass. App. Ct. at 176 (affirming denial of motion for leave to add c. 93A claim against non-profit hospital because "[n]othing in the record indicated that the hospital, a non-profit organization, was acting in a business context so as to generate a profit" in land purchase from home owners).

Furthermore, the Plaintiffs cannot assert a Chapter 93A claim against the Hospitals merely as interested citizens who believe that an unfair or deceptive act or practice has occurred. Chapter 93A is not intended "to authorize purely 'vicarious suits by self-constituted private attorneys-general.'" Bellerman v. Fitchburg Gas & Elec. Light Co., No. WOCV200900023B, 2013 WL 518526, at *15 (Mass. Super. Jan. 7, 2013) (quoting Leardi v. Brown, 394 Mass. 151, 161 (1985)); see also Roberts v. Enterprise Rent-A-Car Co., 445 Mass. 811, 813-14 (2006) (concluding that plaintiff had no standing to allege that car rental company's collision damage waivers were deceptive for purposes of c. 93A because plaintiff never purchased such a waiver). Rather, the Plaintiffs must allege that they have "suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). "[T]he violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Id.

Here, Plaintiffs recite the same general five-category description of their purported damages in each Count. ¶¶ 334, 346, 351, 419. The three additional allegations relating to "harm" made in connection with Plaintiffs' c. 93A claim demonstrate that Plaintiffs have not suffered any distinct injury: (i) "Defendants shared Plaintiffs' . . . personally identified information with third parties;" (ii) "Defendants bartered and sold Plaintiffs' personally identifiable information . . . ;" and (iii) "Defendants used Plaintiffs' . . . personally identifiable information and communications

18

for marketing purposes." ¶ 419 (b), (c), (e).[10] Even if these alleged actions could be considered unfair or deceptive (they were not), Plaintiffs have not alleged that they suffered any separate, identifiable harm resulting from these actions. Therefore, Plaintiffs have failed to allege distinct injuries, and their Chapter 93A claim should be dismissed for this reason as well.

## IV.    CONCLUSION

For the foregoing reasons, the Hospitals respectfully request that the Court grant the Hospitals' motion to dismiss.

---

[10] Plaintiffs make no allegations about the security settings they deployed on their own Internet browsers, no allegations about what free and publicly-available tools they used to protect their Internet behavior, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

19

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM
HEALTH, INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

Dated:  September 20, 2019

## CERTIFICATE OF SERVICE

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via first-class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

20

#70392032_v1

Exhibit B

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930

10·23

**NOTIFY**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

NOTICE SENT
12·07·20
H.+K.
C.A.M.
C.M.I.
M.T.M.
R.B.
K.+C.
J.M.C.
S.H.C.
E.S.J.
T.R.V.T.
~~

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

1 2018 OCT 18 P 2 44

---

JOHN DOE AND JANE DOE,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM,
HEALTH INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

Defendants.

---

### DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital

Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and

Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"),

Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals"),[1]

through their undersigned counsel, move under Massachusetts Rule of Civil Procedure 12(b)(6) to

dismiss this case in its entirety for failure to state a claim upon which relief can be granted.  As

grounds for this motion, the Hospitals state as follows:

---

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and
Dana-Farber, Inc. as parties in this case.

1.  In their First Amended Complaint, Plaintiffs attempt to allege claims individually and on behalf of the unsubstantiated Class and Subclasses against the Hospitals for: interception of wire communications in violation of G.L. c. 272, § 99 (Count I); invasion of privacy in violation of G.L. c. 214, § 1B (Count II); breach of fiduciary duty (Count III); and, unfair and deceptive business practices in violation of G.L. c. 93A, § 9 (Count IV).

2.  Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99. Indeed, the actions that Plaintiffs describe in their First Amended Complaint do not amount to "interception" at all.

3.  Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy," as required to recover under G.L c. 214, § 1B. The Hospitals' disclosures amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

4.  Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients.

5.  Plaintiffs also fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are nonprofit, charitable institutions that are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally cognizable injury.

For the foregoing reasons, explained in detail in the accompanying Memorandum of Law, the Court should (A) grant this Motion, (B) dismiss all counts of the First Amended Complaint with prejudice and without leave to amend, (C) award the Hospitals costs and reasonable attorney's fees, and (D) grant such further relief as justice requires.

2

#70323917_v5

## REQUEST FOR ORAL ARGUMENT

The Hospitals respectfully request a hearing on this Motion at the Court's earliest convenience.

PARTNERS HEALTHCARE SYSTEM, INC.,
THE GENERAL HOSPITAL
CORPORATION D/B/A MASSACHUSETTS
GENERAL HOSPITAL, BRIGHAM
HEALTH, INC., DANA-FARBER CANCER
INSTITUTE, INC., DANA-FARBER/
PARTNERS CANCER CARE, INC., AND
DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

Dated: September 20, 2019

#70323917_v5

3

## SUPERIOR COURT RULE 9C CERTIFICATION

Pursuant to Mass. Sup. Ct. R. 9C(a) and (b), Adam J. Bookbinder (counsel for Defendants) and J. Michael Conley (counsel for Plaintiffs) met and conferred on August 14, 2019 by telephone. Despite good faith efforts, the parties were unable to eliminate or narrow the issues of dispute.

_____
Michael T. Maroney

## CERTIFICATE OF SERVICE

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via email and first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

_____
Michael T. Maroney

#70323917_v5

4

P26

# Exhibit C

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB     Document 11     Filed 01/29/25     Page 160 of 485
Docket Number 2384CV00930

1

```
                                        Volume:    I
                                        Pages:     1-88
                                        Exhibits:  0

              COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS                           SUPERIOR COURT


* * * * * * * * * * * * * * * *
* JOHN DOE,                     *
*                               *
*                               *
*                               *
*        Plaintiff,             *
*                               *        No. 1984CV01651
* v.                            *
*                               *
* PARTNERS HEALTHCARE SYSTEM INC*
*                               *
*        Defendant              *
* * * * * * * * * * * * * * * *


                  RULE 12 HEARING
           BEFORE THE HONORABLE BRIAN A. DAVIS


APPEARANCES:

For the Plaintiffs, Mr. J. Michael Conley, Esquire
For the Plaintiffs, Mr. Jason Barnes, Esquire
For the Defendants, Mr. Michael Maroney, Esquire
For the Defendants, Mr. Mark Melodia, Esquire
(Full Appearance list on Page 2)
```

(Full Appearance list on Page 2)

```
                          Boston, Massachusetts
                          November 20, 2020


(Transcript prepared from Audio Recording)
Reporter:  Raymond F. Catuogno, Jr.
```

Real Time Court Reporting
Transcripts@realtimereporting.net

```
APPEARANCES:

For the Plaintiffs John & Jane Doe:
      Kenney & Conley, P.C.
      100 Grandview Road
      Post Office Box 9139
      Braintree, Massachusetts 02185
      By:  J. Michael Conley, Esquire

      Simmons Hanly Conroy
      One Court Street
      Alton, Illinois 62002
      By:  Jason Barnes, Esquire

For the Defendants Partners Healthcare System Inc.; The General
Hospital Corporation Doing Business as Massachusetts General
Hospital; Brigham Health Inc.; Dana-Farber Cancer Institute
Inc.; Dana-Farber Partners Cancer Center Inc.; Dana-Farber Inc.:
      Holland & Knight LLP
      10 Saint James Avenue
      Boston, Massachusetts 02116
      By:  Michael T. Maroney, Esquire
           Mark Melodia, Esquire
```

```
 1                    (Court in session.)
 2                       (2:01 p.m.)
 3        THE CLERK:  Good afternoon, your Honor.  Calling
 4   Docket No. 1984CV1651; John Doe versus Partners
 5   Healthcare System Incorporated.  This matter is
 6   before the Court for a Rule 12 hearing.
 7        Counsel, will you please state your name for the
 8   record beginning with plaintiff's counsel, followed
 9   by the defense counsel.
10        THE COURT:  Good afternoon.  You can hear me?
11        MR. BARNES:  Yes, your Honor.
12        MR. CONLEY:  Yes, your Honor.  Mike Conley for
13   the plaintiffs.
14        THE COURT:  Okay.  Welcome.
15        Again, who's here on behalf of plaintiffs?
16        MR. CONLEY:  In addition to me Mike Conley, Jay
17   Barnes is present, and -- Jay, who else is --
18        MR. BARNES:  Your Honor, Eric Johnson is on the
19   phone.  And Mitchell Bright is here.  Mr. Bright has
20   not entered his appearance in the case.  But of
21   course I want to note his presence --
22        THE COURT:  Okay.
23        MR. BARNES:  -- on the call.
24        THE COURT:  Welcome.  So who will be arguing on
25   behalf of plaintiffs?
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB     Document 11     Filed 01/29/25     Page 163 of 485
Docket Number 2384CV00930

4

1     MR. BARNES:  I will, your Honor --

2     THE COURT:  Mr. Barnes.

3     MR. BARNES:  -- Jay Barnes.

4     THE COURT:  Mr. Barnes.  Got it.

5     All right.  And who's here on behalf of

6  defendants?

7     MR. MARONEY:  Good afternoon, your Honor.

8  Michael Maroney on behalf of defendants.  And my

9  colleague Mr. Melodia will be arguing.  I'll let him

10  introduce himself.

11     MR. MELODIA:  Good afternoon, your Honor.  Mark

12  Melodia from Holland and Knight on behalf of all of

13  the defendants on this motion.  And I'll just note

14  that a number of my colleagues who are not

15  necessarily needed in the case but who are attending

16  arguments are in attendance; Chris Iaquinto, Teresa

17  Lahoy, Ester Clovitz, Courtney Grow and Chelsea

18  Rogan.

19     THE COURT:  Mm-hm.  All right.

20     MR. MELODIA:  But I'll be arguing, your Honor.

21     THE COURT:  Got it.  So counsel, for those of you

22  who are, you know, interested but not arguing, would

23  you be kind enough to turn off your microphones and

24  your cameras.  It does reduce the Hollywood Squares

25  effect for me during the course of the argument.  So

```
 1    I appreciate that.  Thank you.
 2        Counsel, we're here -- I think we're here
 3    officially on the motion to dismiss.  However, we
 4    still have the motion for preliminary injunction that
 5    I need to address which is -- and you should note
 6    I've read all the materials on the motion to dismiss
 7    and I've gone through the stack of materials that
 8    were sent to me, some of which I asked for, some of
 9    which I didn't necessarily ask for, with respect to
10    the preliminary injunction.  So I have submissions
11    from both sides; defendant's response on the
12    preliminary order, I received the plaintiff's
13    response to preliminary order, and then I received a
14    series of letters with attachments.  And I've
15    reviewed those materials.
16        So what I intend to do here today is I'd like to
17    start with the motion to dismiss.  And then I --
18    don't worry, I intend to circle back on the motion
19    for the preliminary injunction.
20        So we're going to start with the motion to
21    dismiss.  All right, folks, again I've read the
22    papers.  So we've got four counts here that we're
23    fighting over, correct?  We've got a count -- first
24    count is wiretap act, the Massachusetts Wiretap Act.
25    Then we've got the invasion of privacy claim which is
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 165 of 485
Docket Number 2384CV00930

6

1   also officially statutory in Mass.  We've got the

2   breach of fiduciary duty claim.  And we have the 93A

3   claim.  And defendants are moving forward to dismiss

4   all of those claims.  Okay.

5       MR. MELODIA:  Correct, your Honor.

6       THE COURT:  All right.  So again I've read the

7   papers Mr. Melodia.  I've -- recognizing that I've

8   read your papers and I've reviewed the arguments, is

9   there information that isn't in your papers that you

10  wish to share with me or anything that you want to

11  highlight at this point in time?

12      MR. MELODIA:  I think there are some fundamental

13  things, your Honor, that cut across each of the

14  counts.  And I would be happy to address each of the

15  specific counts as well.  But I do recognize that the

16  (inaudible -- indecipherable at 2:05:10) plaintiff.

17  But let me focus on some of the fundamental reasons

18  that really require dismissal of this case in its

19  entirety as reflected in the first amended complaint.

20      Is anybody else getting an echo?  Perhaps --

21      THE COURT:  No.

22      MR. MELODIA:  -- somebody's not on mute.

23      THE COURT:  No.  And again, and I'll give you an

24  opportunity to speak Mr. Melodia.  I am going to --

25  if you're going to jump into all the fundamental

```
 1    aspects, again a reminder -- so I read the papers.  I
 2    read the papers.  And I have questions for both
 3    sides.  And again it's an -- and let me remind you as
 4    well as you address the issues this is a motion to
 5    dismiss.  So I accept the factual allegations as
 6    true.  There seems to be some back and forth with
 7    respect to voracity of some of the factual
 8    allegations, but I have to accept the factual
 9    allegations as true.  So what we're really doing here
10    is we're testing the legal viability of the claims.
11    That's all that this proceeding is about.  And I make
12    no determination at the motion to dismiss stage
13    regarding the merits of the claims, just their legal
14    viability.
15        MR. MELODIA:  Yes, your Honor.  And this
16    complaint is legally not viable for fundamental
17    reasons that can assume the truth of the properly
18    pled parts of the first amended complaint.  And I say
19    properly pled because there are some things that this
20    court can see and take judicial notice of from the
21    websites themselves which are I think fair game on a
22    motion to dismiss under Massachusetts State case law.
23        The privacy cases always need to be about an
24    identifiable person.  And here we don't have an
25    identifiable person.  We have at most an (inaudible
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 167 of 485
Docket Number 2384CV00930

8

1    -- indecipherable at 2:06:54) which as the Court
2    knows really just identifies a machine and really
3    identifies the random physical numbers that changes
4    every few months.  And any one of those devices can
5    in fact be held by any number of people at any given
6    moment using it, but doesn't identify a person.
7        And similarly, even the Facebook ID and the
8    Google ID that are used to somehow identify a person,
9    even identify a patient according to plaintiff's
10   theory don't, because a web point visitor has to
11   first allow, set up their browser in a way that would
12   allow for that information to pass to Facebook and
13   Google, and would have to have a relationship with
14   Facebook and Google ahead of time with their own
15   terms and condition.
16       So I'm just talking about a privacy case needs to
17   be about identifiable people.  And this one, even if
18   you take the first amended complaint as true, legally
19   and technically is not.
20       Second, successful privacy cases like the cases
21   that the plaintiff cite in this case; "Pharmatrak",
22   "Google Cookies" from the third circuit, the
23   "Nickelodeon" case in the third circuit, each and
24   every one of those cases had deception by the
25   defendant at their core.  And we have no deception or

1    secrecy here.   Instead we have website privacy

2    policies that were and are on each of these hospital

3    websites.   And each and every one of those discloses

4    the use of cookies, and discloses (inaudible --

5    indecipherable at 2:08:38.)

6        Third, you need a private space to be intruded

7    upon in some way in a privacy case.   And here we have

8    public websites, literally public websites that

9    anybody with an internet connection anywhere in the

10   world can access.

11       And so I think it's important, your Honor, given

12   that you've already mentioned the preliminary

13   injunction motion -- I'm going to reference your

14   Honor's order from April on that motion, there's a

15   reference in the factual summary on page one of that

16   order that talks about the hospital websites as

17   providing direct portals that allow for access to

18   health records and services.   That is factually

19   incorrect.   And not because I say so or because an

20   expert says so, but because it's obvious from the

21   face of the websites which are specifically

22   referenced in the first amended complaint and

23   therefore are properly considered by the Court on a

24   motion to dismiss.   The three hospital websites

25   referenced in the first amended complaint do not

1   share personal and protected health information.  And

2   the only way the plaintiff's counsel confuses the

3   issue repeatedly in the first amended complaint is by

4   referencing information pages on each hospital

5   website that are about the patient gateway, your

6   Honor, about it, descriptive of it.  Not --

7       THE COURT:  Pause for a moment Mr. Melodia.

8       MR. MELODIA:  -- allowing --

9       THE COURT:  So the allegation is -- pause.  And

10  here's one thing -- I apologize in advance to

11  everyone.  One thing I don't like about Zoom is it's

12  difficult -- it's more difficult to sort of modulate

13  the back and forth between counsel and -- between me

14  and counsel.  So I apologize if at some points in

15  time I feel like I'm barging in.  But unfortunately

16  unless I mute you, which I think is even more

17  offensive, I have no choice but to sort of get your

18  attention.

19      So what's alleged in the complaint -- and here's

20  what I recall from our discussion around the

21  preliminary injunction, is that it is possible -- so

22  someone can go on what you call the informational

23  website -- and I recognize that there's a separate

24  patient portal.  That really doesn't seem to be in

25  dispute in this proceeding.  I got that.

1      MR. MELODIA:  Correct.

2      THE COURT:  I think.  I recognize that.  So what

3  we're talking about is what the defendants refer to

4  as the informational websites.  What plaintiffs

5  allege is that someone can go on the informational

6  websites.  They claim -- they're representing

7  patients; existing patients, go on the informational

8  website, look at information, pull down information.

9  For example, look at the information about specific

10 medical providers, say a particular doctor at MGH or

11 the like, and that that information gets conveyed --

12 it's what's alleged, gets conveyed through Facebook

13 in such a way that Facebook can match that

14 information perhaps with its own Facebook identifier.

15 So Facebook can put together, do a, you know, one and

16 one, they can conclude that that individual who has a

17 Facebook page -- which isn't -- is not that unusual,

18 that person is cruising for for example a breast

19 cancer specialist or something for that, looking for

20 information about breast cancer on the MGH website.

21 So Facebook can say this particular person -- you

22 have someone in the waiting room with you?  Would you

23 mind?  Thank you.  This particular person is looking

24 for information about breast cancer specialists,

25 which -- and doesn't say it for sure, but it could

1   lead to an inference that that person has a real

2   concern or perhaps a diagnosis of breast cancer,

3   which would be confidential information perhaps.  So

4   that's what I understand to be the allegations.  And

5   again, it seems to me I have to take those

6   allegations as true for purposes of the motion to

7   dismiss.

8       I understand that there are disputes about

9   whether in fact that information gets conveyed or how

10  useful it is to Facebook.  But at this point in time

11  I've got to accept the allegations if that

12  information flows to Facebook that they can match it

13  with an individual, and therefore that there is a

14  disclosure of patient confidential information.

15      Don't I have to look at it that way?

16      MR. MELODIA:  You do have to look at it in terms

17  of taking the allegations are true, your Honor, but

18  no, you don't have to pile supposition upon

19  supposition, and inference and possibility upon

20  possibility to perhaps find some probability.  We're

21  not in a, you know, (inaudible -- indecipherable at

22  2:13:15) state.  I mean (inaudible -- indecipherable

23  at 2:13:20) standard of pleading.  And these do need

24  to be probable allegations, and these are not.

25  Number one, because it's not personally identifiable.

 1        THE COURT:  If there's one thing plaintiffs

 2   didn't do in this case is under-plead, okay?

 3        MR. MELODIA:  Well certainly --

 4        THE COURT:  Actually they're not guilty of under-

 5   pleading.  But go ahead.

 6        MR. MELODIA:  -- well, in some senses that's

 7   true, your Honor.  It's a 111 page complaint.  It's

 8   over 400 paragraphs.  True enough.  However,

 9   literally page 67 is the only page that deals with

10   the named plaintiffs in this case.  So they

11   absolutely did under-plead with respect to the only

12   two people who are before this Court.  And they do

13   not state anything about themselves.  They don't tell

14   us about their browser settings.  They don't tell us

15   whether they're Google and Facebook members.  They

16   don't tell us whether they had information accessed.

17   They don't tell us whether they took privacy

18   protective measures like trying to block cookies and

19   that somehow those were overcome by something the

20   defendant did.  They don't even say if they ever

21   looked at the privacy policy or the notice of privacy

22   practices; the NPP, which I want to make sure we talk

23   about, which is inapplicable to this website because

24   it only deals with protected health information as

25   required by HIPAA and OCR.

1          So we know nothing actually, notwithstanding the

2     111 pages, about the actual named plaintiffs and

3     their claims in this case.  And ultimately they have

4     to stand, as this court knows, on their own two feet

5     before they can claim to represent other people with

6     similar claims.

7          But let me go back to the IP address idea that

8     somehow that identifies a person.  It doesn't.

9          THE COURT:  So you -- no, I get -- I picked up on

10    that argument in your papers Mr. Melodia.

11         MR. MELODIA:  Okay.

12         THE COURT:  So I did go back and I took a look at

13    the amended complaint because I wanted to see what

14    was -- specifically was alleged.  And I look at for

15    example page 74 of the complaint which is part of the

16    Count One interception of wire communications, the

17    wiretap act claim.  Paragraph 327 says "Defendants

18    engaged in and continue to engage in an interception

19    by aiding others including Facebook and Google to

20    secretly record the contents of plaintiff's and class

21    member's wire communications."

22         So that's what's alleged.  And I read your

23    argument about that there isn't much meat on the bone

24    with respect to these individual plaintiffs.

25         MR. MELODIA:  Okay.

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 174 of 485
Docket Number 2384CV00930

15

1     THE COURT:  Again but I look at the -- so that's
2  why I pulled the complaint to see what allegations
3  were made with respect to these individual
4  plaintiffs.  And it looks like they covered their
5  bases in terms of making allegations that these
6  plaintiffs are representative with respect to at
7  least the complaints that are made in this amended
8  complaint.
9     MR. MELODIA:  Yes, I was just responding to your
10 Honor's sense of volume.  That the volume is mostly
11 generalized pleadings discussed in almost like a
12 white paper about the internet, as opposed to about
13 what happened to identifiable people.  But I'll move
14 on --
15    THE COURT:  Let me -- can I -- can we talk about
16 the claims one at a time?
17    MR. MELODIA:  Sure.
18    THE COURT:  So wiretap act claim, really you have
19 two arguments.  One of the arguments is that it's not
20 an interception, but -- and there are various cases
21 cited, but I'm dealing with the Massachusetts statute
22 which is Chapter 272, Section 99.  And that defines
23 an interception as among other things -- and I'm
24 inserting some letters in here, but aiding another to
25 secretly hear or secretly record a wire

1  communication.

2      And I'm going to come back to the secret piece

3  for a second.

4      But the Massachusetts Wiretap Act alleges -- it

5  prohibits aiding someone else in secretly hearing or

6  secretly recording.

7      So doesn't that address the arguments in your

8  papers that it's not an interception because what

9  they're -- what's alleged in this case is that these

10  defendants have configured their websites in such a

11  way as to aid Facebook and Google?  And I just read

12  you the allegation in Google and others --

13      MR. MELODIA:  But --

14      THE COURT:  -- and secretly recording or

15  listening and to hearing the communications between

16  MGH and its patients.

17      So doesn't that, at least for purposes of this

18  statute, qualify as an interception?

19      MR. MELODIA:  No, it doesn't, your Honor.

20  Putting aside the secrecy issue for the moment and

21  just focusing on the interception, there needs to be

22  a third party at some point while the communication

23  is in transit between person number one and person

24  number two.  There needs to be a third person --

25      THE COURT:  The statute doesn't say that.  The

1  statute doesn't say that.  The statute says aiding --

2      MR. MELODIA:  Well --

3      THE COURT:  -- aiding somebody.  It doesn't say

4  if it has to be contemporaneous or the like.  It

5  simply says aiding a third party in hearing or -- in

6  secretly hearing or secretly recording.

7      MR. MELODIA:  -- right.  But we don't -- even by

8  the allegation the hospital's website does not aid in

9  the interception.  It does not in any way allow

10  Facebook to eavesdrop or get in the middle of in the

11  way that one can intercept a passing football or

12  intercept anything else.  You need to get in the

13  middle of a communication that is ongoing.  That

14  communication has already finished.  The get

15  communication, communication number one -- may I

16  share my screen, your Honor?  We have a couple of

17  demonstratives that I've shown to Mr. Barnes a couple

18  of days ago.

19      THE COURT:  Yes.  I'll let you share a screen.

20  One moment.  All right, you should have that

21  capability now.

22      MR. BARNES:  Your Honor, Mr. Melodia did share

23  them with me.  I have no objection -- assuming

24  they're the same, and I assume they are going to be

25  the same, particularly in regards to the preliminary

```
 1   injunction.  I would note however on the motion to
 2   dismiss, to the extent they go beyond anything in the
 3   motion itself, that's not entirely proper.  But I've
 4   seen them.  They're fine for the Court to consider.
 5   Particularly that we're taking up both motions here
 6   today.  Thank you, your Honor.
 7        THE COURT:  Mr. Melodia?
 8        MR. MELODIA:  So what we've tried to do, your
 9   Honor, is just diagram based upon the way it's
10   described in the complaint and the way it's described
11   in the plaintiff's expert's report, the so-called get
12   communication; communication number one, and the so-
13   called post communication; communication number two.
14   And there are two distinct communications here.  One
15   is between the hospital's website and the visitor's
16   browser -- that is the plaintiff, if the plaintiff
17   has configured their browser in a way that allows
18   that communication to occur.  And --
19        THE COURT:  Meaning if they allow third-party
20   cookies?
21        MR. MELODIA:  To allow third-party cookies, your
22   Honor.
23        THE COURT:  Yes.
24        MR. MELODIA:  And so in that case there's a
25   communication there that Facebook is not a part of.
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 178 of 485

19

```
1   So there is no interception or aiding and abetting.

2   And then that communication complete --

3       THE COURT:  So pause for a moment.  Mr. Melodia,

4   would it be possible for Facebook to gain access to

5   that communication if for example defendants did not

6   include Facebook, did not permit Facebook to post

7   cookies through their website?

8       MR. MELODIA:  -- I don't believe so.

9       THE COURT:  You don't believe it would be

10  possible?

11      MR. MELODIA:  I don't believe it would be

12  possible.  But of course --

13      THE COURT:  So isn't that -- doesn't that at

14  least qualify as aiding?

15      MR. MELODIA:  -- it's aiding, but not aiding a

16  communication that is communication number two, the

17  post communication, yes.

18      THE COURT:  Got it.

19      MR. MELODIA:  Aiding an interception, no.

20      THE COURT:  But again, we're talking about --

21      MR. MELODIA:  An interception --

22      THE COURT:  -- an interception is defined as

23  aiding another party in its ability to hear --

24      MR. MELODIA:  -- hearing, hearing.

25      THE COURT:  -- or secretly -- to hear or secretly
```

```
 1   record.  And here --
 2        MR. MELODIA:  To hear or secretly record.
 3        THE COURT:  -- yes.
 4        MR. MELODIA:  But there is no -- let me show you
 5   the next slide, your Honor, which -- okay, these are
 6   the actual communications.  This is the code, your
 7   Honor, in the Smith affidavit that shows the actual
 8   communication.  These are not the same
 9   communications.  So you can't aid and abet somebody
10   either hearing or recording something they don't hear
11   or record.  Communication number one is neither heard
12   nor recorded by Facebook.
13        THE COURT:  So you read "hear" -- and the
14   definition of interception you mean it really has to
15   be audibly heard as opposed to communicated --
16        MR. MELODIA:  No.
17        THE COURT:  -- no?  I see.
18        MR. MELODIA:  No.  I accept -- I'm not taking
19   some luddite approach to the wiretap act, even though
20   it's been around 40 years and has not been applied to
21   this exact scenario.  Nonetheless, I'm not taking
22   that approach.  I'm saying that these are separate
23   communications.  And one way we know they're separate
24   communications, not just a (inaudible --
25   indecipherable at 2:22:43) but it is the actual
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 180 of 485

21

1  separateness, the content of the communication as

2  reflected on these slides from the Smith affidavit.

3      The next is you can see communication number one

4  is over and communication number two continues.  You

5  cannot aid and abet somebody in intercepting

6  something that is neither heard in any technological

7  sense, or recorded by Facebook.  They're simply not a

8  part of communication number one.  In the same way

9  hospital is not a part of communication number two.

10 So there is true separateness in the way that they're

11 -- so in other words, using the football analogy, you

12 know, here's -- if there's no completion, you know,

13 if there's a completion of a transmission, a

14 completion of a pass, and then the other team gets

15 it, that's called a fumble.  And the difference is

16 there has -- there's a complete transmission in

17 communication number one.  And then communication

18 number two occurs, and that is a different

19 communication.  It's a communication between the

20 individual plaintiff; the website visitor and Google

21 and Facebook, or any other third party.  And that's

22 the way the internet works across the internet;

23 healthcare companies and all sorts of other companies

24 including law firms.

25     So your Honor, again this whole theory, I mean

1   every --

2       THE COURT:  Mr. Melodia, let me -- if you don't

3   mind, let me jump in here and help you with your

4   argument which is I don't buy this argument.  Okay.

5   I don't buy it.  The language of the wiretap act in

6   Mass is broad, is different than what I -- I looked

7   at the language of some of the other jurisdictions

8   that were cited.

9       So it seems to me that what you're describing is

10  aiding.  And so -- and let me just -- I'll help you

11  along by saying you're not going to win that one.

12  I'm not persuaded.

13      I want to talk briefly about the secret piece.

14  Which is I did -- this is another situation where I

15  went back to see what was alleged, because again I've

16  got to -- I'm bound by the allegations of the

17  complaint, the amended complaint.  And it's alleged,

18  at least in paragraph 327, among other places, I

19  think, that there was a secret recording of

20  plaintiff's wire communications by Facebook, Google

21  and others.  So again, if I'm dealing with a motion

22  to dismiss, and I have to accept that allegation as

23  true, why are we fighting about whether it's secret?

24      MR. MELODIA:  Because that's a legal label, your

25  Honor, that plaintiffs added.  That's not a factual

 1   statement.  That is not something the Court has to

 2   accept as true.  That is a legal conclusion.  The

 3   word "secret" is in the wiretap act, and they have

 4   merely (inaudible -- indecipherable at 2:25:30) back

 5   to the Court.  That is not a sufficient pleading.

 6   There is no secret here.  In addition to these being

 7   -- this is the way in which the internet works.

 8   Literally this hasn't been secret for 20 years.  The

 9   "Double-Click" case in 2001 acknowledged that the use

10   of cookies and the use of tracking on websites is not

11   secret.

12       In this particular case each hospital disclosed

13   the use of cookies and disclosed tracking on the

14   website, including references to Google analytics, as

15   well as the pixels.  So where is the secret?  There

16   can't be a secret by people who are using a free

17   website from a device and looking at -- and clicking

18   around.  In the same way that if somebody visited a

19   law firm website, your Honor, they don't become a

20   client.  These people don't become patients by virtue

21   of simply clicking around on a public website.

22   There's no secrecy going on.

23       THE COURT:  Right, but these plaintiffs allege

24   they are patients.  They're already patients.

25       MR. MELODIA:  It doesn't matter, your Honor.  If

1  a client of a law firm who is a client goes on to the

2  general website of a law firm and clicks around and

3  searches anti-trust law, or searches breach of

4  contract, or fraud, and then looks at attorney bios,

5  and looks at email addresses and phone numbers for

6  contacting, that does not make that person a client

7  in that setting.  They are not for example -- the

8  clicking and the searching is not for example

9  attorney/client privilege, is it?  That can't be

10 attorney/client privilege.  Does the law firm have a

11 duty all of a sudden -- for example, if they looked

12 up breach of contract and then they missed a statute

13 of limitations, can the law firm be sued for

14 malpractice because they missed the statute of

15 limitations on behalf of somebody who was a client

16 but didn't tell the law firm in engagement that they

17 are a client for purposes of a contract claim?  No.

18 Those --

19     THE COURT:  See the problem with that --

20 actually, Mr. Melodia, that's interesting that you

21 choose that analogy, because I've been bouncing that

22 one around in my head for some time.  And here's the

23 problem I ran into with that analogy, which is assume

24 for the moment that the person who's using the

25 website is a client of the law firm.  And they're

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 184 of 485

25

```
 1  getting on and looking at some of the law firm
 2  materials about their particular legal problem, which
 3  is confidential.  And the law firm then takes that
 4  communication and makes it available to Facebook,
 5  such that Facebook can then match the fact that that
 6  client of the law firm has been rummaging around the
 7  law firm's website with respect to a particular legal
 8  issue that's confidential, and can match that
 9  information with the identity of the user?  So that's
10  more like what we have here.  And in those
11  circumstances would that be deemed again -- there are
12  a number of claims here that are made with respect to
13  that type of activity, but it seems to me that at
14  least again -- and I understand you have an argument
15  with respect to disclosure, I've got that, but the
16  allegation is it's done secretly.  It seems to me
17  that in those circumstances that's potentially a
18  violation of the wiretap act.
19      Let me also mention yet again this is a motion to
20  dismiss.  You read the prologue to the wiretap act --
21  and the wiretap act is designed really for different
22  circumstances I'll have to say.  And so again the --
23  let me pull up the actual language in the act.  But
24  the preamble says, "The general court finds that
25  organized crime exists within the Commonwealth and
```

1    that the increasing activities of organized crime

2    constitute a grave danger to the public welfare and

3    safety."

4         So I agree with you this statute I think was

5    targeted towards a different set of problems.  But

6    what I have to deal with in this context is how does

7    it apply here, and does plaintiff state a viable

8    claim?  And I have to say under the wiretap act, I

9    think they do, based on the allegations of the

10   complaint.  I recognize you disagree.  I recognize

11   that.  But I'm bound by what the allegations of the

12   complaint are in a motion to dismiss.  And it seems

13   to me that they do, they state a viable claim under

14   the wiretap act.  Whether that claim will succeed or

15   not is a completely different matter.  But I'm --

16        MR. MELODIA:  Understood, your Honor, but --

17        THE COURT:  -- yes?

18        MR. MELODIA:  -- the Court respectfully does not

19   need to take as true the secrecy allegation when the

20   secrecy is how the internet works across the entire

21   internet.  Logically, just realistically,

22   sociologically, technically, there is no secret here.

23   This is all public information that anybody who is

24   using the internet ought to know and is charged with

25   knowing.  And our law all the time charges people

1   with knowing things they may or may not actually in

2   fact know, but that doesn't make it secret and that

3   doesn't make it improper.  And even the "Pharmatrak"

4   case, your Honor, which is the one case they can

5   point to that applies to in the Federal Wiretap Act

6   context apply, you know, these types of statutes to

7   facts that are somewhat similar in the sense that

8   they're happening on a website and they involve

9   deflection of information.  But they're still

10  different.  I mean "Pharmatrak", it was an anonymous

11  party.  There was absolutely no disclosure whatsoever

12  of a PII being collected.  PII being collected was

13  name, and address, and gender, and insurance

14  information, and medical conditions and medications.

15  And in there -- and this is the case, the main case

16  the plaintiffs rely upon your Honor for their wiretap

17  act theory.  In that case the court did not decide

18  this timing issues as Mr. Barnes calls it on this --

19  and what I think of as separate communications, they

20  didn't resolve the timing issue.  They in fact

21  explicitly reserved the timing issue and said the

22  facts here do not require us to enter the debate over

23  the existence of a real time requirement.  And why

24  was that?  Because they found a simultaneous

25  communication, which we don't have here, and an

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 187 of 485
Docket Number 2384CV00930

28

1   identical communication, which we -- I showed on the
2   screen, we don't have here.  So "Pharmatrak" really
3   doesn't get them where they need to go.  Nor does the
4   "Facebook" case out of the ninth circuit.  I mean
5   that case only --
6       THE COURT:  Again -- again, Mr. Melodia, I don't
7   see any simultaneous or contemporaneous requirement
8   in the Massachusetts Wiretap Act.  I don't see it.
9   Am I missing something?  Is it there?  Have I just
10  overlooked it?
11      MR. MELODIA:  -- well I think it doesn't say the
12  word "simultaneous", your Honor, that is true.
13  However, what it does say is a third party needs to
14  have heard or recorded a communication.  And that
15  didn't happen here.  As alleged, it didn't happen
16  here.  There was no recording, secret or otherwise.
17  And there was no hearing, secret or otherwise by
18  Facebook, or Google, or any third party to
19  communication number one, the get communication, as
20  pled by Mr. Barnes in the complaint and as is
21  obviously found in the Smith affidavit repeatedly.
22      THE COURT:  Okay.  Let me pause for a moment --
23      MR. MELODIA:  So that's my point.
24      THE COURT:  -- Mr. Melodia.  I'm going to ask you
25  to pause there.  I'm going go through these claims

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB     Document 11     Filed 01/29/25     Page 188 of 485
Docket Number 2384CV00930

29

1    one at a time.

2        Mr. Barnes, briefly what do you have to say in

3    response to Mr. Melodia's point that it's not the

4    same communication?

5        MR. BARNES:  Well, your Honor, if you have Mr.

6    Smith's declaration -- well, do you have the

7    complaint in front of you?

8        THE COURT:  I do.  The amended complaint, yes.

9        MR. BARNES:  Right.  If you go to paragraphs 103

10   and 104, they are on pages 24 and 25.  Mr. Melodia

11   says --

12       THE COURT:  I have them.

13       MR. BARNES:  -- Mr. Melodia says there are two

14   separate communications here.  And I want to provide

15   just one example from the complaint to show that

16   there are not two separate communications.  Your

17   Honor has it right.  The Massachusetts law makes no

18   distinction that the federal law does.  But if you

19   look at paragraph 103 there is the button up there at

20   the top right screen in the screenshot that says

21   "enroll or sign in to patient gateway."?

22       THE COURT:  Yes.

23       MR. BARNES:  Okay.  When a patient clicks that

24   button what happens is that's the patient's

25   communication.  That is the patient's sole

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB     Document 11     Filed 01/29/25     Page 189 of 485

30

1  communication to Mass General Hospital in that

2  example.  It starts a transmission of data and

3  exchange of content between Mass General and the

4  patient's web browser.  But immediately upon clicking

5  that button the source code Mass General puts on its

6  website redirects the content, the precise content of

7  that button click to Facebook.  And that's shown in

8  paragraph 104.  You see --

9       THE COURT:  I see.

10      MR. BARNES:  -- at the top of the graph where it

11  says "EV subscribe button click", and then it says

12  "button text enroll or sign in to patient gateway."

13  That's not a -- the patient did nothing else to send

14  that data to Facebook.  That's entirely the result of

15  the source code that Mass General put on its web

16  property.  And the same is true of every other

17  communication we're talking about in this case.  As

18  it relates to the Facebook tracking pixel, your

19  Honor, this piece of source code is set up in a way

20  that Facebook actually gets the content of the

21  communication in most circumstances before Mass

22  General even receives it.  And the reason for that is

23  Facebook wants to make sure that it gets it.

24      I also heard Mr. Melodia say that this is only

25  because the plaintiff's web browsers are configured

1    -- they had to choose to let this happen.  First of

2    all the default setting out of the box, this happens

3    in the default setting out of the box.

4        Second of all, I believe we've alleged in the

5    complaint -- I don't have the particular paragraph,

6    we've alleged the deployment of what's called cookies

7    syncing technology.  And what cookie syncing

8    technology means is that even if a user tried to

9    block Facebook's cookies and tracking on a website

10   like MGH, it happened anyway because of this cookie

11   syncing.  They've hacked -- they've figured out a way

12   to hack their way around the browser settings that

13   would block this tracking behavior.

14       So there is no separate communication of the

15   patient.  And the Massachusetts Wiretap Act is set up

16   to protect the communications of people, not of the

17   redirections caused by intercepting devices.

18       What Mr. Melodia is essentially asking this Court

19   to do is repeal the wiretap act.  Because if you

20   think even in the context of a traditional wiretap

21   act, right, where there's a bug on a telephone, a bug

22   on a telephone results in the content of that

23   communication being delivered to the recording

24   interceptor along a separate path from the

25   communication between the victim's phone and the

1   person they're speaking with's phone.  The bug sends

2   it this way.  And that's exactly what this Facebook

3   source code does.  That's why they're called web

4   bugs, your Honor.

5       THE COURT:  Got it.  All right, I think I've got

6   it Mr. Barnes.  Thank you, sir.

7       So Mr. Melodia, I think I've got this one, sir.

8   I -- this is a motion to dismiss.  I'm going to deny

9   the motion to dismiss with respect to the wiretap

10  claim.  Again, a different matter whether that claim

11  ultimately succeeds, but on a motion to dismiss I've

12  got to -- I have to deny the motion with respect to

13  -- that's Count One.

14      We talked briefly about the invasion of privacy

15  claim.  That's statutory as well.  "Has to be an

16  unreasonable, substantial or serious interference

17  with privacy, and whether the intrusion is

18  unreasonable, substantial or serious presents a

19  question of fact."  That's the "Polay" case from the

20  SJC back in 2014.  And again when I look at the

21  allegations of a complaint of what the plaintiff

22  allege is that the defendants are disclosing

23  confidential patient medical information to third

24  parties, including information about their medical

25  condition.  Here's what -- okay, you can -- I'll

 1    listen to you in a moment Mr. Melodia, but here's
 2    what I saw in the complaint.  And if I'm misreading
 3    it you can point it out to me.  But what I see in the
 4    complaint is plaintiffs allege that the defendants
 5    are disclosing confidential patient medical
 6    information to third parties, like Facebook and
 7    Google, that the information includes information
 8    about the patient's medical condition and diagnoses,
 9    and interest in particular specialists.  For example
10    what we just discussed, the perhaps a patient's
11    interest in a breast cancer specialist.  And that
12    they're doing it in a way that allows the third
13    parties like Facebook to correlate that information
14    and identify the particular user.
15        So again, you say that's not an unreasonable, or
16    substantial or serious invasion of the privacy of
17    those people.  I am not sure I see it that way.
18        MR. MELODIA:  Well, your Honor, I would never say
19    that the disclosure of an individual's personally
20    identifiable health information was not serious and
21    substantial.  The hospitals completely understand
22    that.  I understand that.  Nobody is disputing that.
23    But that's not what's happening.  Not because --
24        THE COURT:  But pause one moment.  What's
25    happening is a different animal.

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 193 of 485
Docket Number 2384CV00930

34

1       MR. MELODIA:  Okay.

2       THE COURT:  So that's the point I'm trying to get

3   across here --

4       MR. MELODIA:  I get it.

5       THE COURT:  -- is there's a huge dispute between

6   these parties with respect to how this technology

7   actually works and what's being transmitted.  I got

8   that.  I understand that.  But my point is simply

9   I've got a motion to dismiss.  So what I have to do

10  is I have to accept plaintiff's version which is no,

11  it is happening, it is happening.  That's what

12  plaintiffs allege.  And in those circumstances if it

13  is happening isn't that an invasion of privacy?

14      MR. MELODIA:  Well if a true medical condition of

15  an identified individual were being transmitted to

16  Facebook and Google from our website that would be

17  actionable, that would be an invasion of privacy,

18  that would be substantial and serious.  But that's

19  not what really is alleged.  They use the word

20  medical conditions, but what they're talking about is

21  searches, and URLs and search terms on a public

22  website like these hospitals.  And that is not

23  actionable.  That is not PHI.  That is not covered by

24  HIPAA.  That is no way protected health information.

25  PHI is defined by the law.  It's also not even

 1  personal information as defined by Massachusetts law.

 2      THE COURT:  If a patient has --

 3      MR. MELODIA:  And --

 4      THE COURT:  -- has breast cancer for example.

 5  Again, obviously something that can be deeply

 6  disturbing to that patient for good reason --

 7      MR. MELODIA:  -- certainly.

 8      THE COURT:  -- there's something that they do not

 9  wish to disclose publicly.  They get on the MGH

10  website and start cruising the MGH website for

11  information about breast cancer and about breast

12  cancer specialists.  Maybe they're looking at Dana-

13  Farber.  I don't know.  But they're looking on your

14  defendant's websites for information that will help

15  inform them about, you know, their diagnosis, about

16  what alternative treatment alternatives exist, who

17  their treatment, you know, provider should be.  All

18  of that information seems to me that can be, very

19  possibly is, confidential information, confidential

20  patient information.  That patient doesn't want other

21  people to know that the looking for information about

22  breast cancer diagnosis, and treatment and potential

23  providers.  But that's the kind of information that

24  plaintiff say is shared with Facebook and that

25  Facebook can then trace back and say we know that

1  this particular Facebook user is looking for a breast
2  cancer specialist.  That's what they allege.  And I
3  don't -- again, I don't think I've got the
4  allegations wrong.  That's -- whether again that's
5  true in the real world is not a matter for me to
6  resolve today.  But that's what they allege.  Isn't
7  that enough to support a claim for invasion of
8  privacy under Mass law?
9      MR. MELODIA:  Not to an unidentified individual,
10  your Honor.  They may be a patient in the same way
11  again that somebody may be a client going onto a law
12  firm website, but they are not a patient on a public
13  website with disclosures telling them that cookies
14  are being used and tracking is happening.  Not to
15  mention the disclosures that they agreed to which
16  Facebook and Google when they became users of those
17  products to begin with.  So no, your Honor, somebody
18  -- whether they're a patient or not, that visits a
19  general website -- they could be on Google.com, they
20  could be on WebMD, they could be anywhere doing that
21  search, and if their information went to Facebook and
22  Google from any of those websites, it is not the
23  website operator's business whether that operator is
24  a hospital or anybody else; Google, or WebMD, or
25  anybody else, to know that that person's a patient.

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 196 of 485

37

1   In fact, the hospitals don't know.  And they don't
2   try to know in any way who a device ID represents,
3   because as I mentioned at the outset, a device ID
4   could represent -- I'm sorry, not a device ID, an IP
5   address, can represent any number of people, any
6   number of devices.  And it doesn't tell us that that
7   person is a patient doing a search on their
8   condition.  That is not what personal health
9   information is, protected health information is.  It
10  has to be identifiable to an individual.  And that's
11  not, because all you're doing is a search on a public
12  website from a certain IP address that can change
13  over time, can change that day.  And it could be you,
14  it could be somebody doing medical research for a
15  friend or a family member, it could be somebody doing
16  a term paper in eighth grade or in medical school.
17  It could be a competing research facility that wants
18  to know what's going on at Dana-Farber because they
19  just won, you know, a Nobel Prize in that particular
20  area, and so let's find out more about the research.
21  That does not signify patient status.
22      And importantly, this idea -- I want to go back
23  to paragraph one of three that Mr. Barnes was
24  highlighting.  That's a really important paragraph in
25  the complaint because that shows us the page from

1   which the Court seems concerned that there could be a

2   direct portal into actual patient records and the

3   types of HIPAA protected information that does

4   deserve full protection and is subject to HIPAA, and

5   is subject to the notice of privacy practice; NPP

6   that is prominently displayed as it is required to be

7   by federal law on the website.  Not because there's

8   PHI on the website, but because that notice has to be

9   disclosed on a website in the same way for example

10  that you put a notice of a federal employment law

11  like a parental leave policy.  You put that on the

12  bulletin board of the employer.  That doesn't mean

13  that everybody who walks by the parental leave policy

14  becomes a parent and has a right to all of a sudden

15  get leave and get paid for leave.  It doesn't create

16  a new right, nor does the NPP create rights or

17  signify that there's PHI or patient activity going on

18  on these websites.  Instead these websites are about

19  the services being offered in the appropriate places,

20  in the protected places.  These hospitals know how to

21  handle HIPAA.  And as your Honor pointed out in his

22  paragraph 146 of the amended complaint makes really

23  clear this is not about the patient gateway.  This is

24  not about what's behind a firewall.  Where you get if

25  you log in with a user name, and credentials and a

1   password, that's where you can make an appointment

2   with a doctor.  That's where you can communicate with

3   a doctor.  That's where your PHR or your pharmacy

4   records are.  None of this that is going on on a

5   public website is protectable.  And it's certainly

6   not a substantial and serious privacy concern.  If it

7   is, then websites across the world -- not just for

8   hospitals, because this basic principle would flow

9   through to virtually every profession, every website

10  dealing with any sort of information that if it were

11  linked truly to an individual, an identifiable

12  individual could be of concern.  But it's not.

13  That's the entire reason to have a general website,

14  and then a separate distinct URL which is the patient

15  gateway.  Which I'm not sure whether that's become

16  clear enough yet that that is a separate URL --

17        THE COURT:  No, it's clear.

18        MR. MELODIA:  Okay.  I --

19        THE COURT:  I promise you it's clear.  And also

20  -- I'll also tell you I think at a macro level I

21  agree with you I think that HIPAA is a bit of a red

22  herring in this proceeding and in these arguments,

23  okay?  I'm not persuaded that HIPAA really has much

24  of a role to play in the analysis that I have to

25  undertake.  But I'm taking it --

```
 1         MR. MELODIA:  Well --
 2         THE COURT:  -- in a much more maybe mundane
 3    pragmatic level, which is I've got a complaint that
 4    alleges that take aside, ignore the patient portals,
 5    that patients who use the defendant's website for
 6    other purposes, their own personal medical purposes,
 7    that that information is in fact being shared with
 8    third parties through the website.  And that -- we'll
 9    get to -- at some point in time again I want -- we
10    need to re-circle, circle back on the question of
11    disclosure and consent, we're going to get there.
12    But I -- and that's what I've got is alleged here.
13         So Mr. Melodia I'm going to ask you to pause for
14    a second.
15         MR. MELODIA:  Mm-hm.
16         THE COURT:  Mr. Barnes, two minutes, anything you
17    want to say on this -- we're talking about invasion
18    of privacy.
19         MR. BARNES:  Right, your Honor.  I think I want
20    to answer that I think there is a question there in
21    HIPAA's role and the analysis.  We would agree that
22    the Court doesn't have to ultimately reach any HIPAA
23    question here.  But HIPAA does play some role in the
24    analysis.  And let me explain why.  And the first
25    place I think to start is paragraph one where Mass
```

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 200 of 485

41

1   General's chief marketing officer says the trust and
2   confidence that you have in your --
3       THE COURT:  This is the sacred language, the
4   sacred language that if I -- I wish I could search
5   your complaint for sacred, I think it would pop up a
6   number of times.  Certainly plaintiff's made good use
7   of that language.  I got it.
8       MR. BARNES:  -- right.  And those are their
9   words.
10      THE COURT:  Yes, I understand.
11      MR. BARNES:  And part of that is patients to a
12  person understand -- they might not know the line and
13  detail of the HIPAA statute and HIPAA regs, but
14  they've got this idea that HIPAA protects their
15  personally identifiable information from disclosure
16  from their healthcare provider.  And that idea is
17  furthered when they show up for their first
18  appointment and it's required by law that the HIPAA
19  notice is provided to them.  And as you noted in the
20  previous hearing, that HIPAA notice says we never
21  share your personal information for marketing
22  purposes without your written authorization.  And
23  "never" is in italics.  And so any time that a
24  patient goes to these web properties they go to --
25  they go there with the -- they're bringing with them

1    this baggage so to speak, this trust and confidence

2    that their healthcare provider is not like

3    Zappos.com.  They're not buying shoes here, Judge,

4    they're talking to their healthcare provider.  Okay?

5    And so that colors every other disclosure that there

6    may or may not have.  And I want to -- we can get

7    further into those disclosures later but that colors

8    everything.

9         In addition to that Mr. Melodia keeps talking

10   about public websites, oh, and basically making the

11   argument I think that there is no privacy on public

12   websites on the internet.  Well, your Honor, the

13   "Pharmatrak" case called that argument frivolous.

14   Not my words.  That's the first circuit's words to

15   the argument that hey if you go on the internet you

16   need to be wary.

17        The second thing is that didn't prevent the court

18   in "Medstar" -- "Doe versus Medstar" from finding a

19   claim, or "Doe versus Virginia Mason", or the "Google

20   Cookie" case that I happened to argue, or the

21   "Nickelodeon" case that I happened to be counsel for

22   the plaintiffs on, or "Weld versus -- well, "Weld

23   versus CVS" was not an internet privacy case, or the

24   Facebook" internet case that the ninth circuit said

25   was actionable on which I represented the plaintiffs.

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 202 of 485

43

1  This is squarely in the line of those cases.  If

2  anything, the conduct of the defendants here are

3  worse.

4      THE COURT:  Thank you.

5      MR. MELODIA:  Your Honor, may I respond?

6      THE COURT:  Mr. Melodia, one minute, I'll give

7  you one minute to respond.  But then we're going to

8  keep moving.

9      MR. MELODIA:  It's absurd to say that the conduct

10  here was worse.  The whole idea of the "Google" case

11  in the third circuit, the "Nickelodeon" case in the

12  third circuit, and the "Pharmatrak" decision is

13  outright deception by the plaintiff -- by the

14  defendants against the plaintiffs, the active

15  hoarding of their efforts to protect their privacy

16  and active deception; saying one thing and doing

17  another.  The only thing that plaintiffs can come up

18  with to try to create the impression of that here is

19  by tying us to a promise in the NPP which only

20  applies, according to OCR, when you have PHI.  So if

21  your Honor is true to his words --

22      THE COURT:  Believe me -- pause for a moment Mr.

23  Melodia.  I've got it.  There's always a certain

24  level of hyperbole in these arguments.  Okay?  And so

25  I've got it.  I heard what Mr. Barnes had to say.

```
 1          Here's what we're going to do.  I'm denying the
 2     motion to dismiss with respect to the invasion of
 3     privacy claim.  Folks, that's a very ambiguous right
 4     in Massachusetts, but it seems to extend to
 5     confidential medical information.  And the
 6     allegations of the complaint are that patient's
 7     confidential medical information is being shared
 8     probably without their knowledge or understanding
 9     with third parties.  That it seems to me that at
10     least states a viable claim for invasion of right of
11     privacy under Massachusetts law.  So I'm going to
12     deny it.
13          We've got a breach of fiduciary duty claim.
14     Here's the -- I think we can deal with this one
15     pretty quickly.
16          Mr. Melodia, I read the arguments.  Not a lot of
17     ink was spilled on either side on this one.  But I
18     did.  So I was interested to see actually the SJC has
19     recognized a fiduciary obligation on the part of
20     physicians not to disclose medical information.  They
21     did that in the "Alberts versus Devine" case.  And
22     the appeals court has picked up on that as well in
23     the "Corper versus Weinstein" case.  So --
24          MR. BARNES:  Yes.
25          THE COURT:  -- those cases seem to recognize yes
```

```
 1    in Mass a physician could have a fiduciary obligation
 2    not to disclose -- or the opposite side, flip side of
 3    the coin is to maintain the confidentiality of a
 4    patient's medical information.
 5         So basically what we've got alleged here, it
 6    seems to me that it's potentially -- potentially it's
 7    a breach of fiduciary duty.  And it seems a little
 8    bit of an odd fit.  But those cases recognize a
 9    fiduciary obligation.
10         MR. MELODIA:  But we're being -- no, that would
11    be I think clear error to find that in this case.
12    Because --
13         THE COURT:  It wouldn't be the first time, but go
14    ahead.
15         MR. MELODIA:  -- no.  But this one -- clearer
16    than most, your Honor, because of this reason.  Look,
17    the -- if you take as a given that a physician can
18    have such a personal fiduciary relationship with a
19    patient in the same way that for example a priest
20    might have with a parishioner like the "Petrelvy
21    Reposi"(phonetic) case we've cited, case nine of our
22    brief.  That's fair enough, those are personal
23    relationships.  I'm not contesting that.  I don't
24    think we ever contested that.  The point here is
25    nobody has sued a physician.  We've sued hospital
```

```
 1    systems and hospitals.  Fundamentally what the
 2    "Petrelvy Reposi" case stands for is that the church
 3    as an organization and the diocese is not the priest.
 4    Nor is the physician, the hospital or the hospital
 5    system.  There's fundamentally a difference in a
 6    fiduciary --
 7        THE COURT:  So you're argument essentially that
 8    an organization can't owe a fiduciary obligation?  It
 9    has to be an individual obligation?  Am I
10    characterizing --
11        MR. MELODIA:  -- it has to --
12        THE COURT:  -- correctly?
13        MR. MELODIA:  -- but I think there are times when
14    you could have a sole proprietorship or something,
15    your Honor, where there's an organization technically
16    speaking, but there is a personal relationship.  I'm
17    not suggesting that it only has to do with how many
18    people or the corporate form.  I'm having -- I'm
19    talking about where the reality of the relationship
20    rests, where the duty rests.  And the duty rests not
21    with the hospital in terms of an individualized
22    personal relationship with the plaintiff here, with
23    the patient.  Rather it rests with the physician.  In
24    the same way that --
25        THE COURT:  Well pause, Mr. Melodia.  You're
```

1  confusing me.  So are you saying for example that MGH

2  doesn't have any duty or obligation to its patients?

3      MR. MELODIA:  -- well --

4      THE COURT:  You have MGH -- let me finish the

5  question.  Does MGH, or Dana-Farber, or Brigham, have

6  any duty as organizations not to disclose their

7  patient's confidential information?  Do they have a

8  duty?

9      MR. MELODIA:  Yes, under HIPAA, absolutely, your

10 Honor.  They have a --

11     THE COURT:  You don't think they have any common

12 law duty?  So when the SJC talks about a physician's

13 obligation not to disclose confidential medical

14 information of a patient again you don't think that

15 there's a comparable duty on the part of the

16 organizations as well?

17     MR. MELODIA:  -- I don't think there's a

18 fiduciary duty, your Honor.  I think you could have a

19 negligence claim, your Honor.  There could be a duty

20 in the negligence sense.  So you could have a breach

21 of a duty in the negligence claim potential.  But I

22 can't see -- I mean and of course if an institution

23 says one thing and does another, you know, there's a

24 problem there.  But that's not what we have here.

25 We're trying to impose a fiduciary duty.  And that is

```
 1   different in the law than other types of duties,
 2   including duty in the negligence sense.  So I'm not
 3   suggesting in any way that any of these hospitals
 4   don't fully understand and meet their obligations for
 5   privacy.  But these are highly regulated
 6   institutions.  And HIPAA does (inaudible --
 7   indecipherable at 2:57:51) how they approach these
 8   issues.  So to sort of suggest that HIPPA defines the
 9   expectation as Mr. Barnes would have it, of everybody
10   walking in the door, and yet HIPAA doesn't really
11   technically have to apply and we don't really have to
12   find that PHI is present (inaudible -- indecipherable
13   at 2:58:10).  That's disingenuous.  So I think here
14   there is no case law that extends anything in terms
15   of a fiduciary duty to institutions in the (inaudible
16   -- indecipherable at 2:58:23) of hospitals here.
17        THE COURT:  Got it.  All right.
18        MR. MELODIA:  And I think it would be a mistake.
19        THE COURT:  Mr. Barnes, he says institutions,
20   that the duty that's been recognized by the Supreme
21   Judicial Court and the Mass Appeals Court doesn't
22   extend to the institutions, it's personal to the
23   physicians.  What do you say?
24        MR. BARNES:  Can you hear me, your Honor?
25        THE COURT:  I can hear you, sir.
```

```
 1        MR. BARNES:  Okay.  Sorry.  I got -- the
 2   technology got mixed up here.  Well we disagree, your
 3   Honor.  I don't think that should surprise you, for a
 4   number of reasons.  First, the case "Doe versus
 5   Harbor Schools", the Massachusetts -- the Supreme
 6   Judicial Court outlined that a fiduciary duty exists
 7   quote, "When one reposes faith, confidence and trust
 8   in another."
 9        Paragraph one -- to go back to it, the quote from
10   Mass General's own chief marketing officer was "The
11   trust and confidence you place in your existing or
12   potential healthcare provider is sacred."
13        That fits the Massachusetts test and we're there.
14        The "CVS" case found a breach of fiduciary duty
15   of the first go-around.  That's a corporate entity.
16   And I think the "Alberts versus Devine", which you
17   mentioned your Honor, that court -- the court clearly
18   said just because a certain fact pattern hasn't come
19   before us before doesn't mean the common law doesn't
20   recognize a cause of action in that fact pattern.
21   And it's not a far stretch.  And it's interesting
22   because the remedy for a dismissal for failure to
23   name the corporate entity is to bring in every doctor
24   at all of these hospitals as defendants in this case,
25   which would be somewhat unwieldy and we don't really
```

1    think that's the thing to do because the corporate

2    entities were the ones making the decision to put

3    this source code on these web pages.

4        And your Honor, there's one thing I'd like to --

5    Mr. Melodia said -- seemed to suggest we were making

6    the argument that HIPPA defines the expectations.  I

7    think that's the opposite of the argument I made.

8    It's that HIPAA colors the expectations.  And I'd

9    like to give you an example as it relates to this

10   breach of fiduciary claim.

11       THE COURT:  Yes.

12       MR. BARNES:  Okay?  If an oncologist clinic took

13   down the phone numbers of everyone who called the

14   public phone line for that clinic and some basic

15   notes on the topics of what the caller discussed, and

16   at the end of the day they bundled all of that up and

17   they sent it off to a third-party marketing firm and

18   said hey, we want to advertise to these people to

19   potentially come in for treatment at our clinic,

20   would that be a breach of fiduciary duty for that

21   subset of callers who were patients?  I think there

22   is no doubt that it would be.  But we also know that

23   there would likely be some pharmaceutical drug reps

24   who had called.  There may be some random advertising

25   people who had called.  There may be other doctors

1   who had called, who would have been in that batch of

2   phone numbers that was sent to the third-party

3   marketing company.  But the fact that those positives

4   might exist in the data does not negate the

5   hospital's duty to its patients.  It can't just give

6   patient information away.  And the other thing, your

7   Honor that's relating to this is it's not just the

8   enroll or sign in to the patient portal click that

9   attaches patient status to a person at the primary

10  website, it's also all kinds of other things, like

11  when they look up to request an appointment, when

12  they look up at Dana-Farber to get a second opinion.

13  Those examples are in our complaint.  And we

14  specifically pled that our clients -- and you stated

15  this earlier, we specifically pled that our clients

16  used that sign in button to get where they were

17  going, which attaches patient status to them.  It's

18  as if they called the phone line and the phone number

19  said hey, press one if you're a patient --

20      THE COURT:  I'm not sure I --

21      MR. BARNES:  -- and you press one.

22      THE COURT:  -- I agree with you on that point Mr.

23  Barnes.  But okay, I think I've got it.

24      So here's what I'm going to do with respect to

25  this claim.  Folks, I want to reserve -- I want to

```
 1   take a look.  I want to take closer look at the point
 2   that Mr. Melodia raised.  Certainly again I agree
 3   with the Mass law definitely recognizes some sort of
 4   fiduciary obligation.  And it's kind of interesting.
 5   You read -- I read the "Alberts" case earlier.  You
 6   can see sort of the SJC wrestling with the notion of
 7   there is this obligation and how they're going to
 8   characterize it.  Ultimately they say it's a
 9   fiduciary obligation.  I can't say they look like
10   they're entirely comfortable with that.  But I -- but
11   that's what they hold.  I need to go back and take a
12   look, and see whether that would extend to the
13   organization as well.  So I'm going to defer on that
14   one.
15        That leaves the 93A claim.  Let me jump on that
16   one.
17        So Mr. Barnes, front and center, you have on that
18   one, 93A.  So the SJC has held -- let me pull it up,
19   they held in the "Linkage Corp versus Trustees of
20   Boston" case, "That in most circumstances a
21   charitable institution will not be engaged in trade
22   or commerce when it undertakes activities in
23   furtherance of its core mission."
24        So you have to agree with me Mr. Barnes that
25   these websites definitely are part of the core
```

```
 1   mission of these institutions.
 2        MR. BARNES:  Well I -- accept that the reason for
 3   the -- for the use of these marketing tools is to
 4   increase revenue, gain more patients --
 5        THE COURT:  I saw that.
 6        MR. BARNES:  -- your Honor.
 7        THE COURT:  But that's not what we're talking
 8   about here.  We're talking about the relationship,
 9   the interaction between these organizations and the
10   patients, your clients.  So your patients, they're
11   going to this website, they're going to these
12   websites because they're looking for healthcare
13   information.  Part of what these defendants provide.
14   That's their core mission is to provide healthcare to
15   people who need it.  And so it's a little difficult
16   to say that really anything that goes on at these
17   websites is trade or commerce when it's part of the
18   core.  It's the core mission of these not-for-profit
19   healthcare institutions.  And I'll hear you, but I'm
20   wrestling with it.  I don't see how you can see it
21   any other way.
22        MR. BARNES:  Well, thank you for that warning,
23   your Honor.  And I --
24        THE COURT:  Laughing.  Go for it.  Go for it.
25   You know, it's never caused people to hold back in
```

 1  the past.  Go for it.

 2      MR. BARNES:  -- okay.  So your Honor, I think

 3  that the Massachusetts Consumer Protection Act is out

 4  there to -- it's not just to protect consumers, it's

 5  to protect businesses engaged in commerce from unfair

 6  methods or practice in their business.

 7      There is no doubt that these hospitals compete

 8  against other institutions that are not nonprofit

 9  institutions; that are for-profit institutions.  And

10  that --

11      THE COURT:  But you're not pursuing a claim on

12  behalf of other institutions against these hospitals.

13  You've got individuals.  So if anything, this is a

14  Section 9 claim, 93A, Section 9.  It's not business

15  to business.

16      MR. BARNES:  -- correct.  And I want to connect

17  the dots to why it involves commerce.  It's because

18  it involves competition for the dollars that are

19  attached to those consumer patients that it involves

20  commerce.  And in -- first of all we have alleged it,

21  but in addition to that I think the opposition papers

22  on the motion for preliminary injunction it's

23  conceded that this was to increase patient volume to

24  -- it's a marketing effort.  That's what these tools

25  are, they're marketing efforts.  Maybe it would be

```
 1   more appropriate to -- do you want me to talk about
 2   -- we've got a couple documents in discovery that
 3   we're going to provide for the Court relating to the
 4   motion for preliminary injunction that I guess can
 5   wait, or if you want me to speak about them now, your
 6   Honor, I can.
 7        THE COURT:  No, well actually, let's stay on --
 8   if you don't mind just stay on this point for the
 9   moment, which again is what we're talking about are
10   the websites.  That's the core.
11        MR. BARNES:  Yes.  That --
12        THE COURT:  That's the core of the complaint, is
13   what happens on the websites.  And again it seemed --
14   I don't think you actually -- with all due respect, I
15   don't think you answered the question which is the
16   website --
17        MR. BARNES:  -- well, I wanted --
18        THE COURT:  -- the websites --
19        MR. BARNES:  -- what --
20        THE COURT:  -- seem to be again to be front and
21   center even these days.  There are probably more
22   people interact with these institutions via their
23   websites than in person I'm guessing.  But in any
24   event, that the websites are part and parcel of what
25   these folks deliver which is healthcare, healthcare
```

1  advice and it's part of -- when you look at it that
2  way you can't characterize it I don't think fairly as
3  anything other than part of the core mission.
4      So Mr. Barnes, you want to take another crack at
5  it?
6      MR. BARNES:  Yes.  I think the Court should
7  narrow in a little bit further.  It is about the
8  websites.  It's also about the deployment of these
9  specific invisible marketing tools on those websites,
10  and how those marketing tools are used by the
11  defendant to increase revenues by bringing more
12  patients to their facilities to increase revenues.
13  That's the purpose of this, is to increase revenue.
14  And our argument is look, when you have an entity
15  engaged in commerce -- and they are engaged in
16  commerce and they're taking -- making an effort to
17  increase their revenue that falls under the Chapter
18  93A, Section 9.
19      THE COURT:  It seems to me -- I hear you Mr.
20  Barnes.  What I think you're saying though is you're
21  focusing on what you allege are the unfair or
22  deceptive acts or practices.  But again, the context
23  in which those purportedly arise is in the websites.
24      Mr. Melodia, do you want to say something on this
25  point?

```
 1        MR. MELODIA:  Just a little bit, your Honor.  You
 2   know the case your Honor cited, the "Linkage" case
 3   from the Supreme Judicial Court was actually the case
 4   the plaintiffs cited.  There are two other cases; the
 5   "All Seasons Services" case against the "Boston" --
 6   then called "Boston City Hospital" and the "Melrose
 7   Wakefield Hospital" case, both cited in our briefs.
 8   Those are cases that show where hospitals;
 9   nonprofits, were engaged in conduct that if a for-
10   profit were doing it could be something that makes
11   money.  But that doesn't mean, according to the
12   Supreme Judicial Court, that automatically because
13   one markets, or advertises or amplifies the message
14   of these public charitable institutions that
15   automatically that converts it to trade or commerce.
16   So if there is no message that get out there, if
17   there is ultimately no margin to the services
18   offered, there is no mission, there is no public
19   charity to be had because the organizations won't
20   exist very long.
21        So I think in addition to the point your Honor
22   made even taking Mr. Barnes' representations as, you
23   know, part of what he's after in this case, focusing
24   on the advertising tool, that isn't enough to convert
25   this to trade or commerce under the case law from the
```

 1    Supreme Judicial Court.

 2        THE COURT:  Okay.  All right, Counsel.

 3        Mr. Barnes --

 4        MR. BARNES:  Your Honor?

 5        THE COURT:  -- yes, very briefly, sir.  Yes?

 6        MR. BARNES:  Very briefly.  So I'd like to point

 7    out the defendant's memorandum on page 13

 8    characterized what it's doing here as quote, "routine

 9    commercial behavior."  And the precise quote from

10    Linkage Corp -- and it cites to a Planned Parenthood

11    case is "That where an institution has inserted

12    itself into the marketplace in a way that makes it

13    only proper that it be subject to the rules of

14    ethical behavior and fair play."

15        And I think that language from the case lends

16    itself to what I was speaking about earlier that the

17    CPA is designed not just to protect consumers, but

18    one of its purposes is to make sure there is ethical

19    behavior and fair play in the marketplace.  And that

20    means making sure that even nonprofit corporations

21    when they're engaged in revenue enhancing activities

22    in the marketplace they're subject to the CPA.

23        THE COURT:  That would be true for all sorts of

24    activities it seems to me that not-for-profits would

25    be engaged in.

```
 1          I'm going to dismiss Count Four.  Again, SJC has
 2   indicated that as a general matter 93A doesn't apply
 3   when a charitable institution undertakes activities
 4   in furtherance of its core mission.  Again, I can't
 5   describe these websites as anything other than part
 6   of these defendants' core mission.  So maybe this is
 7   another instance of my clear error.  I don't think
 8   so, but I'm going to run with it.
 9          All right, let me address the motion for
10   preliminary injunction.  Folks, I'm denying that
11   motion.  And here's why.  I read everything that was
12   supplied to me in the aftermath of our last hearing
13   of the various submissions; the written submissions,
14   the affidavits, the further letters.  A preliminary
15   injunction is prospective in nature.  And anyone who
16   was alive and listened to or participated in our last
17   hearing on this matter understood that I had very
18   significant concerns that really revolve primarily
19   around issues of notice and consent on the part of
20   users of these websites.  And consent seems to me, if
21   it exists, effectively moots all of the plaintiff's
22   claims.  So a lot of your fight here is going to be
23   about consent, whether there is in fact consent.  By
24   plaintiff's own admission defendants already have
25   gone a long way to solving the problem.  I know
```

```
 1   that's the same -- that's the equivalent of the

 2   sacred language that you're probably going to hear a

 3   lot about Mr. Barnes, but by including those cookie

 4   banners and other changes in their websites.  I mean

 5   I got on folks.  I looked at the cookie banners.  And

 6   I -- they're also recited in the papers.  And I don't

 7   -- I'm not required to say I think in the preliminary

 8   injunction context whether those changes are

 9   sufficient to eliminate all liability.  In fact it

10   seems to me the cookie banners might make some

11   reference to the fact that actually the institutions

12   share some of the data that's collected with third

13   parties.  That could be referenced it seems to me in

14   the cookie banners as well.  But I'm not -- it's not

15   up to me to dictate the language of the cookie

16   banners.  But it does cause me to conclude that in

17   light of those changes and in light of the

18   prospective nature of a preliminary injunction that

19   the defendants -- that the plaintiffs have not

20   demonstrated a likelihood of success going forward.

21       And I'll also mention that I think the changes

22   that have been made significantly undermine

23   plaintiff's irreparable harm arguments because if the

24   nondisclosure -- if nondisclosure of confidential

25   information is of great importance to a user of those
```

```
1    websites then I suspect that they'll click on those
2    privacy notices that are presented to them in the
3    cookie banner and that they will get a fairly good
4    understanding of what is actually happening with
5    their data and how it can be used.
6         And so it seems to me in those circumstances they
7    have a means themselves, it's available to them, to
8    address any potential irreparable harm.
9         So I'm going to -- it seems that this is not a
10   case right now that calls for a preliminary
11   injunction.  I'm denying the motion for preliminary
12   injunction for the reasons that I've stated.
13        Counsel, some of this case is going to survive.
14   I have to get back to you with respect to the count
15   for breach of fiduciary duty.  I'm going to do that
16   quickly.  It's not going to take me very long.  I'm
17   going to do that research.  You should get my
18   decision on that by next week.
19        We need to give you a next date in this case.
20   All right.  It's going to take -- regardless of how I
21   rule with respect to the breach of fiduciary duty
22   claim, some of the claims survive, which means that
23   defendant's going to need to respond and then I need
24   to answer the amended complaint in this case.
25        Mr. Melodia, how long do you think it's going to
```

```
 1   take for your client's to do that?
 2        MR. MELODIA:  I'd ask if 30 days from your
 3   Honor's ruling on the fiduciary duty?
 4        THE COURT:  Yes, I'm going to give that to you
 5   next week.  So let's just pick a date that works.
 6        Mr. Barnes, 30 days, that sounds reasonable in
 7   the circumstances, do you agree?
 8        MR. BARNES:  More than reasonable, your Honor.
 9        THE COURT:  So let's just say -- well, I'll give
10   you until the end of December.  That works.  So
11   December 31st, Mr. Melodia, you need to get your --
12   please if you would, get the answers on file, get
13   those served.
14        Then let me give you -- see if I can set you up
15   for a Rule 16 conference in this case say maybe later
16   in January?  Does that work?
17        MR. MELODIA:  It does.
18        MR. BARNES:  Yes, your Honor.
19        THE COURT:  How's the 26th look, or the 27th look
20   Ms. Brooks?
21        MR. MELODIA:  We will make either work, your
22   Honor.
23        THE COURT:  Are they problematic Mr. Barnes?  If
24   those are problematic I can give you other dates.
25   There's no urgency to those dates?
```

```
 1        MR. BARNES:  I don't believe so at this point in
 2   time.
 3        THE COURT:  Maybe move it to the first week of
 4   February, is that better?  I want to give --
 5        MR. BARNES:  I've pulled up --
 6        THE COURT:  -- the parties are going to need to
 7   get together.  You're going to get a Rule 16 order in
 8   this case which is going to require you to confer,
 9   come up with some -- a proposed agenda for Rule 16.
10   I just want to leave you enough time in this case to
11   do that.
12        MR. MELODIA:  The first week in February would
13   work for me, your Honor if it works for Mr. Barnes.
14        THE COURT:  Mr. Barnes, you get to choose --
15        MR. BARNES:  I'm sorry.  As soon as you give me
16   -- it will -- tell me, I can look at my calendar,
17   your Honor.  I'm -- it's -- my computer is locking up
18   a little bit here.
19        THE COURT:  All right.
20        MR. BARNES:  Hold on.
21        THE COURT:  That's okay.
22        MR. BARNES:  Okay.  The --
23        THE COURT:  Yes, this is going to be on Zoom, so
24   no travel required.
25        MR. BARNES:  -- yes.  Okay.  Earlier in the week
```

```
 1   is better for me, your Honor.
 2       THE COURT:  All right.  How about the 2nd of
 3   February?
 4       MR. MELODIA:  Groundhog Day, works, your Honor.
 5       THE COURT:  Mr. Barnes, February 2nd, is that
 6   early enough?
 7       MR. BARNES:  Yes, your Honor.
 8       THE COURT:  All right.  Let's do it 2:00 p.m.
 9   please on February 2nd is going to be your Rule 16
10   conference.  Again, it will almost certainly be a
11   Zoom folks, unless those vaccines are available in
12   vending machines in the next eight weeks.
13       So with that, we'll do it via Zoom on the 2nd.
14   Again, you're going to get a notice and an order from
15   the court that tells you what needs to be done in
16   advance of the Rule 16.  Please come with an agenda.
17   And actually if you get that to the Court in advance
18   that would be appreciated.
19       Also, we'll invite you -- you're going to need to
20   work out some tracking order dates in this case,
21   meaning discovery deadlines; things of that nature.
22   I ask you in this first instance to confer.  We try
23   to be pragmatic about that in this session which
24   means we're interested in your input and what you
25   think works in this case.  So again I will give you
```

```
 1   the dates that you propose but we're very interested
 2   in what you think is reasonable in the circumstances.
 3   So please --
 4        MR. MELODIA:  Your Honor, we've been cooperating
 5   already on discovery, notwithstanding the pending
 6   motions.  So I suspect we'll have no problem doing
 7   that.
 8        THE COURT:  Good.  Okay.  So I'll give you a new
 9   date for a next date for a Rule 16 conference on the
10   2nd of February.  I will get you a decision on that
11   one remaining count, which I think is Count Three;
12   the breach of fiduciary duty count.  I want to take a
13   look at the case law on that.  So you'll get that by
14   next week.  I'm not expecting to do anything
15   elaborate folks, but I will give you an answer by
16   next week.
17        Is there anything else that we can accomplish on
18   this case today, Counsel?  No?
19        MR. MELODIA:  No, your Honor.  Thank you your
20   Honor.
21        THE COURT:  Thank you.
22        MR. BARNES:  Thank you, your Honor.
23        THE COURT:  Stay well everyone.
24        MR. MELODIA:  Thank you.  You too.  Have a good
25   weekend.
```

```
 1   (Hearing ends at 3:18 p.m.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                   C E R T I F I C A T E
 3        I, Raymond F. Catuogno, Jr., do hereby certify
 4   that the foregoing is a true and accurate transcript,
 5   prepared to the best of my ability, of an audio
 6   recording provided to me in the matter of John Doe
 7   vs. Partners Healthcare System, Inc.
 8        I, Raymond F. Catuogno, Jr., further certify that
 9   the foregoing is in compliance with the
10   Administrative Office of the Trial Court Directive on
11   Transcript Format.
12        I, Raymond F. Catuogno, Jr., further certify that
13   I neither am counsel for, related to, nor employed by
14   any of the parties to the action in which this
15   hearing was taken, and further that I am not
16   financially nor otherwise interested in the outcome
17   of the action.
18
19
20        _____
21             Raymond F. Catuogno, Jr.
22             November 25, 2020
23             9 Hammond Street
24             Worcester, MA 01610
25             raycatuogno@realtimereorting.net
```

Real Time Court Reporting
Transcripts@realtimereporting.net



**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

**AUDIO ASSESSMENT FORM**

*For court transcribers:* Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.

**TODAY'S DATE:** 11/25/2020 _____ **TRANSCRIBER NAME:** Raymond F. Catuogno, Jr.

**CASE NAME:** Doe v Partners Healthcare System **DOCKET NUMBER:** 1984CV01651

**RECORDING DATE:** 11/20/2020 _____ **TRANSCRIPT VOLUME:** __I__ OF __I__

*(circle one)* TYPE: **CD** TAPE  QUALITY:  EXCELLENT  GOOD  **FAIR**  POOR

*(circle all that apply)* **ISSUES** *(include time stamp):*

**background noise**          **time stamp:**_____

_____

**low audio**          _____

_____

**low audio at sidebar**          _____

_____

**simultaneous speech**          _____

_____

**cannot understand**          2:05:10, 2:06:54, 2:08:38, 2:13:15, 2:13:20,
2:22:43, 2:25:30, 2:57:51, 2:58:10, 2:58:23.

**other:**_____          **time stamp:**_____

**COMMENTS:**

_____

Real Time Court Reporting
Transcripts@realtimereporting.net

P95



**0**

0 --------------- 1
01 --------------- 3
01610 ---------- 67
04/15/2019 ----- 68
05 ---------- 6, 68
06 ---------- 8, 68
08 ---------- 9, 68

**1**

1 --------------- 1, 68
10 --- 2, 6, 48, 68
100 ------------- 2
1001CR006761 --- 68
103 ------------ 29
104 -------- 29, 30
11 ------------- 68
11/13/2018 ----- 68
11/2 ------------ 68
11/20 ---------- 68
111 -------- 13, 14
12 ----------- 1, 3
13 -- 1, 12, 58, 68
1323CR0284 -- 1, 68
146 ------------ 38
15 --------- 12, 68
1523CR001679 --- 68
1523CR1679 ------ 1
16 - 62, 63, 64, 65
18 ------------ 66
1984CV1651 ------ 3

**2**

2 -- 1, 3, 6, 8, 9,
   12, 20, 23, 48,
   64, 68
20 -- 1, 12, 23, 68
2001 ----------- 23
2013 ----------- 68
2014 ----------- 32
2015 ----------- 68
2016 ----------- 68
2018 ----------- 68
2019 ----------- 68
2020 ---- 1, 67, 68

22 ---------- 20, 68
23 ---------- 48, 68
24 ------------- 29
25 --1, 23, 29, 67,
   68
26th ----------- 62
272 ----------- 15
27th ----------- 62
2nd --------- 64, 65

**3**

3 ----------- 66, 68
30 ------ 23, 62, 68
327 -------- 14, 22
38 ---------- 9, 68
31st ----------- 62

**4**

40 ------------- 20
400 ----------- 13
43 ---------- 20, 68

**5**

5 -------------- 68
5/2 ------------ 68
5/20 ----------- 68
51 ---------- 48, 68
54 ---------- 8, 68
57 ---------- 48, 68
58 ---------- 48, 68

**6**

6 -------------- 68
67 ---------- 1, 13

**7**

74 ------------ 14

**9**

9 ------- 54, 56, 67
99 ------------- 15

**A**

a 3, 4, 5, 7, 8, 9,
   10, 11, 12, 13,
   14, 15, 16, 17,
   18, 19, 20, 21,
   22, 23, 24, 25,
   26, 27, 28, 29,
   30, 31, 32, 33,
   34, 35, 36, 37,
   39, 40, 41, 42,
   43, 44, 45, 46,
   47, 48, 49, 50,
   52, 53, 54, 56,
   57, 58, 59, 60,
   61, 62, 63, 64,
   65, 67
A ------- 1, 59, 67
abet ------- 20, 21
abetting ------- 19
ability ---- 19, 67
about 7, 8, 9, 10,
   11, 12, 13, 14,
   15, 19, 22, 25,
   30, 32, 34, 35,
   37, 38, 40, 42,
   46, 47, 53, 55,
   56, 58, 59, 64
absolutely 13, 27,
   47
absurd --------- 43
ac - 6, 21, 26, 34,
   39
accept - 7, 12, 20,
   22, 23, 34, 53
access ------ 9, 19
accessed ------- 13
accomplish ----- 65
according 8, 43, 57
accurate ------- 67
acknowledged --- 23
across - 6, 21, 26,
   34, 39
Act 5, 16, 27, 28,
   31, 54
action ----- 49, 67
actionable - 34, 42
active --------- 43
activities 26, 52,
   58, 59

activity --- 25, 38
acts ---------- 56
actual 14, 20, 25,
  38
actually -- 14, 24,
  27, 30, 34, 44,
  55, 57, 60, 61,
  64
Actually ------- 13
added ---------- 22
addition 3, 23, 42,
  54, 57
address -- 5, 6, 7,
  14, 16, 27, 37,
  59, 61
addresses ------ 24
Administrative - 67
admission ------ 59
advance ---- 10, 64
advertise ------ 50
advertises ----- 57
advertising 50, 57
advice --------- 56
affidavit - 20, 21,
  28
affidavits ----- 59
after ---------- 57
aftermath ------ 59
afternoon ---- 3, 4
again 5, 6, 12, 19,
  21, 22, 25, 28,
  32, 33, 36, 40,
  47, 52, 55, 56,
  64
Again -- 3, 15, 28,
  32, 35, 59, 64
against 43, 54, 57
agenda ----- 63, 64
ago ------------ 17
agree - 26, 39, 40,
  51, 52, 62
agreed --------- 36
ahead --- 8, 13, 45
aid 16, 17, 20, 21
aiding 14, 15, 16,
  17, 19, 22
alive ---------- 59
all -- 4, 5, 6, 21,
  24, 26, 31, 37,
  38, 49, 50, 54,

55, 58, 59, 68
All---4, 5, 6, 17,
  32, 35, 48, 57,
  58, 59, 61, 63,
  64
allegation-10, 16,
  17, 22, 25, 26
allegations-7, 12,
  15, 22, 26, 32,
  36, 44
allege-11, 23, 32,
  34, 36, 56
alleged10, 11, 14,
  16, 22, 28, 31,
  34, 40, 45, 54
alleges------16, 40
allow-8, 9, 17, 18
allowing--------10
allows------18, 33
almost------15, 64
along-------22, 31
already-9, 17, 23,
  59, 65
also 6, 25, 30, 34,
  39, 50, 56, 60
Also------------64
alternative-----35
alternatives----35
Alton------------2
always-------7, 43
am-------6, 33, 67
Am----------28, 46
ambiguous-------44
amended 6, 7, 8, 9,
  14, 15, 22, 29,
  38, 61
among-------15, 22
amplifies-------57
an 6, 7, 9, 12, 14,
  15, 16, 19, 25,
  27, 32, 33, 34,
  36, 39, 42, 45,
  46, 47, 50, 56,
  58, 64, 65, 67
An--------------19
analogy-----21, 24
analysis-----39, 40
and-3, 4, 5, 6, 7,
  8, 9, 10, 11,
  12, 13, 14, 15,

16, 17, 18, 19,
  20, 21, 22, 23,
  24, 25, 26, 28,
  29, 30, 31, 32,
  33, 34, 35, 36,
  38, 39, 40, 41,
  42, 43, 46, 47,
  48, 49, 50, 51,
  52, 53, 55, 56,
  57, 58, 59, 61,
  64, 67, 68
And 3, 4, 5, 6, 7,
  8, 9, 10, 12,
  13, 14, 15, 16,
  18, 20, 21, 22,
  24, 25, 26, 28,
  29, 30, 31, 32,
  34, 35, 36, 37,
  39, 40, 41, 43,
  44, 45, 46, 47,
  48, 49, 50, 51,
  52, 53, 54, 55,
  56, 58, 59, 60,
  61, 64
animal --------- 33
anonymous ------ 27
another 15, 19, 22,
  43, 47, 49, 56,
  59
answer - 40, 61, 65
answered ------- 55
answers -------- 62
any 8, 17, 21, 28,
  36, 39, 40, 41,
  47, 48, 53, 55,
  61, 67
anybody - 6, 9, 26,
  36
anyone --------- 59
anything 6, 13, 17,
  18, 40, 43, 48,
  53, 54, 56, 59,
  65
anyway --------- 31
anywhere ---- 9, 36
apologize ------ 10
app ------------ 20
appeals -------- 44
appearance ----- 3
APPEARANCE ----- 1

APPEARANCES -- 1, 2
applied -------- 20
applies ---- 27, 43
apply - 26, 27, 48,
  59, 68
appointment 39, 41,
  51
appreciate ------ 5
appreciated ---- 64
approach --- 20, 48
appropriate 38, 55
April ---------- 9
are 4, 6, 7, 8, 9,
  12, 13, 15, 17,
  18, 20, 22, 23,
  24, 25, 26, 27,
  29, 30, 32, 36,
  38, 41, 43, 44,
  45, 46, 47, 48,
  51, 52, 54, 55,
  56, 57, 60, 61,
  62, 63, 64
Are ------------ 62
area ----------- 37
argue ---------- 42
arguing ------ 3, 4
argument 4, 14, 22,
  25, 42, 46, 50,
  56
arguments 4, 6, 15,
  16, 39, 43, 44,
  60
arise ---------- 56
around 10, 20, 23,
  24, 31, 59
as - 2, 6, 7, 8, 9,
  11, 13, 14, 15,
  16, 19, 20, 21,
  22, 23, 26, 28,
  32, 35, 37, 38,
  41, 44, 45, 47,
  48, 49, 50, 51,
  52, 56, 57, 58,
  59, 60, 63
As ----- 28, 30, 63
aside ------ 16, 40
ask 5, 28, 40, 62,
  64
aske ------------ 5
asked ---------- 5

asking ---------- 31
aspects ---------- 7
assessment ------ 68
ASSESSMENT ------ 68
assume --- 7, 17, 24
assuming -------- 17
attached -------- 54
attaches -------- 51
attachments ------ 5
attendance ------- 4
attending -------- 4
attention ------- 10
attorney/client - 24
audibly --------- 20
audio ------- 67, 68
Audio ------------ 1
authorization --- 41
automatically --- 57
available -- 25, 61,
  64
Avenue ----------- 2
away ------------ 51

**B**

back - 5, 7, 10, 14,
  16, 22, 23, 32,
  35, 37, 40, 49,
  52, 53, 61, 68
background ------ 68
baggage --------- 42
banner ---------- 61
banners --------- 60
barging --------- 10
BARNES --- 3, 4, 17,
  29, 30, 40, 41,
  44, 48, 49, 50,
  51, 53, 54, 55,
  56, 58, 62, 63,
  64, 65
based ------- 18, 26
bases ----------- 15
basic ------- 39, 50
basically --- 42, 45
batch ----------- 51
be -- 3, 4, 6, 7, 8,
  9, 10, 12, 16,
  17, 19, 20, 23,
  24, 25, 32, 34,
  35, 36, 38, 42,

45, 46, 47, 48,
  49, 50, 52, 54,
  55, 57, 58, 59,
  61, 63, 64
became --------- 36
because -- 7, 8, 9,
  12, 13, 14, 16,
  22, 24, 30, 31,
  33, 37, 45, 49,
  53, 54, 57, 60
Because 22, 27, 31,
  45
become ----- 23, 39
becomes -------- 38
been -- 20, 23, 24,
  48, 51, 60, 65
before - 3, 13, 14,
  30, 49
BEFORE ---------- 1
begin ---------- 36
beginning ------- 3
behalf 3, 4, 24, 54
behavior --- 31, 58
behind --------- 38
being - 23, 27, 31,
  34, 36, 38, 40,
  44, 45
believe 19, 31, 63
Believe -------- 43
best ----------- 67
better ----- 63, 64
between 10, 16, 18,
  21, 30, 31, 34,
  53
beyond --------- 18
bios ----------- 24
bit 39, 45, 56, 57,
  63
block ------ 13, 31
bone ----------- 14
Boston 1, 2, 52, 57
both - 5, 7, 18, 57
bouncing ------- 24
bound ------ 22, 26
Box ------------- 2
Braintree ------- 2
breach - 6, 24, 44,
  45, 47, 49, 50,
  61, 65
breast - 11, 33, 35

brief ---------- 45
briefly 22, 29, 32, 58
briefs --------- 57
Brigham ----- 2, 47
bring ---------- 49
bringing --- 41, 56
broad ---------- 22
Brooks --------- 62
browser 8, 13, 18, 30, 31
browsers ------- 30
bug ------------ 31
bugs ----------- 32
bulletin ------- 38
bundled -------- 50
business --- 36, 54
businesses ----- 54
but 4, 7, 8, 9, 10, 11, 12, 15, 19, 20, 23, 24, 25, 26, 27, 32, 33, 34, 36, 38, 41, 44, 45, 46, 52, 53, 54, 58, 59, 60, 65
But -- 3, 4, 6, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 26, 27, 29, 30, 33, 34, 35, 39, 40, 43, 44, 45, 47, 50, 51, 52, 53, 54, 55, 56, 57, 60
button - 29, 30, 51
buy ------------ 22
buying --------- 42
By ---------- 2, 59

C

C ------- 2, 67, 68
calendar ------- 63
call -------- 3, 10
called 18, 21, 31, 32, 42, 50, 57
caller --------- 50
callers -------- 50
Calling --------- 3

calls -------27, 61
cameras ---------- 4
can 3, 7, 8, 9, 10, 11, 12, 14, 15, 17, 20, 21, 23, 24, 25, 27, 32, 35, 37, 39, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 55, 56, 59, 61, 62, 63, 65
Can -------------48
cancer---11, 33, 35
cannot------21, 68
capability------17
case 3, 4, 6, 7, 8, 9, 13, 14, 16, 18, 23, 27, 30, 32, 42, 43, 44, 45, 48, 49, 52, 57, 58, 61, 62, 63, 64, 65
CASE------------68
cases 7, 8, 15, 43, 44, 45, 57
Catuogno--1, 67, 68
cause-------49, 60
caused------31, 53
CD--------------68
Center-----------2
certain-37, 43, 49
certainly--13, 35, 39, 64
Certainly---41, 52
certificate-----68
certify--------67
change----------37
changes------8, 60
Chapter-----15, 56
characterize 52, 56
characterized---58
characterizing--46
charged---------26
charges---------26
charitable-52, 57, 59
charity---------57
Chelsea----------4
chief-------41, 49
choice----------10

choose - 24, 31, 63
Chris ------------ 4
church --------- 46
circle -- 5, 40, 68
circuit 8, 28, 42, 43
circumstances - 25, 30, 34, 52, 61, 62, 65
cite ------------ 8
cited - 15, 22, 45, 57
cites ---------- 58
claim -- 5, 11, 14, 15, 24, 26, 32, 36, 42, 44, 47, 50, 51, 52, 54, 61
claims -- 6, 7, 14, 15, 25, 28, 59, 61
class ---------- 14
clear - 38, 39, 45, 59
clearer -------- 45
clearly -------- 49
click -- 30, 51, 61
clicking 23, 24, 30
clicks ----- 24, 29
client 23, 24, 36, 62
clients ---- 51, 53
clinic --------- 50
closer --------- 52
Clovitz --------- 4
co ------------- 21
code 20, 30, 32, 50
coin ----------- 45
colleague ------- 4
colleagues ------ 4
collected -- 27, 60
colors ----- 42, 50
com -------- 36, 42
come -- 16, 43, 49, 50, 63, 64
comfort -------- 52
comfortable ---- 52
COMMENTS ------- 68
commerce -- 52, 53, 54, 56, 57

commercial ----- 58
common ----- 47, 49
Commonwealth 25, 68
COMMONWEALTH ---- 1
communicate ---- 39
communicated --- 20
communication - 16,
  17, 18, 19, 20,
  21, 25, 27, 28,
  29, 30, 31
communications 14,
  16, 18, 20, 22,
  27, 29, 31
companies ------ 21
company -------- 51
comparable ----- 47
compete -------- 54
competing ------ 37
competition ---- 54
complaint 6, 7, 8,
  9, 10, 13, 14,
  15, 18, 22, 26,
  28, 29, 31, 32,
  37, 40, 41, 44,
  51, 55, 61
complaints ----- 15
complete --- 19, 21
Complete ------- 68
completely - 26, 33
completion ----- 21
compliance ----- 67
computer ------- 63
conceded ------- 54
concern ---- 12, 39
concerned ------ 38
concerns ------- 59
conclude --- 11, 60
conclusion ----- 23
condition -- 8, 32,
  34, 37
conditions - 27, 34
conduct ---- 43, 57
confer ----- 63, 64
conference 62, 64,
  65
confidence 41, 42,
  49
confidential -- 12,
  25, 32, 35, 44,
  47, 60

confidentiality-45
configured-16, 18,
  30
confuses--------10
confusing-------47
Conley-----1, 2, 3
connect---------54
connection-------9
Conroy-----------2
consent-----40, 59
consider--------18
considered-------9
constitute------26
consumer--------54
consumers---54, 58
contacting------24
contemporaneous 17,
  28
content-21, 30, 31
contents--------14
contested-------45
contesting------45
context 26, 27, 31,
  56, 60
continue--------14
continues-------21
contract--------24
convert---------57
converts--------57
conveyed----11, 12
cookie--31, 60, 61
cookies-9, 13, 18,
  19, 23, 31, 36
coop------------65
cooperating-----65
Coppola---------68
copy------------68
core 8, 52, 53, 55,
  56, 59
Corp--------52, 58
corporate---46, 49
corporations----58
correct------5, 54
Correct------6, 11
correctly-------46
correlate-------33
could--11, 36, 38,
  41, 45, 46, 47,
  57, 60
Counsel--3, 5, 58,

61, 65
count ---- 5, 61, 65
Count - 14, 32, 59,
  65
counts ------- 5, 6
couple ----- 17, 55
course 3, 4, 19, 47
Court - 2, 3, 8, 9,
  13, 18, 23, 26,
  31, 38, 40, 48,
  49, 55, 56, 57,
  58, 64, 67
COURT - 1, 3, 4, 6,
  10, 11, 13, 14,
  15, 16, 17, 18,
  19, 20, 22, 23,
  24, 26, 28, 29,
  30, 32, 33, 34,
  35, 39, 40, 41,
  43, 44, 45, 46,
  47, 48, 50, 51,
  53, 54, 55, 56,
  58, 62, 63, 64,
  65, 68
Courtney -------- 4
covered ---- 15, 34
CPA ------------ 58
crack ---------- 56
create ----- 38, 43
credentials ---- 38
crime ---------- 25
cruising --- 11, 35
cut ------------- 6
CVS -------- 42, 49

**D**

Dana 2, 35, 37, 47,
  51
danger --------- 26
data 30, 51, 60, 61
date --- 61, 62, 65
DATE ----------- 68
dates ------ 62, 64
day -------- 37, 50
Day ------------ 64
days --- 17, 55, 62
deadlines ------ 64
deal ------- 26, 44
dealing 15, 22, 39

deals ---------- 13
debate --------- 27
December ------- 62
deception --- 8, 43
deceptive ------ 56
decide --------- 27
decision -- 43, 50,
    61, 65
declaration ---- 29
deemed --------- 25
deeply --------- 35
def ------------ 52
default -------- 31
Defendant ------- 1
DEFENDANT ------- 1
defendants -- 4, 6,
    11, 16, 19, 32,
    43, 49, 53, 59
Defendants 1, 2, 14
defense --------- 3
defer ---------- 52
defined ---- 19, 34
defines 15, 48, 50
definitely ----- 52
definition ----- 20
deflection ----- 27
deliver -------- 55
delivered ------ 31
demonstrated --- 60
demonstratives - 17
deny ------- 32, 44
denying 44, 59, 61
deployment - 31, 56
describe ------- 59
described ------ 18
describing ----- 22
descriptive ---- 10
deserve -------- 38
designed --- 25, 58
detail --------- 41
determination --- 7
device ----- 23, 37
devices - 8, 31, 37
Devine ----- 44, 49
diagnoses ------ 33
diagnosis -- 12, 35
diagram -------- 18
dictate -------- 60
difference - 21, 46
different - 21, 22,

25, 26, 27, 32,
    33, 48
difficult --- 10, 53
diocese --------- 46
Directive ------- 67
disagree ---- 26, 49
disclose --- 35, 44,
    45, 47
disclosed --- 23, 38
discloses -------- 9
disclosing ------ 32
disclosures - 36, 42
discovery -- 55, 64,
    65
discussed -- 15, 33,
    50
discussion ------ 10
disingenuous ---- 48
dismiss --- 5, 7, 9,
    12, 18, 22, 25,
    26, 32, 34, 44,
    59
dismissal ---- 6, 49
displayed ------- 38
dispute ----- 10, 34
disputes -------- 12
disputing ------- 33
distinct ---- 18, 39
distinction ----- 29
disturbing ------ 35
do - 5, 6, 8, 9, 10,
    11, 12, 13, 14,
    16, 17, 18, 19,
    23, 26, 27, 28,
    29, 31, 34, 35,
    37, 38, 40, 44,
    46, 47, 48, 49,
    51, 55, 56, 57,
    59, 61, 62, 63,
    64, 65, 67
Do -------------- 47
Docket ----------- 3
DOCKET ---------- 68
doctor -- 11, 39, 49
doctors --------- 50
documents ------- 55
does 4, 17, 24, 26,
    28, 29, 32, 37,
    38, 40, 47, 51,
    60, 62

Does --- 24, 47, 62
doing -- 7, 33, 36,
    43, 57, 58, 65
Doing ----------- 2
dollars -------- 54
Don ------------ 12
done ------- 25, 64
door ----------- 48
dots ----------- 54
doubt ------ 50, 54
down ------- 11, 50
drug ----------- 50
due ------------ 55
during ---------- 4
duties --------- 48
duty 6, 24, 44, 45,
    46, 47, 48, 49,
    50, 61, 62, 65

E

E -------------- 67
each 6, 8, 10, 23,
    68
earlier 51, 52, 58
Earlier -------- 63
early ---------- 64
eavesdrop ------ 17
eff ------------ 59
effect ---------- 4
effectively ---- 59
effort ----- 54, 56
efforts ---- 43, 54
eight ---------- 64
eighth --------- 37
either - 20, 44, 62
elaborate ------ 65
eliminate ------ 60
else 3, 6, 16, 17,
    30, 36, 65
email ---------- 24
employed ------- 67
employer ------- 38
employment ----- 38
end -------- 50, 62
ends ----------- 66
engage --------- 14
engaged 14, 52, 54,
    56, 57, 58
engagement ----- 24

enhancing ------ 58
enough - 4, 13, 36,
   39, 45, 57, 63,
   64
enroll - 29, 30, 51
enter ---------- 27
entered --------- 3
entire ----- 26, 39
entirely 18, 30, 52
entirety -------- 6
entities ------- 50
entity ----- 49, 56
equivalent ----- 60
Eric ------------ 3
error ------ 45, 59
Esquire ------ 1, 2
ethical -------- 58
even 8, 10, 13, 17,
   20, 27, 30, 31,
   34, 55, 57, 58
event ---------- 55
ever ------- 13, 45
every -- 8, 22, 30,
   39, 42, 49, 68
everybody -- 38, 48
everyone 10, 50, 65
everything - 42, 59
exact ---------- 20
exactly -------- 32
example 11, 14, 19,
   24, 29, 30, 33,
   35, 38, 45, 47,
   50
examples ------- 51
exchange ------- 30
Exhibits -------- 1
exist -- 35, 51, 57
existence ------ 27
existing --- 11, 49
exists - 25, 49, 59
expectation ---- 48
expectations --- 50
expecting ------ 65
expert ------ 9, 18
explain -------- 40
explicitly ----- 27
extend - 44, 48, 52
extends -------- 48
extent --------- 18

### F

F--------1, 67, 68
face------------9
Facebook 8, 11, 12,
   13, 14, 16, 17,
   18, 19, 20, 21,
   22, 25, 28, 30,
   31, 32, 33, 34,
   35, 36, 42
facilities ------56
facility--------37
fact 8, 12, 25, 27,
   32, 37, 40, 49,
   51, 59
facts-----------27
factual---7, 9, 22
factually--------9
failure---------49
fair-----7, 45, 58
fairly------56, 61
faith-----------49
falls-----------56
family----------37
far-------------49
Farber--2, 35, 37,
   47, 51
February 63, 64, 65
federal-----29, 38
feel------------10
feet------------14
few-------------8
fiduciary---6, 44,
   45, 46, 47, 49,
   50, 52, 61, 62,
   65
fight-----------59
fighting-----5, 22
figured---------31
file------------62
financially-----67
find 12, 37, 45, 48
finding---------42
finds-----------25
fine------------18
finish----------47
finished--------17
firewall--------38
firm 23, 24, 36, 50
firms-----------21

first - 5, 6, 7, 8,
   9, 40, 41, 42,
   45, 49, 54, 63,
   64
First ------ 31, 49
fit ------------ 45
fits ----------- 49
flip ----------- 45
flow ----------- 39
flows ---------- 12
focus ----------- 6
focusing 16, 56, 57
folks -- 5, 55, 60,
   64, 65
Folks -- 44, 51, 59
followed -------- 3
football --- 17, 21
For - 1, 2, 11, 33,
   68
foregoing ------ 67
form ------- 46, 68
Format --------- 67
forth ------- 7, 10
forward ----- 6, 60
found -- 27, 28, 49
four ------------ 5
Four ----------- 59
fraud ---------- 24
free ----------- 23
friend --------- 37
frivolous ------ 42
from 1, 4, 5, 7, 8,
   9, 10, 21, 23,
   29, 31, 32, 34,
   36, 37, 41, 42,
   49, 54, 57, 58,
   62, 64
front -- 29, 52, 55
full ----------- 38
fully ---------- 48
fumble --------- 21
fundamental -- 6, 7
fundamentally -- 46
further 42, 56, 59,
   67
furtherance 52, 59
furthered ------ 41

### G

gain ---- 7, 19, 53
game ------------ 7
gender --------- 27
general 24, 25, 36, 39, 59
General 2, 30, 41, 49
generalized ---- 15
get 10, 14, 17, 18, 28, 34, 35, 38, 40, 42, 51, 57, 61, 62, 63, 64, 65
gets 11, 12, 21, 30
getting ----- 6, 25
give 6, 43, 50, 51, 61, 62, 63, 64, 65
given ---- 8, 9, 45
go 10, 11, 13, 14, 18, 28, 29, 37, 41, 42, 45, 49, 52
Go ------------ 53
goes --- 24, 41, 53
going 5, 6, 9, 16, 17, 22, 23, 28, 32, 36, 38, 40, 43, 44, 51, 53, 55, 59, 61, 62, 63, 64
gone ------- 5, 59
good 35, 41, 61, 65
Good ----- 3, 4, 65
Google - 8, 13, 14, 16, 21, 22, 23, 28, 33, 34, 36, 42, 43
got 5, 10, 12, 22, 25, 32, 34, 36, 40, 41, 43, 44, 45, 49, 51, 54, 55, 60
Got - 4, 19, 32, 48
grade --------- 37
graph --------- 30
grave --------- 26
great --------- 60

Groundhog ------- 64
guess ---------- 55
guessing -------- 55
guilty --------- 13

### H

h ------- 32, 42, 50
hack ----------- 31
hacked --------- 31
had - 8, 13, 31, 43, 50, 57, 59
Hammond --------- 67
HAMPDEN --------- 1
handle --------- 38
happen ------ 28, 31
happened 15, 31, 42
happening -- 27, 33, 34, 36, 61
happens - 29, 31, 55
happy ----------- 6
harm -------- 60, 61
has -- 3, 8, 11, 17, 18, 20, 21, 23, 25, 29, 35, 37, 38, 39, 44, 45, 46, 52, 58, 59
Has ------------- 32
hat -------- 23, 39
have 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 34, 39, 40, 42, 43, 45, 46, 47, 51, 52, 54, 56, 59, 60, 61, 65
Have -------- 28, 65
having --------- 46
he - 21, 37, 38, 48, 57, 67, 68
head ----------- 24
health -- 9, 13, 33, 34, 37
healthcare - 21, 41, 49, 53, 55
hear 3, 15, 19, 20, 48, 53, 56, 60

heard - 20, 21, 28, 30, 43
hearing 3, 16, 17, 19, 20, 28, 41, 59, 67
Hearing -------- 66
HEARING BEFORE -- 1
held -------- 8, 52
help ------- 22, 35
here 3, 4, 5, 7, 9, 10, 15, 18, 20, 21, 22, 23, 24, 26, 28, 29, 33, 34, 40, 42, 43, 45, 46, 47, 49, 51, 53, 58, 59, 63
Here ------- 32, 44
hereby --------- 67
herring -------- 39
hey ---- 32, 42, 50
highlight ------- 6
highlighting --- 37
highly --------- 48
him ------------ 4
himself --------- 4
HIPAA - 13, 34, 38, 39, 40, 41, 47, 48, 50
HIPPA ------ 48, 50
his ----- 3, 38, 43
hoarding ------- 43
hold ------- 52, 53
Hold ---------- 63
Holland ------ 2, 4
Hollywood ------ 4
Honor - 3, 4, 6, 7, 9, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 26, 27, 28, 29, 30, 32, 33, 36, 38, 40, 42, 43, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 58, 62, 63, 64, 65
HONORABLE ------- 1
hospital 9, 17, 18, 21, 23, 36, 45,

46, 51
Hospital 2, 30, 57
hospitals - 33, 34,
   37, 38, 46, 48,
   49, 54, 57
how 12, 26, 34, 38,
   46, 48, 52, 53,
   56, 61
How ------- 62, 64
However - 5, 13, 28
huge ----------- 34
hyperbole ------ 43

I

I 1, 3, 4, 5, 6, 7,
   8, 9, 10, 11,
   12, 13, 14, 15,
   16, 17, 19, 20,
   21, 22, 24, 25,
   26, 27, 28, 29,
   30, 31, 32, 33,
   34, 35, 37, 39,
   40, 41, 42, 43,
   44, 45, 46, 47,
   48, 49, 50, 51,
   53, 54, 55, 56,
   57, 58, 59, 60,
   61, 62, 63, 64,
   65, 67, 68
I know --------- 59
Iaquinto -------- 4
ID ---------- 8, 37
idea 14, 37, 41, 43
identical ------ 28
identifiable 7, 8,
   12, 15, 33, 37,
   39, 41
identified ----- 34
identifier ----- 11
identifies -- 8, 14
identify ---- 8, 33
identity ------- 25
if -- 6, 8, 10, 12,
   13, 17, 18, 19,
   21, 22, 23, 24,
   29, 31, 33, 34,
   36, 38, 41, 42,
   43, 45, 47, 51,
   54, 55, 57, 59,

60, 62, 63, 64
If -13, 23, 29, 35,
   39, 43, 50, 62
ignore ----------40
Illinois---------2
immediately -----30
importance ------60
important ----9, 37
importantly -----37
impose ----------47
impression ------43
improper --------27
in --3, 4, 6, 8, 9,
   10, 11, 12, 13,
   14, 15, 16, 17,
   18, 19, 20, 21,
   22, 23, 24, 25,
   26, 27, 28, 29,
   30, 31, 32, 34,
   36, 37, 39, 40,
   41, 42, 43, 44,
   45, 46, 47, 49,
   50, 52, 53, 54,
   55, 56, 57, 58,
   59, 61, 62, 63,
   64, 67
In --3, 21, 23, 27,
   37, 42, 46, 60
inapplicable----13
inaudible-6, 7, 9,
   12, 20, 23, 48
Inc----------2, 67
include-----19, 68
includes--------33
including--14, 21,
   23, 32, 48, 60
incorrect--------9
increase 53, 54, 56
increasing------26
indecipherable--6,
   8, 9, 12, 20,
   23, 48
index-----------68
indicated-------59
individual-11, 12,
   14, 15, 21, 33,
   34, 36, 39, 46
individualized--46
individuals-----54
inference-------12

inform --------- 35
information - 6, 8,
   10, 11, 12, 13,
   25, 26, 32, 33,
   34, 35, 36, 38,
   40, 41, 44, 45,
   47, 51, 53, 60
informational - 10,
   11
injunction -- 5, 9,
   10, 18, 54, 59,
   61
ink ------------ 44
input ---------- 64
inserted ------- 58
inserting ------ 15
instance --- 59, 64
Instead ----- 9, 38
institution 47, 52,
   58, 59
institutions -- 48,
   53, 54, 55, 57,
   60
insurance ------ 27
intend ---------- 5
inter ---------- 33
interact ------- 55
interaction ---- 53
intercept ------ 17
intercepting 21, 31
interception -- 14,
   15, 16, 17, 19,
   20
interest ------- 33
interested - 4, 44,
   64, 67
interesting 24, 49,
   52
interference --- 32
internet 9, 15, 21,
   23, 26, 42
into 6, 24, 38, 42,
   58
introduce ------- 4
intruded -------- 9
intrusion ------ 32
invasion 5, 32, 33,
   34, 36, 40, 44
invisible ------ 56
invite --------- 64

involve -------- 27
involves ------- 54
IP --------- 14, 37
irreparable 60, 61
is - 3, 5, 6, 7, 8,
  9, 10, 11, 12,
  13, 14, 15, 16,
  17, 18, 19, 20,
  21, 22, 23, 24,
  25, 26, 28, 29,
  30, 31, 32, 33,
  34, 35, 36, 38,
  39, 40, 41, 42,
  43, 44, 45, 46,
  47, 49, 50, 52,
  53, 54, 55, 56,
  57, 58, 59, 60,
  61, 63, 64, 65,
  67
Is ------ 6, 28, 65
isn 6, 11, 14, 19,
  34, 57
issue - 10, 16, 25,
  27
issues - 7, 27, 48,
  59
it 4, 7, 8, 9, 10,
  11, 12, 13, 15,
  16, 17, 18, 19,
  20, 21, 22, 24,
  25, 26, 27, 28,
  29, 30, 31, 32,
  33, 34, 36, 38,
  39, 41, 43, 44,
  45, 46, 48, 49,
  50, 51, 52, 53,
  54, 55, 56, 57,
  58, 59, 61, 63,
  64, 68
It - 4, 13, 14, 17,
  21, 23, 25, 30,
  34, 37, 38, 43,
  45, 46, 50, 51,
  53, 54, 56, 61,
  62
italics -------- 41
its 6, 11, 16, 19,
  30, 47, 51, 52,
  58, 59
itself ----- 18, 58

J
J-------------1, 2
James -----------2
Jane ------------2
January --------62
Jason ---------1, 2
Jay ----------3, 4
John------2, 3, 67
Johnson ---------3
Judge ----------42
judicial --------7
jump-----6, 22, 52
jurisdictions---22
jus---4, 7, 8, 15,
  16, 18, 20, 22,
  26, 28, 29, 33,
  37, 39, 49, 51,
  54, 55, 58, 62,
  63
just--4, 7, 8, 15,
  16, 18, 20, 22,
  26, 28, 29, 33,
  37, 39, 49, 51,
  54, 55, 58, 62,
  63
Just------------57

K
keeps ----------42
kind-----4, 35, 52
kinds ----------51
Knight -------2, 4
know 4, 11, 12, 14,
  20, 21, 26, 35,
  36, 38, 41, 47,
  50, 53, 57
knowing --------26
knowledge ------44
knows -------8, 14

L
label ----------22
Lahoy -----------4
language---22, 25,
  41, 58, 60
last -----------59

later ------ 42, 62
law 7, 21, 23, 24,
  26, 29, 34, 36,
  38, 41, 44, 47,
  48, 49, 52, 57,
  65
lead ----------12
least - 15, 16, 19,
  22, 25, 44
leave ------ 38, 63
leaves --------52
legal --- 7, 22, 25
legally ------ 7, 8
lends ---------58
let -- 4, 6, 7, 14,
  17, 20, 22, 25,
  31, 37, 40, 47,
  52, 55, 59, 62
Let 15, 25, 28, 52,
  64
letters - 5, 15, 59
level -- 39, 40, 43
liability ------ 60
light ---------- 60
like 5, 8, 10, 11,
  13, 15, 17, 25,
  31, 33, 34, 38,
  42, 45, 50, 51,
  52, 58
likelihood ----- 60
likely --------- 50
lim -----------24
limitations ---- 24
line --- 41, 43, 50
Linkage 52, 57, 58
linked -------- 39
list ----------- 1
listen --------- 33
listened ------- 59
listening ------ 16
literally --- 9, 13
little 45, 53, 56,
  57, 63
ll -- 4, 6, 15, 17,
  22, 25, 32, 39,
  40, 43, 53, 60,
  62, 64, 65
LLP ------------ 2
locking -------- 63
log ----------- 38

Real Time Court Reporting
Transcripts@realtimereporting.net

long --- 57, 59, 61
look -- 11, 12, 14,
  15, 29, 32, 51,
  52, 56, 62, 63,
  65
Look ----------- 45
looked 13, 22, 24,
  60
looking 11, 23, 25,
  35, 53
looks ------ 15, 24
lot -------- 44, 59
low ------------ 68
luddite -------- 20

## M

MA ------------ 67
machine --------- 8
machines ------- 64
macro ---------- 39
made -- 15, 25, 41,
  50, 57, 60
main ----------- 27
maintain ------- 45
make 7, 13, 24, 27,
  30, 39, 58, 60,
  62
makes - 25, 29, 38,
  57, 58
making 15, 42, 50,
  56, 58
malpractice ---- 24
MANAGEMENT ----- 68
many ----------- 46
margin --------- 57
Mark ------ 1, 2, 4
marketing - 41, 49,
  50, 53, 54, 56
marketplace ---- 58
markets -------- 57
MARONEY --------- 4
Mason ---------- 42
Mass 6, 22, 30, 36,
  40, 45, 48, 49,
  52
Massachusetts 1, 2,
  5, 7, 15, 16,
  28, 29, 31, 35,
  44, 49, 54, 68

MASSACHUSETTS ---- 1
match ---11, 12, 25
materials ----5, 25
matter--3, 23, 26,
  32, 36, 59, 67
may 17, 27, 36, 42,
  43, 50
maybe---40, 59, 62
Maybe---35, 54, 63
me --3, 4, 5, 6, 7,
  10, 12, 14, 15,
  17, 20, 22, 25,
  26, 28, 33, 35,
  40, 43, 44, 45,
  47, 48, 52, 55,
  56, 58, 59, 61,
  62, 63, 64, 67
mean---12, 20, 21,
  27, 38, 47, 49,
  57, 60
meaning---------64
means--31, 58, 61,
  64
measures--------13
meat------------14
medical 11, 27, 32,
  34, 37, 40, 44,
  45, 47
medications-----27
meet------------48
Melodi a 1, 2, 4, 6,
  10, 14, 17, 18,
  19, 22, 24, 28,
  29, 30, 31, 32,
  33, 40, 42, 43,
  44, 46, 50, 52,
  56, 61, 62
Melrose---------57
member------14, 37
memorandum------58
mention-25, 36, 60
mentioned 9, 37, 49
merely----------23
merits-----------7
message---------57
methods---------54
MGH 11, 16, 31, 35,
  47
microphone------68
microphones------4

middle ---------17
might - 41, 45, 51,
  60
Mike ------------ 3
mind ---11, 22, 55
minute --------- 43
minutes -------- 40
misreading ----- 33
missed --------- 24
missing -------- 28
mistake -------- 48
Mitchell -------- 3
mixed ---------- 49
Mm ---------- 4, 40
modulate ------- 10
moment - 8, 10, 16,
  17, 19, 24, 28,
  33, 43, 55
money ---------- 57
months ---------- 8
moots ---------- 59
more -- 10, 25, 37,
  40, 53, 55, 56
More ----------- 62
most 7, 30, 45, 52
mostly --------- 15
motions ---- 18, 65
move ------- 15, 63
moving ------ 6, 43
Mr 1, 3, 4, 6, 10,
  14, 17, 18, 19,
  22, 24, 27, 28,
  29, 30, 31, 32,
  33, 37, 40, 42,
  43, 44, 46, 48,
  50, 51, 52, 56,
  57, 58, 60, 61,
  62, 63, 64
MR 3, 4, 6, 7, 10,
  11, 12, 13, 14,
  15, 16, 17, 18,
  19, 20, 22, 23,
  26, 28, 29, 30,
  33, 34, 35, 36,
  39, 40, 41, 43,
  44, 45, 46, 47,
  48, 49, 50, 51,
  53, 54, 55, 56,
  57, 58, 62, 63,
  64, 65

Ms ------------- 62
much --- 14, 39, 40
mundane -------- 40
mute -------- 6, 10

**N**

NA ------------- 68
name 3, 27, 38, 49
NAME ----------- 68
named ------ 13, 14
narrow --------- 56
nature ----- 59, 64
necessarily -- 4, 5
need - 5, 7, 9, 12,
   17, 26, 40, 42,
   52, 53, 61, 62,
   63, 64
needed ---------- 4
needs 8, 16, 28, 64
negate --------- 51
negligence ----- 47
neither 20, 21, 67
never -- 33, 41, 53
new -------- 38, 65
next -- 20, 21, 61,
   62, 64, 65
nine ----------- 45
ninth ------ 28, 42
No 1, 3, 6, 16, 20,
   24, 39, 55, 65
Nobel ---------- 37
nobody --------- 45
Nobody --------- 33
noise ---------- 68
nondisclosure -- 60
None ----------- 39
Nonetheless ---- 20
nonprofit -- 54, 58
nonprofits ----- 57
nor ---- 20, 38, 67
not 3, 4, 6, 7, 8,
   9, 11, 12, 13,
   15, 16, 17, 18,
   19, 20, 21, 22,
   24, 26, 29, 30,
   31, 33, 34, 35,
   36, 38, 39, 41,
   42, 44, 45, 46,
   47, 49, 51, 52,

53, 54, 58, 60,
   61, 65, 67
Not 10, 33, 36, 38,
   42, 44
note --- 3, 4, 5, 18
noted ----------- 41
notes ----------- 50
nothing ----- 14, 30
notice -- 7, 13, 38,
   41, 59, 64
notices --------- 61
notion ---------- 52
notwithstanding 14,
   65
November ----- 1, 67
now ----- 17, 55, 61
NPP ----- 13, 38, 43
number --- 4, 8, 16,
   17, 18, 19, 20,
   21, 25, 28, 37,
   41, 49, 51
Number ---------- 12
NUMBER ---------- 68
numbers -- 8, 24, 50

**O**

o --- 12, 33, 55, 67
objection ------- 17
obligation - 44, 45,
   46, 47, 52
obligations ----- 48
obvious --------- 9
occur ----------- 18
occurs ---------- 21
OCR -------- 13, 43
odd ------------- 45
OF ----------- 1, 68
off --------- 4, 50
Off ---------- 2, 67
offensive ------- 10
offered ----- 38, 57
Office ------- 2, 67
OFFICE ---------- 68
officer ----- 41, 49
officially ---- 5, 6
Okay - 3, 6, 14, 22,
   28, 29, 34, 39,
   42, 43, 49, 50,
   58, 63, 65

on - 1, 3, 4, 5, 6,
   7, 9, 10, 11,
   14, 15, 16, 18,
   21, 23, 24, 25,
   26, 27, 29, 30,
   31, 32, 34, 35,
   36, 38, 40, 42,
   44, 47, 50, 51,
   52, 53, 54, 55,
   56, 57, 58, 59,
   61, 62, 63, 64,
   65, 67
oncologist ----- 50
one - 8, 9, 10, 11,
   12, 13, 15, 16,
   17, 18, 20, 21,
   22, 24, 27, 28,
   29, 32, 33, 37,
   40, 43, 44, 45,
   47, 49, 50, 51,
   52, 57, 58, 65,
   68
One 2, 10, 14, 15,
   17, 18, 32
ones ----------- 50
ongoing -------- 17
only -- 10, 13, 28,
   30, 43, 46, 58
onto ----------- 36
operator ------- 36
opinion -------- 51
opportunity ----- 6
opposed ---- 15, 20
opposite --- 45, 50
opposition ----- 54
or 6, 8, 9, 11, 12,
   13, 15, 16, 17,
   19, 20, 21, 24,
   26, 27, 28, 29,
   30, 32, 33, 36,
   38, 42, 44, 45,
   46, 47, 49, 51,
   52, 53, 54, 55,
   56, 57, 59, 62,
   64, 67, 68
order 5, 9, 63, 64
organization 46, 52
organizations - 47,
   53, 57
organized ------ 25

original ------- 68
other - 14, 15, 21,
    22, 30, 35, 40,
    42, 48, 50, 53,
    54, 56, 57, 59,
    60, 62, 68
others - 14, 16, 22
otherwise -- 28, 67
ought --------- 26
our 10, 26, 34, 45,
    50, 56, 57, 59
out 28, 31, 33, 37,
    38, 54, 57, 58,
    64
outcome -------- 67
outlined ------- 49
outright ------- 43
outset --------- 37
over 5, 13, 21, 27,
    37
overcome ------- 13
overlooked ----- 28
owe ------------ 46
own 8, 11, 14, 40,
    49, 59

**P**

p ------- 3, 64, 66
pa ------------- 68
page 9, 11, 13, 14,
    37, 58, 68
Page ------------ 1
PAGE ------------ 2
Pages ----------- 1
paid --------- 38
paper ------ 15, 37
papers 5, 6, 7, 14,
    16, 54, 60
Paragraph -- 14, 49
paragraphs - 13, 29
parcel --------- 55
parent --------- 38
parental ------- 38
Parenthood ----- 58
parishioner ---- 45
part -- 14, 18, 21,
    41, 44, 47, 52,
    53, 55, 57, 59
Part ----------- 53

participated----59
particular-11, 23,
    25, 31, 33, 36,
    37
particularly----17
parties 32, 34, 40,
    44, 60, 63, 67
parts-----------7
party--16, 17, 18,
    19, 21, 27, 28,
    50
pass---------8, 21
passing---------17
password--------39
past------------54
path------------31
patient-8, 10, 12,
    29, 30, 31, 32,
    35, 36, 38, 40,
    41, 44, 45, 46,
    47, 51, 54
patients---11, 16,
    23, 40, 41, 47,
    50, 53, 54, 56
pattern---------49
Pause-----------10
PDF-------------68
pending---------65
people--8, 13, 14,
    15, 23, 26, 31,
    33, 35, 37, 46,
    50, 53, 55
perhaps-11, 12, 33
Perhaps----------6
permit----------19
person---7, 8, 11,
    14, 16, 24, 32,
    36, 41, 51, 55
personal---10, 35,
    37, 40, 41, 45,
    46, 48
personally-12, 33,
    41
persuaded---22, 39
pharmaceutical--50
pharmacy--------39
phone 3, 24, 31, 50
phonetic--------45
PHR-------------39
physical--------8

physician - 45, 46,
    47
physicians - 44, 48
pick ---------- 62
picked ----- 14, 44
piece -- 16, 22, 30
PII ------------ 27
pile ---------- 12
pixel ---------- 30
pixels --------- 23
place ------ 40, 49
places ----- 22, 38
plaintiff 3, 5, 6,
    8, 10, 14, 18,
    21, 22, 26, 30,
    32, 34, 35, 41,
    43, 46, 59, 60
Plaintiff ------- 1
plaintiffs - 3, 11,
    13, 14, 15, 22,
    23, 27, 33, 34,
    42, 43, 57, 60
play --- 39, 40, 58
plead --------- 13
pleading 12, 13, 23
pleadings ------ 15
please - 3, 62, 64,
    65
Please --------- 64
pled ---- 7, 28, 51
point 6, 8, 12, 16,
    27, 28, 29, 33,
    34, 40, 45, 51,
    52, 55, 56, 57,
    58, 63
pointed -------- 38
points --------- 10
policies -------- 9
policy ----- 13, 38
pop ------------ 41
portal - 10, 38, 51
portals ----- 9, 40
positives ------ 51
possibility ---- 12
possible --- 10, 19
possibly ------- 35
post ------- 18, 19
potential - 35, 47,
    49, 61
potentially 25, 45,

50
practice --- 38, 54
practices -- 13, 56
pragmatic -- 40, 64
preamble ------- 25
precise ----- 30, 58
preliminary - 5, 9,
  10, 17, 54, 59,
  61
prepared ---- 1, 67
presence -------- 3
present ----- 3, 48
presented ------ 61
presents ------- 32
press --------- 51
pretty --------- 44
prevent -------- 42
previous ------- 41
priest --------- 45
primarily ------ 59
primary -------- 51
principle ------ 39
privacy 5, 7, 8, 9,
  13, 32, 33, 34,
  36, 38, 40, 42,
  43, 44, 48, 61
private --------- 9
privilege ------ 24
probability ---- 12
probable ------- 12
probably 44, 55, 60
problem 24, 47, 59,
  65
problematic ---- 62
problems ------- 26
produced ------- 68
products ------- 36
profession ----- 39
profit - 53, 54, 57
profits -------- 58
prohibits ------ 16
prologue ------- 25
prominently ---- 38
promise ---- 39, 43
proper ----- 18, 58
properly ----- 7, 9
properties ----- 41
property ------- 30
propose -------- 65
proposed ------- 63

proprietorship--46
prospective-----59
protect 31, 43, 54,
  58
protectable-----39
protected--10, 13,
  34, 37, 38
protection------38
protective------13
protects--------41
provide-29, 53, 55
provided----41, 67
provider 35, 41, 49
providers---11, 35
providing--------9
public--9, 23, 26,
  34, 36, 39, 42,
  50, 57
publicly--------35
pull----11, 25, 52
pulled------15, 63
purportedly-----56
purpose---------56
purposes---12, 16,
  24, 40, 41, 58
pursuing--------54
put-11, 30, 38, 50
puts-----------30

Q

qualify-----16, 19
QUALITY---------68
question---32, 40,
  47, 55
questions--------7
quickly-----44, 61
quote-------49, 58

R

R--------------67
ra-------------52
raised---------52
ran------------24
random------8, 50
Rather---------46
Raymond--1, 67, 68
re---5, 6, 11, 12,

13, 16, 17, 19,
  20, 21, 22, 23,
  24, 27, 30, 31,
  32, 33, 34, 35,
  36, 38, 40, 41,
  43, 44, 45, 46,
  47, 49, 51, 52,
  53, 54, 55, 56,
  58, 60, 63, 64
reach ---------- 40
read - 5, 6, 7, 14,
  16, 20, 25, 44,
  52, 59
real --- 12, 27, 36
realistically -- 26
reality -------- 46
really 6, 7, 8, 10,
  15, 20, 25, 28,
  34, 37, 39, 48,
  49, 53, 59
reason 30, 35, 39,
  45, 53
reasonable - 62, 65
reasons - 6, 7, 49,
  61
rec 16, 17, 20, 22,
  28, 31, 67
recall --------- 10
received ------- 5
receives ------- 30
recited -------- 60
recognize -- 6, 10,
  11, 26, 44, 45,
  49
recognized - 44, 48
recognizes ----- 52
recognizing ----- 6
record - 3, 14, 15,
  20
recorded 20, 21, 28
Recording ------- 1
RECORDING ------ 68
records ----- 9, 38
red ------------ 39
redirections --- 31
redirects ------ 30
reduce --------- 4
ref -------- 9, 60
refer ---------- 11
reference --- 9, 60

referenced -- 9, 60
references ----- 23
referencing ---- 10
reflected --- 6, 21
regarding ------- 7
regardless ----- 61
regards -------- 17
regs ----------- 41
regulated ------ 48
related -------- 67
relates ---- 30, 50
relating --- 51, 55
relationship 8, 45,
  46, 53
relationships -- 45
rely ----------- 27
remaining ------ 65
remedy --------- 49
remind --------- 7
reminder ------- 7
repeal --------- 31
repeatedly - 10, 28
report --------- 18
Reporter -------- 1
reposes -------- 49
represent -- 14, 37
representations 57
representative - 15
represented ---- 42
representing --- 11
represents ----- 37
reps ----------- 50
request -------- 51
require - 6, 27, 63
required -- 13, 38,
  41, 60, 63
requirement 27, 28
research --- 37, 61
reserve -------- 51
reserved ------- 27
resolve ---- 27, 36
respect - 5, 7, 13,
  14, 15, 25, 32,
  34, 44, 51, 55,
  61
respond ---- 43, 61
responding ----- 15
response ---- 5, 29
rests ---------- 46
result --------- 30

results --------31
revenue-53, 56, 58
revenues--------56
reviewed------5, 6
revolve--------59
right-4, 5, 6, 17,
  29, 31, 32, 38,
  41, 44, 48, 58,
  59, 61, 63, 64
Right---23, 29, 40
rights---------38
Road------------2
Rogan-----------4
role--------39, 40
room-----------11
routine--------58
rule-----------61
Rule 3, 62, 63, 64,
  65
rules----------58
ruling---------62
rummaging-------25
run------------59

S

s 3, 4, 5, 6, 7, 8,
  9, 10, 11, 12,
  13, 14, 15, 16,
  17, 18, 19, 20,
  21, 22, 23, 24,
  28, 29, 30, 31,
  32, 33, 34, 35,
  36, 37, 39, 40,
  41, 42, 43, 44,
  45, 46, 47, 48,
  49, 50, 51, 53,
  54, 55, 56, 57,
  58, 59, 60, 61,
  62, 63, 64
S--------------68
sacred--41, 49, 60
safety----------26
said 27, 42, 49, 50
Saint-----------2
same---17, 20, 21,
  23, 29, 30, 36,
  38, 45, 46, 60
saw---------33, 53
say--7, 9, 11, 13,

16, 17, 25, 26,
  28, 29, 30, 33,
  35, 40, 43, 48,
  52, 53, 56, 60,
  62
saying 20, 22, 43,
  47, 56
says 9, 14, 17, 25,
  29, 30, 41, 47,
  48
scenario ------- 20
school --------- 37
screen - 17, 28, 29
screenshot ----- 29
search - 34, 36, 41
searches --- 24, 34
searching ------ 24
second 16, 40, 42,
  51
Second ------ 8, 31
secrecy 9, 16, 23,
  26
secret 16, 22, 23,
  26, 28
secretly -- 14, 15,
  16, 17, 19, 20,
  25
Section 15, 54, 56
see 7, 14, 15, 20,
  21, 22, 28, 30,
  33, 44, 47, 52,
  53, 62
See ------------ 24
seem 10, 44, 50, 55
seemed ----- 50, 55
seems -- 7, 12, 22,
  25, 26, 35, 38,
  44, 45, 56, 58,
  59, 61
seen ----------- 18
send ----------- 30
sends ---------- 32
sense - 15, 21, 27,
  47
senses --------- 13
sent -------- 5, 50
separate -- 10, 20,
  27, 29, 31, 39
separateness --- 21
series ---------- 5

serious 32, 33, 34, 39
served --------- 62
Services --- 57, 68
session ----- 3, 64
set 8, 26, 30, 31, 62
setting ---- 24, 31
settings --- 13, 31
share -- 6, 10, 17, 41, 60
shared - 35, 40, 44
shoes ---------- 42
should - 5, 17, 35, 49, 56, 61
show 20, 29, 41, 57
showed --------- 28
shown ------ 17, 30
shows ------ 20, 37
side ------- 44, 45
sidebar -------- 68
sides -------- 5, 7
sign --- 29, 30, 51
significant ---- 59
significantly -- 60
signify ---- 37, 38
similar ---- 14, 27
similarly ------- 8
Simmons --------- 2
simply 17, 21, 23, 34
simultaneous -- 27, 28, 68
sir ---- 32, 48, 58
situation ------ 22
SJC 32, 44, 47, 52, 59
slide ---------- 20
slides --------- 21
Smith - 20, 21, 28, 29
so -- 7, 9, 10, 15, 18, 19, 21, 22, 25, 37, 41, 43, 53, 59, 61, 63
So - 3, 4, 5, 6, 7, 8, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 25, 26, 28,

31, 32, 33, 34, 36, 40, 43, 44, 45, 46, 47, 51, 52, 53, 54, 56, 57, 58, 59, 61, 62, 64, 65
So the-10, 13, 19, 21, 31, 52
sociologically--26
sole--------29, 46
solving---------59
some ---5, 6, 7, 9, 10, 12, 13, 15, 16, 20, 22, 24, 40, 50, 52, 60, 61, 63, 64
somebody 6, 17, 20, 21, 23, 24, 36
somehow--8, 13, 14
someone-10, 11, 16
something--11, 13, 20, 21, 23, 28, 35, 46, 56, 57
somewhat----27, 49
soon-----------63
sorry-------37, 63
Sorry----------49
sort 10, 39, 48, 52
sorts-------21, 58
sounds---------62
source--30, 32, 50
space-----------9
speak----6, 42, 55
speaking 32, 46, 58
specialist-11, 33, 36
specialists 11, 33, 35
specific-6, 11, 56
specifically 9, 14, 51
speech----------68
spilled--------44
squarely-------43
Squares---------4
SS--------------1
stack-----------5
stage-----------7
stamp----------68
stand----------14

standard -------12
stands ---------46
start --- 5, 35, 40
starts ---------30
State -----------7
stated ----- 51, 61
statement ------23
status ----- 37, 51
statute 15, 16, 24, 26, 41
statutes -------27
statutory --- 6, 32
stay -----------55
Stay -----------65
still ------- 5, 27
Street ------ 2, 67
stretch --------49
subject ---- 38, 58
submissions - 5, 59
subscribe ------30
subset ---------50
substantial 32, 33, 34, 39
succeed --------26
succeeds -------32
success --------60
successful ------8
such 11, 16, 25, 45
sudden ----- 24, 38
sued ------- 24, 45
sufficient - 23, 60
suggest ---- 48, 50
suggesting - 46, 48
summary ---------9
supplied -------59
support --------36
supposition ----12
Sure -----------15
surprise -------49
survive --------61
suspect ---- 61, 65
syncing --------31
system ---------46
systems --------46

T

T ----------- 2, 67
ta ------------25
take 7, 8, 12, 26,

40, 45, 52, 56,
    61, 62, 65
taken ---------- 67
takes ---------- 25
taking 12, 18, 20,
    39, 56, 57
talk 13, 15, 22, 55
talked --------- 32
talking 8, 11, 19,
    30, 34, 40, 42,
    46, 53, 55
talks ------- 9, 47
TAPE ----------- 68
targeted ------- 26
technically 8, 26,
    46, 48
technological -- 21
technology 31, 34,
    49
telephone ------ 31
tell -- 13, 24, 37,
    39, 63
telling -------- 36
tells ---------- 64
Teresa ---------- 4
term ----------- 37
terms -- 8, 12, 15,
    34, 46, 48
test ----------- 49
testing --------- 7
text ----------- 30
than -- 22, 45, 48,
    55, 59, 62
Thank -- 5, 11, 18,
    32, 43, 65
that 4, 5, 6, 7, 8,
    9, 10, 11, 12,
    13, 14, 15, 16,
    17, 18, 19, 20,
    21, 22, 23, 24,
    25, 26, 28, 29,
    30, 31, 32, 33,
    34, 35, 36, 37,
    39, 40, 41, 42,
    43, 44, 45, 46,
    47, 48, 49, 50,
    51, 52, 53, 54,
    55, 56, 57, 58,
    59, 60, 61, 62,
    63, 64, 65, 67,

68
That -7, 9, 10, 15,
    17, 22, 24, 29,
    30, 32, 34, 35,
    37, 42, 44, 45,
    48, 49, 52, 53,
    54, 55, 56, 58,
    60, 62, 63
that I---5, 6, 17,
    39, 40, 42, 54,
    59, 60, 61, 67
the-1, 2, 3, 4, 5,
    6, 7, 8, 9, 10,
    11, 12, 13, 14,
    15, 16, 17, 18,
    19, 20, 21, 22,
    23, 24, 25, 26,
    28, 29, 30, 31,
    32, 33, 34, 35,
    36, 37, 39, 40,
    41, 42, 43, 44,
    45, 46, 47, 48,
    49, 50, 52, 53,
    54, 55, 56, 57,
    58, 59, 60, 61,
    62, 63, 64, 65,
    67, 68
The---2, 7, 9, 16,
    17, 21, 22, 23,
    25, 29, 32, 33,
    42, 43, 45, 49,
    63, 68
THE 1, 3, 4, 6, 10,
    11, 13, 14, 15,
    16, 17, 18, 19,
    20, 22, 23, 24,
    26, 28, 29, 30,
    32, 33, 34, 35,
    39, 40, 41, 43,
    44, 45, 46, 47,
    48, 50, 51, 53,
    54, 55, 56, 58,
    62, 63, 64, 65
THE CLERK--------3
their 7, 8, 13, 14,
    15, 16, 18, 19,
    25, 27, 31, 32,
    35, 36, 40, 41,
    43, 44, 47, 48,
    53, 54, 55, 56,

60, 61
them -- 17, 28, 29,
    35, 36, 41, 51,
    55, 61
themselves - 7, 13,
    61
Then -------- 5, 62
theory -- 8, 21, 27
there 6, 7, 9, 10,
    12, 13, 14, 15,
    16, 18, 20, 21,
    22, 25, 26, 28,
    29, 31, 34, 35,
    38, 40, 41, 42,
    46, 47, 49, 50,
    52, 54, 57, 58,
    59, 65
There -- 7, 16, 23,
    27, 28, 43, 46,
    47, 50, 54, 55,
    57, 62
therefore --- 9, 12
these -- 9, 12, 14,
    15, 16, 20, 23,
    27, 28, 34, 38,
    39, 41, 43, 48,
    49, 50, 52, 53,
    54, 55, 56, 57,
    59
These -- 20, 23, 38
They -- 11, 13, 18,
    21, 23, 24, 27,
    31, 34, 35, 36,
    42, 44, 47
thing - 10, 13, 42,
    43, 47, 50, 51
things -- 6, 7, 15,
    27, 51, 64
think - 5, 6, 7, 9,
    10, 11, 22, 26,
    27, 28, 31, 32,
    36, 39, 40, 41,
    42, 44, 45, 46,
    47, 48, 49, 50,
    51, 54, 55, 56,
    57, 58, 59, 60,
    61, 64, 65
third -- 8, 16, 17,
    18, 21, 28, 32,
    40, 43, 44, 50,

60
Third ---------- 9
this -- 4, 6, 7, 8,
    10, 11, 12, 13,
    14, 15, 16, 20,
    21, 22, 23, 25,
    26, 27, 30, 31,
    32, 34, 36, 37,
    39, 40, 41, 44,
    45, 49, 50, 51,
    53, 54, 55, 56,
    57, 59, 61, 62,
    63, 64, 65, 67,
    68
This 3, 11, 20, 26,
    38, 41, 43
those - 4, 5, 6, 8,
    12, 13, 25, 33,
    34, 36, 41, 42,
    43, 44, 45, 51,
    54, 56, 60, 61,
    62, 64
Those -- 24, 51, 57
though ----- 20, 56
three -------- 9, 37
Three ---------- 65
through 5, 11, 19,
    28, 39, 40
time 6, 8, 10, 12,
    15, 24, 26, 29,
    37, 40, 41, 45,
    63, 68
times ------ 41, 46
timing --------- 27
to - 3, 4, 5, 6, 7,
    8, 9, 10, 11,
    12, 13, 14, 15,
    16, 17, 18, 19,
    20, 22, 23, 24,
    25, 26, 28, 29,
    30, 31, 32, 34,
    35, 36, 37, 39,
    40, 41, 42, 43,
    44, 45, 46, 47,
    48, 49, 50, 51,
    52, 53, 54, 55,
    56, 57, 58, 59,
    60, 61, 62, 63,
    64, 65, 67
To --------- 18, 20

today 5, 18, 36, 65
together ----11, 63
too -------------65
took ----13, 14, 50
tool ------------57
tools ---53, 54, 56
top --------29, 30
topics ----------50
towards --------26
trace ----------35
tracking---23, 30,
    31, 36, 64
trade ----52, 53, 57
traditional -----31
TRANSCRIBER -----68
transcribers ----68
transcript --67, 68
TRANSCRIPT ------68
Transcription ---68
transit ---------16
transmission 21, 30
transmitted -----34
travel ----------63
treatment ---35, 50
Trial -----------67
tried -------18, 31
true -7, 8, 12, 13,
    21, 22, 23, 26,
    28, 30, 34, 36,
    43, 58, 67
truly -----------39
trust --24, 41, 42,
    49
truth------------7
trying --13, 34, 47
turn ------------4
two 13, 14, 15, 16,
    18, 19, 21, 29,
    40, 57
tying -----------43
type ------------25
TYPE ------------68
types ---27, 38, 48

U

Ultimately------52
under---7, 13, 26,
    36, 44, 47, 56,
    57

undermine ------60
understand 12, 25,
    33, 34, 41, 48,
    68
understanding - 44,
    61
understood -----59
Understood -----26
undertake ------39
undertakes - 52, 59
unfair -----54, 56
unfortunately --10
unless ----- 10, 64
unreasonable 32, 33
until ----------62
unusual --------11
unwieldy -------49
up - 8, 14, 18, 24,
    25, 29, 30, 31,
    41, 43, 44, 49,
    50, 52, 60, 62,
    63
upon 9, 12, 18, 27,
    30
urgency --------62
URL ------------39
URLs -----------34
us 13, 27, 37, 43,
    49
use 9, 23, 34, 40,
    41, 53
used 8, 36, 51, 56,
    61
useful ---------12
user -- 25, 31, 33,
    36, 38, 60
users ------36, 59
using -- 8, 21, 23,
    24, 26

V

v ---------- 1, 68
V ------------- 1
vaccines ------64
various ---- 15, 59
ve 5, 6, 9, 12, 17,
    18, 22, 24, 31,
    32, 34, 36, 40,
    41, 43, 44, 45,

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 246 of 485

87

51, 54, 55, 61,
63, 65
vending -------- 64
version -------- 34
versus - 3, 42, 44,
49, 52
very -- 35, 44, 57,
58, 59, 61, 65
Very ----------- 58
VI -------------- 1
via -------- 55, 64
viability ------- 7
viable -- 7, 26, 44
victim --------- 31
violation ------ 25
Virginia ------- 42
virtually ------ 39
virtue --------- 23
visited -------- 23
visitor - 8, 18, 21
visits --------- 36
Volume ---------- 1
VOLUME --------- 68
voracity -------- 7
vs ------------- 67

```
       W
```

w -- 9, 10, 11, 13,
17, 18, 19, 21,
23, 24, 27, 30,
31, 34, 35, 36,
38, 40, 51, 53,
55
wait ----------- 55
waiting -------- 11
Wakefield ------ 57
walk ----------- 38
walking -------- 48
walks ---------- 38
want 3, 6, 13, 22,
29, 35, 37, 40,
42, 50, 51, 54,
56, 63, 65
wanted ----- 14, 55
wants ------ 30, 37
warning -------- 53
wary ----------- 42
was 14, 15, 22, 24,
26, 27, 28, 33,

37, 42, 43, 44,
49, 51, 54, 57,
58, 59, 67
way--8, 9, 10, 11,
12, 16, 17, 18,
20, 21, 23, 30,
31, 32, 33, 34,
36, 38, 45, 46,
48, 53, 56, 58,
59
we-5, 7, 8, 9, 11,
13, 14, 15, 17,
18, 19, 20, 22,
25, 27, 30, 31,
33, 35, 40, 41,
43, 44, 45, 47,
49, 50, 53, 54,
55, 64, 65
We---5, 7, 12, 17,
32, 40, 44, 45,
47, 53, 61, 62,
64
web-8, 30, 32, 41,
50
WebMD-----------36
website-9, 10, 11,
13, 17, 18, 19,
21, 23, 24, 27,
30, 31, 34, 35,
36, 38, 40, 51,
53, 55
websites-7, 9, 11,
16, 23, 35, 36,
38, 42, 52, 53,
55, 56, 59, 61
week 61, 62, 63, 65
weekend---------65
weeks-----------64
Welcome---------3
welfare---------26
well-6, 7, 13, 23,
28, 29, 32, 42,
44, 47, 52, 55,
60, 62, 65
Well---13, 17, 29,
33, 34, 40, 42,
46, 49, 53
went--------22, 36
were-5, 9, 13, 15,
22, 34, 39, 50,

57
what 5, 7, 10, 11,
14, 15, 16, 18,
22, 25, 26, 27,
28, 29, 31, 32,
33, 34, 35, 37,
38, 40, 43, 44,
45, 46, 47, 50,
51, 53, 54, 55,
56, 57, 58, 61,
64
What -- 11, 31, 33,
48, 56
whatsoever ----- 27
when -- 26, 32, 36,
41, 43, 46, 47,
51, 52, 53, 56,
58, 59
When -------29, 49
where - 22, 23, 28,
30, 31, 39, 40,
46, 51, 57, 58
Where ---------- 38
whether 12, 13, 22,
32, 36, 39, 52,
59
Whether -------- 26
which - 5, 7, 8, 9,
10, 11, 13, 14,
15, 20, 22, 23,
24, 27, 34, 36,
38, 40, 42, 43,
49, 51, 55, 56,
61, 63, 64, 65,
67
Which ------ 22, 39
while ---------- 16
white ---------- 15
who - 3, 4, 11, 13,
23, 24, 26, 35,
37, 38, 40, 50,
53, 59
whole ------ 21, 43
will 3, 4, 26, 35,
52, 61, 62, 63,
64, 65
win ------------ 22
wire --- 14, 15, 22
wiretap 5, 14, 15,
20, 22, 23, 25,

```
26, 27, 31, 32                    14, 15, 16, 17,
wish ---- 6, 35, 41              18, 20, 21, 22,
wit ------------ 25              24, 26, 27, 28,
with 3, 5, 6, 7, 8,             29, 31, 32, 33,
  9, 11, 12, 13,                 35, 37, 38, 39,
  14, 15, 17, 22,                40, 41, 42, 43,
  24, 26, 32, 34,                45, 46, 47, 48,
  35, 36, 38, 39,                49, 50, 51, 52,
  40, 41, 43, 44,                53, 54, 55, 56,
  45, 46, 51, 52,                57, 60, 61, 62,
  53, 55, 59, 60,                63, 64, 65
  61, 63, 64, 67,          You-3, 12, 17, 19,
  68                             21, 25, 30, 38,
within --------- 25             46, 47, 52, 53,
without ---- 41, 44             54, 57, 61, 63,
won -------- 37, 57             65
Worcester ------ 67        your 3, 4, 6, 7, 9,
word 23, 28, 34, 68            10, 12, 13, 14,
words - 21, 41, 42,            15, 16, 17, 18,
  43                            20, 21, 22, 23,
work --- 62, 63, 64           26, 27, 28, 29,
work¬ -- 62, 63, 64           30, 32, 33, 35,
works - 21, 23, 26,           36, 38, 40, 41,
  34, 62, 63, 64               42, 43, 45, 46,
world --- 9, 36, 39           47, 48, 49, 50,
worry ----------- 5           51, 53, 54, 55,
worse ---------- 43           57, 59, 62, 63,
would 4, 6, 8, 12,            64, 65
  18, 19, 25, 31,        Your 3, 17, 29, 43,
  33, 34, 39, 40,             58, 65
  41, 45, 48, 49,
  50, 52, 54, 58,
  62, 63, 64
Would ---------- 11
wrestling -- 52, 53
written ---- 41, 59
wrong ---------- 36


        ┌─────────────────┐
        │        Y        │
        └─────────────────┘

years ------ 20, 23
yes 19, 20, 26, 29,
  44, 58, 63
Yes - 3, 7, 15, 17,
  18, 29, 41, 44,
  47, 50, 55, 56,
  58, 62, 63, 64
yet ---- 25, 39, 48
you 3, 4, 5, 6, 8,
  9, 10, 11, 12,
```

Exhibit D

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 249 of 485
Docket Number 2384CV00930

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 6 of 52

| | | |
|---|---|---|
| JANE DOE, *on behalf of herself and all others* * *similarly situated* | * | IN THE |
| **Plaintiff** | * | **CIRCUIT COURT** |
| **v.** | * | **FOR BALTIMORE CITY** |
| **MEDSTAR HEALTH, INC.,** *et al.* | * | CASE NO.: 24-C-19-000499 |
| **Defendants** | * | |

  *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION

This matter has come before the Court on Defendants Medstar Health, Inc. and Medstar Good Samaritan's Motion to Dismiss (Docket Entry #5). The Court has considered the briefs of the parties, oppositions, replies, and the oral argument of counsel, held on July 27, 2020.

### I. Background.

Plaintiff, Jane Doe, is a patient of Defendant, medical provider MedStar Health, Inc. ("MedStar"). MedStar is the owner and operator of hospitals and health care facilities, including MedStar Good Samaritan Hospital. MedStar has public websites that any individual can access to obtain information about general medical topics and information about MedStar and its facilities and services. Patients can also use MedStar's website to log in, access their private medical records, communicate with doctors, and schedule appointments. Plaintiff alleges that MedStar uses computer coding to disclose personally identifiable, private data related to patients' medical care to at least 23 different third parties, including, but not limited to Facebook, Google, LinkedIn, Twitter, and Pinterest. Plaintiff claims that MedStar disclosed: the URLs that Plaintiff visited; "search queries about specific doctors, medical conditions, treatments"; patients' clicks to "Search," "FindADoctor," "Login," or "Enroll' in MyMedStar (Medstar's online patient portal); "summaries of MedStar's responsive communications, the parties to all

1

communications at MedStar's web properties, and the existence of communications at MedStar's web properties."

Plaintiff raises five claims: 1) violation of the Maryland Wiretap Act, 2) intrusion upon seclusion, 3) publication of private facts, 4) breach of confidence, and 5) violation of the Consumer Protection Act. Plaintiff alleges that her data was disclosed without prior authorization, and that the disclosure of her data harms Plaintiff by invading her privacy and harming her property rights to her data. Plaintiff seeks general damages and economic damages for these harms. Additionally, Plaintiff pursues a theory of unjust enrichment for Defendant's profit from Plaintiff's data, as well as statutory damages.

## II. **Applicable Law.**

In deciding a Motion to Dismiss, the Court takes as true all well-pleaded allegations and reviews them in the light most favorable to the plaintiff. *Lloyd v. General Motors Corp.*, 397 Md. 108, 121 (2007). Although a court must assume the truth of all well-pleaded facts, dismissal is proper when the facts alleged, if proven, would fail to afford relief to the plaintiff. Md. Rule 2-322(b)(2); see also *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 561 (2004). The facts as set forth in the complaint must be pleaded with "sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Sutton v. FedFirst Financial Corp.*, 226 Md. App. 46, 74 (2015) (quoting *RRC Northeast, LLC v. BAA MD, Inc.*, 413 Md. 638, 643 (2010)). Any ambiguity or uncertainty in the allegations is construed against the pleader. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009).

## III. **Analysis.**

In Count 1 of the Complaint, Plaintiff alleges that Defendants have violated the Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-402. Maryland's appellate courts have not,

2

to this Court's knowledge, addressed wiretapping in the context of online data being intercepted

and disclosed to third parties. This is apparent from the briefs of the parties, which look

extensively to other jurisdictions for persuasive authority to assist in interpreting the Maryland

statute.[1]

Despite the paucity of Maryland precedent, the Court feels that the plain language of the

statute itself is straightforward and provides a legal foundation for Count 1 of the Complaint.

The Maryland Wiretap Act provides as follows with respect to prohibited conduct:

> (a) Except as otherwise specifically provided in this subtitle it is unlawful for any
> person to:
> (1) Willfully intercept, endeavor to intercept, or procure any other person to
> intercept or endeavor to intercept, any wire, oral, or electronic
> communication;
> (2) Willfully disclose, or endeavor to disclose, to any other person the
> contents of any wire, oral, or electronic communication, knowing or having
> reason to know that the information was obtained through the interception of a
> wire, oral, or electronic communication in violation of this subtitle; or
> (3) Willfully use, or endeavor to use, the contents of any wire, oral, or
> electronic communication, knowing or having reason to know that the
> information was obtained through the interception of a wire, oral, or electronic
> communication in violation of this subtitle.

Md. Code Ann., Cts. & Jud. Proc. § 10-402.  The statute goes on to authorize a civil cause of

action for any victim of the unlawful conduct:

---

[1] The Court finds the analysis in *Doe v. Virginia Mason Medical Center*, 2020 WL 1983046, No. 19-2-26674-1 (Kings County, WS Feb. 12, 2020) to be persuasive. In that matter, MedStar presented nearly identical arguments as Defendant in the instant case. The court rejected MedStar's arguments and distinguished that case from *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), noting that the *Smith* Plaintiffs "consented to Facebook tracking . . . and the allegations in this case are broader than sharing URL information only." *Virginia Mason* at 2.  Similarly, in the instant matter, Plaintiff alleges to be a patient, that Defendant Medstar's information disclosures were executed without Plaintiff's knowledge, and that the disclosures were made to "at least 23 different third-party marketing firms."  The *Virginia Mason* court noted that the case before it, as with the instant case, "involves the allegations of sharing data with more than Facebook and does not hinge on the relationship between the Plaintiff and Facebook." *Id.*

3

(a) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:

    (1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

    (2) Punitive damages; and

    (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Md. Code Ann., Cts. & Jud. Proc. § 10-410. In the instant case, the Court finds that Plaintiff has sufficiently plead the elements of a Wiretap Act claim and that such a claim can be maintained by Plaintiff under the Act. The Court further finds that there are questions of fact as to whether Defendant's conduct constitutes an "interception," whether the types of data alleged to have been disclosed constitute "communications" and/or "disclosures," and whether Plaintiff consented to disclosure, thus rendering Defendant's conduct lawful under Md. Code Ann., Cts & Jud. Proc. § 10-402(c)(3).

    Counts 2 and 3 of Plaintiff's Complaint assert privacy claims: invasion of privacy – intrusion upon seclusion (Count 2), and invasion of privacy – publication of private facts (Count 3). Intrusion upon seclusion is "the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 163 (1986) (citing Restatement of Torts, 2d, § 652B). The parties disagree about the kinds of data that Defendant disclosed and whether that data is personally identifiable information. At this stage in the proceedings, and pursuant to a motion to dismiss, the Court assumes the truth of Plaintiff's allegations that Defendant provided express promises of privacy to patients, and that Defendant violated those promises by disclosing Plaintiff's data. Under these circumstances, dismissal of this claim is inappropriate as a

4

reasonable finder of fact could conclude that, if Plaintiff's disclosed data constitutes personally identifiable information, Defendant's disclosures are highly offensive.

Similarly, Defendant has failed to persuade the Court regarding Count 3 alleging disclosure of private facts. To sustain such a claim, Plaintiff must demonstrate that a party has publicized Plaintiff's "private life" and that the matter publicized "is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Furman v. Sheppard*, 130 Md. App. 67, 77 (2000). Private medical data is not of legitimate concern to the public, and again, assuming the allegations in the Complaint to be true, the data disclosed constitutes personally identifiable information; a reasonable fact-finder could conclude that Defendant's disclosures are highly offensive.

Count 4 of the Complaint alleges a claim for breach of a confidential relationship. Generally, there is no cause of action in Maryland offering relief for a breach of confidence claim involving a patient-provider relationship. Plaintiff likens her case to precedent that addresses confidentiality in the context of business relationships involving free competition and trade secrets, but the comparison is not persuasive. *See Space Aero Prods. Co. v. R. E. Darling Co.*, 238 Md. 93, 208 A.2d 74 (1965). In *Space Aero Prods. Co.*, the breaching party profited by replicating the non-breaching party's product, and the non-breaching party lost profits as a result. The Court in *Space Aero Prods. Co.* provided that compensatory damages are awarded unless they would be inadequate, in which case the Court will issue an injunction. Even assuming *arguendo* that there is a cause of action for a patient-provider relationship, Plaintiff has not demonstrated a monetary loss tied to the data itself, and the purpose of an injunction for this type of claim is meant to curb further economic loss, again not present here. *Id.* at 124. While

5

P121

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 254 of 485
Docket Number 2384CV00930

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 11 of 52

Plaintiff's other privacy tort claims may recognize general damages for the loss of privacy itself, the Court has no method to award her relief under a breach of confidence claim.

Finally, in Count 5, Plaintiff alleges a breach of the Consumer Protection Act. To establish a claim under the Consumer Protection Act, a consumer must state "an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Lloyd v. GMC*, 397 Md. 108, 143 (2007). Although Plaintiff cites to cases from other jurisdictions, there is no basis in Maryland law to suggest that Plaintiff is entitled to claim a "privacy injury" under this cause of action. Any recovery for such an injury should be limited to Plaintiff's privacy tort claims. Additionally, Plaintiff argues that she is entitled to this cause of action because she can claim benefit of the bargain damages and unjust enrichment, but Plaintiff is not raising a breach of contract claim, and these are theories for damages under contract law.

## IV. Conclusion.

For the reasons set forth above, the Court will grant the Motion in part, dismissing Counts 4 and 5.

_August 5, 2020_
Date

Judge's Signature appears on the
original document
Jeffrey M. Geller, Judge
Circuit Court for Baltimore City

6

P122

Exhibit E

## SUPERIOR COURT OF CALIFORNIA,
### COUNTY OF SACRAMENTO
### GORDON D SCHABER COURTHOUSE

### MINUTE ORDER

DATE: 06/09/2022                    TIME: 01:30:00 PM        DEPT: 28

JUDICIAL OFFICER PRESIDING: Lauri A. Damrell
CLERK: V. Aleman
REPORTER/ERM: Shelia Pham #13293
BAILIFF/COURT ATTENDANT: T. Gonzalez

CASE NO: **34-2019-00258072-CU-BT-GDS** CASE INIT.DATE: 06/10/2019
CASE TITLE: **Doe I vs. Sutter Health**
CASE CATEGORY: Civil - Unlimited

**EVENT TYPE**: Motion for Judgment on the Pleadings - Civil Law and Motion - Demurrer/JOP

**APPEARANCES**
Jeffrey A Koncius, counsel, present for Plaintiff(s) remotely via video.
Nicole Ramirez, specially appearing for counsel Mitchell M. Breit, present for Plaintiff(s).
Jay Barnes, counsel, present for Plaintiff(s) remotely via video.
Stephen C Steinberg, counsel, present for Defendant(s) remotely via video.
Michael D. Abraham, counsel, present for Defendant(s) remotely via video.

**Nature of Proceedings: Motion for Judgment on the Pleadings**

The matter became before the Court his date for a hearing with the above-indicated counsel present.

After hearing from the parties, the Court affirmed the tentative ruling.

**Tentative Ruling:**

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**
Facts
In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (*Id.*, ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (*Id*, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (*Id.*, ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (*Id.*, ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (*Id.*, ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the

---

DATE: 06/09/2022                    MINUTE ORDER                    Page 1
DEPT: 28                                                Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 39 of 52

CASE TITLE: Doe I vs. Sutter Health    CASE NO: 34-2019-00258072-CU-BT-GDS

California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**
Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**
A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company v. Vaughn* (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal. App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations. (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).) It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable,</u> or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to

---

DATE: 06/09/2022    MINUTE ORDER    Page 2
DEPT: 28    Calendar No.

CASE TITLE: Doe I vs. Sutter Health

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 40 of 52

CASE NO: 34-2019-00258072-CU-BT-GDS

communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

<u>First Argument: "Without the Consent of All the Parties"</u>
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In *Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id.* at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id.* at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid.*) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id.* at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid.* (Emphasis added.)) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid.*) Sutter argues that, pursuant to *Kight*, the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

---

DATE: 06/09/2022
DEPT: 28

MINUTE ORDER

Page 3
Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 41 of 52

CASE TITLE: Doe I vs. Sutter Health                CASE NO: 34-2019-00258072-CU-BT-GDS

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc.* (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id.* at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id.* at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid.*; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiff's browsers sent to the defendant's servers]; *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc.* (W.D.Wash. 2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."] As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement

---

DATE: 06/09/2022                    MINUTE ORDER                          Page 4
DEPT: 28                                                              Calendar No.

CASE TITLE: Doe I vs. Sutter Health      CASE NO: 34-2019-00258072-CU-BT-GDS

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 42 of 52

of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra,* 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra,* 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same Is in Transit or Passing Over any Wire, Line, or Cable"
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with another person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra,* 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*) ["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra,* the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument"

---

DATE: 06/09/2022                  MINUTE ORDER                    Page 5
DEPT: 28                                                          Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 43 of 52

CASE TITLE: Doe I vs. Sutter Health          CASE NO: 34-2019-00258072-CU-BT-GDS

and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra*, at *77.) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter.  In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra*, at *52); see also (*Yoon v. Lululemon United States* (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications.  These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra*, at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner*, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or
(ii) who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court

DATE: 06/09/2022                    MINUTE ORDER                              Page 6
DEPT: 28                                                                Calendar No.

P129

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 44 of 52

CASE TITLE: Doe I vs. Sutter Health                CASE NO: 34-2019-00258072-CU-BT-GDS

rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person from *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means* of any machine, *instrument,* or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra,* 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra,* 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra,* 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

Disposition
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.* **Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28*
*To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

---

DATE: 06/09/2022                    MINUTE ORDER                    Page 7
DEPT: 28                                                            Calendar No.

CASE TITLE: Doe I vs. Sutter Health

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 45 of 52

CASE NO: **34-2019-00258072-CU-BT-GDS**

---

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**
Facts
In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (Id., ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (Id, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (Id., ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (Id., ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (Id., ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**
Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund* v. ReadyLink Healthcare, Inc. (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**
A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company* v. Vaughn (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking

---

DATE: 06/09/2022
DEPT: 28

MINUTE ORDER

Page 8
Calendar No.

CASE TITLE: Doe I vs. Sutter Health                    CASE NO.: 34-2019-00258072-CU-BT-GDS

---

all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal.App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations.  (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).)  It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable</u>, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

<u>First Argument: "Without the Consent of All the Parties"</u>
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants must be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In

---

DATE: 06/09/2022                              MINUTE ORDER                                    Page 9
DEPT: 28                                                                               Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 47 of 52

CASE TITLE: Doe I vs. Sutter Health                CASE NO: 34-2019-00258072-CU-BT-GDS

---

*Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id*. at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id*. at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid*.) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id*. at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid*. (Emphasis added).) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid*.) Sutter argues that, pursuant to *Kight*, the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc*. (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id*. at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id*. at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid*.; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc*. (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiff's browsers sent to the defendant's servers); *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc*. (W.D.Wash.

---

DATE: 06/09/2022                    MINUTE ORDER                              Page 10
DEPT: 28                                                                   Calendar No.

CASE TITLE: Doe I vs. Sutter Health    Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 48 of 52    CASE NO: **34-2019-00258072-CU-BT-GDS**

2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."]) As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra,* 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra,* 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

<u>Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same is in Transit or Passing Over any Wire, Line, or Cable"</u>
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra,* 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*)

DATE: 06/09/2022                            MINUTE ORDER                            Page 11
DEPT: 28                                                                           Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 49 of 52

CASE TITLE: Doe I vs. Sutter Health                    CASE NO: 34-2019-00258072-CU-BT-GDS

["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra,* the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state.'" (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument" and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra,* at *77.*) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter. In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra,* at *52); see also (*Yoon* v. Lululemon United States (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications. These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra,* at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of

---

DATE: 06/09/2022                          MINUTE ORDER                              Page 12
DEPT: 28                                                                        Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 50 of 52

CASE TITLE: Doe I vs. Sutter Health          CASE NO: 34-2019-00258072-CU-BT-GDS

the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner,* intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
(ii) who wilfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable,</u> or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means of any machine, instrument,* or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra,* 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra,* 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra,* 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

Disposition
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

---

DATE: 06/09/2022                    MINUTE ORDER                    Page 13
DEPT: 28                                                       Calendar No.

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 51 of 52

CASE TITLE: Doe I vs. Sutter Health              CASE NO: **34-2019-00258072-CU-BT-GDS**

---

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.* **Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28
To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

---

DATE: 06/09/2022                    MINUTE ORDER                    Page 14
DEPT: 28                                                            Calendar No.

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO** | |
|---|---|
| Gordon D Schaber Courthouse<br>720 Ninth STREET<br>Sacramento, CA 95814-1311 | |
| **SHORT TITLE:** Doe I vs. Sutter Health | |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL (Minute Order)** | CASE NUMBER:<br>**34-2019-00258072-CU-BT-GDS** |

I certify that I am not a party to this cause. I certify that a true copy of the Minute Order was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at Sacramento, California, on 06/14/2022.

Clerk of the Court, by:  /s/ *V. Aleman* _____ , Deputy

PAUL R KIESEL
KIESEL LAW LLP
8648 WILSHIRE BOULEVARD
BEVERLY HILLS, CA 90211-2910

---

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**

Page: 1

V3 1013a (June 2004)                                        Code of Civil Procedure , § CCP 1013(a)

Exhibit F



D133503521

**IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO**

ENTERED
NOV 2 3 2021

| | | |
|---|---|---|
| John Doe, on behalf of himself and all others similarly situated, | : | Case No.: A2002633 |
| | : | |
| Plaintiff, | : | Judge Christian A. Jenkins |
| | : | |
| v. | : | Decision And Entry Granting In Part And |
| | : | Denying In Part Defendant's Motion To |
| Bon Secours Mercy Health, | : | Dismiss |
| | : | |
| Defendant. | : | |

**I. Procedural Background**

Plaintiff filed a complaint on July 24, 2020. On August 28, 2020, defendant moved to dismiss for failure to state a claim pursuant to Civ.R. 12(B)(6). Defendant's motion was fully briefed on December 2, 2020 when plaintiff filed a motion for leave to file an amended complaint. Defendant opposed plaintiff's motion for leave to amend.

By entry docketed on February 12, 2021, the Court granted plaintiff's motion for leave to file an amended complaint. The Court deemed plaintiff's amended complaint filed as of said date.

Defendant filed a motion to dismiss plaintiff's amended complaint pursuant to Civ.R. 12(B)(6) on March 9, 2021. That motion is now fully briefed and ripe for decision.

**II.     Standard of Review**

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. *Assn. for the Defense of the Washington Local School Dist. v. Kiger*, 42 Ohio St.3d 116, 117, 537 N.E.2d 1292 (1989). The material allegations in the complaint are taken as admitted, and all reasonable inferences must be drawn in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Before the Court may dismiss the complaint, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitlir

VERIFY RECORD

to recovery. *O'Brien v. University Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975).

### III.    Plaintiff's Allegations

The Court accepts the well-pleaded allegations set forth in the amended complaint to consider defendant's motion to dismiss. Plaintiff is a patient of defendant, a health care provider. (Amended Complaint ¶¶ 1-2). Defendant operates a website (i.e., www.mercy.com) that it encourages its patients to utilize. (*Id.* ¶¶ 4, 42). Defendant's website includes a "patient portal" through which patients can access medical records and test results and make appointments. *Id.* Plaintiff has visited and used www.mercy.com. (*Id.* ¶¶ 11, 154-159).

Plaintiff's Amended Complaint explains at length how a website can be designed to cause information about visitors to the website and their activity on the website to be provided to third parties such as Facebook and Google, and that defendant's site employs such tactics. (*Id.* ¶¶ 44-63). Plaintiff alleges that the information provided to third parties includes among other things: (1) information from which individual users can be identified by matching them to their Facebook accounts (*Id.* ¶¶ 64-73); (2) individual users' IP address and thereby their physical location (*Id.* ¶¶ 89-97); (3) the substance of individual users' searches on mercy.com (*Id.* ¶ 140); (4) whether a user logged into the mychart portal (*Id.* ¶ 149); (5) whether a user attempted to schedule a virtual visit (*Id.* ¶¶ 143-145); and (6) the pages visited on mercy.com by a user (*Id.* ¶ 142). The net effect according to plaintiff is that defendant discloses to Google, Facebook and others the identity of patients who visit mercy and the substance of their search and other activity on mercy.com (*Id.* ¶ 159).

Plaintiff alleges that the disclosure of such information is not necessary for the operation of mercy.com, but rather that it enables defendant and others to engage in targeted marketing to

visitors to mercy.com that generates revenue for defendant. (*Id.* ¶¶ 180-181). Plaintiff alleges claims for disclosure of non-public medical information pursuant to *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395, 715 N.E.2d 518 (1999), breach of confidence, invasion of privacy – intrusion upon seclusion, breach of contract, negligence and breach of fiduciary duty.

### IV.    Discussion

#### A.    The Complaint Adequately Alleges A Claim Under *Biddle v. Warren General Hospital.*

In *Biddle*, the Ohio Supreme Court established a common law tort under Ohio law "for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Id.* at 401. According to the Ohio Supreme Court, the *Biddle* decision represents an effort to provide a "legal identity" for "an evident wrongdoing" that Ohio courts had "shoehorned" into traditional legal theories. *See Menorah Park Center for Senior Living v. Rolston*, 164 Ohio St.3d 400, 2020-Ohio-6658, 173 N.E.3d 400, ¶ 14. Thus, a *Biddle* claim is properly evaluated in this broad light.

Defendant argues that plaintiff's *Biddle* claim fails because: (1) no information learned through the physician-patient relationship was disclosed; (2) there was no disclosure of non-public medical information; and (3) public policy interests favoring the digitization of medical records and defendant's First Amendment right to promote its services on its website outweigh any privacy interest of plaintiff implicated by the conduct alleged in this case. Defendant's first two arguments fail based on the factual allegations in the Amended Complaint. Defendant's third argument cannot be properly assessed on a motion to dismiss on the facts alleged in this case.

Defendant first notes that its website is available to anyone, not just its patients. (Defendant's Memorandum in Support of Motion to Dismiss p. 2). No doubt this is true, but plaintiff is a patient. Plaintiff alleges he and other patients are encouraged by defendant to use its

3

website to obtain information about medical conditions, access medical records through the mychart portal and schedule appointments. While a non-patient may visit defendant's website to view some of the information thereon, in the absence of a physician-patient relationship with defendant, plaintiff and others would be unlikely to visit defendant's website to access their medical records or schedule appointments, actions that are allegedly disclosed to third parties. Plaintiff alleges that the information disclosed to third parties includes the fact that a visitor to defendant's website is a patient of defendant. (Amended Complaint ¶ 148).

Defendant also argues that visitors to its website are anonymous. (Defendant's Memorandum in Support of Motion to Dismiss p. 4). But this is contradicted by the Amended Complaint. Plaintiff alleges defendant's website deploys Facebook cookies to identify individual patients by matching them to their Facebook accounts. (Amended Complaint ¶¶ 70-71). Coupled with the other information allegedly disclosed such as IP address, user agent and browser fingerprint (*Id.* 89), the clear implication is that third parties are able to identify plaintiff and other patients of defendant and associate their identities with the data about their activity on defendant's website. (*Id.* 99-116). Plaintiff also alleges that defendant's website does not utilize available "anonymization" tools to protect the identities of visitors to its website. (*Id.* 126). One of the authorities relied on by defendant aptly summed up the net effect of these allegations by noting that by "[u]sing these techniques, Facebook can identify individual users and watch as they browse third-party websites . . ." *Smith v. Facebook*, 262 F.Supp.3d 943, 948 (N.D.Ca.2017).

The real question before the Court at this juncture is whether the aggregated information allegedly disclosed to third parties could conceivably constitute information learned within the physician-patient relationship so as to state a claim at this stage of the proceedings. In *Biddle*, the hospital's law firm requested four pieces of information to assess patients for social security

P143

disability eligibility – name, telephone number, age and medical condition. *Biddle*, 86 Ohio St.3d

at 396. The information allegedly disclosed in this case appears to be potentially more extensive

when considered collectively. (Amended Complaint ¶¶ 134-153). Plaintiff has used defendant's

website to research his and his wife's medical conditions, make appointments and access his

medical records. (*Id.* 155-156). These actions were purportedly disclosed to third parties. (*Id.*

78-80). According to the allegations of the Amended Complaint, this means that searches for

plaintiff's conditions and/or visits to pages containing information about such conditions have

been disclosed to third parties and associated with identifying information about plaintiff. The

sum and substance of such disclosures appears at least equivalent to the information at issue in

*Biddle*. None of this information would be publicly available if not for defendant's disclosure

thereof. (*Id.* 164-167). Thus, the Court cannot say from the face of the Amended Complaint at

this juncture that plaintiff can prove no set of facts that would support a *Biddle* claim.[1]

    With respect to defendant's disclaimer declaring that use of the website does not establish

a physician-patient relationship, defendant seemingly misses the point of plaintiff's allegations.

Plaintiff does not allege that he became a patient by accessing the website; he is an actual patient

of defendant who, at defendant's suggestion, has used defendant's website. If in fact defendant

caused the disclosure of nonpublic medical information about one of its patients through the

---

[1] Defendant's reliance on *Jenkins v. Metro Life Ins. Co.*, 171 Ohio St. 557, 173 N.E.2d 122 (1961) and *Evans v. Toledo Neurological Assocs.*, 2014-Ohio-4336, 20 N.E.3d 333 (6th Dist.) is misplaced. *Jenkins* involved application of the statutory testimonial privilege in a case involving a life insurance claim. The Ohio Supreme Court held that, under the privilege statute and in the context of a dispute about whether the decedent lied on a life insurance application, there was no privilege to prevent a physician from testifying about the fact that the decedent had seen the physician. *Jenkins* predates *Biddle* by 38 years and arises in a completely different context. It does not inform application of *Biddle* in this case. Likewise, *Evans* was a medical malpractice claim in which defense counsel provided a physician with medical records obtained in discovery for his review. The physician being consulted by defense counsel happened to be employed by the same hospital system where plaintiff received care and that he was suing for medical malpractice. There is no allegation in this case that the information allegedly disclosed was provided to third parties other than as a result of the actions of defendant that caused such disclosures. Accordingly, *Evans* is unhelpful.

5

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 277 of 485
Docket Number 2384CV00930

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 18 of 52

operation of its website, its self-serving proclamation that use of the website is not part of the physician-patient relationship does not in this Court's view make it otherwise. Thus, the existence of a physician-patient relationship is established for purposes of the current analysis.

Finally, defendant argues that its alleged disclosures are permitted because public policy interests advanced by such disclosures outweigh plaintiff's interest in confidentiality. Defendant relies primarily on the Ohio Supreme Court's decision in *Menorah Park* holding that disclosure of the minimum information necessary to pursue a collection action against a patient is permissible. The *Menorah Park* court based its holding on language in the *Biddle* decision recognizing that "special situations may exist where the interest of the public, the patient, the physician, or a third person are of sufficient importance to justify the creation of a conditional or qualified privilege to disclose in the absence of any statutory mandate or common-law duty." *Biddle*, 86 Ohio St.3d at 402.

In the absence of a statutory mandate or common law duty requiring disclosure, the *Menorah Park* court looked "to HIPAA for guidance in determining how those competing interests should be weighed." *Menorah Park*, 2020-Ohio-6658 at ¶ 32. Federal regulations promulgated pursuant to HIPAA expressly permit disclosure of protected health information "for treatment, payment, or health care operations." 45 C.F.R. 164.502(a)(1)(ii). The *Menorah Park* court went on to find public policy support for a payment-related exception in R.C. 3798.04, which prohibits unauthorized disclosure "except when the use or disclosure is required or permitted without such authorization [under HIPAA regulations]." *Menorah Park* at ¶ 33. Based on these clear recognitions of public policy under which disclosure may be proper, the *Menorah Park* court recognized a qualified privilege under which physicians and hospitals may disclose the minimum amount of patient information necessary to pursue a collection action. *Id.* at ¶ 35.

6

Looking to HIPAA regulations for guidance as in *Menorah Park* does not yield the same result in this case. HIPAA permits limited disclosures for treatment, payment or health care operations. The alleged disclosures in this case clearly do not facilitate treatment or payment, and review of the regulation defining "health care operations" is equally unavailing. *See* 45 C.F.R. § 164.501.

Without a statute or regulation expressly recognizing that plaintiff's privacy interests are outweighed by a policy interest advanced by the disclosures at issue, defendant argues that federal policy favoring the digitization of medical records and defendant's First Amendment commercial speech rights supply countervailing policy interests. Perhaps they do, but unlike *Menorah Park*, the connection between defendant's asserted policy interests and the disclosures in this case are far from clear. *See e.g. Turk v. Oiler*, 732 F.Supp.2d 758, 776 (N.D. Ohio 2010) (declining to grant judgment on the pleadings where defendant asked court to "extend the countervailing interests doctrine").

To be sure there is a public policy interest in making the delivery of healthcare more effective, efficient and less costly through widespread adoption of electronic medical records. But defendant has failed to sufficiently articulate how that interest is advanced by the disclosure of information about plaintiff's and others' activity on defendant's website to third parties to warrant dismissal as a matter of law. Likewise for defendant's First Amendment argument, unlike the *Menorah Park* court that could look to an unambiguous federal regulation recognizing that the policy interest in allowing providers to pursue payment outweighs patient confidentiality, defendant's claimed commercial speech interests are simply too nebulous and undeveloped at this stage of the proceedings for this Court to hold as a matter of law that plaintiff cannot establish any facts that might entitle him to relief. This is in accord with the decision of the Cuyahoga County

7

Court of Common Pleas in an analogous case. *See Jane Doe v. University Hospital Health System, Inc.*, Cuyahoga C.P. No. CV-20-933357 (June 25, 2021).

Plaintiff has adequately alleged a claim under *Biddle v. Warren General Hospital.* Defendant's motion to dismiss is denied with respect to Count I of the Amended Complaint.

**B.    Breach of Confidence**

Count II of the Amended Complaint alleges a claim for "breach of confidence." This count appears to be a verbatim restatement of the *Biddle* claim stated in Count I. Subsequent to *Biddle* it is unnecessary to "shoehorn a breach-of-confidence theory of recovery into many traditional legal theories . . ." *Menorah Park*, 2020-Ohio-6658, ¶ 14. This claim is duplicative of Count I and is therefore subsumed within it and unnecessary. Defendant's motion to dismiss is granted with respect to Count II of the Amended Complaint.

**C.    Invasion of Privacy – Intrusion Upon Seclusion**

Ohio law recognizes the common law tort of invasion of privacy by intrusion upon seclusion where the defendant intentionally intrudes upon the solitude or seclusion or the private affairs or concerns of another, and if such an intrusion would be highly offensive to a reasonable person. *See Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956), syllabus. Defendant cites *Moran v. Lewis*, 2018-Ohio-4423, 114 N.E.3d 1254, ¶ 5 (8th Dist.) ("In order to properly plead an invasion of privacy claim, there must be allegations that the tracking invaded the seclusion or private affairs of another."). Defendant argues that there was no intrusion in this case, especially not into any secluded or private place.

*Moran v. Lewis* involved a GPS tracker placed on the plaintiff's car that tracked his movement on public roads. The Eighth District Court of Appeals cited authorities noting that the tracking at issue had not "led to the disclosure of private facts" and there was "no evidence that the vehicle was driven into a private or secluded location where one would have a reasonable

8

expectation of privacy." *Id.* at ¶ 10, citing *Troeckler v. Zeiser*, S.D.Ill. No. 14-cv-40-SMY-PMF, 2015 WL 1042187, *3 (March 5, 2015) and *Villanova v. Innovative Investigations, Inc.*, 21 A.3d 650, 652, 420 N.J.Super. 353 (2011). The *Moran* court held that "[t]he mere act of monitoring another's public movements through the attachment of a GPS tracking device is not, in and of itself, sufficient to state an invasion of privacy claim." *Id.* at ¶ 11.

Moran is not analogous to this case. Plaintiff's public movements were not tracked, rather his online engagement with his healthcare provider was allegedly disclosed to third parties. As discussed above, this included the substance of searches for medical conditions that plaintiff submitted on defendant's website, plaintiff's access of his medical records and scheduling of medical appointments.[2]

Indeed, intrusion upon seclusion is a heavily fact-dependent claim. An evidentiary record will likely reveal the substantive details of these disclosures for closer scrutiny, but for purposes of a motion to dismiss the allegations are sufficient. *See e.g. Demo v. Kirksey*, D.Md. No. 8:18-cv-00716-PX, 2018 WL 5994995, *6 ("the trier of fact [must] consider all the circumstances including the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion, as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.") (citations omitted). Defendant's motion is denied with respect to Count III of the Amended Complaint.

---

[2] Distinguishing decisions like *Moran* involving only tracking in public spaces, courts have noted that other forms of electronic surveillance may be much more intrusive. For example, with respect to cell phone location data, Justice Sotomayor noted in a concurrence that "the time stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter v. U.S.*, 138 S.Ct. 2206, 2217, 201 L.Ed.2d 507 (2018), citing *U.S. v. Jones*, 556 U.S. 400, 415, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Based on the allegations of the Amended Complaint, which must be accepted as true, the net effect of the aggregated data allegedly disclosed in this case seems more akin to the latter than the former.

9

### D.   Breach of Contract

Plaintiff's breach of contract claim is not subsumed because the source of the obligation allegedly breached is a contract rather than the common law duty recognized in *Biddle*. However, the parties disagree about the substance of any alleged contract between patients who utilize defendant's website and defendant. Plaintiff contends that the HIPAA Notice of Privacy Practices contains contractually enforceable promises that defendant made to plaintiff and others, which defendant allegedly breached. (Amended Complaint ¶¶ 270-275). Plaintiff also contends that defendant breached the covenant of good faith and fair dealing implicit in contracts under Ohio law. (*Id.* ¶ 276). Defendant argues that the HIPAA Privacy Notice applies to patients' medical records and information communicated in connection with patients' healthcare but is inapplicable to the information allegedly disclosed in this case. The Court cannot resolve this disagreement in the context of a motion to dismiss on the record presented. Defendant's motion is therefore denied with respect to Count IV.

### E.   Negligence and Breach of Fiduciary Duty

Plaintiff alleges that defendant negligently breached its duty of confidentiality to plaintiff by disclosing the content of plaintiff's communications to third parties, and that plaintiff suffered damages. (Amended Complaint ¶¶ 289-294). Plaintiff also alleges that defendant has a fiduciary duty to its patients, including plaintiff, and that defendant breached that duty by engaging in the conduct alleged in the amended complaint. (Id. ¶¶ 295-303). Defendant argues that these claims are duplicative and are subsumed by plaintiff's *Biddle* claim.

To determine whether these claims are subsumed within plaintiff's *Biddle* claim, this Court questions whether a *Biddle* claim includes a claim for unintentional disclosure. If so, they are

10

P149

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 282 of 485
Docket Number 2384CV00930

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 23 of 52

subsumed within plaintiff's *Biddle* claim because these theories do not present distinct theories of recovery for plaintiff.

In *Scott v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-4383, 999 N.E.2d 231, ¶ 29 (10th Dist.), the Tenth District Court of Appeals indicated in dicta that a *Biddle* claim could include a claim for negligent disclosure. In *Sheldon v. Kettering Health Network*, 2015-Ohio-3268, 40 N.E.3d 661, the Second District Court of Appeals considered whether a *Biddle* claim could be maintained against a health care provider where an employee allegedly abused his position to disclose his ex-spouse's medical information. Plaintiff did not specifically state a *Biddle* claim and alleged that the medical provider was negligent in failing to detect and prevent the disclosure. The court analyzed plaintiff's claims under *Biddle* and concluded that "an inadvertent disclosure might, under different facts, fulfill the elements of *Biddle*, [but] the present case does not." *Id.* at ¶¶ 32-33.

In *Herman v. Kratche*, 8th Dist. Cuyahoga No. 86697, 2006-Ohio-5938, the Court of Appeals analyzed a *Biddle* claim based on a "mistaken" disclosure as a breach of fiduciary duty relying on *Hammonds v. Aetna Cas. & Sur. Co.*, 243 F. Supp. 793 (N.D. Ohio 1965). The Eighth District held that a medical provider owes a patient a fiduciary duty and reasoned that "a claim for breach of fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Herman* at ¶ 18 (citations omitted). On this basis the Court of Appeals reversed summary judgment in favor of the medical provider. *Id.* at ¶ 39.

The result is a continuing lack of clarity with respect to whether and under what circumstances an unintentional disclosure can support a *Biddle* claim. It is the opinion of this Court that *Biddle* does not require intentional disclosure to support a claim. *Biddle* does not expressly require intentional conduct. The *Scott* court held that an unintentional disclosure claim

11

can be theoretically maintained under *Biddle*, but not on the facts presented in *Scott*. And no court seems to have clearly held that a disclosure must be intentional to support a *Biddle* claim. Accordingly, defendant's motion to dismiss is granted with respect to Counts V and VI of the Amended Complaint, with the caveat that plaintiff's *Biddle* claim can proceed based on intentional and/or negligent conduct if supported by the evidentiary record to be developed as this matter proceeds.

**V.    Conclusion**

For all the foregoing reasons, defendant's motion to dismiss is granted with respect to Count II, V and VI of the Amended Complaint and denied with respect to Counts I, III and IV of the Amended Complaint.

So ordered.

Date: _11/22/21_                    _____
                                   Judge Christian A. Jenkins

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930

Exhibit G

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 26 of 52

CV2093357        113123719

COURT OF COMMON PLEAS
CUYAHOGA COUNTY

| | | |
|---|---|---|
| JANE DOE, | ) | Case No. CV-20-933357 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS HEALTH | ) | |
| SYSTEM, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FILED**
NOV 16 2020
Clerk of Courts
Cuyahoga County, Ohio

**OPINION AND ORDER**

Plaintiff Jane Doe, proceeding anonymously at this point in the proceedings by agreement of the parties due to the confidential health information underlying the allegations in the complaint, claims that Defendant University Hospitals Health System, Inc. disclosed her confidential health information to Facebook, Google, Microsoft, and other technology and data companies when she used the hospital's website. Defendant moves to dismiss, arguing that Jane Doe lacks standing and that Plaintiff's complaint fails to state claims under *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, or for intrusion upon seclusion. For the reasons that follow, the Court concludes that Plaintiff has standing and so DENIES Defendant's motion to dismiss on that ground. Pending the Ohio Supreme Court's forthcoming decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Court defers ruling on the balance of Defendant's motion to dismiss.

**PLAINTIFF'S ALLEGATIONS**

Plaintiff's complaint contains lengthy and detailed allegations about claimed information-sharing between Defendant's website and various technology and data companies through the use of certain source code, cookies, and browser fingerprints. According to the complaint, various

1

P153

information shared with or available to the technology and data companies through these means contains or transmits personally identifiable health and similar information. This information allegedly allows technology and data companies to market to those who use Defendant's website or engage in other data mining.

In her complaint, Jane Doe alleges that she is a patient receiving treatment for an unspecified illness at University Hospitals and uses the patient portal on Defendant's website. (Complaint at ¶ 12.) Plaintiff avers that the specific communications she exchanged with University Hospitals through its website include "communications about specific appointments, providers, conditions and treatments." (Complaint at ¶ 173.) She also alleges that she "registered for, used, and exchanged communications with UH inside the MyUHCare patient portal." (Complaint at ¶ 172.) Further, the complaint alleges that the source code of a different domain that hosts the patient portal for University Hospitals causes "data transmissions from patient computers to Google connected to personally identifiable information about patients." (Complaint at ¶ 165.) This information, according to the complaint, constitutes confidential information entitled to privacy protections under State and federal law. Beyond these facts, the complaint scarcely contains any additional information regarding the information Jane Doe claims Defendant improperly disclosed.

Plaintiff's complaint asserts three causes of action. Count I alleges disclosure of non-public medical information under *Biddle.* Count II asserts a claim for breach of confidence, and Count III alleges intrusion on seclusion. Additionally, Plaintiff seeks to maintain this action on behalf of a class of "Ohio residents who are, or were, patients of UH or any of its affiliates, and who used UH's web properties, including but not limited to, [*sic*] www.uhhospitals.org and the Patient Portal at MyUHCare." (Complaint at ¶ 224.)

2

P154

## ANALYSIS

The Eighth District set forth the governing standard under which this Court considers a motion to dismiss pursuant to Rule 12(B)(6) as follows:

> Under the notice pleading requirements of Civ.R. 8(A)(1), the plaintiff need only plead sufficient, operative facts to support recovery under his claims. *Doe v. Robinson*, 6th Dist. Lucas No. 1-07-1051, 2007-Ohio-5746, ¶ 17. Nevertheless, to constitute fair notice, the complaint must still allege sufficient underlying facts that relate to and support the alleged claim, and may not simply state legal conclusions. *See DeVore v. Mut. of Omaha Ins. Co.*, 32 Ohio App.2d 36, 38, 288 N.E.2d 202 (7th Dist.1972).

*Henderson v. State*, 8th Dist. Cuyahoga No. 101862, 2015-Ohio-1742, ¶ 10. "[W]hen a party files a motion to dismiss for failure to state a claim, all the factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." *Kennedy v. Dottore*, 8th Dist. Cuyahoga No. 108562, 2020-Ohio-3451, ¶ 30.

### I.    Standing

"The Ohio Constitution expressly requires standing for cases filed in common pleas courts." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 11. A court of common pleas may only exercise jurisdiction over "justiciable matters." Ohio Constitution, Article IV, Section 4(B). To present a justiciable controversy, a plaintiff must have standing to sue. *Federal Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 41.

To have standing, a plaintiff must show that she has suffered an injury fairly traceable to the defendant's allegedly unlawful conduct that is likely to be redressed through the relief requested. *Estate of Mikulski v. Centerior Energy Corp.*, 2019-Ohio-983, 133 N.E.3d 899, ¶ 59 (8th Dist.), citations omitted. "Perhaps the most basic requirement to bringing a lawsuit is that the plaintiff suffer some injury. Apart from a showing of wrongful conduct and causation, proof of

3

actual harm to the plaintiff has been an indispensable part of civil actions." *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St.3d 329, 2015-Ohio-3430, 49 N.E.3d 1224, ¶ 36. Injury results from "an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not hypothetical or conjectural." *City of Athens v. Testa*, 2019-Ohio-277, 119 N.E.3d 469, ¶ 60 (10th Dist.), quotations omitted. Plaintiff's attempt to proceed on behalf of a class does not change this threshold standing requirement. *Estate of Mikulski* at ¶ 60, quotation omitted. Indeed, "[i]ndividual standing is a threshold to all actions, including class actions." *Id.*

Defendant makes two separate arguments that Plaintiff lacks standing. The Court addresses each in turn.

### I.A.    The Allegations of the Complaint

Defendant maintains that Plaintiff fails to allege concrete and particularized injury in fact. Instead, according to this argument, the complaint details the operation of the website of University Hospitals and its alleged disclosure of protected health information to third parties. In this way, Defendant contends that the complaint presents circumstances involving hypothetical patients or visitors to the website or patient portal. In light of the complaint's voluminous allegations about the technology at issue and the comparatively few facts alleged about Jane Doe herself, Defendant makes an understandable, though misplaced, argument.

Plaintiff pleads that she is a patient of University Hospitals who communicated with the hospital through its website about specific conditions, appointments, and providers. (Complaint at ¶ 12, 173.) Similarly, she alleges that she exchanged communications with the hospital through the patient portal. (Complaint at ¶ 172.) Although she fails to identify specific protected information or data allegedly disclosed to third parties, one may fairly infer from the allegations of the complaint that transmission of Jane Doe's private data is at least plausible. Construing these

4

allegations in Plaintiff's favor, as the Court must at this stage of the proceedings, the complaint pleads sufficient operative facts under Ohio's notice pleading requirements that Jane Doe has allegedly suffered an injury in fact.

### I.B.    Economic Harm

Defendant also argues that Plaintiff cannot establish standing based on generic allegations that the personal data and information at issue may have value in the marketplace. University Hospitals pins this argument on the absence of any allegation that Jane Doe has lost value in her data. Defendant's position misunderstands Plaintiff's claims. The complaint does not allege unjust enrichment, loss of value of her data, or another sort of claim rooted in pecuniary value. Instead, Plaintiff asserts privacy claims. Valuing such an injury, if proved, may present challenges, but any such difficulties do not warrant dismissal at the pleading stage.

### II.    Motion to Dismiss the Three Counts of the Complaint

In *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Ohio Supreme Court *sua sponte* ordered post-argument briefing on whether to overturn or modify *Biddle* in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. Because the Ohio Supreme Court's ruling may well bear on each of Plaintiff's claims, the Court defers ruling on Defendant's motion to dismiss the three counts of the complaint at this time. Doing so will not prejudice the parties because the Ohio Supreme Court's ruling will likely come before the end of the year. Once it does, the Court requests the parties to submit supplemental briefs, not to exceed fifteen pages, by January 18, 2021 on how, if at all, the Ohio Supreme Court's ruling affects Plaintiff's claims. Alternatively, the parties may advise that they are standing on their previous briefing on Defendant's motion to dismiss the three counts of the complaint.

5

## CONCLUSION

For the foregoing reasons, the Court concludes that the allegations of the complaint establish that Jane Doe has standing. Following the Ohio Supreme Court's forthcoming ruling on whether to overturn or modify *Biddle*, the Court requests supplemental briefing from the parties on how, if at all, the ruling affects the claims in this case.

If Plaintiff's claims survive the Ohio Supreme Court's ruling, it may turn out in discovery that the evidence does not support Jane Doe's factual allegations. Because of the costs and burdens associated with discovery of the technological matters underlying Plaintiff's claims and the likely scope of such discovery Plaintiff will seek, the Court directs the parties to direct their discovery efforts to those matters relating specifically to Jane Doe's use of Defendant's website and the patient portal first. If discovery shows that Defendant has not in fact transmitted Jane Doe's personal health information to any technology or data company as alleged, then an early summary judgment may be appropriate in this case or Plaintiff may lack standing to maintain her claims in in whole or in part. On the other hand, if discovery tends to corroborate Jane Doe's factual allegations, then the case may proceed with that assurance. Such an approach is consistent with the proportionality requirement of Rule 26(B)(1) and the mandate of Rule 1(B).

ORDER:

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss for lack of standing and defers ruling on the balance of Defendant's motion to dismiss pending the Ohio Supreme Court's forthcoming ruling in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, and supplemental briefing regarding the same.

Dated: November 16, 2020

_____
Judge J. Philip Calabrese

6



117625842

**FILED**

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

JUN 2 8 2021

Clerk of Courts
Cuyahoga County, Ohio

JANE DOE, ON BEHALF OF HERSELF AND ALL
OTHERS, ETC
    Plaintiff

Case No: CV-20-933357

Judge: WILLIAM F. B. VODREY

UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.
    Defendant

## JOURNAL ENTRY

THIS CASE IS BEFORE THE COURT ON DEFENDANT'S MOTION TO DISMISS. FOR THE REASONS STATED IN THE
ATTACHED DECISION, DEFENDANT'S MOTION TO DISMISS IS HEREBY DENIED.

6-25-21

Judge Signature        Date

06/25/2021

Page 1 of 1

P159

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 292 of 485
Docket Number 2384CV00930

Case 3:22-cv-03580-WHO    Document 48    Filed 08/25/22    Page 33 of 52

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JANE DOE, ON BEHALF OF HERSELF AND ALL OTHERS, ETC | ) ) | CASE NO. CV-20-933357 |
| Plaintiff, | ) ) ) | Judge: WILLIAM F.B. VODREY |
| v. | ) ) ) | **JOURNAL ENTRY** |
| UNIVERSITY HOSPITAL HEALTH SYSTEM, INC. | ) ) ) | |
| Defendant. | ) ) | |

    This case is before the court on defendant's motion to dismiss. On Nov. 16, 2020, the court issued an order that denied defendant's motion to dismiss on the grounds that plaintiff lacked standing. At that time, the court deferred ruling on defendant's motion to dismiss the three counts of plaintiff's complaint pending the Supreme Court of Ohio's decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582. The parties have completed supplemental briefing on the issue, and the remainder defendant's motion to dismiss is now ripe for review.

    In *Menorah Park*, the Supreme Court of Ohio, *sua sponte*, ordered post-argument briefing on whether the court should overturn or modify its previous decision in *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. The court held that "*Biddle* remains good law and it continues to permit a cause of action for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information." *Menorah* at ¶40.

    A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992). A complaint is subject to dismissal for failure to state a claim upon which relief can be granted when it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would entitle plaintiff to relief. *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶11. When considering a Civ.R. 12(B)(6) motion, the court must construe all factual allegations of the complaint as true, and all reasonable inferences shall be drawn in favor of the nonmoving party. *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144, 573 N.E.2d 1063 (1991).

    Here, in accepting plaintiff's allegations as true and acknowledging the Supreme Court of Ohio's ruling in *Menorah Park,* the court finds that plaintiff has adequately stated claims upon which relief can be granted. Defendant's motion to dismiss is hereby denied.

In accordance with this court's prior order on Nov. 16, 2020, the court hereby orders the parties to direct their initial discovery efforts to those matters relating specifically to Jane Doe's use of defendant's website and patient portal. If discovery reveals that defendant did not, in fact, transmit her personal health information to any technology or data company as alleged, an early motion for summary judgment may then be appropriate.

_WBVodrey_    6-25-21

**William F.B. Vodrey, Judge**

Exhibit H

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                               CIVIL ACTION
                                               NO. 11-2808-BLS1

DEBRA L. MARQUIS

v.

GOOGLE INC.

## MEMORANDUM OF DECISION AND ORDER ON
## DEFENDANT GOOGLE INC.'S MOTION TO DISMISS

This action arises from the alleged monitoring of emails by defendant Google

Inc. ("Google") in order to sell advertisements based on keywords that appear in

those emails. Google operates Gmail, which is an electronic communications or email

service. The plaintiff, Debra L. Marquis, represents a putative class of Massachusetts

residents who have non-Gmail email accounts, but who exchange emails with Gmail

users. Marquis alleges that Google's monitoring of emails sent from non-Gmail email

accounts violates the Massachusetts wiretap statute, G.L. c. 272, § 99.

Google has now moved to dismiss this action on the grounds that the wiretap

statute does not apply to email communications or to its conduct. For the reasons

discussed below, Google's motion to dismiss is denied.

### BACKGROUND

The court takes as true all well-pled factual allegation set forth in Marquis's

Complaint, see *Marshall* v. *Stratus Pharms., Inc.*, 51 Mass. App. Ct. 667, 670-71

(2001). Marquis is a Massachusetts resident who has a non-Gmail email account.

**Add. 063**

Compl. ¶ 3.  Google is a Delaware corporation with its principal place of business in California.  Compl. ¶ 4.  It operates Gmail, which is an electronic communication service that is free to its users.  Compl. ¶¶ 6-8.  While Google does not charge Gmail account holders for using its service, Google generates revenue through advertisements that it presents to Gmail users.  Compl. ¶ 8.  Google intercepts and scans emails sent from non-Gmail users, such as Marquis, in order to find keywords or content in the emails that will enable it to target advertisements specifically at Gmail users.  Compl. ¶ 9.  Once targeting individual emails, Google now focuses on numerous emails to find keywords.  Compl. ¶ 11.  This system is known as "interest-based advertising."  Compl. ¶ 11.

Marquis has an America-On-Line ("AOL") email account that she has used since the late 1990s.  Compl. ¶ 13.  While she routinely exchanged emails with Gmail users, Marquis did not consent to Google's secret interception, disclosure, or scanning of her emails.  Compl. ¶¶ 12, 14.  Marquis seeks to represent a class of Massachusetts residents who have non-Gmail email accounts and who exchange emails with Gmail users, and who have their emails intercepted and/or scanned without their consent.  Compl. ¶ 15.

Marquis alleges that Google's conduct violates the Massachusetts Wiretap statute, G.L. c. 272, § 99.  The statute "was enacted to give due protection to the privacy of individuals by barring the secret use of electronic surveillance devices for

2

Add. 064

eavesdropping purpose . . . ." *Dillon* v. *Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 310 (2000). It prohibits any person from intercepting or attempting to intercept "any wire or oral communication." G. L. c. 272, § 99(C)(1). A wire communication is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* at § 99(B)(1). An intercepting device does not include "any telephone or telegraph instrument, equipment facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of business." *Id.* at § 99(B)(3).

Google has now moved to dismiss the Complaint. First, it contends that the Massachusetts wiretap statute does not apply to electronic communications, and if it does, then it is preempted by the federal wiretap statute. Second, it argues that Marquis was aware that Google intercepted and scanned her emails, and the statute requires that the interception be done secretly. Third, Google's alleged interception occurred in the ordinary course of business and is therefore exempted from the statute.

<u>DISCUSSION</u>

In order to withstand a motion to dismiss, a plaintiff's complaint must contain "allegations plausibly suggesting (not merely consistent with) an entitlement to relief,

3

**Add. 065**

in order to reflect [a] threshold requirement . . . that the plain statement possess

enough heft to sho[w] that the pleader is entitled to relief." *Iannacchino* v. *Ford Motor*

*Co.*, 451 Mass. 623, 636 (2008), quoting *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955,

1966 (2007) (internal quotations omitted). While a complaint need not set forth

detailed factual allegations, the plaintiff is required to present more than labels and

conclusions, and must raise a right to relief "above the speculative level . . . [based]

on the assumption that all the allegations in the complaint are true (even if doubtful

in fact)." *Id.* See also *Harvard Crimson, Inc.* v. *President & Fellows of Harvard Coll.*, 445

Mass. 745, 749 (2006). The court will examine the Complaint under this standard.

Google's first argument is that the Massachusetts wiretap statute does not

include a prohibition against monitoring emails. In essence, it contents that had the

Legislature desired to include such electronic communications in the statute, then it

would have done so expressly.[1] The Massachusetts wiretap statute was originally

intended to mirror its federal counterpart. See *O'Sullivan* v. *NYNEX Corp.*, 426

Mass. 261, 264 (n.5) (1997). In 1986, the federal statute was "recognized to be

hopelessly out of date," and it was amended by the Electronic Communications

Privacy Act ("ECPA") in order to cover "electronic communication," which

encompasses email. *Dillon*, 49 Mass. App. Ct. at 314-15 (citations omitted); 18

---

[1] Google presents G.L. c. 276, § 1B, which expressly defines "electronic communication services" and "remote computing services,"as one such example. In contrast, the Massachusetts wiretap statute does not define these terms.

4

**Add. 066**

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930

U.S.C. § 2510(12). The Massachusetts Legislature did not provide for a similar amendment. However, "the fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading [an exception] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases." *Dillon*, 49 Mass. App. Ct. at 315.

This court declines to accept Google's contention that the Massachusetts wiretap statute does not prohibit the secret interception of emails. First, the statute's definition of "wire communications" is sufficiently broad to include electronic communications, as it includes "the aid of wire, cable, or *other like connection* between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1) (emphasis supplied). Permitting the interception of private emails, while prohibiting the same conduct for oral telephone conversations, is an inconsistency that contravenes the purpose of the statute. Second, a Massachusetts court has recently held that the Massachusetts wiretap statute cover email, and the court finds its reasoning persuasive. See *Rich v. Rich*, 2011 WL 3672059, *5 (Mass. Super. July 8, 2011) (McGuire, J.).

At this stage of the litigation, the court must accept the factual allegations of the Complaint. Marquis alleges that Google intercepts and scans private emails that she sends from her AOL account to Gmail account users, and that she did not consent to Google's interception. Compl. ¶¶ 9, 13-14. This alleged conduct violates

5

Add. 067

the Massachusetts wiretap statute.

Google's second argument is that federal law preempts the Massachusetts wiretap statute. Federal law may preempt state law "when it explicitly or by implication defines such an intent, or when a State statute actually conflicts with Federal law or stands as an obstacle to the accomplishment of Federal objectives. Whether a Federal statute preempts State law is ultimately a question of Congress's intent." *City of Boston* v. *Commonwealth Employment Relations Bd.*, 453 Mass. 389, 396 (2009) (internal citations omitted). A court should be hesitant to find preemption, as "[u]nless Congress's intent to do so is clearly manifested, a court does not presume that Congress intended to displace State law on a particular subject. . . ." *Id.*

Prior to the 1986 amendments to the federal wiretap statute, the Supreme Judicial Court determined that the federal statute did not preempt the Massachusetts wiretap statute. See *Commonwealth* v. *Vitello*, 367 Mass. 224, 249-53 (1975). Google maintains that the ECPA's comprehensive regulatory scheme indicates Congress's intent to occupy the field. However, this is insufficient to warrant a finding that the federal wiretap statute preempts the Massachusetts wiretap statute. The ECPA does not contain language expressly, or by implication, preempting state law. See 18 U.S.C. §§ 2510-2522. In addition, the ECPA does not occupy the entire field of interception of electronic surveillance, as Google contends. As long as the Massachusetts wiretap statute does not conflict with the federal wiretap statute, then

Add. 068

P168

it is a valid law under principles of federalism. *Vitello*, 367 Mass at 247 ("[A] State statute may adopt standards more stringent than the requirements of Federal law."). As Google itself notes, the federal wiretap statute prohibits the secret interception of electronic communications, just like the Massachusetts wiretap statute, *see supra*. In the absence of manifest Congressional intent to preempt state law, the ECPA does not preempt the Massachusetts wiretap statute.

Google's next contention is that while the Massachusetts wiretap statute prohibits "secret" interceptions, its advertisement policy is publicly disclosed and transparent. As a result, Google argues that its conduct does not violate the Massachusetts wiretap statute. Under the statute, an interception "means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication. . . ." G.L. c. 272, § 99(B)(4). Marquis alleges that Google "secretly" intercepts her electronic communications with Gmail users. Compl. ¶¶ 14, 27. To rebut that allegation, Google has submitted an affidavit that includes Google's Terms of Service and Privacy Center screen. See Burhans Affidavit at Tabs 1 and 2. These documents illustrate that Google's "interest-based advertising" is fully disclosed.

The Burhans Affidavit does not rebut the Complaint's allegations. First, Google's attempt to introduce documents outside the pleadings is improper at the

7

Add. 069

P169

motion to dismiss stage.[2]  Second, the court accepts as true Marquis's allegation that

Google secretly intercepted her electronic communications with Gmail users.

Additionally, Marquis is entitled to the reasonable inference that she, as an AOL

account holder, would not be privy to or have notice of Google's Terms of Use and

Privacy Center policy for Gmail users.  The Complaint alleges sufficient facts that

Google secretly intercepted electronic communications between non-Gmail users and

Gmail users.

Google's final argument is that it is exempt from liability because it is a

communications common carrier, and that it conducted the alleged interceptions "in

the ordinary course of its business."  G.L. c. 272, § 99(B)(3).  In support of this

contention, Google presents two cases that involve employers who secretly

intercepted communications between their employees and third-parties.  Google's

reliance on these cases is misplaced, as it does not have an employer-employee

relationship with Gmail users.  While Gmail is a free service, Google generates

revenue through selling advertising.  Compl. ¶ 8.  It intercepts and scans emails sent

to Gmail users by non-Gmail users such as Marquis in order to find keywords so that

---

[2]  "In evaluating a rule 12(b)(6) motion, we take into consideration the
allegations in the complaint, although matters of public record, orders, items
appearing in the record of the case, and exhibits attached to the complaint, also may
be taken into account."  *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000)
(quotation omitted).  Google's Terms of Use and Privacy Center policy, external to
the Complaint, are not appropriate for consideration at this stage.

8

Add. 070

P170

it can target Gmail users with relevant advertisements. Compl. ¶¶ 9, 11. At this

preliminary stage, the court cannot conclude as a matter of law that intercepting and

scanning emails for purposes of "interest-based advertising" is "in the ordinary course

of [Google's] business" under the Massachusetts wiretap statute.

<u>ORDER</u>

For the foregoing reasons, Defendant Google Inc.'s Motion to Dismiss is

<u>DENIED</u>.



Peter M. Lauriat
Justice of the Superior Court

Dated: January 17, 2012

9

Add. 071

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                          Plaintiff,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>                          Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION**<br><br>CIVIL ACTION NO. 2384CV00930-BLS1 |

## DEFENDANT TUFTS MEDICAL CENTER'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Mass. R. Civ. P. 12(b)(1) and 12(b)(6), Defendant Tufts Medical Center, Inc. ("Tufts MC") respectfully moves this Court to dismiss Plaintiff's Complaint with prejudice. Plaintiff lacks standing because she has not plausibly pled any real and immediate injuries that resulted from the complained of practices. Moreover, the Complaint must also be dismissed because it fails to plausibly plead any actionable violation of the Massachusetts Wiretap Act (M.G.L. c. 272, § 99). Plaintiff has not plead an unlawful interception within the meaning of the statute and no intercepting device was used. Plaintiff further fails to allege that the contents of any communications were ever intercepted, and that any interceptions was secretly heard or recorded. Moreover, applying the statute as broadly as Plaintiff suggests is contrary to the what the General Court intended. The grounds for dismissal are set forth more fully in Tufts MC's Memorandum in Support of this Motion. In accordance with Superior Court Rule 9A(1) and (c)(2) and (3), Tufts

MC respectfully requests a hearing on this Motion, which it believes will aid the Court in consideration of the issues presented.

WHEREFORE, Tufts MC respectfully requests that the Court grant this Motion and dismiss the Plaintiff's Complaint in its entirety with prejudice.

Dated: August 17, 2023

Respectfully submitted,

*/s/ James H. Rollinson*

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: _____
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on August 17, 2023 copies of the foregoing Motion and accompanying memorandum were transmitted electronically via email to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson

*Attorney for Defendant Tufts MC*

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION**<br><br>CIVIL ACTION NO. 2384CV00930-BLS1 |

## DEFENDANT TUFTS MEDICAL CENTER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFF'S ALLEGATIONS ........................................................................ 3

III.    STANDARD OF REVIEW ................................................................................. 5

        A.    Rule 12(b)(1) ........................................................................................... 5

        B.    Rule 12(b)(6) ........................................................................................... 5

IV.     ARGUMENT ...................................................................................................... 6

        A.    Plaintiff Lacks Standing to Pursue Her Claim ........................................ 6

        B.    Plaintiff's Overbroad Interpretation of the Wiretap Act Is Contrary to the
              Legislature's Intent ................................................................................. 8

        C.    Plaintiff Fails to State a Plausible Claim for Relief Under the Wiretap Act ........ 10

              1.    Plaintiff's Wiretap Act Claim Fails Because She Has Not Plausibly Alleged
                    an Unlawful Interception .................................................................... 11

                    a.    Plaintiff Fails to Allege that an "Intercepting Device" Was Used ....... 11

                    b.    The Ordinary Course of Business Exception Bars Plaintiff's Wiretap
                          Act Claim ................................................................................... 13

              2.    Plaintiff Fails to Plausibly Allege That Any "Interception" Was Secretly
                    Heard or Recorded ............................................................................. 14

              3.    Plaintiff Fails to Allege that an "Interception" Occurred in Massachusetts
                    ........................................................................................................ 17

              4.    Plaintiffs Fail to Plausibly Allege That Any "Contents" of
                    Communications Were Ever Intercepted .............................................. 18

V.      CONCLUSION .................................................................................................. 20

## Cases

*A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 479 Mass. 419 (2018) .............. 5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2008) ..................................................................... 5

*Callahan v. First Congregational Church of Haverhill*, 441 Mass. 699 (2004) ........................... 5

*Cardoso v. Whirlpool Corp.*, 2021 WL 2820822 (S.D. Fla. July 6, 2021)................................... 12

*Com. v. Alleyne*, 23 Mass. L. Rep. 606, 2007 WL 4997621, at *2 (Mass. Super. Ct., Nov. 1, 2007)................................................................................................................................ 10

*Com. v. Alleyne*, 474 Mass. 771 (2016) ................................................................................. 14

*Com. v. Ashford*, 486 Mass. 450 (2020) ............................................................................... 19

*Com. v. Boyarsky*, 452 Mass. 700 (2008) ............................................................................. 14

*Com. v. Connolly*, 454 Mass. 808 (2009) ............................................................................. 10

*Com. v. Dayton*, 477 Mass. 224 (2017) ................................................................................. 8

*Com. v. Hyde*, 434 Mass. 594 (2001).................................................................................... 9

*Com. v. Morganti*, 455 Mass. 388 (2009) ...................................................................... 14, 17

*Com. v. One 2004 Audi Sedan Auto.*, 456 Mass. 34 (2010)..................................................... 15

*Com. v. Rainey*, 491 Mass. 632 (2023) ............................................................................ 9, 17

*Com. v. Wilcox*, 63 Mass. App. Ct. 131 (2005) ..................................................................... 18

*Connor v. Whirlpool Corp.*, 2021 WL 3076477 (S.D. Fla. July 6, 2021) ................................... 12

*Cook v. Patient Edu., LLC*, 465 Mass. 548 (2013) ................................................................... 9

*Cousin v. Sharp Healthcare*, --- F. Supp. 3d ---, 2023 WL 4484441 (S.D. Cal. 2023)...... 3, 18, 20

*Crosland v. Horgan*, 401 Mass. 271 (1987) .......................................................................... 14

*Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001).................................... 12

*Curatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2021) .............................................. 14, 15, 16

*DiFiore v. Am. Airlines, Inc*, 454 Mass. 486 (2009)................................................................. 9

*Dillon v. Mass. Bay Transit Authority*, 49 Mass. App. Ct. 309, 310 (2000) ..................... 9, 13, 14

*Dunn v. Genzyme Corp.*, 486 Mass. 713 (2021) ..................................................................... 6

*Enos v. Secretary of Envt'l Affairs*, 432 Mass. 132 (2000) ...................................................... 5

*Ginther v. Comm'r of Ins.*, 427 Mass. 319 (1998)................................................................... 7

*Greenleaf Arms Realty Trust I, LLC v. New Boston Fund, Inc.*, 81 Mass. App. Ct. 282 (Mass. App. 2012).......................................................................................................................... 6

*HSBC Bank USA, N.A. v. Matt*, 464 Mass. 193 (2013) ............................................................ 5

*Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008) ........................................................ 5, 6

*Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447 (E.D. Pa. Dec. 13, 2007) ....... 12

*In re Facebook Tracking Litig. Inc.*, 956 F.3d 589 (9th Cir. 2020)............................................ 19

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015) .... 13, 19, 20

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942 (S.D. Cal. 2012).......................................................................................................................... 12

*In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014) .......................................................... 19

*Jacome v. Spirit Airlines*, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021)................................ 11

*Kurowski, et al. v. Rush Sys. for Health*, --- F. Supp. 3d ---, 2023 WL 2349606
(N.D. Ill. 2023)............................................................................................. 3, 18

*Kurowski, et al. v. Rush Sys. for Health*, 2023 WL 4707184 (N.D. Ill. July 24, 2023)................. 3

*Leocal v. Ashcroft*, 543 U.S. 1, 11 n. 8 (2004).................................................................. 8

*MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199 (D. Mass. 1999)................................ 18

*Marquis v. Google, Inc.*, 2015 WL 13037257 (Mass. Super. Ct. Feb. 13, 2015)........................ 17

*Maxwell v. AIG Domestic Claims, Inc.*, 460 Mass. 91 (2011)....................................................... 15

*O'Sullivan v. NYNEX Corp.*, 426 Mass. 261 (1997)......................................................... 13, 14

*Pendell v. AMS/Oil, Inc.*, 1986 WL 5286 (D. Mass. Apr. 30, 1986) ........................................ 17

*Pishev v. City of Somerville*, 95 Mass. App. Ct. 678 (Mass. App. 2019) .............................. 5, 8

*Potter v. Havlicek*, 2008 WL 2556723 (S.D. Ohio June 23, 2008) ............................................ 11

*Puglsey v. Police Dept. of Boston*, 472 Mass. 367 (2015).................................................. 6, 7, 8

*Rich v. Rich*, 28 Mass. L. Rep. 553, 2011 WL 3672059 (Mass. Super. Ct., July 8, 2011)........... 10

*Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290 (D. Mass. June 2, 2020)....................... 17

*Slama v. Attorney General*, 384 Mass. 620 (1981)....................................................................... 5

*Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017) .............................................. 3

*Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018) ......................................................... 3

*Styller v. Zonning Bd. Of Appeals*, 487 Mass. 588 (2021)......................................................... 7

*Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*, 448 Mass. 15 (2006)........... 5, 8

*Town of Sudbury v. Mass. Bay Transp. Authority*, 485 Mass. 774 (2020) .................................. 5

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ........................................................... 7, 8

*Ultimate Outdoor Movies, LLC v. FunFlicks*, LLC, 2019 WL 2233535 (D. Md. May 23, 2019) 12

*United States v. Ackies*, 918 F.3d 190 (1st Cir. 2019) .............................................................. 12

*Velazquez v. Com.*, 491 Mass. 279 (2023) ............................................................................. 8

**Statutes**

18 U.S.C. § 2510................................................................................................................. 19

M.G.L. c. 272 § 99 .................................................................................................. passim

## I.    INTRODUCTION

Plaintiff's Complaint is the latest of numerous putative class action lawsuits that have been filed against health care providers nationwide concerning the ubiquitous practice of using analytics and advertising technologies on their public websites. Plaintiff claims that Defendant Tufts Medical Center, Inc. ("Defendant" or "Tufts MC") violated Massachusetts' wiretapping statute by allegedly installing third-party source code from Meta[1] and Google on Tufts MC's *public website only*, which is located at www.tuftsmedicalcenter.org (the "public website"). (*See* Compl. ¶ 2.) Plaintiff alleges generically that this source code caused information that she characterizes as protected health information ("PHI") and personally identifiable information ("PII") to be transmitted to Meta and Google when patients used the public website. (*Id.* at ¶¶ 2, 3, and 6.) This alleged information does not come in the form of personal health information tied to an actual person's name, but instead consists of Internet metadata that is related to the proper functioning of the website, including the transmission of a webpage's Universal Resource Locator ("URL"), IP addresses, information about the user's web browser configuration and alleged cookie identifiers. (*Id.* at ¶¶ 64-73.)

Significantly, this case concerns Tufts MC's *public website only*—not its secure patient portal where patients can access medical records, test results and communicate with their doctors. Unlike the patient portal, Defendant's public website can be accessed by anyone and provides information to the public about the broad range of Tufts MC's services. As a leading academic medical center with a world-renowned reputation in research and medicine, Tufts MC attracts visitors to its public website for a number of different reasons, not just for their own healthcare-

---

[1] Facebook, Inc. rebranded itself as Meta in 2021. The Complaint refers to both "Facebook" and "Meta." For ease of reference and consistency, Tufts MC will refer only to "Meta" here.

related purposes. For example, website visitors may be researchers, job seekers, donors, employees, or vendors. In short, the public website is used as a public resource, not to communicate with medical providers. Plaintiff does not allege facts showing otherwise.

Instead, Plaintiff has used artful pleading to create the false impression, without actually pleading facts in support, that Tufts MC has shared protected patient health information with Meta and Google concerning users of its public website. The well-pleaded facts, if true, would establish only that Defendant's public website contains software coding that transmits traffic data to Meta and Google about users' browsing of Tufts MC's public website. Even accepting Plaintiff's allegations as true, as the Court must for purposes of this motion, Plaintiff's Complaint is notable for what it does *not* say rather than what is actually stated. Significantly, Plaintiff's Complaint does not allege any transfer of internet metadata specific to the Plaintiff. Instead, the Complaint makes allegations concerning what could happen when a hypothetical patient goes to Tufts MC's public website. (*Id.* at ¶¶ 74–95.) The alleged facts do not support the conclusion that any protected health information about any patient, let alone about Plaintiff, or portions of any private communications between Plaintiff and her doctors, have been disclosed. The alleged facts also do not support the conclusion that Plaintiff has suffered any legally cognizable injury that would entitle her to relief.

Plaintiff's Complaint consists of nothing more than conclusory and formulaic recitations of the elements of her asserted wiretap claim. The legal theories underlying this and similar class actions have their origins in an unsuccessful class action brought against Facebook and the operators of various public health-related websites in 2016. In that case, the plaintiffs alleged that healthcare provider websites violated federal and California state law by embedding the Facebook "Like" button on their websites. The Northern District of California dismissed the complaint under

Rule 12(b)(6), and the Ninth Circuit affirmed. As the appellate court explained: "Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018), *affirming Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (same; "These pages contain general information that is accessible to the public at large."). Federal district courts have twice reached a similar conclusion this year. *See Kurowski, et al. v. Rush Sys. for Health*, --- F. Supp. 3d ---, 2023 WL 2349606, at *3-6 (N.D. Ill. 2023)("*Kurowski I*") (rejecting Federal Wiretap Act claim for several reasons); *Kurowski, et al. v. Rush Sys. for Health*, 2023 WL 4707184, at *2-4 (N.D. Ill. July 24, 2023) ("*Kurowski II*") (rejecting allegations in amended complaint for Federal Wiretap Act claim); and *Cousin v. Sharp Healthcare*, --- F. Supp. 3d ---, 2023 WL 4484441, at *7-8 (S.D. Cal. 2023) (rejecting CMIA claim for failure to allege the disclosure of medical information of a hypothetical plaintiff).

As addressed in more detail below, Plaintiff fails to state a viable Massachusetts wiretap claim against Tufts MC, and the Complaint against it should be dismissed with prejudice.

## II.   PLAINTIFF'S ALLEGATIONS

Tufts MC is a non-profit healthcare provider in Massachusetts and maintains and controls the content of the Tufts Medical Center Website, https://www.tuftsmedicalcenter.org/ (the "public website"). (Compl. ¶¶ 11, 14.) The public website provides general information about the services Tufts MC provides and can be accessed and used by anyone—not just patients. (*Id.* at ¶¶ 14-15.) The public website also provides general information about Tufts MC and can be used by the public to search for information related to specific health conditions, as well as finding a doctor and paying bills. (*Id.*) Separate from the public website, Tufts MC has a secure patient portal where

3

registered users can securely communicate with his or her doctor and nurses and access their medical records (the "patient portal"). The Meta Pixel was never on the Tufts MC patient portal, nor does Plaintiff allege otherwise.

Plaintiff alleges that Tufts MC implemented various advertising and analytics technologies on its public website, including the Meta Pixel and Google Analytics. Plaintiff alleges that when users visited the Tufts MC's public website these technologies transferred certain URL browsing information from the website user's browser to Meta and Google. (*Id.* at ¶¶ 2, 9, 41-55, 64-65, 92).

With respect to Plaintiff personally, she only alleges that she is a resident of Massachusetts, that she is a patient of Tufts MC, and that she regularly used Tufts MC's public website to obtain information about Tufts MC doctors, research particular medical procedures, and review her medical records through the Tufts MC Portal. (*Id.* at ¶ 10.) Plaintiff makes no allegations about any specific communication she had or information about her identity that she claims was disclosed to Facebook or Google. Moreover, Plaintiff does not allege any specific harm or injury that she incurred.

Plaintiff purports to sue on behalf of "[a]ll Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.tuftsmedicalcenter.org within three years prior to the date of filing of this initial complaint in this action." (*Id.* at ¶ 100).

Relying on these threadbare allegations, Plaintiff alleges a single cause of action against Tufts MC for violation of the Massachusetts Wiretap Act ("Wiretap Act"), M.G.L. c. 272 § 99. (Count I, Compl. ¶¶ 108-15). As explained below, this claim is insufficiently pled and fails as a matter of law.

### III.    STANDARD OF REVIEW

#### A.    Rule 12(b)(1)

"A court lacks subject matter jurisdiction over an action, and is without power 'to decide the merits of a dispute or claim,' if a plaintiff does not have standing to file the lawsuit." *Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683 (Mass. App. 2019) (citing *HSBC Bank USA, N.A. v. Matt*, 464 Mass. 193, 199 (2013)). "To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury." *Slama v. Attorney General*, 384 Mass. 620, 624 (1981). Standing "requires 'a definite interest in the matters in contention in the sense that [a plaintiff's] rights will be significantly affected by a resolution of the contested point[.]'" *Town of Sudbury v. Mass. Bay Transp. Authority*, 485 Mass. 774, 779 (2020) (quoting *Enos v. Secretary of Envt'l Affairs*, 432 Mass. 132, 135 (2000)). When a motion to dismiss for lack of subject matter jurisdiction does not rely on extrinsic evidence, Massachusetts courts apply a similar standard to a Rule 12(b)(6) motion. *See Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*, 448 Mass. 15, 20-21 (2006); *Callahan v. First Congregational Church of Haverhill*, 441 Mass. 699, 709 (2004) (finding a Rule 12(b)(1) motion "unsupported by affidavit presents a 'facial attack' based solely on the allegations of the complaint, taken as true for purposes of resolving the complaint").

#### B.    Rule 12(b)(6)

Massachusetts follows the federal plausibility standard when determining whether to dismiss a complaint for failure to state a claim. *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 636 (2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2008)). "Factual allegations are sufficient to survive a motion to dismiss if they plausibly suggest that the plaintiff is entitled to relief." *A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 479 Mass. 419, 425 (2018) (citing *Iannacchino*, 451 Mass. at 636); *see also Greenleaf Arms Realty Trust I, LLC v. New Boston*

5

*Fund, Inc.*, 81 Mass. App. Ct. 282, 288 (Mass. App. 2012) (drawing reasonable inferences from factual allegations in plaintiff's favor). "Such factual allegations must be enough to raise a right to relief above the speculative level based on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Dunn v. Genzyme Corp.*, 486 Mass. 713, 721 (2021) (cleaned up) (citing *Iannacchino*, 451 Mass. at 636). Although a complaint "need not include 'detailed factual allegations[,] a plaintiff's obligation to provide the grounds for *his [or her] entitle[ment]* to relief requires more than labels and conclusions. *Dunn*, 486 Mass. at 720-21 (emphasis added, alterations in original) (quoting *Iannacchino*, 451 Mass. at 636). "The ultimate inquiry is whether the plaintiffs alleged such facts, adequately detailed, so as to plausibly suggest an entitlement to relief." *Greenleaf Arms*, 81 Mass. App. at 288. Where "claimed damages [are] 'speculative and premature,'" the complaint must be dismissed. *Ianncchino*, 451 Mass. At 628.

## IV.   ARGUMENT

Plaintiff's sole cause of action, an alleged violation of the Massachusetts Wiretap Act, fails for several reasons and should be dismissed with prejudice. Plaintiff lacks standing to assert her claim because she has not alleged any real and immediate injury that resulted from the complained of practices. Plaintiff's Complaint also fails to plausibly allege any actionable Wiretap Act violation because: (1) there are no "wire communications," as defined by the statute, that have been pled; (2) there was no unlawful interception; and (3) Plaintiff fails to allege facts to show that the "contents" any communications have been intercepted.

### A.   Plaintiff Lacks Standing to Pursue Her Claim

Plaintiff's Complaint must be dismissed because it fails to plausibly allege that Plaintiff personally has standing to pursue her claims. "[I]t is solely the plaintiff's burden to prove [her] standing. [She] must allege sufficient facts to show that [she] has suffered a nonspeculative, direct injury." *Puglsey v. Police Dept. of Boston*, 472 Mass. 367, 373 (2015). Plaintiff's forty-nine (49)

page, 115 paragraph Complaint is utterly devoid of any factual allegations with respect to Plaintiff personally. Moreover, Plaintiff's Complaint contains no factual allegations as to any damage or harm she allegedly suffered; instead, she merely alleges that she is entitled to statutory damages. (Compl. ¶ 115.)

Plaintiff cannot rely exclusively on the statute's provision of statutory damages to meet her burden to establish standing. Under Massachusetts law, where a statute provides a right of action a plaintiff must show both: (1) a "direct and certain injury" that is not "speculative, remote, and indirect"; and (2) "the injury alleged must fall 'within the area of concern' of the statute." *Ginther v. Comm'r of Ins.*, 427 Mass. 319, 323 (1998); *see also Puglsey*, 472 Mass. at 373 (requiring "injury [that] is sufficiently concrete and imminent" for statutory violations).

Here, Plaintiff fails to identify any "direct and certain injury," and, even if she could satisfy the statutory requirements of her claim, which she cannot, she lacks standing to sue. *Ginther*, 427 Mass. at 323; *Puglsey*, 472 Mass. at 373. Moreover, the Massachusetts' decisions are consistent with U.S. Supreme Court precedent and the Massachusetts Supreme Judicial Court ("SJC") repeatedly looks to U.S. Supreme Court precedent when addressing standing. *See, e.g.*, *Pugsley*, 472 Mass. at 371; *Styller v. Zoning Bd. Of Appeals*, 487 Mass. 588, 592 (2021). Recently, the U.S. Supreme Court articulated that "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). As pertinent to Plaintiff's Complaint, the legislature's "creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm . . . ." *TransUnion*, 141 S. Ct. at 2205.

Without any indication of what, if any, information of Plaintiff's may have been intercepted and further how, if at all, Plaintiff was injured by the interception, Plaintiff's Complaint is abstract at best. *See TransUnion*, 141 S. Ct. at 2204 (requiring an alleged injury to be "real and not abstract" to establish standing). Plaintiff's use of a hypothetical visitor to Tufts MC's public website further evidences her inability to establish standing. "[A] plaintiff must show that he or she was injured as a result of the defendant's conduct." *Pishev*, 95 Mass. App. Ct. at 683 n.13. "Simply alleging injury alone is not sufficient and '[i]njuries that are speculative, remote, and indirect' do not confer proper standing." *Pugley*, 472 Mass. at 371 (quoting *Sullivan*, 448 Mass. at 21). Indeed, Plaintiff specifically disclaims that the examples presented in the Complaint about what could have happened if a hypothetical user visited and took certain actions on Tufts MC's public website "do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes." (Compl. ¶ 74.) The specific allegations concerning Plaintiff appear in just one paragraph out of more than one hundred paragraphs. (*Id.* at ¶ 10.) Plaintiff's Complaint contains not a single allegation of any harm or injury that she (or anyone else) suffered. Because Plaintiff only alleges that she was a patient of Defendant and used Tufts MC's public website with no specific allegations of any concrete harm or injury, she has failed to satisfy her burden to establish standing.

**B.    Plaintiff's Overbroad Interpretation of the Wiretap Act Is Contrary to the Legislature's Intent**

In evaluating the Plaintiff's allegations and claim, it is important for this Court to keep in mind the primarily criminal nature of Wiretap Act. As such, the Rule of Lenity should be applied, and compels the Court to resolve any statutory ambiguities in Tufts MC's favor.[2]

---

[2] *See Velazquez v. Com.*, 491 Mass. 279, 283 n. 5 (2023) ("where language of a criminal statute plausibly can be found ambiguous, the rule of lenity requires that the defendant receive the benefit of the ambiguity") (quoting *Com. v. Dayton*, 477 Mass. 224, 226 (2017); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n. 8 (2004) (where the same statute has both criminal and civil applications in a criminal or noncriminal context, the rule of lenity applies"); *Cook v. Patient Edu., LLC*, 465 Mass. 548,

The Wiretap Act makes willful "interception" of oral/wire communications a felony punishable by a fine up to $10,000 and/or up to five years in prison. *See* M.G.L. c. 272 § 99. Among its eighteen subsections, just one, subsection Q creates a private right of action to bring a civil claim for damages in certain circumstances arising from unlawful "interceptions," and applying the very same definitions of "interception," "interception device," "wire communication," *etc.* that govern the Act's criminal applications. *Id.* at §§ 99(C)(1), 99(Q).

The Wiretap Act was enacted in large part "to help the fight against organized crime." *Dillon v. Mass. Bay Transit Authority*, 49 Mass. App. Ct. 309, 310 (2000).

As the Massachusetts Supreme Court observed in *Rainey*, when enacting the Wiretap Act "[t]he Legislatures focus was the use of devices, like bugs, for clandestine or surreptitious eavesdropping" and it "was concerned principally with the investigative use of surveillance devices by law enforcement officials to eavesdrop surreptitiously on ***conversations***." *Com. v. Rainey*, 491 Mass. 632, 646 (2023) (emphasis added); *see also Com. v. Hyde*, 434 Mass. 594, 600 (2001) ("our own statute broadly prohibits the interception of *speech*") (emphasis in original).

Consistent with the intended purpose of the law, the Massachusetts Wiretap Act appellate cases largely, if not exclusively, deal with the recording of human-to-human conversations. *See Rainey*, 491 Mass. at 639-40 (discussing various Wiretap Act cases, all of which recorded individual statements made in conversations). Although the Act was initially modelled after the Federal Wiretap Statute, when the federal statute was amended to include wiretapping of "electronic communications in 1986, the Massachusetts Legislature refused to expand the scope. *Id.* at 645-47.

---

555-56 (2013) (assuming, without deciding, that the same civil application of the Rule of Lenity applies under Massachusetts law); *DiFiore v. Am. Airlines, Inc*, 454 Mass. 486, 497 n. 12 (2009) (same).

Here, Plaintiff has not alleged that Tufts MC intercepted any speech or conversation between two people, as the Wiretap Act contemplates. Moreover, Tufts MC is unaware of any Massachusetts criminal or civil appellate decision that has extended the Act to apply to the type of website browsing metadata at issue in this case. Rather, Massachusetts courts have found modern **methods of communications to be "wire communications" under the** Wiretap Act only so long as they retain the concept of person-to-person speech or conversations that a third party could intercept. *Compare Com. v. Alleyne*, 23 Mass. L. Rep. 606, 2007 WL 4997621, at *2 (Mass. Super. Ct., Nov. 1, 2007) (applying **"wire communications" under the** Wiretap Act to communications over cellular phones) *with Rich v. Rich*, 28 Mass. L. Rep. 553, 2011 WL 3672059, at *4 (Mass. Super. Ct., July 8, 2011) (stating wire communications were extended to email and instant messaging) *with Com. v. Connolly*, 454 Mass. 808, 825 (2009) (holding that "[d]ata from GPS devices also does not fall within the language of the wiretap statute . . . which authorizes interception of "oral and wire communications.").

Not only is Plaintiff's proposed interpretation of the Wiretap Act legally flawed and inconsistent with the intended purpose of the Act, it also would lead to absurd results and bad policy. Should the Court adopt Plaintiff's proposed interpretation of the Wiretap Act, such an interpretation would essentially subject all Massachusetts businesses, including non-profits, like Tufts MC, and charitable organizations to potential criminal and civil liability for merely using common technologies on their public websites.

**C.    Plaintiff Fails to State a Plausible Claim for Relief Under the Wiretap Act**

Plaintiff's Complaint must also be dismissed under Rule 12(b)(6) because the Complaint fails to plausibly suggest any entitlement to relief under the Wiretap Act. The Wiretap Act provides for a private, civil cause of action to any aggrieved person whose wire communications were secretly intercepted, disclosed, or used, except as permitted or authorized by the Massachusetts

Legislature. M.G.L. c. 272 § 99(Q). To state a claim under the Wiretap Act, a plaintiff must plead sufficient facts to plausibly allege that a defendant (1) through the use of an "intercepting device;" (2) willfully and secretly; (3) hear, record, or aid another to secretly hear or record; (4) the "contents;" (5) of a "wire communication;" (6) without the consent of all parties to the communication. *Id.* at 272 § 99(C)(1), (Q). For each of the independent reasons articulated below, Plaintiff fails to plausibly allege facts to show that she is entitled to any relief for her claim.

> **1.     Plaintiff's Wiretap Act Claim Fails Because She Has Not Plausibly Alleged an Unlawful Interception**

>> **a.     Plaintiff Fails to Allege that an "Intercepting Device" Was Used**

Plaintiff's Wiretap Act claim fails because she has not alleged facts to support her conclusory assertion that any alleged communications were intercepted using a "device." Under the Wiretap Act, an "intercepting device" "means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communications . . . other than any telephone or telegraph instrument, equipment, facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of its business." M.G.L. c. 272 § 99(B)(3).

Plaintiff alleges in a conclusory fashion that the embedded code for Google Analytics and Meta Pixel constitutes an "intercepting device," under the Massachusetts statute. When faced with this exact issue, courts throughout the country have expressly rejected Plaintiff's theory that code embedded into a publicly accessible website constitutes a "device" or "apparatus" under similar wiretap statutes. *See, e.g., Potter v. Havlicek*, 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008) (dismissing federal wiretap claim because "the word 'device' does not encompass software"); *Jacome v. Spirit Airlines*, 2021 WL 3087860, at *5 (Fla. Cir. Ct. June 17, 2021) (dismissing Florida wiretap claim because session replay software is not a "device or apparatus"); *Cardoso v.*

11

*Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021) (same); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *2 (S.D. Fla. July 6, 2021) (same); *cf. United States v. Ackies*, 918 F.3d 190, 199 n.5 (1st Cir. 2019) (rejecting argument that software is a "device" under Federal Stored Communications Act because "software is not a 'device' under its plain meaning"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012) ("[S]oftware is not a tangible good or service.").

Plaintiff also alleges that her personal computer, server and web browser used to access Defendant's Website amounts to an "intercepting device" as defined by the Wiretap Act. Again, such allegations have been rejected by other courts analyzing what constitutes a "device" under other similar wiretap acts. *See Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447, at *4 (E.D. Pa. Dec. 13, 2007) ("The drive or server on which an e-mail is received does not constitute a device for purposes of the Wiretap Act."); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001) ("Holding that Amazon, by receiving an e-mail, intercepted a communication within the meaning of the Wiretap Act ... would effectively remove from the definition of intercept the requirement that the acquisition be through a 'device.' Therefore, the amended Complaint fails to state a claim against Amazon under the Wiretap Act, and Amazon's motion to dismiss that claim is granted."); *see also Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2233535, at *21 (D. Md. May 23, 2019) ("Moreover, the emails were sent, as addressed, to Defendants' funflicks.com server, and that server is not a 'device' used for interception as defined by the Wiretap Act.").

The alleged facts also fail to establish that any of the URL data was unlawfully "intercepted" by Tufts MC. The allegations made in the complaint make clear that electronic transmissions at issue are transmissions that go directly from a user's browser to Meta and Google,

not transmissions from a user's browser to Tufts MC that are somehow intercepted in transit by Meta and Google. (Compl. ¶¶ 67, 70). Courts analyzing substantially similar statutory language in other wiretapping statutes have concluded that direct transmissions of information from a browser to a third-party website cannot satisfy the definition of "interception," even if code on the defendant's website causes those transmissions to occur. *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 142 (3d Cir. 2015) ("*Cookie Placement*") ("The cookie doesn't acquire anything . . . The cookie doesn't look for anything. It just sits on the browser and gets sent along with information that would otherwise be sent.") (alterations in original).

### b. The Ordinary Course of Business Exception Bars Plaintiff's Wiretap Act Claim

Even if the Court were to conclude that the alleged code embedded on Tufts MC's website amounted to an "intercepting device" under the statute, the ordinary course of business exception nevertheless bars Plaintiff's Wiretap Act claim.

When the Wiretap Act was overhauled in 1968, the General Court excluded from the Act measures taken in the ordinary course of business from the definition of an unlawful interception. Within the statutory definition of "intercepting device," it excluded equipment used in the ordinary course of a communication common carrier's business. *See* M.G.L. c. 272 § 99(B)(3); *see also* M.G.L. c. 272 § 99(D)(1)(b) (use of an office intercommunication system in the ordinary course of business is not an unlawful interception). The Supreme Court of Massachusetts and Appeals Court have since applied that the ordinary course of business exception to more than just traditional communication common carriers, even when the recording systems were assumed to have operated in secret. *See Dillon*, 49 Mass. App. Ct. at 319 (recording system used by MBTA monitoring of employee phone conversations from its operations centers not unlawful); *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 266-67 (1997) (recording system used by NYNEX to monitor sales and

13

marketing calls for effectiveness not unlawful); *see also Crosland v. Horgan*, 401 Mass. 271, 274 (1987) (hospital employee's secret eavesdropping, via an extension line, on telephone call to hospital conveying a bomb threat did not violate Act because use of extension occurred in ordinary course of hospital's business). The technologies at issue in this case are the 2023 website owners' equivalent of the telephone recording technologies considered in *O'Sullivan* and *Dillon*.[3] The Complaint alludes to the fact that the technologies at issue were used in the ordinary course of Tufts MC's website operations, including to improve website functionality and Tufts MC's marketing and engagement efforts to inform the public of its services. (Compl. ¶¶ 31, 38.) Given these facts, this Court should, in accordance with the decisions in *O'Sullivan* and *Dillon*, find that the ordinary course of business exception bars Plaintiff's Wiretap Act claim as a matter of law.

2.    **Plaintiff Fails to Plausibly Allege That Any "Interception" Was Secretly Heard or Recorded**

The Wiretap Act defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." M.G.L. c. 272 § 99(B)(4). In addressing the meaning of "secrecy" under the Act, the Massachusetts Supreme Court has held that it means a lack of actual notice or notice of the act of recording or hearing. *Curatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658-59 (2021); *see also Com. v. Alleyne*, 474 Mass. 771, 785 (2016); *Com. v. Morganti*, 455 Mass. 388, 401 (2009); *Com. v. Boyarsky*, 452 Mass. 700, 705 (2008). As a matter of law, express permission or consent to hear/record the communication is not required. *Id.* Moreover, it is the act of hearing or

---

[3] While the Act's "normal course of business" exceptions are phrased in terms of telephone equipment, that is simply because the 1968 statutory text has not subsequently been updated, as the Appeals Court explained in *Dillon*. 49 Mass. App. Ct. at 314-316; *see also Restuccia v. Burk Tech., Inc.*, No. CA 952`25, 1996 WL 1329386, at *2 (Mass. Super. Ct. Aug. 13, 1996) (applying ordinary course of business exception to email backup system).

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930

recording that must be secret to constitute a potentially unlawful interception—not the identity of the person who is hearing/recording or what one does with the recording or information obtained. *Curatone*, 487 Mass. at 656-57 (granting motion to dismiss and holding that where act of recording itself was not secret, even when the identity of the listener/recorder was intentionally falsified and kept secret, there could be no unlawful interception under the Wiretap Act).

Here, Tufts MC specifically disclosed to Plaintiff and other website users that it tracked users' browsing activity on the Tufts MC public website through the use of "cookies, "tracking pixels, or tags," and further disclosed that it used third-party analytics and tag management services, including Google "to collect certain information relating to use of our advertising and websites." (*Compare* Compl. ¶¶ 22-23, 25 *with* Exhibit A to Scully Decl.[4]) A review of Exhibit A, Tufts MC's *complete* Website Privacy Policy, demonstrates that the alleged usage of tracking technology was made abundantly clear and was certainly not something that was hidden, unexplained, or somehow kept from the knowledge of those individuals who used Tufts MC's public website.

Specifically, under the heading "Additional Information," with a subheading of "Cookies and tracking pixels," Tufts MC's Website Privacy Policy expressly states the following:

> The Tufts Medical Center website use "cookies" and "tracking pixels or tags" to track our website analytics. This allows us, for example to determine the most popular pages on our website, how people get to our site and what activities visitors do while on the site. This helps us improve the experience, provide relevant content and better serve our visitors. Cookies are a small piece of code set to your browser by a website you visit. Cookies are used by search engines and sites to remember

---

[4] Exhibit A to the Scully Declaration is a complete copy of Tufts MC's Website Privacy Policy that is referred to and selectively and misleadingly quoted in Plaintiff's Complaint. This policy has thereby been incorporated by reference to the Complaint and may be considered by the Court on a motion to dismiss. (Compl. ¶¶ 22-23, 25.); *see Maxwell v. AIG Domestic Claims, Inc.*, 460 Mass. 91, 112 (2011) (utilizing doctrine of incorporation by reference to analyze final count in complaint); *Com. v. One 2004 Audi Sedan Auto.*, 456 Mass. 34, 43 n. 8 (2010) (considering affidavits filed with complaint and incorporated by reference for motion to dismiss).

your preferences. A tracking pixel, often referred to as a tag, is HTML code, which is loaded when you click an ad, visit a website, or open an email to track behavior and actions on the site. They do not provide us with any personally identifiable information.

Most internet browsers automatically accept cookies, but you can set your browser to refuse them or to alert you when they are being sent. You can access the information on Tufts Medical Center websites without enabling cookies in your browser. You can manage Google cookies by going to https://policies.google.com /technologies/managing (https://policies.google.com/technologies/managing). Please note that if you delete your cookies or upgrade your browser you will have to opt-out again.

We may additionally collect interest or behavioral information based on users' activity on our website and then provide related Tufts Medical Center digital advertising. We may also target "lookalike" audiences relying on interest and behavioral data but never on patient, clinical, or portal information. You can opt-out of receiving interest based advertising through the Digital Advertising Alliance (DAA) website: http:/www.aboutads/info/choices. (http://www.aboutads. info/choices).

Tufts Medical Center uses web analytics and tag management services and tools, such as Google Tag Manager, provided by Google, Inc. and other third parties to collect information relating to use of our advertising and websites. To find out how Google uses data go to: https://policies.google.com/technologies/partner-sites (https://policies.google.com/technologies/partner-sites). To opt-out of Google Analytics    you    can    go    to    https://tools.google.com/dlpage/gapotout/ (https://tools.google.com/dlpage/gaoptout).

*See* Ex. A to the Scully Declaration.

Plaintiff alleges that the Website Privacy Policy was inaccurate because she contends that the alleged interceptions were not anonymous. (Compl. ¶¶ 22-23, 25.) Although these allegations are denied by Tufts MC, even assuming *arguendo* that they are true, these allegations are irrelevant to the pending motion. These allegations do not change the critical and undisputed fact that Plaintiff was clearly on notice that her activity on Tufts MC's website was being tracked by Tufts MC through the use of third-party technology, and, therefore cannot save her Wiretap Act claim. *See Curatone*, 487 Mass. at 659 ("[Barstool] did not secretly hear or record the challenged communication within the meaning of the act, because the plaintiff knew throughout the call that

16

his words were being heard and recorded," even though he thought they were being heard and recorded by a Boston Globe reporter—not Barstool Sports); *Rainey*, 491 Mass. at 640, 643 and nn. 18, 22 (subject's general awareness of the potential for recording is sufficient, even absent evidence of knowledge of specific recording details); *Morganti*, 455 Mass. at 401 ("Because the defendant knew that his words in the interview room were subject to being recorded, the actual interception of his words was not unlawful."). As a matter of law, this Court should find that there was no secret recording of any communication and dismiss Plaintiff's Wiretap Act claim. *See id.*

### 3. Plaintiff Fails to Allege that an "Interception" Occurred in Massachusetts

Plaintiff's Complaint also fails to allege that any alleged interception took place in the Commonwealth of Massachusetts. Both Massachusetts state and federal courts have repeatedly rejected arguments that attempt to apply the Wiretap Act to interceptions occurring outside the Commonwealth of Massachusetts. *See Marquis v. Google, Inc.*, 2015 WL 13037257, at *7 (Mass. Super. Ct. Feb. 13, 2015) ("The servers on which Google scans emails of Gmail users are physically located in [redacted]. None are located in Massachusetts, and so no interceptions physically occur within our borders.") (alteration in original); *Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. June 2, 2020) ("[B]ecause the recordings took place in Michigan, they are outside the reach of the Massachusetts Wiretapping Statute.") (citing *Pendell v. AMS/Oil, Inc.*, 1986 WL 5286, at *4 (D. Mass. Apr. 30, 1986) ("There is no language whatsoever to indicate that the [Massachusetts Wiretapping] statute was intended to be given extraterritorial effect. As a general rule, when no such intention is clearly expressed, it is presumed that the statute was intended to be applicable only within the territorial jurisdiction of the enacting governmental body.") (alterations in *Ross*).

Moreover, "secretly recording a conversation outside Massachusetts does not give rise to liability under Section 99Q even if the call originated in Massachusetts." *MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199, 202 (D. Mass. 1999); *Com. v. Wilcox*, 63 Mass. App. Ct. 131, 139 (2005) (recognizing that "defendant cites no authority for the proposition that G.L. c. 272 § 99, applies to recordings made outside of Massachusetts.") In this case, Plaintiff has not alleged that any interception took place in Massachusetts. Plaintiff merely alleges that she is a resident of Massachusetts and that she regularly uses Defendant's Website. (Compl. ¶ 10.) Plaintiff's threadbare allegations are not sufficient to support her Wiretap Act claim.

### 4. Plaintiffs Fail to Plausibly Allege That Any "Contents" of Communications Were Ever Intercepted

Furthermore, Plaintiff's Complaint fails to plausibly allege that Defendant intercepted the "contents" of communications, as defined by the Wiretap Act. The Wiretap Act defines "contents" as "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication. M.G.L. c. 272 § 99(B)(5). Because Plaintiff relies only on allegations of what a hypothetical user's experience on Defendant's Website would be, she has failed to plausibly allege the existence of any communication that she personally had with Tufts MC. (Compl. ¶¶ 10, 58-96.) Accordingly, she has failed to plausibly allege the "contents" requirement of the Wiretap Act. *See Kurowski I*, 2023 WL 2349606, at *5 ("Moreover, the hypotheticals provided by Kurowski appear to illustrate only what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website. Kurowski does not allege what surreptitious patient data disclosures occur when an actual Rush patient enters her MyChart portal and navigates through it."); *Cousin*, 2023 WL 4484441, at *4 (dismissing all of plaintiff's claims when relying on a hypothetical user's experience).

18

Assuming *arguendo* that Plaintiff could cure this defect, **Plaintiff's hypothetical allegations** nevertheless fail to satisfy the statutory definition of "contents." While Massachusetts appellate courts have not yet analyzed the meaning of "contents" under the Wiretap Act, federal case law is informative because the Massachusetts Wiretap Act defines "contents" similarly to the federal wiretapping statute, 18 U.S.C. § 2510 ("ECPA"). *See Com. v. Ashford*, 486 Mass. 450, 462 (2020) (recognizing federal construction of federal counterpart "highly persuasive" where the Massachusetts state law was explicitly modeled after its federal counterpart). Like the Massachusetts Wiretap Act, the ECPA defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8).[5]

In interpreting the meaning of contents under the ECPA, courts distinguish between the substantive "contents" of a communication and mere "record information." Stated differently, to be liable under the ECPA, a defendant must intercept "the intended message conveyed by the communication," such as the substance and subject of an email message or words in a telephone call. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). Contrary to the substantive communication, "non-content" or "record information" is not actionable, even if collected. *Cookie Placement*, 806 F.3d at 135; *In re Zynga Priv. Litig.*, 750 at 1108.[6]

---

[5] It bears mentioning that the Massachusetts Wiretap Act, unlike the federal ECPA, also includes as part of its definition of "contents," "information concerning the identity of the parties to such communication," M.G.L. c .272, § 99(B)(5). However, as Plaintiff pleads only hypotheticals, she has not plead any facts from which it can plausibly be inferred that information concerning the identities of the parties to any of the purported communications were identified. (Compl. ¶¶ 58-96.) Instead, Plaintiff's Complaint at best alleges that IP addresses and URL information was disclosed to third parties, and fails to allege any facts to support how this information can be traced to identify an actual individual as opposed to a device, browser, or router. (*Id.* at ¶¶ 45-49.)

[6] Although later courts have suggested that some URLs *could* rise to the level of a communication, such as when the URL reflects the results of a user search, Plaintiff has not alleged facts regarding any search she conducted on the Tufts MC public website. *See In re Facebook Tracking Litig. Inc.*, 956 F.3d 589 (9th Cir. 2020).

In this case, even if the factual allegations in Plaintiff's Complaint were true (they are not), such information nevertheless fails to satisfy the Wiretap Act's definition of "contents." Specifically, the IP address, URLs, cookies, and other allegedly disclosed information does not amount to the substance, purport, or meaning of the communication; they are non-content information that is outside of the Wiretap Act's purview. M.G.L. c .272, § 99(B)(5). Plaintiff has failed to allege what, if any, substance of her personal communication occurred, relying instead on a hypothetical user's alleged experience. (Compl. ¶¶ 58-96.) At best, the information allegedly collected and disclosed is the same type of "extrinsic information used to route a communication" that courts have repeatedly concluded does not constitute "contents" under wiretap statutes. *Cookie Placement*, 806 F.3d at 135; *see also Cousin*, 2023 WL 4484441 at *9 (granting motion to dismiss where "Plaintiffs do not provide sufficient factual support to plausibly claim their content was intercepted by Meta as a result of installing Meta Pixel on Sharp's webpage").

## V.    CONCLUSION

For the reasons and authorities set forth above, Tufts MC respectfully asks the Court to grant its motion to dismiss, with prejudice.

Dated: August 17, 2023

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 17, 2023 copies of the foregoing memorandum were transmitted electronically via email to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: _____
Asst. Clerk

/s/ James H. Rollinson

*Attorney for Defendant Tufts MC*

1

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 333 of 485
Docket Number 2384CV00930

**18**

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION** |
| Plaintiff, | CIVIL ACTION NO. 2384CV00930-BLS1 |
| v. | |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

## <u>DECLARATION OF ELIZABETH A. SCULLY</u>

I, Elizabeth A. Scully, make this declaration pursuant to M.G.L. c. 268 § 1A and Rule 15 of the Massachusetts Superior Court Rules and hereby declare and state as follows:

1. I am over the age of 21 and competent to make this declaration. I have personal knowledge of the information set forth in this declaration and could testify to these matters if asked to do so.

2. I am currently one of the attorneys representing Tufts Medical Center, Inc. ("Tufts MC") in the above-captioned action.

3. In support of Tufts MC's Motion to Dismiss, attached as Exhibit A is a true and complete copy of Tufts MC's Website Privacy Policy.

Pursuant to M.G.L. c. 268 § 1A and Rule 15 of the Massachusetts Superior Court Rules, I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: August 17, 2023
Washington, D.C.

_____
Elizabeth A. Scully

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2023, copies of the foregoing were served on the

following by email at the email addresses listed below:

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

/s/ Elizabeth A. Scully
*One of the attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

# Exhibit A

# Tufts Medicine
## Tufts Medical Center

# Website Privacy Policy

Patients' and other visitors' privacy and security is a top priority at Tufts Medical Center. Learn more about how we protect patient information. (/patient-care-services/patient-rights/hipaa)

The website privacy policy will tell you about the type of information our websites collect, how it is used and how to set your preferences. By visiting the Tufts Medical Center websites, you accept this privacy policy. Please read below before using our sites. Collectively, we refer to both sites as Tufts Medical Center for the purpose of this document.

## Your information

All visitors use the Tufts Medical Center websites anonymously. We do not collect any identifiable information unless you specifically provide us with that information voluntarily through our forms such as request appointment forms, e-newsletter sign-ups, clinical trial enrollment, etc. By submitting this information voluntarily, you grant Tufts Medical Center the right to transmit, monitor, retrieve and securely store your information. We adhere to all requirements outlined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (/patient-care-services/patient-rights/hipaa).

Tufts Medical Center only uses your voluntarily supplied information to fulfill online requests, respond to customer service inquiries and track usage of the website or in other ways required by law. We may also use this information to contact you to provide health-related information on new services and/or products that may be of interest to you, information you have requested, surveys and/or event invitations, updates and programs. Comments and other survey results you submit may be published on the website in a de-identified manner. You may opt-out of any Tufts Medical Center communication at any time. You can manage your email subscriptions at the bottom of any of our emails. For other communication you may call us at 617-636-5000. Please note this opt-out does not include your medical communication through our portal, which is managed separately.

Only authorized staff at Tufts Medical Center who are responsible for responding and tracking online requests have access to the identifiable information you enter in the online forms. Tufts Medical Center does not and will never sell or rent any identifiable information to third party vendors.

## Data security

Tufts Medical Center uses various technologies to make every effort to secure your information as much as possible. Although, we make every effort to protect your personal information, Tufts Medical Center cannot warrant the security of any information you transmit to us through online applications, you do that at your own risk. We use Secure Socket Layer (SSL) encryption to protect information. SSL is the industry standard. However, Tufts Medical Center is not responsible if unauthorized parties gain access to confidential information voluntarily shared over our online forms. To protect your privacy, please do not use online forms to communicate information that you consider confidential.

We do not take responsibility for the collection of information, data, disclosures or the security policies and practices of third party organizations such as Facebook or any other social media provider. This is in addition, but not limited to, Apple, Google, Microsoft, app developers, operating systems or service providers who you may disclose your personal information to and may be linked to our site or social media pages.

## Additional information

*Cookies and tracking pixels*

The Tufts Medical Center websites use "cookies" and "tracking pixels, or tags" to track our website analytics. This allows us, for example, to determine the most popular pages on our website, how people get to our site and what activities visitors do while on the site. This helps us improve the experience, provide relevant content and better serve our visitors. Cookies are a small piece of code sent to your browser by a website you visit. Cookies are used by search engines and sites to remember your preferences. A tracking pixel, often referred to as a tag, is HTML code, which is loaded when you click on an ad, visit a website, or open an email to track behavior and actions on the site. They do not

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk
Docket Number 2384CV00930

Website Privacy Policy at Tufts Medical Center

provide us with any personally identifiable information.

Most internet browsers automatically accept cookies, but you can set your browser to refuse them or to alert you when they are being sent. You can access the information on the Tufts Medical Center websites without enabling cookies in your browser. You can manage Google cookies by going to https://policies.google.com/technologies/managing (https://policies.google.com/technologies/managing). Please note that if you delete your cookies or upgrade your browser you will have to opt-out again.

We may additionally collect interest or behavioral information based on users' activity on our website and then provide related Tufts Medical Center digital advertising. We may also target "lookalike" audiences relying on interest and behavioral data but never on patient, clinical or portal information. You can opt-out of receiving interest-based advertising through the Digital Advertising Alliance (DAA) website: http://www.aboutads.info/choices. (http://www.aboutads.info/choices)

Tufts Medical Center uses web analytics and tag management services and tools, such as Google Tag Manager, provided by Google, Inc., and other third parties to collect certain information relating to use of our advertising and websites. To find out how Google uses data go to: https://policies.google.com/technologies/partner-sites (https://policies.google.com/technologies/partner-sites). To opt-out of Google Analytics you can go to https://tools.google.com/dlpage/gaoptout/ (https://tools.google.com/dlpage/gaoptout/).

*Links to external websites*

This Website Privacy Policy applies only to the Tufts Medical Center websites. In some cases, our website includes links to other websites to provide more information. We do not have authority over external organizations' websites and this policy does not apply to external sites that are provided as links.

*Changes to this policy*

Tufts Medical Center reserve the right to change or update this policy without notice, so please review it periodically to keep informed of any changes.

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| KAREN MCMANUS,<br><br>For herself and the Class,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2834-CV-000930-BLS1 |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

I HEREBY ATTEST AND CERTIFY ON
_January 8, 2025_, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

## Table of Contents

I.      Introduction ...................................................................................................1

II.     The Facts. ......................................................................................................2

        A.    The Tracking Technologies.............................................................2

        B.    The Interceptions Were Secret .......................................................3

        C.    Allegations Regarding the Plaintiff................................................3

III.    Argument.......................................................................................................3

        A.    Plaintiff Has Standing to Assert an MWA Claim. .........................4

        B.    The MWA Applies to Internet Communications ...........................7

        C.    Plaintiff Alleges Tufts MC's Use of an Intercepting Device.........9

        D.    Plaintiff Alleges an Interception...................................................10

        E.    The "Telephone Equipment" Defense Does Not Apply................12

              1.    Tracking Technologies Are Not Telephone Equipment. ...................12

              2.    Tufts MC Did Not Use Tracking Technologies in the Ordinary
                    Course of Its Business.......................................................13

        F.    The Interceptions Tufts MC Facilitated Were Secret. ..................14

        G.    The MWA Provides a Remedy for Interceptions of Communications
              Between Massachusetts Parties, Effected Through a Device Located in
              Massachusetts........................................................................17

        H.    Plaintiff Alleges the Interception of "Contents" of Wire Communications. ..............19

IV.     Conclusion...................................................................................................20

## Table of Authorities

Pages

**Cases**

*Alves v. BJ's Wholesale Club, Inc.,*
2023 Mass. Super. LEXIS 59 (Super. Ct. June 21, 2023) .............................3, 12, 13

*Backhaut v. Apple, Inc.,*
74 F. Supp. 3d 1033 (N.D. Cal. Nov. 19, 2014) ...................................................10

*Barrows v. Farmum's Stage Lines, Inc.,*
254 Mass. 240 (1926) ...........................................................................................5

*Calhoun v. Google, LLC,*
526 F. Supp. 3d 605 (N.D. Cal. Mar. 17, 2021) ..................................................15

*Campbell v. Facebook, Inc.,*
951 F.3d 1106 (9th Cir. 2020) ..............................................................................6

*Cardoso v. Whirlpool Corp.,*
2021 WL 2820822 (S.D. Fla. July 6, 2021) .........................................................10

*Commonwealth v. Alleyne,*
2007 Mass. Super. LEXIS 591 (Nov. 1, 2007) .....................................................8

*Commonwealth v. Blood,*
400 Mass. 61 (1987) .............................................................................................11

*Commonwealth v. Connolly,*
454 Mass. 808 (2009) ...........................................................................................8

*Commonwealth v. Hyde,*
434 Mass 594 (2001) ............................................................................................9

*Commonwealth v. Jackson,*
370 Mass. 502 (1976) ......................................................................................7, 14

*Commonwealth v. Moody,*
466 Mass. 196 (2013) ...........................................................................................8

*Commonwealth v. Morganti,*
455 Mass. 388 (2009) ...........................................................................................16

*Commonwealth v. Rainey,*
491 Mass. 632 (2023) .......................................................................................8, 16

*Commonwealth v. Wilcox,*
    63 Mass. App. Ct. 131 (App. Ct. 2005)...................................................................18

*Connor v. Whirlpool Corp.,*
    2021 WL 3076477 (S.D. Fla. July 6, 2021) ............................................................10

*Cosme v. Whitin Mach. Works,*
    417 Mass. 643 (1994) ...............................................................................................18

*Cousin v. Sharp Healthcare,*
    2023 U.S. Dist. LEXIS 120211 (S.D. Cal. July 12, 2013).................................. 4, 20

*Crosland v. Horgan,*
    401 Mass. 271 (1987) ...............................................................................................13

*Crowley v. Cybersource Corp.,*
    166 F. Supp. 2d 1263 (N.D. Cal. 2001) ...................................................................10

*Curtatone v. Barstool Sports, Inc.,*
    487 Mass. 655 (2021) ...............................................................................................16

*Dillon v. Mass. Bay Transp. Auth.,*
    49 Mass. App. Ct. 309 (App. Ct. 2000)....................................................................13

*District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.,*
    379 Mass. 586 (1980) ...............................................................................................20

*Doe v. Bon Secours Mercy Health,*
    Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) ..................................................4

*Doe v. Medstar Health, Inc.,*
    No. 24-C-20-000591 (Md. Cir. Ct. 2022) ..................................................................4

*Doe v. Partners Healthcare System, Inc.,*
    Case No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) ...................passim

*Doe v. Sutter Health,*
    Case No. 34-2019-00258072 (Cal. Cty. Ct. June 9, 2022) ................................ 4, 7, 9

*Doe v. University Hospitals Health System, Inc.,*
    Case No. CV-20-93333357 (Ohio Ct. Com. Pleas Nov. 16, 2020) ...........................4

*Enos v. Secretary of Envt'l Affairs,*
    432 Mass. 132 (2000) .................................................................................................6

*Fournier v. Troianello,*
    332 Mass. 636 (1955) .................................................................................................5

*Gilk v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011) ........................................................................9

*Ginther v. Comm'r of Ins.,*
   427 Mass. 319 (1998) ...............................................................................6

*Haufler v. Zotos,*
   446 Mass. 489 (2006) ...............................................................................15

*Heffernan v. Hashampour,*
   2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009) .......................17, 18, 19

*Hill v. MCI WorldCom Communs., Inc.,*
   120 F. Supp. 2d 1194 (S.D. Iowa 2000)....................................................19

*Ideal Aerosmith, Inc. v. Acutronic U.S., Inc.,*
   2007 U.S. Dist. LEXIS 91644 (W.D. Pa. Dec. 13, 2007)............................10

*In re Carrier IQ, Inc. Consumer Privacy Litig.,*
   78 F. Supp. 3d 1051 (N.D.Cal. 2015)........................................................9

*In re Facebook, Inc.,*
   402 F. Supp. 3d 767 (N.D. Cal. 2019).......................................................15

*In re Google Inc. Cookie Placement Consumer Privacy Litig.,*
   934 F.3d 316 (3d Cir. 2019).......................................................................6

*In re Google Location History Litig.,*
   428 F. Supp. 3d 185 (N.D. Cal. 2019).......................................................15

*In re Meta Pixel Healthcare Litig.,*
   2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022).........................4, 9, 11

*In re Pharmatrak, Inc. Privacy Litig.,*
   329 F.3d 9 (1st Cir. 2003) .........................................................................4, 11, 14

*In re: Google Inc. Cookie Placement Consumer Privacy Litig.,*
   806 F.3d 125 (3d Cir. 2015).......................................................................11

*Jacome v. Spirit Airlines,*
   2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021) ...........................9

*Johnson v. Frei,*
   2016 Mass. App. Div. LEXIS 36 (App. Div. 2016)....................................9

*Johnson v. Frei,*
   93 Mass. App. Ct. 1111 (App. Ct. 2018) ...................................................5

*Keikian v. Norwegian Cruise Line,*
    2004 Mass. App. Div. 91 (App. Div. 2004)..............................................................15

*Kurkowski v. Rush Sys. for Health,*
    2023 U.S. Dist. LEXIS 126777 (N.D. Ill. July 24, 2023) ......................................4

*Kurkowski v. Rush Sys. for Health,*
    2023 U.S. Dist. LEXIS 35702 (N.D. Ill. Mar 3, 2023) ....................................4, 20

*Lopez v. Apple, Inc.,*
    519 F. Supp. 3d 672 (N.D. Cal. 2021)..............................................................14, 15

*Luis v. Zang,*
    833 F.3d 619 (6th Cir. 2016) ...................................................................9, 11, 19

*Marquis v. Google Inc.,*
    No. 11-2808-BLS1 (Super. Ct. Jan. 17, 2012)................................................8, 17

*Marquis v. Google,*
    2015 WL 130375277 (Mass. Super. Ct. Feb. 13, 2015) ......................................19

*Martin v. Evans,*
    241 F. Supp. 3d 276 (D. Mass. 2017).....................................................................9

*Mount v. Pulsepoint, Inc.,*
    684 Fed. Appx. 32 (2d Cir. 2017) ..........................................................................6

*O'Sullivan v. NYNEX Corp.,*
    426 Mass. 261 (1997)...................................................................................12, 13

*Pendell v. AMS/Oil, Inc.,*
    1986 U.S. Dist. LEXIS 26089 (D. Mass. Apr. 30, 1986)......................................18

*Pishev v. Somerville,*
    95 Mass. App. Ct. 678 (2019)................................................................................6

*Popa v. Harriet Carter Gifts, Inc.,*
    52 F.4th 121 (3d Cir. 2022) .................................................................................19

*Potter v. Havlicek,*
    2008 U.S. Dist. LEXIS 122211 (S.D. Ohio June 23, 2008)..................................10

*Project Veritas Action Fund v. Rollins,*
    982 F.3d 813 (1st Cir. 2020) .................................................................................9

*Pugsley v. Police Dep't of Boston,*
    472 Mass. 367 (2015)............................................................................................6

*Rackemann v. LISNR, Inc.,*
   2017 U.S. Dist. LEXIS 162567 (S.D. Ind. 2017) ..................................................7

*Restuccia v. Burk Tech., Inc.,*
   1996 Mass. Super. LEXIS 367 (Super. Ct. Aug. 13, 1996) ..................................13

*Rich v. Rich,*
   2011 Mass. Super. LEXIS 148 (Super Ct. July 8, 2011) ............................ 8, 9, 11

*Smith v. Facebook, Inc.,*
   745 F. App'x 8 (9th Cir. 2018) ..............................................................................4

*Spokeo Inc. v. Robins,*
   578 U.S. 330 (2016) ................................................................................................5

*State v. Worthy,*
   661 A.2d 1244 (N.J. 1995) ....................................................................................18

*Ultimate Outdoor Movies, LLC v. Funflicks, LLC,*
   2019 U.S. Dist. LEXIS 86763 (D. Md. May 23, 2019) ........................................10

*United Food & Com. Workers Union v. Police Chief of Natick,*
   29 Mass. App. Ct. 554 (App. Ct. 1990) ..................................................................5

*United States v. Hutchins,*
   2018 U.S. Dist. LEXIS 183898 (E.D. Wis. 2018) ..................................................9

*United States v. Lyons,*
   740 F.3d 702 (1st Cir. 2014) ..................................................................................7

*United States v. Szymuszkiewicz,*
   622 F.3d 701 (7th Cir. 2010) ................................................................................11

*Weld v. Glaxo Wellcome, Inc.,*
   434 Mass. 81 (2001) ................................................................................................6

*Williams v. Poulos,*
   11 F.3d 271 (1st Cir. 1993) ...................................................................................13

## Statutes

Fla. Stat. § 934.02 ..................................................................................................10

M.G.L. c. 272 § 99 ..........................................................................................passim

## Treatises

Rest. (2d) Conflict of Laws § 152 .........................................................................18

## I.    INTRODUCTION

Tufts Medical Center ("Tufts MC") aided third parties—including Google and Facebook—to secretly intercept Plaintiff Karen McManus's ("Plaintiff") and other consumers' wire communications with Tufts MC. Tufts MC injected hidden code for tracking technologies into its website, including Google Analytics and Facebook's Meta Pixel, but did not disclose the resulting interceptions to consumers. Plaintiff asserts a claim under the Massachusetts Wiretap Act, G.L. c. 272 § 99 ("MWA").

Plaintiff's claim follows a well-tread path of cases arising from the undisclosed use of tracking technologies, including Google Analytics and Meta Pixel, on healthcare providers' websites. At least eight courts have affirmed wiretap and similar claims relating to tracking technologies such as Meta Pixel and Google Analytics, including in *Doe v. Partners Healthcare System, Inc.*, where this Court (Davis, J.) rejected several arguments Tufts MC makes here.[1] Tufts MC's arguments for dismissal each lack merit.

*First*, Tufts MC argues Plaintiff lacks standing to bring an MWA claim. The MWA, however, defines precisely who has standing to bring a claim, and Plaintiff meets those requirements.

*Second,* Tufts MC argues that the MWA protects only "human-to-human conversations" such as in-person or telephone conversations, and Plaintiff's claims do not involve those types of communication. The MWA's terms are not limited to in-person and telephone communications; the Legislature designed the MWA to apply to emerging technologies.

*Third*, Tufts MC argues that the tracking technologies are not "intercepting devices" because they are implemented using computer code, and such "code" is not a "device." Ample authority under the MWA and similar laws confirms that Plaintiff's allegations describe an intercepting device.

*Fourth*, Tufts MC attempts to invoke the "telephone equipment" exception to liability but demonstrates neither required element for the defense—that the technologies are "telephone equipment" nor that Tufts MC used the technologies in the ordinary course of its healthcare business.

---

[1] *See* Ex. A (motion to dismiss in *Partners*, Case No. 1984CV01651-BLS1); Ex. B (Nov. 20, 2020 order denying motion to dismiss); Ex. C (transcript of motion to dismiss hearing explaining Court's reasoning, incorporated into order denying motion to dismiss).

*Fifth*, Tufts MC argues the interceptions were not "secret." Nothing in the Complaint establishes Plaintiff's actual knowledge of the eavesdropping, which Tufts MC must prove for the defense.

*Sixth*, Tufts MC argues that the MWA does not apply because Plaintiff fails to allege interceptions occurred in Massachusetts. Not true. The intercepted communications were between two Massachusetts parties accomplished through devices located in Massachusetts. On these facts, Plaintiff states a claim.

*Seventh*, Tufts MC argues that no "contents" were intercepted. To the contrary, Plaintiff alleges interception of information concerning the identity of the parties **and** the communications' substance.

## II.    THE FACTS.

A.    *The Tracking Technologies*

Tufts MC injected hidden code in its website that enabled third parties, including Google, Facebook, LinkedIn, and others, to intercept healthcare consumers' communications with Tufts MC. ¶¶ 31–58, 96.[2] Tufts MC caused website users' browsers to load hidden code when the user visits the website. ¶ 54–55, 59. The code causes the browser to intercept information about the contents of each webpage Plaintiff visited and transmit that information to third parties. ¶¶ 63–65, 69–73.

The contents intercepted include: (i) URLs of webpages visited (an identifier that acts as an address for a webpage but also describes the content of the webpage, *e.g.,* https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview), *e.g.,* ¶¶ 52, 64, 70, 76, 78–79; (ii) the title of each page visited (such as "Obstetric and Gynecology in Boston | Tufts Medical Center"), *e.g.,* ¶ 79; and (iii) actions users took on the website, including appointment requests, symptom searches, find-a-doctor searches, bill payments, and records requests ¶ 78–95. Tufts MC installed the trackers throughout its website. ¶ 58.

The interceptions revealed identifying information about users designed to enable Google and Facebook to use the intercepted contents for individualized advertising, including IP addresses, ¶¶ 29,

---

[2] "¶ __" refers to paragraphs of Plaintiff's Complaint.

46, 53, 67, 71; browser fingerprints, ¶¶ 68, 72; personal identifiers assigned by Google or Facebook used to track an individual's movements across and actions on the Tufts MC Website, ¶¶ 65, 73.

    B.    *The Interceptions Were Secret.*

The interceptions were secret and performed without the consent of Plaintiff and class members. The code for the tracking technologies was invisible to the website user, implemented through hidden code that is not depicted visually in any part of the website visible to the website user. ¶¶ 34, 49, 54, 59. Although Tufts MC disclosed it used "tools" made by "third parties" that permitted **Tufts MC** to collect certain information, Scully Decl. Ex. A, it did not disclose it permits those third parties to eavesdrop on such communications. Tufts MC also falsely promised that "[a]ll visitors use the [Tufts MC Website] anonymously" (¶ 26), but Google Analytics and Meta Pixel are designed to identify website users to enable personalized advertising. ¶¶ 2, 23, 29, 37–39.

    C.    *Allegations Regarding the Plaintiff.*

Plaintiff is a resident of Massachusetts and a policyholder of Tufts MC. ¶ 10. She regularly uses the Tufts MC Website to obtain information about doctors, search for information on medical procedures, and obtain and review medical records. *Id.* The pages on the Tufts MC Website Plaintiff visits are the same pages on which Tufts MC used the tracking technologies. ¶¶ 58, 85–89, 93–95 (trackers used on practically all pages, including medical searches, find-a-doctor searches, and records requests).

Plaintiff alleges that she and other Class Members are "Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed" the Tufts MC Website. ¶ 100. That is, Plaintiff's claims concern communications between Massachusetts residents and a Massachusetts hospital made while Plaintiff and other Class Members were physically present within Massachusetts. *Id.*

## III.    ARGUMENT

At least eight courts have upheld claims relating to tracking technologies similar to those here. These include this Court's decisions in *Partners* (see n.1 & accompanying text, *supra*) and *Alves v. BJ's Wholesale Club, Inc.*, 2023 Mass. Super. LEXIS 59 (Super. Ct. June 21, 2023); *In re Pharmatrak, Inc. Privacy*

*Litig.*, 329 F.3d 9 (1st Cir. 2003) (upholding wiretap claims relating to trackers on pharmaceutical

websites); *In re Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022)

(plaintiffs made a "strong showing as to each of the elements of their [federal] Wiretap Act claim" relating

to Meta Pixel on hospital websites); *Doe v. Medstar Health, Inc.*, No. 24-C-20-000591 (Md. Cir. Ct. 2022)

(Ex. D); *Doe v. Sutter Health*, Case No. 34-2019-00258072 (Cal. Cnty. Ct. June 9, 2022) (Ex. E); *Doe v. Bon

Secours Mercy Health*, Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) (Ex. F); *Doe v. University Hospitals

Health System, Inc.*, Case No. CV-20-933357 (Ohio Ct. Com. Pleas Nov. 16, 2020) (Ex. G).[3]

These cases and the serious faults in Tufts MC's arguments on particular MWA elements, to

which Plaintiff responds below, compel the conclusion that Plaintiff amply states a claim under the MWA.

A.    *Plaintiff Has Standing to Assert an MWA Claim.*

The MWA's civil remedy provision provides:

> Any **aggrieved person** whose oral or wire communications were intercepted,
> disclosed, or used…by means of an interception except as permitted or authorized by
> this section shall have a civil cause of action against any person who so intercepts,
> discloses or uses such communications….

M.G.L. c. 272 § 99(Q) (emphasis added). The same section mandates that an "aggrieved person" "**shall**

be entitled to recover" liquidated damages plus other remedies. *Id.* (emphasis added). It defines an

"aggrieved person" as "any individual who was a party to an intercepted wire or oral communication."

That is, the MWA commands, in unambiguous terms, that upon showing that a person was a party to an

intercepted wire communication, that person "shall" be awarded the remedies the MWA provides.

---

[3] The cases Tufts MC cites in its introduction either involved different factual scenarios or materially
different statutes. The dispositive issue in *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018), was a
disclosure in **Facebook's** terms of service. Here, Tufts MC's disclosures failed to disclose the
eavesdropping Plaintiff alleges. *See* § III-F, *infra.* The two decisions Tufts MC cites from *Kurkowski v. Rush
Sys. for Health* each turned on the federal wiretap law's exception to liability where one party to a
communication consents to an interception. 2023 U.S. Dist. LEXIS 35702, at *8–14 (N.D. Ill. Mar 3,
2023); 2023 U.S. Dist. LEXIS 126777, at *4–12 (N.D. Ill. July 24, 2023). The MWA has no one-party
consent defense and instead imposes a stricter standard, providing a defense only where "prior authority
by **all** parties to such communication" is obtained for an interception. M.G.L. c. 272 § 99(B)(4) (emphasis
added). Tufts MC's other case—*Cousin v. Sharp Healthcare*, 2023 U.S. Dist. LEXIS 120211, at *8–9 (S.D.
Cal. July 12, 2013)—appears likewise to have been driven by an assumption that the plaintiff must plead
the interception of "Protected Health Information" to state a claim.

Tufts MC asks the Court to ignore the MWA's express terms and instead, by judicial fiat, repeal so much of the MWA as provides relief to citizens of the Commonwealth unless they prove some form of harm or injury **in addition** to the injury the Legislature defined in the MWA. Tufts MC cites no basis or authority to impose such requirements for an MWA claim. MTD[4] 6–8. There is none.

In contrast to federal courts, as to which the U.S. Constitution places limits on Congress's ability to confer standing,[5] Massachusetts courts have long acknowledged the Legislature has discretion, unrestrained by any constitutional limitations, to define injuries and confer standing:

> The State has power to confer jurisdiction upon its courts to consider suits at the instance of those who have very remote and even no personal interest in the subject matter…. A stated number of citizens or a single individual may be clothed by the Legislature with authority to invoke the aid of courts in the suppression of violations of law.

*Fournier v. Troianello*, 332 Mass. 636, 639 (1955) (quoting *Barrows v. Farnum's Stage Lines, Inc.*, 254 Mass. 240, 243 (1926)); *Loc. 1445, United Food & Com. Workers Union v. Police Chief of Natick*, 29 Mass. App. Ct. 554, 488 (App. Ct. 1990) ("When a statute confers standing in relation to particular subject matter, that statute…governs who may initiate legal action in relation to the subject matter.").

Because the Legislature has defined who has standing to bring an MWA claim, the Court must apply the MWA's terms and cannot graft onto the statute an "injury" requirement that differs from the MWA's text. *Johnson v. Frei*, 93 Mass. App. Ct. 1111 (App. Ct. 2018) (because "an 'aggrieved person' is defined as 'any individual who was a party to an intercepted wire or oral communication,'" and "there is no dispute that [defendant] secretly recorded [the plaintiff, then the plaintiff] meets the plain reading of an 'aggrieved person under the statute **and we need not look further**.") (emphasis added).

Notably, the SJC expressly affirmed that statutory damages may be awarded under the MWA to an aggrieved person "even though…no actual harm has been incurred," while additional, punitive damages require such proof of actual harm. *Pine v. Rust*, 400 Mass. 411, 414–16 (1989).

---

[4] "MTD" is Tufts MC's Memorandum in Support of Tufts MC's Motion to Dismiss.
[5] Article III limits the "judicial Power" of the federal courts to "Cases" and "Controversies." U.S. Const. Art. III § 2. This constitutional provision, for which there is no Massachusetts analogue, limits Congress's power to confer standing in federal courts. *Spokeo Inc. v. Robins*, 578 U.S. 330, 339 (2016).

Tufts MC's federal court authorities construing Article III do not apply here because Article III does not constrain Massachusetts courts.[6] *Weld v. Glaxo Wellcome, Inc.*, 434 Mass. 81, 88 (2001) ("State courts…are not burdened by these same [Article III] jurisdictional concerns…."). The state court cases Tufts MC cites in which courts have borrowed injury language from federal law (MTD 6–8) involved (i) statutes that confer standing to an "aggrieved" person without defining that term; or (ii) judicially created claims for which the court fashioned an injury requirement without statutory direction.[7] None of Tufts MC's cases impose different standing requirements where a statute defines an injury and confers standing.

As reflected in the United States Supreme Court's recent 5–4 decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the notion that a plaintiff must plead an injury in addition to an injury defined by statute is controversial even in federal courts, where Article III applies. *Id.* at 2220 (Thomas, J., dissenting on behalf of four justices, concluding that "[a] statute that creates a private right and cause of action…*does* give plaintiffs an adequate interest in vindicating their private rights in federal court") (emphasis in original). This Court should not adopt a rule that is controversial even in federal courts, given that Article III does not apply here, and the SJC has never even hinted at similar constraints on the Legislature's authority to define injuries and confer standing.

Finally, that Plaintiff did not specify the precise pages she visited or the exact dates she visited them does not matter. Plaintiff need not plead the communications were sensitive; any interception of

---

[6] Even if the Court were to impose an injury requirement similar to Article III, a violation of wiretap laws, without more, meets any such requirement. *Campbell v. Facebook, Inc.,* 951 F.3d 1106, 1117–19 (9th Cir. 2020) ("[A] wiretapping plaintiff need not allege any further harm to have standing [under Article III]."); *In re Google Inc. Cookie Placement Consumer Privacy Litig.,* 934 F.3d 316, 325 (3d Cir. 2019) (same); *Mount v. Pulsepoint, Inc.,* 684 Fed. Appx. 32, 34–35 (2d Cir. 2017) ("unauthorized…monitoring of plaintiffs' web-browsing activity" sufficient for Article III).

[7] *Ginther v. Comm'r of Ins.,* 427 Mass. 319, 324 (1998) (construing insurance statute's grant of appeal to "any person aggrieved" by decision of insurance commissioner); *Pugsley v. Police Dep't of Boston,* 472 Mass. 367, 370–71 (2015) (construing state discrimination claims, but statute did not define who is "aggrieved"); *Pishev v. Somerville,* 95 Mass. App. Ct. 678, 683 (2019) (judicially created claim for challenging statutory eminent domain where statute did not provide claim or delineate who may bring a claim). Another case Tufts MC cites, *Enos v. Secretary of Envt'l Affairs,* 432 Mass. 132 (2000), construed the Massachusetts Environmental Protection Act to conclude that "nothing in the statute's language, purpose, or administrative scheme…suggest[s] a legislative intent that persons such as the plaintiffs should be able to seek [relief.]" *Id.* at 138. The MWA, in contrast, reveals an express intent to afford Plaintiff a remedy.

any communication supports a claim. *Commonwealth v. Jackson*, 370 Mass. 502, 506 (1976) ("[W]e would render meaningless the Legislature's careful choice of words if we were to interpret [the MWA] as encompassing only those situations where an individual has a reasonable expectation of privacy.").[8] Moreover, this is not a fraud claim; Rule 8 notice pleading standards apply. *Rackemann v. LISNR, Inc.*, 2017 U.S. Dist. LEXIS 162567, at *16–18 (S.D. Ind. 2017) ("Defendants argue that [plaintiff] has failed to identify in his Complaint any specific, private communications that were intercepted… Defendants ask this Court to apply the wrong standard…. [T]his is not a fraud case, subject to the heightened pleading requirements of [Rule 9(b)]…. [The plaintiff] is subject to the normal notice-pleading requirements….").

B.    *The MWA Applies to Internet Communications*

Tufts MC argues (MTD 11–13) the Court should limit the MWA to "human-to-human conversations" or similar communications. The MWA's plain text rejects any such limitation.

The MWA defines a "**wire** communication" as "**any** communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." M.G.L. c. 272 § 99(B)(1) (emphasis added). The communications here plainly occurred "by the aid of wire, cable, or other like connection," as the "Internet is an instrumentality" that transmits information "by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014) (construing law with similar wire communication definition).

This Court (Davis, J.) held in *Partners* that the MWA applies to tracking technologies, rejecting the defendants' arguments that Google Analytics and Meta Pixel do not involve a "communication." *See* Ex. A at 12; Exs. B, C; *see also Sutter* (Ex. E) at 3–4 (rejecting argument under California wiretap act that

---

[8] For this reason, Tufts MC's protestations (MTD 2) that no "protected patient health information" was intercepted is beside the point. Plaintiff states a claim regardless of whether sensitive information was involved. In any event, contrary to Tufts MC's unsourced factual contentions (MTD 2), Tufts MC **did** use tracking technologies on sensitive pages that revealed users' patient status and health information, including find-a-doctor searches, appointment requests, and medical record requests. ¶¶ 80–84, 87–95.

participants to communication must each be "natural persons," collecting authorities construing federal wiretap act that reject the same argument).

That the Massachusetts legislature has not amended the MWA to carve out a provision for "electronic communications" separate from "wire communications" (MTD 9) does not reflect any intent to exclude electronic wire communications. It is not the case, as Tufts MC contends (MTD 12), that Congress "expand[ed] the scope" of the federal law in the 1986 amendment. Before the amendment, "the federal definition of 'wire communication' was broad enough to include [electronic] communications." *Rich v. Rich*, 2011 Mass. Super. LEXIS 148, at *13–14 (Super Ct. July 8, 2011). Congress's amendment "purposefully **narrowed** the definition of 'wire communication'" to **exclude** electronic communications, *Commonwealth v. Moody*, 466 Mass. 196, 207 (2013), in order to tailor different requirements and exceptions to liability specific to electronic wire communications, *e.g.,* 18 U.S.C. § 2511(g)(1), (h)(ii). As to the MWA, the Legislature has never narrowed the definition of "wire communication" and instead has made clear that the MWA applies broadly to "**electronic** surveillance devices." M.G.L. c. 272 § 99(A) (emphasis added). The SJC has confirmed the MWA "is broad enough to cover non-oral electronic transmissions." *Moody*, 466 Mass. at 208; *Marquis v. Google Inc.*, No. 11-2808-BLS1, Order on Motion to Dismiss at 4–5 (Super. Ct. Jan. 17, 2012) (Ex. H) (rejecting argument that "had the Legislature desired to include…electronic communications in the [MWA], then it would have done so expressly").

The cases Tufts MC cites applying the MWA to devices "like bugs" used to intercept human conversation do not hold that the MWA is limited to only of such forms of communication.[9] The MWA applies to the internet wire communications at issue here.

---

[9] *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023) (referencing "conversations," but **no** holding limiting "wire communication" to human-to-human communications); *Commonwealth v. Alleyne*, 2007 Mass. Super. LEXIS 591, at *4–6 (Nov. 1, 2007) (applying MWA to cell phone conversations, but **no** suggestion of exclusion of website communications); *Rich*, 2011 Mass. Super. LEXIS 148, at *12 (holding MWA language is "sufficiently broad to include… new technologies" including "email and instant messaging"; **no** suggestion of exclusion of other forms of internet communication); *Commonwealth v. Connolly*, 454 Mass. 808, 825 (2009) (holding "[d]ata from GPS devices…does not fall within the language of the wiretap statute," but case involved no communication). Tufts MC's citation to *Commonwealth v. Hyde*, 434

C.     *Plaintiff Alleges Tufts MC's Use of an Intercepting Device.*

Tufts MC argues the interceptions involve no "intercepting device" because "device" does not include computer "code." MTD 13–16. On the contrary, the MWA does not exclude interceptions merely because software is involved. The Superior Court in *Rich v. Rich* confirmed, in discussing hidden software that records activities on a computer, that such a "logger program is an 'intercepting device' (at least when surreptitiously installed on a computer) because it 'is capable of…recording a wire…communication.'" *Rich*, 2011 Mass. Super. LEXIS 148, at *15–16. This Court in *Partners* and *Alves* also denied motions to dismiss claims arising from tracking technologies. *Rich*, *Partners*, and *Alves* align with the weight of authority construing the same word, "device," under federal and other states' wiretap laws.[10]

These decisions align with common sense. Practically all modern devices are a combination of hardware and software. Construing the phrase "intercepting device" to exclude interceptions involving software would effect a judicial repeal of the MWA as applied to most modern technology.[11]

Tufts MC's cases (MTD 11–12) either do not hold as Tufts MC contends or construe materially different statutes. Tufts MC highlights a series of Florida cases construing Florida's wiretap act to exclude software. The Florida act, however, is different. In *Jacome v. Spirit Airlines*, 2021 Fla. Cir. LEXIS 1435 (Fla. Cir. Ct. June 17, 2021), the court emphasized the Florida act "exclude[s] '[a]ny communication from an

---

Mass 594 (2001), to argue the MWA covers "the interception of *speech*" is remarkable. MTD at 9 (emphasis in *Hyde*). The footnote Tufts MC cites from *Hyde* construed the phrase "oral communication," *see id.* at 600 n.6, which the MWA defines to include "speech." M.G.L. c. 272 § 99(B)(2). The fact that "oral communication" is defined by reference to "speech" but "wire communication" is not, shows that "wire communication" is not limited to "speech" or its equivalents.

[10] *Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *37 (Meta Pixel intercepts "through the use of 'devices'"); *Sutter* (Ex. E) at 5–6 (California wiretap covers Meta Pixel and Google Analytics "code"); *Luis v. Zang*, 833 F.3d 619, 634 (6th Cir. 2016) (computer spyware a "device"); *United States v. Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *34–37 (E.D. Wis. 2018) (software is "device" given "ordinary meaning of '[a] "device"); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) ("[S]oftware [which records websites visited] is a 'device' for purposes of the Wiretap Act.").

[11] Under Tufts MC's argument, cell phone recordings would be beyond the MWA's reach because cell phones use a recording app (software) to record, and software is not a "device." This is not the law. *Gilk v. Cunniffe*, 655 F.3d 78, 86 (1st Cir. 2011) (cell phone recording falls within MWA's scope); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020) (MWA "makes it…a crime…to use a smartphone to [secretly] record"); *Martin v. Evans*, 241 F. Supp. 3d 276, 286 (D. Mass. 2017) (MWA "not obviously susceptible to a limiting construction that excludes the audio recording function on cell phones") .

electronic or mechanical device which permits the tracking of the movement of a person or an object,'" *id.* at *7–8 (quoting Fla. Stat. § 934.02(12)(c)), and therefore, "software which *tracks* a website browser's movements…is thus definitionally excluded." *Id.* The MWA contains no such exclusion for devices that track the movement of a person; accordingly, *Jacome*'s reasoning does not apply to the MWA.[12]

In *Potter v. Havlicek*, a case in which the only defendant was a computer spyware software company, the court held only that the software "**alone** is not a…device" because software "**alone** cannot be used to intercept communications." 2008 U.S. Dist. LEXIS 122211, at *23 (S.D. Ohio June 23, 2008) (emphasis added). The court's use of the word "alone" implies that even if software "alone" is not a device, software in combination with hardware **may** be an "intercepting device." The court did not decide that issue, as the plaintiff asserted no claim against the party who installed the software.

Tufts MC's other cases are even further afield. Those courts, in holding a computer server was not a "'device' used for interception" (MTD 19), did not hold computers can **never** be intercepting devices but that those devices were not used to accomplish interceptions under the facts of those cases.[13]

D.    *Plaintiff Alleges an Interception.*

Buried in Tufts MC's argument on an "intercepting device" is a one-paragraph, undeveloped argument that Plaintiff fails to allege the interception of a communication "in transit." MTD 12–13. Tufts MC's argument ignores Plaintiff's allegations and fails to grapple with directly on-point case law.

---

[12] The other Florida cases Tufts MC cites simply follow *Jacome* without meaningful independent analysis. *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *6 (S.D. Fla. July 6, 2021) (citing *Jacome*); *Connor v. Whirlpool Corp.*, 2021 WL 3076477, at *6 (S.D. Fla. July 6, 2021) (same).

[13] *Ultimate Outdoor Movies, LLC v. Funflicks, LLC*, 2019 U.S. Dist. LEXIS 86763, at *60–68 (D. Md. May 23, 2019) ("This case does not involve the covert use of a surveillance device, but simply revolves around which entity has the right to receive emails associated with a trademarked domain name.") (quotations omitted); *Ideal Aerosmith, Inc. v. Acutronic U.S., Inc.*, 2007 U.S. Dist. LEXIS 91644, at *12–16 (W.D. Pa. Dec. 13, 2007) (no interception because purchaser of company's assets "had the right to monitor communications received by [the company's] server"); *Crowley v. Cybersource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001) (intended recipient of email does not use a "device" for an "interception"). As a court explained in rejecting such a broad reading of this line of cases, Tufts MC's "reliance on [*Ideal Aerosmith*] is misplaced" because "[i]n *Ideal Aerosmith*, the defendant was the intended *recipient* of an electronic communication, which is why the server or drive on which the communication was received could not be a 'device.'" *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1042–43 (N.D. Cal. Nov. 19, 2014).

The First Circuit in *Pharmatrak* explained that "some courts had narrowed the Wiretap Act's definition of interception to include only acquisitions of a communication contemporaneous with the transmission," that is, that are "in transit." 329 F.3d at 21. Although skeptical that such a requirement exists, the First Circuit held that for tracking technologies, "[t]he acquisition [is] contemporaneous with the transmission by the internet users to the pharmaceutical companies." *Id.* at 22. The court reasoned: "the clear GIF [i.e., the pixel] that enabled the interception…sometimes arrived before the content delivered" by the website. Therefore, the tracking technologies were an "interception." *Id.* The fact that there were two technically separate connections—one between the plaintiff and the website and another between the plaintiff and the third party—does not matter, as an "interception" does "not require that the acquisition somehow constitute the same communication as the transmission." *Id.*[14]

In *Partners*, the hospital made the same argument under similar facts. Ex. A at 12. Judge Davis analyzed this argument at length. He agreed with *Pharmatrak's* skepticism on whether a contemporaneity requirement even exists, observing, "I don't see any simultaneous or contemporaneous requirement in the [MWA]." Ex. C at 16-33. Ultimately, the Court rejected the argument. *Id.* at 32.[15]

As in *Pharmatrak* and *Partners*, Plaintiff **does** allege "[t]he tracking technologies intercept and transmit to third parties the contents of communications between healthcare consumers and [Tufts MC] contemporaneously with those communications," explaining that "[t]he tracking technologies intercept

---

[14] *See also Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754, at *34–35 (Meta Pixel is "designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta"); *Rich*, 2011 Mass. Super. LEXIS 148, at *14–15 (computer monitoring software that tracked user's actions satisfy any contemporaneous requirement); *Luis*, 833 F.3d at 627–32 (similar facts to *Rich* involving tracking software; same holding); *United States v. Szymuszkiecz*, 622 F.3d 701, 705–06 (7th Cir. 2010) (where transmissions are an "eyeblink" apart, "[t]hat's contemporaneous by any standard").

[15] The decision Tufts MC cites, *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 141–143 (3d Cir. 2015), involved cookies, which are different than the JavaScript technologies here. More, the Third Circuit's rule derived from the federal wiretap law's exception for one-party consent, *id.* at 143 ("it is not unlawful [under federal law] for a private person to intercept a…communication where such person is a party"), but the MWA is a two-party consent law, *Commonwealth v. Blood*, 400 Mass. 61, 66 (1987) ("The secret transmission or recording of…communications without the consent of *all* parties is generally proscribed by § 99.") (emphasis in original). The Third Circuit's analysis does not apply here.

and transmit the contents of [the] communication to third parties before the webpage has even completed loading." ¶ 55; *see also* ¶¶ 3, 41, 42, 64, 67, 77, 96 (additional allegations of contemporaneous interception). Plaintiff states a claim consistent with *Partners, Pharmatrak*, and other decisions rejecting similar arguments in cases involving the interception of computer communications.

      E.    *The "Telephone Equipment" Defense Does Not Apply*

Tufts MC argues that its conduct is beyond the MWA's scope because it used tracking technologies "in the ordinary course of business." MTD 13–14. This argument derives from the definition of an "intercepting device," which excludes "any telephone or telegraph instrument, equipment, facility, or a component thereof…being used by the subscriber or user in the ordinary course of its business." M.G.L. c. 272 § 99(B)(7) (emphasis added). As this Court held in *Alves*, 2023 Mass. Super. LEXIS 59, at *10–13, the technologies at issue here are not "telephone or telegraph" equipment. Also, Tufts MC did not use the technologies in the ordinary course of its business.

      1.    <u>Tracking Technologies Are Not Telephone Equipment.</u>

The MWA regulates "intercepting devices," defined broadly to include "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire…communication." M.G.L. c. 272 § 99(B)(3) (emphasis added). The telephone equipment exception is narrower. The MWA does **not** exempt all "intercepting devices" used in the ordinary course of business. Rather, it exempts only "telephone or telegraph instrument, equipment, facility, or…component thereof…being used by the subscriber or user in the ordinary course of its business." *Id.* § 99(B)(3). Tufts MC asks this Court to extend the exemption to **all** intercepting devices. This would require defining "telephone equipment" as synonymous with "intercepting device," an improper and implausible construction of the MWA.

The SJC has affirmed that "'telephone equipment does **not** include eavesdropping devices external and extraneous to **regular telephone devices**." *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 265 (1997) (quotations omitted; emphasis added). That is, the exception is limited to what one would

ordinarily understand to be telephone equipment.[16] Contrary to Tufts MC's footnote argument (MTD 14 n.3), the Appeals Court in *Dillon v. Mass. Bay Transp. Auth.*, 49 Mass. App. Ct. 309 (App. Ct. 2000), did not hold the exception is phrased "in terms of telephone equipment…simply because the 1968 statutory text has not been…updated." Instead, that court confirmed: "[t]o qualify for the exception, [a device] must be 'telephone equipment.'" *Id.* at 316; *Alves*, 2023 Mass. Super. LEXIS 59, at *10–13 (rejecting same argument on "telephone equipment" defense that would "depart…dramatically from the language of [the MWA] to include [tracking technologies that have] characteristics quite different from telephone equipment"). Tufts MC makes no effort to explain how tracking technologies could be telephone equipment under any defensible definition of the phrase.[17]

      2.    <u>Tufts MC Did Not Use Tracking Technologies in the Ordinary Course of Its Business.</u>

Tufts MC's defense also fails because its secret use of tracking technologies was not in the ordinary course of its business—healthcare. "[I]n light of the statutory purpose of [the MWA of] protection from invasion of privacy, neither the concept of legitimate business purpose nor 'ordinary course of business' can be expanded to mean anything that interests a company." *Crosland v. Horgan*, 401 Mass. 271, 275 (1987); *see also In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ("[T]he statutory scheme suggests that [the legislature] did not intend to allow [companies] unlimited leeway to engage in any interception that would benefit their business models"; conduct must be "instrumental to the provision of the service" the company provides).

---

[16] *Williams v. Poulos*, 11 F.3d 271, 280 (1st Cir. 1993) ("[W]e are at a loss to see how…alligator clips attached to a microphone cable at one end and an interface connecting a microphone cable to a VCR and a video camera on the other, can be considered to be a 'telephone or telegraph instrument….'") (cleaned up).

[17] Tufts MC erroneously argues (MTD 14 n.3) that *Restuccia v. Burk Tech., Inc.*, 1996 Mass. Super. LEXIS 367, *5 (Super. Ct. Aug. 13, 1996), holds that email backup systems meet the "telephone equipment" exception. *Restuccia* concerned a different exemption for "office intercommunication system[s]," not "telephone equipment." Tufts MC does not contend the tracking technologies were "office intercommunication systems," given the plain meaning of that phrase covers systems among employees within an office. *Id.* at *5 (exception protects "[a]n employer's interest in storing…information").

13

Nothing in the Complaint suggests that Tufts MC's aiding secret interceptions by technology and media companies is instrumental to providing healthcare (Tufts MC's business). Even if one focuses on the website itself as the "service," Plaintiff alleges that the **secret** use of tracking technologies is **not** essential to the functioning of the Tufts MC Website, ¶¶ 98–99, undermining any conclusion that secret eavesdropping is part of Tufts MC's ordinary course of business. *Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784, at *33 (rejecting exception for Google's scanning of emails because "Plaintiffs have alleged that Google could operate its Gmail system without reading the emails for purposes of targeted advertising").

Moreover, when a company's conduct violates its own policies, that conduct cannot be part of the company's ordinary course of business. *Id.* at *42–43. Here, Tufts MC's policies expressly promised it would **not** engage in the precise conduct Plaintiff alleges. ¶¶ 21–25. Helping third parties eavesdrop on website users' communications was not part of Tufts MC's ordinary course of business.

F.    *The Interceptions Tufts MC Facilitated Were Secret.*

Tufts MC contends its aiding of eavesdropping by Google and Facebook was not "secret." To prevail on this defense, Tufts MC must establish "actual knowledge" of the interception. *Jackson*, 370 Mass. at 505; *Pharmatrak*, 329 F.3d at 19 (defendant bears the burden in establishing consent). The MWA's actual knowledge standard "impose[s] [a] more stringent restriction[] on the use of electronic surveillance devices by private individuals than is done in other States." *Jackson*, 370 Mass. at 506. Proof of knowledge or consent must be "specific and unambiguous." *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 685 (N.D. Cal. 2021).

Plaintiff details in her Complaint how Tufts MC implemented Google Analytics and Meta Pixel through hidden code designed to be invisible to the website user and how Tufts MC failed to disclose eavesdropping to users. ¶¶ 17–26, 50–57. And Plaintiff alleges she did not know about the eavesdropping. ¶ 3. The Court must accept those allegations as true on this motion to dismiss. *Fairneny v. Savogran Co.*, 422 Mass. 469, 470 (1996.

Furthermore, Tufts asks the Court improperly to make factual judgments in deciding its motion to dismiss. Tufts points to its website privacy policy to argue that its use of third-party tracking technologies was not secret. MTD 14–17. As an initial matter, Tufts MC does not contend there was a pop-up disclosure or other effort to alert website users about the existence of the Website Privacy Policy (because there was none). To find the disclosure, a user must first view the separate website "Terms & Conditions" and then scroll down to find the Website Privacy Policy.[18] Only users who went searching for the disclosure would find it.

Even under contract formation principles, which, unlike the MWA, do not require proof of actual knowledge,[19] Massachusetts law requires "reasonably conspicuous notice" of contract terms; online terms of service under Massachusetts law are enforceable "only where the record established that the terms of the agreement were displayed, at least in part, on the user's computer screen..." *Ajemian v. Yahoo!, Inc.,* 83 Mass. App. Ct. 565, 576 (2013). Here, Tufts MC fails to show "reasonably conspicuous notice."[20] It follows that Tufts MC likewise fails to meet the more demanding MWA standard.

Furthermore, Tufts MC's Website Privacy Policy is internally contradictory and deceptive. "[I]n the context of this motion to dismiss the plaintiffs may be deemed to have consented to this arrangement only if that is the only plausible interpretation." *In re Facebook, Inc.,* 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019).[21] Here, the statements Tufts MC highlights (MTD 14–15) as evidence its conduct was not "secret"

---

[18] https://www.tuftsmedicalcenter.org/About-Us/Policies-and-Public-Documents/Terms-and-Conditions.

[19] *Keikian v. Norwegian Cruise Line,* 2004 Mass. App. Div. 91, 94 (App. Div. 2004) ("actual knowledge of the terms in the contract" not required for contract formation); *see also Haufler v. Zotos,* 446 Mass. 489, 501 (2006) ("The general rule is, that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not.") (quotation omitted).

[20] Although Plaintiff highlighted in her complaint the inadequacies of Tufts MC's disclosures, Plaintiff nowhere alleged the disclosures were communicated to her.

[21] *Lopez,* 519 F. Supp. 3d at 685 (rejecting consent defense where terms "nowhere near specific and unambiguous enough to represent" particular interceptions at issue); *Calhoun v. Google, LLC,* 526 F. Supp. 3d 605, 621 (N.D. Cal. Mar. 17, 2021) (where terms of service made arguably contradictory disclosures, denying motion to dismiss given "representations that could suggest to a reasonable user that [the defendant] would not engage in the alleged data collection" the plaintiff alleges); *In re Google Location History Litig.,* 428 F. Supp. 3d 185, 192 (N.D. Cal. 2019) ("Drawing all inferences in favor of Plaintiffs...it is plausible that Plaintiffs gave a narrow consent" to limited recording that did not include particular interceptions at issue).

do **not** disclose that the tracking technologies permit **third parties** to eavesdrop on communications. The disclosures instead discuss how **Tufts MC** may record and use communications. *See* MTD 14–15 (quoting disclosure) (explaining how "tracking pixels" allows "**us**" (Tufts MC) to process information; "**We** may additionally collect interest or behavioral information…."; "**Tufts Medical Center** uses web analytics…to collect information relating to use of our advertising and websites"). To repeat, disclosure that Tufts MC, a party to the communications, may itself record or use those communications does not disclose anything regarding the interception of those communications by third parties like Google and Facebook, which is what constitutes the MWA violations here.[22]

Likewise, the disclosure that Tufts MC uses "tools" that are "provided by" third parties (MTD at 16 (quoting disclosure)) does **not** disclose third parties will intercept the communication.[23] Of course, practically all technology is "provided by" third parties, as almost no companies manufacture their own technology. That Tufts MC uses "third-party" technology does not disclose or even imply the third-party interceptions that Plaintiff alleges.

Finally, Tufts MC falsely promised in clear terms in the same Website Privacy Policy that "All visitors use the Tufts Medical Center websites **anonymously**," that Tufts MC does "not collect any identifiable information," and that Tufts MC "does not and will never sell or rent any identifiable

---

[22] *Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784, at \*55–56 (rejecting "proposition that users who send emails impliedly consent to interception and use of their communications by third parties other than the intended recipient of the email") (emphasis added).

[23] Tufts MC's authorities do not support the proposition that knowledge of **any** recording or hearing by **a party** to the communication counts as unlimited consent to **third-party** eavesdropping. In *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655 (2021), the plaintiff knew that the party to whom he was speaking was recording the conversation and consented to the recording. *Curtatone* did not hold that one party's consent to the other party recording counts as blanket consent to third-party eavesdropping; no such facts were before the Court. Likewise, *Rainey*, 491 Mass. at 640, 643, concerned a participant's video recording of a conversation that the party already knew was being recorded in another form; the Court found no interception in part because the device "was not used as a tool to secretly eavesdrop" (in contrast to here, where Plaintiff expressly alleges such secret eavesdropping). *Commonwealth v. Morganti*, 455 Mass. 388 (2009), is even further off-point; the defendant was told police "intended to videotape" an interview room; that is, the precise recording alleged had been fully disclosed. *Id.* at 395. *See also Google Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at \*55–57 (rejecting "Google's theory…that all email users understand and accept the fact that email is automatically processed" and "recorded"; "**recipients'** recording of the email" does not operate as consent to "interception by **a third-party**") (emphasis added).

information to third party vendors." ¶¶ 22–24. These promises are false because the tracking technologies Tufts MC puts on its website are **designed** to connect the content of intercepted communications to individuals' real-world identities. ¶¶ 2, 23, 29, 39, 41, 53, 67, 68, 70. Tufts MC's deception vitiates any knowledge or consent defense. *Pharmatrak*, 329 F.3d at 19–20 (false promises concerning purported disclosure of recording or interception negate consent defense).

Notably, this Court in *Partners* rejected the same argument that Tufts MC makes here. The disclosures in *Partners* were similar to Tufts MC's disclosures in referring to "cookies" and "tracking pixels" without disclosing how those technologies facilitated third-party eavesdropping. Ex. A at 5–6. Considering such deceptive and incomplete disclosures, this Court rejected the argument that "[t]here was nothing secret about any of the Hospitals' using [Google Analytics and Meta Pixel] to track activity," explaining, "this is another situation where [the Court is] bound by the allegations of the complaint." Ex. A at 10; Ex. C at 22; *Marquis* (Ex. H) at 8 (holding at the "motion to dismiss stage," "the court accepts as true [plaintiff's] allegation that Google secretly intercepted her electronic communications"). The same should hold true here: confusing, incomplete, and deceptive disclosures require the rejection of Tufts MC's pleadings-stage contention that the third-party interceptions were not secret.

G.     *The MWA Provides a Remedy for Interceptions of Communications Between Massachusetts Parties, Effected Through a Device Located in Massachusetts*

Tufts argues Plaintiff fails to allege an interception "in Massachusetts." MTD 17–18. Under any conflicts-of-law analysis, the MWA applies to the interceptions here, which involve communications between two Massachusetts parties accomplished through a device located in Massachusetts.

The only Massachusetts decision that applies to a wiretap claim current Massachusetts conflicts-of-law principles is *Heffernan v. Hashampour*, 2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009). There, an out-of-state defendant secretly recorded telephone conversations with an in-state plaintiff. *Id.* at *1–2. The court applied a conflicts analysis, drawing upon Restatement (2d) of Conflict of Laws and SJC precedent construing it. *Id.* at *4. The court held that "'[w]hen the [privacy] intrusion involves an intrusion upon the plaintiff's solitude,' as plaintiffs allege here, 'the place of invasion is the place where

17

the plaintiff was at the time.'" *Id.* at *6 (quoting Rest. (2d) Conflict of Laws § 152 cmt. c). Here, Plaintiff is a Massachusetts resident; she and other Class Members, "while in the Commonwealth of Massachusetts, accessed" that website. ¶¶ 10, 100. Therefore, under *Heffernan*, the MWA applies here.[24]

Tufts MC cites several cases that diverge from *Heffernan*, focusing on where a defendant made a recording instead of the location of the injured party. The decisions trace their origins to one of two decisions—the Appeals Court decision in *Commonwealth v. Wilcox*, 63 Mass. App. Ct. 131, 139 (App. Ct. 2005), or a federal magistrate judge's 1986 decision in *Pendell v. AMS/Oil, Inc.*, 1986 U.S. Dist. LEXIS 26089 (D. Mass. Apr. 30, 1986). *Wilcox* involved a dispositively different factual scenario: all parties to an in-person verbal conversation were in Rhode Island and were recorded using a tape recorder present with them in Rhode Island. *Wilcox*'s holding that the MWA does not regulate "recordings made outside of Massachusetts" does not apply here, where both parties to the communication were in Massachusetts, eavesdropped through Plaintiff's device located in Massachusetts.

As for *Pendell* and cases citing it, *Pendell* followed "[t]he *lex loci delecti*" principle, which applies "the local law of the place of the wrong" for a tort claim. *Pendell*, 1986 U.S. Dist. LEXIS 26089, at *8. Massachusetts conflicts-of-law principles, however, have changed since *Pendell*. The SJC in 1994 (eight years after *Pendell*) adopted Restatement (2d) of Conflict of Laws, which provides that for tort claims, the "state where the injury occurred applies, unless [another state] has a more significant relationship' to the parties." *Cosme v. Whitin Mach. Works*, 417 Mass. 643, 647 (1994) (cleaned up). *Heffernan* explains:

> The defendants misplace their reliance on [*Pendell*], which a United States District Court magistrate decided in 1986 before the Supreme Judicial Court announced the two-step Restatement analysis [in *Cosme*] in 1994…. *Pendell*, a non-binding opinion, applied the now-outdated *lex loci delecti* approach.

---

[24] *Heffernan* aligns with the MWA's purpose of abating "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which the Legislature found "pose grave dangers to the privacy of all **citizens of the Commonwealth**." M.G.L. c. 272 § 99(A) (emphasis added). It would be perverse to construe the MWA to deny the "citizens of the Commonwealth"—the persons for whose benefit the Legislature enacted the MWA—a remedy expressly afforded to them. *See also State v. Worthy*, 661 A.2d 1244, 1249 (N.J. 1995) ("[T]here can be no doubt that the legislative concern for privacy embraces privacy interests that a resident in New Jersey has in telephone conversations that originate from…out-of-state.").

2009 Mass. Super. LEXIS 409 at *8 n.6.

Even if the Court applies *Pendell's* "lex loci" standard focusing on the place of the interception, the MWA applies here. Plaintiff alleges the interceptions are accomplished through code executed in users' web browsers[25] and that she accessed the Tufts MC Website "while in the Commonwealth of Massachusetts." ¶ 100. The place where "[e]lectronic communications are… 'intercepted' when software reroutes communications to an interceptor." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022). When an interception involves tracking technologies executed in a website user's browser, "the point where [tracking technologies] routed [the] communications to [third parties] was **[the plaintiff's] browser, not where the signals were received at [the third party's] servers**." *Id.* at 131 (emphasis added); *Luis*, 833 F.3d at 633 (an "interception of a communication…occurs at the point where [tracking software] captures the communication and reroutes it").[26] Because the interceptions occurred on devices in Massachusetts, the MWA applies here, even under the outdated *Pendell* rule.

H.    *Plaintiff Alleges the Interception of "Contents" of Wire Communications.*

Tuft MC's argument (MTD 18–20) that Plaintiff alleges no "contents" of a communication is wrong. Tufts MC's argument hinges on the assumption that the MWA "defines 'contents' similarly to the federal wiretapping statute," and therefore, the MWA should not reach interception of "information used to route a communication." Tufts MC ignores the MWA's express text. Congress amended the federal law to **exclude** information concerning the "identity of the parties" from the definition of "contents."[27] The MWA, in contrast, has not been so amended and continues to prohibit interception "any information

---

[25] ¶ 50 ("[the] code…is…executed automatically within the individual's web browser"); ¶ 52 ("[T]he …code causes the user's web browser to retrieve a file from the third party's website [and] causes the browser to communicate certain information to the third-party website…."); ¶ 53 ("When the JavaScript code causes the browser to communicate the information…to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address…."); ¶ 61 (the "user's web browser…execute[s] the JavaScript code" for Google Analytics); ¶ 69 (same for Meta Pixel).
[26] That the interception occurs on Plaintiff's device in Massachusetts distinguishes *Marquis v. Google*, where email scanning occurred on Google's servers. 2015 WL 130375277 (Mass. Super. Ct. Feb. 13, 2015).
[27] *Hill v. MCI WorldCom Communs., Inc.*, 120 F. Supp. 2d 1194, 1196 (S.D. Iowa 2000) (prior to 1986 amendment, electronic communications were included as "wire communications") (emphasis added).

concerning the identity of the parties." M.G.L. c. 272 § 99(B)(5) (emphasis added). The SJC has confirmed

that information used to route a communication counts as "contents," holding that telephone numbers

(which, like IP addresses, are used to route a communication) are "contents" even where the phone call

itself is not recorded. *District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586 (1980).

Plaintiff alleges interception of information on the identity of the parties, including IP addresses,

browser fingerprints, and personal identifiers. ¶¶ 29, 46, 53, 67, 68, 71, 72. Tufts MC protests that Plaintiff

fails to allege "how this information can be traced to identify an actual individual." MTD 19 n.5. To be

clear, **actual identification of a party is not required**: interception of "any" information concerning

parties' identities is enough. M.G.L. c. 272 § 99(B)(5). In any event, Plaintiff alleges that Google and

Facebook use this information to identify individuals. ¶¶ 2, 3, 23, 29, 30, 31, 36–39.

*Second*, Plaintiff alleges interception of "information concerning…the contents, substance,

purport, or meaning" of communications, M.G.L. c. 272 § 99(B)(5), an alternative basis for meeting the

"contents" element. The substance included descriptive URLs, web page titles, form submissions, and

information reflecting Tufts MC patient status. *E.g.,* ¶¶ 52, 63, 64, 69–70, 76, 79, 83, 88, 90.[28]

## IV.    CONCLUSION

The Court should deny Tufts MC's motion to dismiss.

---

[28] Tufts MC's citation to *Kurkowski v. Rush Sys. for Health* for the proposition that Plaintiff fails to allege "what surreptitious patient data disclosures occur[ed]" (MTD 18) ignores a critical difference between the two statutes. In *Kurkowski*, the court required such pleading because under the federal wiretap law, the plaintiff was attempting to avoid the one-party exception to that law by showing a separate violation of federal medical privacy law. 2023 U.S. Dist. LEXIS 35702, at *12–14. There is no one-party defense under the MWA, *see* n.3, *supra*, and Plaintiff's claim does not require proof that the intercepted communications disclosed particularly sensitive information protected by some other law. *See Jackson*, 370 Mass. at 506 ("[W]e would render meaningless the Legislature's careful choice of words if we were to interpret [the MWA] as encompassing only those situations where an individual has a reasonable expectation of privacy."). *Cousin*, which applied California law, likewise proceeded from an assumption, inapplicable to the MWA, that the plaintiff had to plead the interception concerned "Protected Health Information." 2023 U.S. Dist. LEXIS 120211, at *8–10.

Dated: September 15, 2023                    Respectfully submitted,


                                             /s/ Patrick J. Vallely
                                             SHAPIRO HABER & URMY LLP
                                             Edward F. Haber (BBO #215620)
                                             Michelle H. Blauner (BBO #549049)
                                             Patrick J. Vallely (BBO #663866)
                                             One Boston Place
                                             Suite 2600
                                             Boston, MA 02108
                                             (617) 439-3939 – Telephone
                                             (617) 439-0134 – Facsimile
                                             ehaber@shulaw.com
                                             mblauner@shulaw.com
                                             pvallely@shulaw.com

                                             **Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on September 15, 2023.

/s/ Patrick J. Vallely
Patrick J. Vallely

Date Filed 10/31/2023 9:18 AM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 367 of 485
Docket Number 2384CV00930

**20**

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION** |
| Plaintiff, | CIVIL ACTION NO. 2384CV00930-BLS1 |
| v. | |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

### DEFENDANT TUFTS MEDICAL CENTER, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S  COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 1

        A.    Plaintiff Lacks Standing ............................................................................ 1

        B.    Plaintiff Fails to State a Plausible Claim for Relief Under the Wiretap Act ......... 3

              1.    Plaintiff Fails To Plausibly Allege an Unlawful Interception ...................... 4

                    a.    Plaintiff Fails to Allege The Use of an "Intercepting Device" ............... 4

                    b.    Tufts MC's Alleged Conduct Occurred In The Ordinary Course of
                          Business ................................................................................ 5

              2.    Plaintiff Fails to Plausibly Allege That Any "Interception" Was Secretly
                    Heard or Recorded ..................................................................... 7

              3.    Plaintiff Fails to Allege an "Interception" Occurred in Massachusetts ...... 9

              4.    Plaintiffs Fail to Plausibly Allege That Any "Contents" of
                    Communications Were Ever Intercepted ......................................... 10

III.    CONCLUSION ................................................................................................. 11

## Cases

*Alves v. BJ's Wholesale*, 2023 WL 4456956 (Mass. Super. June 21, 2023) ................................. 8

*Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355 (2023) .................................................... 3

*Comm. v. Gordon*, 422 Mass. 816 (1996) ...................................................................... 5

*Comm. v. Hyde*, 434 Mass. 594 (2001) ........................................................................ 8

*Comm. v. Rivera*, 445 Mass. 119 (2005) ....................................................................... 5

*Cousin v. Sharp Healthcare*, --- F. Supp. 3d ---, 2023 WL 4484441 (S.D. Cal. 2023) ............... 11

*Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263 (N.D. Cal. 2001) ..................................... 4

*District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*, 379 Mass. 586 (1980) .... 11

*Doe v. Boston Medical Center Corporation*, No. 2384CV00326-BLS-1 ..................................... 1

*Doe v. Partners Healthcare Sys., Inc.*, (Plf. Exhibit B) ................................................... 8

*Doe v. The Children's Hospital Corporation*, No. 2384CV00411-BLS-1 .................................... 1

*Ginther v. Comm'r of Ins.*, 427 Mass. 319 (1998) .......................................................... 2

*Hershey v. Mount Vernon Partners, LLC*, 2020 WL 4607471 (Mass. Super. June 26, 2020) ....... 7

*Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008) ..................................................... 9

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125 (3d Cir. 2015) ..... 11

*In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003) ......................................................... 9

*Kurowski v. Rush Sys. for Health*, --- F. Supp. 3d ---, 2023 WL 2349606 (N.D. Ill. 2023) ......... 11

*Marquis v. Google, Inc.*, 2015 WL 13037257 (Mass. Super. Ct. Feb. 13, 2015) ...................... 10

*Pendell v. AMS/Oil, Inc.*, 1986 WL 5286 (D. Mass. Apr. 30, 1986) ...................................... 10

*Peters v. Equiserve Inc.*, 20 Mass L. Rptr. 620, 2006 WL 709997 (Mass. Super. Ct. Feb. 24, 2006) .......................................................................................................................... 6

*Pine v. Rust*, 404 Mass. 411 (1989) ............................................................................ 5

*Puglsey v. Police Dept. of Boston*, 472 Mass. 367 (2015) ......................................... 1, 2, 3

*Rich v. Rich*, 2011 WL 3672059 (Mass. Super. Ct. July 8, 2011) ........................................ 4

*Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290 (D. Mass. June 2, 2020) ...................... 10

*Straubmuller v. JetBlue Airways Corp.*, 2023 WL 5671615 (D .Md. Sept. 1, 2023) .................. 2

*Styller v. Zonning Bd. Of Appeals*, 487 Mass. 588 (2021) ................................................. 3

*Sudbury v. Mass. Bay Transp. Auth.*, 485 Mass. 774 (2020) .............................................. 9

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ....................................................... 3

*U.S. Auto Parts Network, Inc. v. Comm'r of Revenue*, 491 Mass. 122 (2022) ......................... 10

*U.S. v. Kearney*, 2009 WL 4591949 (D.Mass. Nov. 30, 2009) ........................................... 11

## Statutes

M.G.L. c. 175 § 296D ............................................................................................... 2

## I.  INTRODUCTION

Plaintiff's Opposition demonstrates how Plaintiff seeks to greatly expand the scope of the Massachusetts Wiretap Act ("Wiretap Act"), M.G.L. c. 272 § 99 beyond the Legislature's intent and criminalize conduct that regularly occurs on the Internet. (Compl. ¶¶ 108-15); (*see also* Opp'n at 6-7; 7 n.2) ("Plaintiff need not plead the communications were sensitive; *any interception of any communication* supports a claim.") (emphasis added). Interpreting the Wiretap Act as Plaintiff seek in this action against Defendant Tufts Medical Center's ("Defendant" or "Tufts MC") would stretch the reasonable bounds of the Act and *criminalize* the use of common social media and analytics tools on all public websites. Plaintiff's arguments are inconsistent with the intent of the statute and contrary to Massachusetts law. Further, Plaintiff fails to allege facts to support essential elements of her claim. Plaintiff's Complaint should be dismissed with prejudice.[1]

## II.  ARGUMENT

### A.  Plaintiff Lacks Standing

Plaintiff's argument that the Wiretap Act can confer standing without a concrete injury is contrary to the Massachusetts Supreme Judicial Court ("SJC") decisions. *Puglsey v. Police Dept. of Boston*, 472 Mass. 367, 373 (2015); (Tufts MC Br. at 6-8). Where a statute provides a right of action, Massachusetts law requires a plaintiff to show *both*: (1) a "direct and certain injury" that is

---

[1] Tufts MC acknowledges the recent decisions issued by Judge Kazanjian in *Doe v. Boston Medical Center Corporation*, No. 2384CV00326-BLS-1 and *Doe v. The Children's Hospital Corporation*, No. 2384CV00411-BLS-1 on September 14, 2023 dismissing those defendants' respective motions to dismiss where similar claims were at issue. Tufts MC's Website Privacy Policy and use of a cookie pop-up banner since at least May 2021 that appears when a user visits the Tufts MC website and alerts the user of the types of cookies used and ability to manage their preferences make this case distinguishable from those decisions. Tufts MC further contends that the legal arguments raised by defendants Beth Israel Deaconess Medical Center ("BIDMC") and New England Baptist Hospital ("NEBH") in case nos. 2384CV00480-BLS-1 and 2384CV00857-BLS-1 and defendant Boston Medical Center Corporation in case no. 2384CV01086-BLS-1 during the motion to dismiss hearings on September 19, 2023 and October 5, 2023, respectively, further support a finding that the Plaintiff's legal claims fail as a matter of law.

not "speculative, remote, and indirect"; and (2) "the injury alleged must fall 'within the area of concern' of the statute." *Ginther v. Comm'r of Ins.*, 427 Mass. 319, 323 (1998); *see also Puglsey*, 472 Mass. at 373 (requiring "injury [that] is sufficiently concrete and imminent" for statutory violations).

Like the statutes at issue in *Pugsley* and *Ginther*, the Wiretap Act affords a private right action to a "person aggrieved." *Compare* G.L. c. 272, § 99(Q) *with Pugsley*, 472 Mass. at 368 (G.L c. 151B, § 9); *and Ginther*, 427 Mass. at 322 (citing G.L. c. 175 § 296D(f)(1)). Under Massachusetts law, "to qualify as a 'person aggrieved,' a person must allege *substantial injury as the direct result of the action complained of.*" *Ginther*, 427 Mass. at 322 (citation omitted) (emphasis added).[2]

Plaintiff's Opposition concedes that the only allegations that involve Plaintiff personally are limited to a single paragraph in her forty-nine page, 115 paragraph Complaint, where she alleges she is a resident of Massachusetts, a patient of Tufts MC, and that she uses Tufts MC's *public* website to obtain information about Tufts MC's doctors and research medical procedures. (Opp'n at 3) (citing Compl. ¶ 10.) Plaintiff's limited factual allegation as to her personal experience is utterly devoid of a direct or certain injury.

Plaintiff's reliance on caselaw that is approximately seventy years old instead of the more recent and on-point authority identified by Tufts MC further demonstrates Plaintiff's inability to plausibly allege standing. (*Compare* Opp'n at 5 *with* Tufts MC Br. at 6-8.); *see also Straubmuller v. JetBlue Airways Corp.*, 2023 WL 5671615, *3 (D .Md. Sept. 1, 2023) (dismissing Maryland

---

[2] Plaintiff's reliance on *Pine v. Rust* is misplaced. (Opp'n at 5) (citing 404 Mass 411, 415 (1989)). The defendants in *Pine* contested the plaintiffs' entitlement only to punitive damages absent proof of harm (on which the defendants prevailed), not their standing to sue. Pine, 404 Mass. at 415. The SJC in *Pine* did not address the issue of standing or any of its precedents on the issue. (*See generally id.*)

Wiretap Act claim for lack of standing where Plaintiff's allegations were limited to an alleged violation of the statute without any additional concrete harm)). Because the SJC repeatedly looks to the United States Supreme Court precedent when addressing standing, *Pugsley*, 472 Mass. at 371; *Styller v. Zoning Bd. Of Appeals*, 487 Mass. 588, 592 (2021), Plaintiff's reliance on outdated caselaw is unavailing. (*See* Opp'n at 6 n.6) (relying on caselaw that was decided before *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)).

Moreover, Plaintiff's attempt to argue that *TransUnion* is controversial and should be ignored by this Court is unpersuasive. Indeed, in the two years since its publication, the principles underlying *TransUnion* have been reaffirmed. *See Biden v. Nebraska*, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023) ("a plaintiff needs a 'personal stake' in the case.").

Plaintiff's use of a hypothetical visitor to Tufts MC's public website further evidences her inability to establish standing. (Compl. ¶ 74.) "[A] plaintiff must show that *he or she* was injured as a result of the defendant's conduct." *Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683 n.13 (Mass. App. 2019) (emphasis added) Without any indication of what, if any, information of Plaintiff's may have been intercepted, and further how, if at all, Plaintiff was injured by the alleged interception, Plaintiff's Complaint is abstract at best and should be dismissed. *See TransUnion*, 141 S. Ct. at 2204 (requiring an alleged injury to be "real and not abstract" to establish standing).

### B.    Plaintiff Fails to State a Plausible Claim for Relief Under the Wiretap Act

Plaintiff's Complaint must also be dismissed under Rule 12(b)(6) because the Complaint fails to plausibly allege any entitlement to relief under the Wiretap Act. Plaintiff repeatedly mischaracterizes Tufts MC's arguments in an effort to bolster her untenable theory of liability. For each of the independent reasons articulated below, Plaintiff fails to plausibly allege facts to show that she is entitled to any relief for her claim.

3

1.    **Plaintiff's Fails To Plausibly Allege an Unlawful Interception**

a.    **Plaintiff Fails to Allege The Use of an "Intercepting Device"**

The pixel technology at issue is not included in the paradigm of a "device," as defined in the Wiretap Act. Plaintiff alleges that Tufts MC installed a piece of software code on Tufts MC's public website. (Compl. ¶ 43.) This internet code does not amount to an intercepting "device" or "apparatus" under the plain language of the Wiretap Act as the alleged "device" is not tangible. M.G.L. c. 272 § 99(B)(3). Plaintiff's reliance on *Rich v. Rich*, is misplaced as the underlying facts involved the installation by the defendant of key logger software directly on the specific, tangible devices of personal computers of individuals whose communications were intercepted. 2011 WL 3672059, at *4 (Mass. Super. Ct. July 8, 2011). *Rich* did not involve snippets of software code embedded on a public website accessible to anyone with access to the Internet.

None of Plaintiff's purported authority involves snippets of software code that is embedded in a publicly accessible website. In fact, courts throughout the country have expressly rejected Plaintiff's theory that code embedded into a publicly accessible website constitutes a "device" or "apparatus" under similar wiretap statutes. (*See, e.g.*, Tufts MC Br. at 11.) Thus, without the involvement of hardware, Plaintiff's Wiretap Act theory fails as a matter of law.

Plaintiff's alternative theory that her personal computer, server and web browser used to access Defendant's Website amounts to an "intercepting device" is flawed at best. (Compl. ¶¶ 67, 70). Aside from the caselaw repeatedly rejecting Plaintiff's theory under similar wiretap statutes, Plaintiff's theory would subject all businesses who cater to Massachusetts residents to potential criminal and civil liability for merely using common technologies on their public websites. *See Com. v. Rainey*, 491 Mass. 632, 640-41, 647 (2023) (rejecting proposed interpretation as overbroad because Legislature's focus was clandestine or surreptitious eavesdropping); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001) (rejecting theory that receipt of

email would effectively remove from the definition of intercept the requirement of acquisition through a device).

### b.     Tufts MC's Alleged Conduct Occurred In The Ordinary Course of Business

Because the Act is a criminal statute, the Rule of Lenity *requires* that it be construed narrowly, with all ambiguities resolved in a defendant's favor, whether applied in a criminal or noncriminal context. (*See* Tufts MC Br. at 10 & n.2.) Plaintiff has no response. She addresses the Rule of Lenity not once in her twenty (20) page Opposition.

The SJC's and Appeals Court's Wiretap Act decisions have consistently interpreted the Act more *narrowly* than its text might literally suggest, in keeping with legislative intent and to avoid absurd results.[3] *Dillon v. Mass. Bay Transit Authority* is particularly instructive. 49 Mass. App. Ct. 309 (2000). There, as here, plaintiffs' counsel pursued a class action for statutory damages under the Massachusetts Wiretap Act. *Dillon*, 49 Mass. App. Ct. at 310. The defendant argued that "interception" did not reach measures undertaken in the ordinary course of business, and the plaintiffs countered with a strict, literal reading of the Act's text—trying to limit the exception only to equipment supplied by the phone company (a "communications common carrier"), rather than procured from

---

[3] *See, e.g., Comm. v. Rainey*, 491 Mass. 632, 642-43 (2023) ("[b]ecause we assume generally that the Legislature intends to act reasonably, we will not adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable."); *Comm. v. Rivera*, 445 Mass. 119, 134-35 (2005) (Cowin, J., concurring in part) (elevating legislative intent over expansive literal reading of the Act's text); *Comm. v. Gordon*, 422 Mass. 816, 832-33 (1996) (noting that the Act could "be read literally as making unlawful the audiotaping of [police] booking procedures without the knowledge of the persons being booked," but declining to so interpret it); *Pine v. Rust*, 404 Mass. 411, 415-16 (1989) (rejecting plaintiffs' literal reading of § 99(Q) concerning punitive damages to maintain longstanding common law prerequisites); *Dillon v. Mass. Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 315-16 (2000) ("interpretation should tend to preserve the substance of a statute rather than diminish it, should not override common sense, or produce absurd or unreasonable results") (citations omitted from all).

another source. *Id.* The Superior Court (Judge Smith) and the Appeals Court rejected the plaintiffs'

textual literalism and ruled instead for the MBTA and common sense. *Id.* The Appeals Court explained:

> We do not depart lightly from the express wording of a statute ... but in the unusual circumstances appearing here we agree with the court below that a deviation is justified. The fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading the exception so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases; *the plaintiffs' proposal would in effect destroy the exception*. Thus the decision below comports with the canons that interpretation should tend to preserve the substance of a statute rather than diminish it ...; *should not override common sense ...; or produce absurd or unreasonable results* ... — in this case the absurdity of allowing the fortuity of the source of the equipment to entail serious material consequences.[4]

Plaintiff here relies on a similar absurdity of textual literalism arguing that the ordinary course

of business exception should not be applied and should be limited to the use of traditional telephone

equipment. Plaintiff's desired outcome is exactly what the *Dillon* court took great pains to avoid: as

communications technology and norms evolve over time, the exception gets smaller and smaller

compared to the corresponding prohibition—"in effect destroy[ing] the exception" and throwing off

the original legislative balance. 49 Mass. App. Ct. at 315. This Court should follow *Dillon* in rejecting

Plaintiff's proposed approach.

Moreover, Plaintiff's argument that "ordinary course of business" is limited to "business

necessity" is not supported by Massachusetts law. Rather, "'[o]rdinary course of . . . business'

translates as 'legitimate business purpose.'" *Id.* at 319 (quoting *O'Sullivan v. NYNEX Corp.*, 426

Mass. 261, 266 (1997)); *see Peters v. Equiserve Inc.*, 20 Mass L. Rptr. 620, 2006 WL 709997, at

*5 (Mass. Super. Ct. Feb. 24, 2006) ("'Ordinary course of business' has been defined as *any action*

that has a 'legitimate business purpose.'") (emphasis added) (quoting *Dillon*, 49 Mass. App. Ct. at

---

[4] *Id.* at 315-16 (citations omitted; emphases added). Judge Krupp quoted this language in *Alves v. BJ's Wholesale Club*, with seeming interest, but ultimately declined to follow *Dillon's* lead absent further appellate guidance. See No. 22-2509-BLS1, at 11 (June 21, 2023). This Court should rule differently, following both Judge Smith and the Appeals Court in *Dillon*.

319). No showing of necessity is required. It is clear that Tufts MC's alleged activities here fall within this Massachusetts definition. Plaintiff alleges that the technologies at issue were used in the ordinary course of Tufts MC's website operations, including to improve website functionality and Tufts MC's marketing and engagement efforts to inform the public of its services. (Compl. ¶¶ 31, 38.)

Healthcare entities use of these technologies in the ordinary course of business is further evidenced by the pending suits alleging similar claims against at least fourteen Massachusetts hospitals, health systems, and medical groups that this Court can take judicial notice of. (*See* Ex. 2.)[5] This Court should, in accordance with the decisions in *O'Sullivan* and *Dillon*, find that the ordinary course of business exception bars Plaintiff's Wiretap Act claim as a matter of law.

### 2. Plaintiff Fails to Plausibly Allege That Any "Interception" Was Secretly Heard or Recorded

Plaintiff does not dispute that the Wiretap Statute applies only to "secret" communications. Plaintiff further does not dispute that Tufts MC notified users of its public website that it used the tracking and analytics technologies at issue in this case, but rather argues that the disclosure was not sufficiently detailed, and that it is Tufts MC's burden to establish plaintiff's "actual knowledge" of the interception. (Opp'n at 14-15). In fact, it is Plaintiff's burden to plausibly plead, and then to prove secrecy—a required element of her Wiretap claim. It is not Tufts MC's burden to disprove it.[6] Contrary to Plaintiff's statement in her Opposition (Opp'n. at 15), Tufts MC has had a cookie pop-up banner on its website since at least May 2021. This pop-up banner appears when users first visit the Tufts MC website and alerts the users of the types of cookies used and

---

[5] Indeed, while not yet part of the record, such website tracking technologies are so ordinary and commonplace that one can find them on, e.g., https://malegislature.gov/, https://www.mass.gov/orgs/massachusetts-court-system, https://www.mass.gov/orgs/office-of-the-attorney-general, https://www.boston.gov/, https://www.hhs.gov/, *etc.*

[6] *See, e.g., Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 656 (2021) (affirming dismissal of § 99(Q) claim); *Hershey v. Mount Vernon Partners, LLC*, 2020 WL 4607471, at *4-5 (Mass. Super. June 26, 2020) (Green, J.) (dismissing § 99(Q) claim).

7

the ability to manage their preferences, including disabling these cookies. This banner is in addition to the Website Privacy Policy.

"Actual knowledge" can be inferred from the circumstances here as the SJC recognized in the *Jackson* decision cited by Plaintiff. The SJC and Appeal Court subsequently and repeatedly have confirmed that notice (in the form of, *e.g.* warnings about *potential* recordings) suffices to create "actual knowledge" and, thus, to eliminate secrecy.[7] Plaintiff also ignores the more recent and on-point authority identified by Tufts MC in its motion to dismiss. (*See* Tufts MC Br. 14-17.) Over the last fifty years since *Jackson* was published, the SJC has interpreted the word "secret" within the definition of "interception" to merely require the *concealment* of the act of hearing or recording itself to fall within the prohibition against interception. (Tufs MC Br. at 14.) Express permission or consent to hear or record the communication is not required. *Id.*; *see also Rainey*, 491 Mass. at 640, 643 and nn. 18, 22 (finding that subject's general awareness of the potential for recording is sufficient, even absent evidence of knowledge of specific recording details).[8]

As Tufts MC articulated in its motion to dismiss, and as Plaintiff expressly concedes in her Complaint, Tufts MC expressly disclosed to all users of its public website that it tracked users'

---

[7] *E.g., Curtatone*, 487 Mass. at 659 ("no violation of act where recording party simply informs those involved of intention to tape record encounter, or even holds tape recorder in plain sight, regardless of identification") (citing *Comm. v. Hyde*, 434 Mass. 594, 603-05 (2001)).

[8] Plaintiff's citation to *Doe v. Partners Healthcare Sys., Inc.*, (Plf. Exhibit B) is unavailing as the defendants did not provide the court with the various hospitals privacy policies in the record, unlike the immediate circumstances where Plaintiff's Complaint incorporated by reference Tufts MC's Privacy Policy. (Compl. ¶¶ 22, 24-25.) Notably the *Partners* order and accompanying transcript further fails to address the argument that the "interception" was conducted in "secret" as the court did not issue a specific ruling on the issue of "interception." (Plf. Exhibit C at 52-54.) Similarly, Judge Krupp's decision in *Alves v. BJ's Wholesale*, 2023 WL 4456956 (Mass. Super. June 21, 2023) is also distinguishable because there is no indication that BJ's disclosed the collection of website browsing data as Tufts MC did here. Further, in its motion to dismiss, BJ's focused heavily on arguments based in federal, California, and/or Florida wiretapping laws, rather than the Act, including provisions in those statutes that materially differ from the Act. Key Massachusetts precedents such as *Curtatone, Rainey*, etc. appear nowhere in BJ's briefing or, as a result, in Judge Krupp's decision.

public browsing activity through the use of "cookies, "tracking pixels, or tags," and further disclosed that it used third-party analytics and tag management services, "to collect certain information relating to use of our advertising and websites." (*Compare* Compl. ¶¶ 22-23, 25 *with* Exhibit A to Scully Decl.)[9] Contrary to Plaintiff's argument in her Opposition, she fails to allege that she was personally unaware of Tufts MC's cookie banner, Privacy Policy and the express disclosures articulated therein. (*Compare* Opp'n at 14 *with* Compl. at ¶ 3.)

Plaintiff argues that this Court, like Judge Davis in considering the Partners Healthcare motion to dismiss in 2020, is bound by the allegations of the Complaint. (Opp'n at 17). However, secrecy is a required element of Plaintiff's wiretap claim and involves a legal conclusion. In evaluating motions to dismiss, courts "do not regard as true legal conclusions cast in the form of factual allegations."[10] And factual allegations must be plausible. *See Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 636 (2008). Here, Plaintiff has not alleged facts to support the conclusory assertion that any "secret" communications were "intercepted." The record properly before the Court shows there was no "secret" hearing or recording and her claim should be dismissed.

### 3.    Plaintiff Fails to Allege an "Interception" Occurred in Massachusetts

Plaintiff's Opposition distorts a clear requirement under the Act that the "interception" must take place in Massachusetts. Plaintiff argues that because she alleges that she is Massachusetts resident and used the Tufts MC website while she was in Massachusetts that is sufficient. But the parties' domiciles are irrelevant to whether an "interception" took place within

---

[9] *In re Pharmatrak, Inc.*, is distinguishable as the pharmaceutical company's website "gave no indication that use meant consent to collection of personal information by a third party." 329 F.3d 9, 21 (1st Cir. 2003). Contrary to the First Circuit's decision, Tufts MC's Privacy Policy (Compl. ¶ 25), expressly identifies the usage of cookies and other tracking technology. (Scully Decl., Exhibit 1.)

[10] *Sudbury v. Mass. Bay Transp. Auth.*, 485 Mass. 774, 778-79 (2020) (quoting *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 39 n.6 (2009)).

Massachusetts. The Complaint does not allege where any of the servers for Tufts MC, Meta and

Google were located. In *Marquis v. Google, Inc.*, the court found that this is the relevant inquiry:

> All of the scanning processes that implement targeted or personalized advertising
> are implemented on *servers located outside of Massachusetts. The code . . . is run
> on servers physically located [elsewhere.] . . . None of the processing occurs in
> Massachusetts.*

2015 WL 13037257, at *7 (Mass. Super. Ct. Feb. 13, 2015) (emphasis added); *See also U.S. Auto*

*Parts Network, Inc. v. Comm'r of Revenue*, 491 Mass. 122, 140-43 (2022) (finding the use of apps,

cookies, and content delivery networks "does not constitute in-State physical presence."); *Ross v.*

*Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. June 2, 2020) ("[B]ecause the

recordings took place in Michigan, they are outside the reach of the Massachusetts Wiretapping

Statute.") (citing *Pendell v. AMS/Oil, Inc.*, 1986 WL 5286, at *4 (D. Mass. Apr. 30, 1986) ("There

is no language whatsoever to indicate that the [Massachusetts Wiretapping] statute was intended

to be given extraterritorial effect..") (alterations in *Ross*). Plaintiff's failure to allege facts that the

"interception" occurred in Massachusetts independently warrants dismissal.

### 4. Plaintiffs Fail to Allege That Any "Contents" of Communications Were Intercepted

Plaintiff's argument that information concerning the "identity" of the Plaintiff constitutes

"content" under the Wiretap Act, critically ignores that none of the information she alleges are

collected by the pixel, such as IP addresses, concern the "identity" of the Plaintiff. At most, the

alleged information can identify a *device*, not an individual party. *See*

https://www.hgexperts.com/expert-witness-articles/identifying-a-person-using-an-ip-address-

52504 (last visited Oct. 13, 2023) ("an IP address either identifies an individual device, or group

of devices, at a specific point in time.").

The SJC's decision in *District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co.*,

does not support Plaintiff's argument. 379 Mass. 586 (1980). In that case the SJC found that

telephone numbers fell within the definition of contents under the Act. However, Plaintiffs' attempt to analogize telephone numbers and IP addresses misses the mark, given the dynamic nature of IP addresses. *U.S. v. Kearney*, 2009 WL 4591949, * 2 (D.Mass. Nov. 30, 2009), *aff'd*, 672 F.3d 81 (1st Cir. 2012) ("IP addresses are often 'dynamic (that is, changing), meaning that an ISP might assign each subscriber a different IP address after a certain number of hours, days, or weeks logged into the system.")

Second, because Plaintiff has failed to plausibly allege the existence of *any* communication that she personally had with Tufts MC (Compl. ¶¶ 10, 58-96), she has failed to plausibly allege the "contents" requirement of the Wiretap Act. *See Kurowski v. Rush Sys. for Health*, --- F. Supp. 3d ---, 2023 WL 2349606, at *5 (N.D. Ill. 2023) ("Moreover, the hypotheticals provided by Kurowski appear to illustrate only what occurs when an individual—whether a patient or not—clicks on certain areas of Rush's public website. Kurowski does not allege what surreptitious patient data disclosures occur when an actual Rush patient enters her MyChart portal and navigates through it."); *Cousin v. Sharp Healthcare*, --- F. Supp. 3d ---, 2023 WL 4484441, at *4 (S.D. Cal. 2023) (dismissing all of plaintiff's claims when relying on a hypothetical user's experience).

At best, the information allegedly collected and disclosed is the same type of "extrinsic information used to route a communication" that courts have repeatedly concluded does not constitute "contents" under wiretap statutes. *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 135 (3d Cir. 2015).

## III. CONCLUSION

For the reasons and authorities set forth above, Tufts MC respectfully asks the Court to grant its motion to dismiss, with prejudice.

Dated: October 13, 2023

Respectfully submitted,

*/s/ James H. Rollinson*

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 13, 2023 copies of the foregoing memorandum were

transmitted electronically via email to the following recipients.


Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*


/s/ James H. Rollinson

*Attorney for Defendant Tufts MC*


I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

1

Date Filed 11/17/2023 2:49 PM
Superior Court - Suffolk
Docket Number 2384CV00930

BC

*NOTIFY*

21

# COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| KAREN MCMANUS, <br><br> For herself and the Class, <br><br> v. <br><br> TUFTS MEDICAL CENTER, INC., <br><br> Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION <br><br> CIVIL ACTION NO. 2384-CV-000930-BLS1 |

## JOINT STIPULATION AND PROPOSED ORDER TO STAY ALL PROCEEDINGS PENDING INTERLOCUTORY APPEAL IN RELATED CASES

Plaintiff Karen McManus ("Plaintiff") and Defendant Tufts Medical Center, Inc. ("Defendant," and with Plaintiff, the "Parties") move to stay this case pending completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1). In support of this motion, the Parties state as follows:

Plaintiff filed her Complaint on April 19, 2023. Defendant removed the case to the United States District Court for the District of Massachusetts on May 16, 2023. The District Court remanded the case to this Court on July 18, 2023. Defendant served a motion to dismiss on August 17, 2023; Plaintiff opposed the motion, and Defendant filed the Rule 9A package for the motion on October 13, 2023. The Court has not yet held a hearing on Defendant's motion.

On October 31, 2023, the Court denied the motions to dismiss in *Beth Israel* and *New England Baptist*. The Court also decided to report its decisions denying the motions to dismiss in those cases to the Massachusetts Appeals Court for interlocutory appellate review, pursuant to Mass. R. Civ. P. 64(a). The issues raised in the *Beth Israel* and *New England Baptist* appeals overlap with the issues in this case, including those presented through Defendant's pending motion to dismiss.

*[handwritten marginal note, left margin:]* 1/24/24 ALLOWED. This case shall be stayed pending decision of the Vita appeals. Within 14 days of a decision in the Vita appeals, the parties shall notify the court and provide the case status in the following 60 days when they would be available for a Rule 16 conference with the court.

*[signature]*

The Parties have conferred and agreed to stay all Superior Court proceedings in this matter

pending completion of the appeals in *Beth Israel* and *New England Baptist* and that the stay should remain

in place and be lifted only after the completion of those appeals.

Accordingly, the Parties stipulate and agree, subject to the Court's approval, that:

1.      All Superior Court proceedings, time standards, and deadlines in this matter should be

stayed during the pendency of the appeals in *Beth Israel* and *New England Baptist*.

2.      No discovery requests or responses will be exchanged between the Parties during the

pendency of the stay, including (without limitation) interrogatories, requests for the production of

documents/data, or deposition notices.

3.      Fourteen days after the completion of the appeals in the *Beth Israel* and *New England*

*Baptist* (including the exhaustion or expiration of any rights to rehearing, reconsideration, or further

appellate review), this stay shall be automatically lifted, and the Parties may then proceed with further

litigating the case in this Court.

Dated: November 17, 2023

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ James H. Rollison*
BAKER & HOSTETLER LLP
James H. Rollinson (BBO #649407)
127 Public Street
Suite 2000
Cleveland, OH 44116
T: (216) 621-0200
F: (216) 626-0740
jrollinson@bakerlaw.com

*Counsel for Defendant*

The Court hereby approves the Parties' Joint Stipulation above.

Entered: _____, 2023

_____
Associate Justice, Superior Court
Commonwealth of Massachusetts

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

2

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSTION** |
| Plaintiff, | CIVIL ACTION NO. 2384CV00930-BLS1 |
| v. | |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

## DEFENDANT TUFTS MEDICAL CENTER, INC.'S
## SUPERIOR COURT RULE 9A NOTICE OF FILING

Pursuant to Superior Court Rule 9A(b)(2)(iii), notice is hereby provided that the undersigned filed the following documents with the Suffolk County Superior Court this 13th day of October 2023:

1. Defendant Tufts Medical Center's Motion to Dismiss Plaintiff's Complaint.

2. Defendant Tufts Medical Center's Memorandum in Support of Its Motion to Dismiss Plaintiff's Complaint.

3. Declaration of Elizabeth A. Scully in Support of Defendant Tufts Medical Center's Motion to Dismiss.

4. Plaintiff's Opposition to Defendant's Motion to Dismiss.

5. Exhibits to Plaintiff's Opposition to Defendant's Motion to Dismiss.

6. Defendant Tufts Medical Center's Reply Memorandum in Support of Its Motion to Dismiss Plaintiff's Complaint.

1

7.    Exhibit 2 to Defendant Tufts Medical Center's Reply Memorandum in Support of

Its Motion to Dismiss Plaintiff's Complaint.

Dated: October 13, 2023                    Respectfully submitted,

                                           /s/ James H. Rollinson
                                           James H. Rollinson (BBO #649407)
                                           BAKER & HOSTETLER LLP
                                           127 Public Street
                                           Suite 2000
                                           Cleveland, OH 44116
                                           jrollinson@bakerlaw.com
                                           T: (216) 621-0200
                                           F: (216) 626-0740

                                           Paul G. Karlsgodt (*pro hac vice* forthcoming)
                                           BAKER & HOSTETLER LLP
                                           1801 California Street
                                           Suite 4400
                                           Denver, CO 80202-2662
                                           pkarlsgodt@bakerlaw.com
                                           T: (303) 764-4013
                                           F: (303) 861-7805

                                           Elizabeth A. Scully (*pro hac vice* forthcoming)
                                           BAKER & HOSTETLER LLP
                                           Washington Square, Suite 1100
                                           1050 Connecticut Avenue, N.W.
                                           Washington, DC 20036-5304
                                           escully@bakerlaw.com
                                           T: (202) 861-1500
                                           F: (202) 861-1783

                                           *Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on October 13, 2023 copies of the foregoing notice were transmitted electronically via email to the following recipients.

Michelle H. Blauner
Patrick J. Vallely
Edward F. Haber
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson

*Attorney for Defendant Tufts MC*

1

Date Filed 12/5/2024 4:25 PM
Superior Court - Suffolk Case 1:25-BV-10008-ADB    Document 11    Filed 01/29/25    Page 388 of 485
Docket Number 2384CV00930

22

## COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| KAREN MCMANUS, | **SUPERIOR COURT DEPARTMENT** |
| For herself and the Class, | **OF THE TRIAL COURT** |
| | **BUSINESS LITIGATION SESSION** |
| v. | |
| | CIVIL ACTION NO. 2384-CV-000930-BLS1 |
| TUFTS MEDICAL CENTER, INC., | |
| Defendant. | |

## NOTICE OF SUPREME JUDICIAL COURT DECISION IN
## *VITA v. NEW ENGLAND BAPTIST HOSPITAL*

Pursuant to the Court's order of January 23, 2024, Plaintiff hereby notifies the Court that on October 24, 2024, the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024), reversing the Superior Court's denial of motions to dismiss in the two cases on appeal. Rescript issued in both appealed cases on November 21, 2024. Plaintiff reached out to counsel for Defendant on December 3, 2024, regarding proposed dates for a Rule 16 conference (after learning that rescript had issued), but Defense counsel did not respond to Plaintiff's counsel by the date of this notice.

Plaintiff's counsel is available for Rule 16 conference on January 7, 2025; January 8, 2025; or January 15, 2025. Plaintiff has also notified Defendant that she intends to file an amended complaint in light of the SJC's decision in *Vita*.

Respectfully submitted this 5th day of December 2024:

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
pvallely@shulaw.com

*Counsel for Plaintiff and the Proposed Class*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon Defendant's counsel by email on December 5, 2024.

/s/ *Patrick J. Vallely*
Patrick J. Vallely

**COMMONWEALTH OF MASSACHUSETTS**

Suffolk, ss.

| | |
|---|---|
| KAREN MCMANUS,<br><br>For herself and the Class,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br><br>CIVIL ACTION NO. 2384-CV-00930-BLS1 |

## DEFENDANT'S NOTICE OF SUPREME JUDICIAL COURT DECISION IN *VITA v. NEW ENGLAND BAPTIST HOSPITAL*

Pursuant to the Court's order of January 24, 2024, Defendant hereby notifies the Court that on October 24, 2024, the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024), reversing the Superior Court's denial of motions to dismiss in the two cases on appeal. Rescript issued in both appealed cases on November 21, 2024.

Plaintiff has notified Defendant that she intends to file an amended complaint in light of the SJC's decision in *Vita*, which is dispositive of Plaintiff's current sole Massachusetts Wiretap Act claim.

Defendant was unable to connect with Plaintiff's counsel before Plaintiff's counsel filed their notice today. Defendant believes scheduling a Rule 16 Conference at this time may be premature. However, Defendant is available on January 7, 8, or 15, 2025. There are 16 putative class actions pending in this Court challenging the alleged use of website technologies. For the Court's convenience, the related actions that have been stayed pending resolution of *Vita* are as follows:

| Case Name | Case No. |
|---|---|
| *Joseph Alves v. BJ's Wholesale Club, Inc.* | No. 2284CV02509-BLS1 |
| *Janice Progin, et al. v. UMass Mem'l Health Care, Inc., et al.* | No. 2284CV02889-BLS1 |

| | |
|---|---|
| *Jane Doe v. Steward Health Care Sys., LLC* | No. 2384CV00174-BLS1 |
| *John Doe et al. v. Boston Med. Ctr. Corp.* | No. 2384CV00326-BLS1 |
| *Jane Doe v. Children's Hosp. Corp.* | No. 2384CV00411-BLS1 |
| *Kathleen Vita v. Beth Israel Deaconess Med. Ctr., Inc.* | No. 2384CV00480-BLS1 |
| *Kathleen Vita v. Blue Cross & Blue Shield of Mass., Inc., et al.* | No. 2384CV00542-BLS1 |
| *Jane Doe v. Atrius Health, Inc.* | No. 2384CV00597-BLS1 |
| *Jane Doe v. Lawrence Gen Hosp.* | No. 2384CV00728-BLS1 |
| *Kathleen Vita v. New England Baptist Hosp.* | No. 2384CV00857-BLS1 |
| *Karen McManus v. Tufts Med. Ctr., Inc.* | No. 2384CV00930-BLS1 |
| *Elizabeth Nova v. Boston Med. Ctr., Corp.* | No. 2384CV01086-BLS1 |
| *Jane Doe v. Cape Cod Healthcare, Inc.* | No. 2384CV01236-BLS1 |
| *Jane Doe v. Baystate Health Sys., Inc.* | No. 2384CV01949-BLS1 |
| *John Doe et al., v. UMass Mem'l Health Care, Inc.* | No. 2384CV02448-BLS1 |
| *John Doe et al., v. Atrius Health, Inc.* | No. 2384CV02704-BLS1 |

In the event the Court intends to proceed with scheduling a Rule 16 Conference, Defendant asks that it be a joint Conference to address next steps across all these pending actions. Tufts Medical Center has consulted with counsel for Defendants in the actions and understands that counsel for Defendants are currently available for such a Conference on the dates above.

2

Dated: December 5, 2024

Respectfully submitted,

*James H. Rollinson*
BAKER & HOSTETLER LLP
James H. Rollinson (BBO #649407)
127 Public Street
Suite 2000
Cleveland, OH 44116
T: (216) 621-0200
F: (216) 626-0740
jrollinson@bakerlaw.com

*Counsel for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk

3

4916-1913-3443.1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Plaintiff's counsel, by email, on December 5, 2024.

*James H. Rollinson*
James H. Rollinson

4916-1913-3443.1

Date Filed 12/12/2024 1:20 PM
Superior Court - Suffolk Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 395 of 485
Docket Number 2384CV00930

MS

24

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| Karen McManus,<br><br>For herself and the Class,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV00930-BLS1<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiff Karen McManus ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1.      Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Tufts Medical Center, Inc. ("Tufts Medical Center"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, Tufts Medical Center aided in the interception of communications between Plaintiff and other Class Members (defined below) and Tufts Medical Center through a website maintained by Tufts Medical Center (the "Tufts Medical Center Website").

2.      Tufts Medical Center aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with Tufts Medical Center by injecting hidden code into the Tufts Medical Center Website. That hidden code enabled Google, Facebook, and other third parties to eavesdrop on healthcare consumers' communications with Tufts Medical Center. Those third parties, including

Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3.     Healthcare consumers' electronic communications with Tufts Medical Center were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent, including through tracking technologies hidden on many webpages of the Tufts Medical Center Website that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, bill payments, medical records, and appointment requests. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4.     Tufts Medical Center did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of individual communications with Tufts Medical Center, nor did Tufts Medical Center seek or obtain their consent for such interception. On the contrary, Tufts Medical Center deceptively told healthcare consumers, through its published online privacy policy, that any information collected about their activities on the Tufts Medical Center Website would be collected "anonymously" and would not be shared with third parties. In reality, Tufts Medical Center facilitated the interception of communications between healthcare consumers and Tufts Medical Center in a manner that permitted third parties such as Google and Facebook to ascertain the consumers' identity and then use that intercepted information for their own commercial

2

purposes, including serving individualized advertising based on the contents of the individuals'
communications with Tufts Medical Center.

5.      Tufts Medical Center owed common law, contractual, statutory, and regulatory duties
to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential.
Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class
Members' Private Information, Tufts Medical Center assumed legal and equitable duties to patients to
protect and safeguard their Private Information from unauthorized disclosure.

6.      Despite the stigmas that, unfortunately, are so often associated with certain health
issues and treatments, Tufts Medical Center chose to put its business interests over the privacy of its
patients. The unilateral disclosure of users' Private Information in this manner violated the Health
Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936
(codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

7.      As described more fully below, Plaintiff and Class Members have suffered injury as a
result of Tufts Medical Center's conduct. These injuries include (i) invasion of privacy; (ii) unwanted
targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed
Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing
risk of further disclosure of their Private Information.

8.      In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts
Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in
similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New
England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for
interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those
cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying
the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass

the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

9.      In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

10.     The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a one-party consent statute similar to the Massachusetts Wiretap Act. Here, Tufts Medical Center intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for Tufts Medical Center's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

11.     Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Tufts Medical Center Website.

Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

12.     Plaintiff is a resident of Walpole, Massachusetts. Plaintiff is a patient of Tufts Medical Center. Plaintiff regularly used the Tufts Medical Center Website to (i) obtain information about Tufts Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal.

13.     As described below, Tufts Medical Center implemented tracking technologies that intercepted communications between Tufts Medical Center and healthcare consumers on nearly every page of the Tufts Medical Center website. The webpages Plaintiff visited on the Tufts Medical Center website were among the webpages on which Tufts Medical Center embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 94-99, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 82-87, *infra* (tracking technologies embedded on pages about medical procedures); ¶¶ 100-02, *infra* (tracking technologies embedded on webpages for personal medical records).

14.     Plaintiff did not consent to or authorize the use of Private Information by third parties or Tufts Medical Center enabling third parties to access and use such Private Information.

15.     Defendant Tufts Medical Center, Inc. is a corporation that operates in Boston, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Boston, Massachusetts. Tufts Medical Center maintains and controls the content of the Tufts Medical Center Website.

**JURISDICTION**

16.    The exercise of personal jurisdiction over Tufts Medical Center is proper according to

M.G.L. c. 223 § 3 because, among other things, Tufts Medical Center is located in and conducts

business in Massachusetts, and Plaintiff's claim arises out of Tufts Medical Center's activities and

conduct in the Commonwealth of Massachusetts.

**FACTUAL ALLEGATIONS**

**Tufts Medical Center and Its Website**

17.    Tufts Medical Center operates a hospital and full-service medical center in Boston,

Massachusetts. Tufts Medical Center offers inpatient and outpatient care to residents near Boston and

surrounding communities. Tufts Medical Center provides healthcare across various specialties,

including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics

and gynecology, and trauma care.

18.    Tufts Medical Center maintains the Tufts Medical Center Website for its hospital and

outpatient facilities, found at https://www.tuftsmedicalcenter.org/. Through that website, healthcare

consumers can obtain information about the services Tufts Medical Center provides, including

information about doctors, services, and treatments provided by Tufts Medical Center for particular

medical conditions.

19.    The Tufts Medical Center Website is designed for communications with healthcare

consumers. The website includes the following functions:

(a)    The Tufts Medical Center Website provides general information about Tufts Medical
       Center.

(b)    The Tufts Medical Center Website provides information about healthcare services
       provided at Tufts Medical Center, communicated through service-specific pages for a
       range of services such as "Obstetrics and Gynecology," "Cancer Center," "Stroke
       Center," and "Psychiatry," among many others.

(c)    The Tufts Medical Center Website permits healthcare consumers to use a "Find a
       Doctor" function to search for doctors by condition, specialty, gender, and location.

(d)  The Tufts Medical Center Website permits healthcare consumers to access and pay bills online.

(e)  The Tufts Medical Center Website lets healthcare consumers access their private medical information online through the myTuftsMed Patient Portal.

20.  Because the Tufts Medical Center Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

## Reasonable Expectations of Users of the Tufts Medical Center Website

21.  Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Tufts Medical Center Website.

22.  Users of healthcare-related websites such as the Tufts Medical Center Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Tufts Medical Center will not share with third parties their communications with Tufts Medical Center without their consent.

23.  The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Tufts Medical Center from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as Tufts Medical Center from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare

7

providers to share protected information with social media and other technology companies for marketing purposes.

24.    Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Tufts Medical Center, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

25.    The expectations and understanding of users of the Tufts Medical Center Website were informed by what Tufts Medical Center told them during the class period about how it handles their personal information. (Tufts Medical Center changed its Website Privacy Policy after the class period; Plaintiff takes no position on the adequacy of the current policy with respect to the adequacy of Tufts Medical Center's current disclosures.)

26.    During the class period, the Tufts Medical Center Website Privacy Policy began by promising, generally, that "Patients' and other visitors' privacy and security is a top priority at Tufts Medical Center." It then continued, near the outset of the policy, to state (emphasis added):

> All visitors use the Tufts Medical Center websites **anonymously**. **We do not collect any identifiable information unless you specifically provide us with that information** voluntarily through our forms such as request appointment forms, e-newsletter sign-ups, clinical trial enrollment, etc.... .... Tufts Medical Center does not and **will never sell or rent any identifiable information to third party vendors**.

27.    These statements were false. As described more fully below, website users did not access the Tufts Medical Center anonymously. Instead, Tufts Medical Center injected hidden code into its website that permitted Facebook, Google, and other third parties to intercept communications between website users and Tufts Medical Center and, critically, to associate those intercepted communications with the real-world identities of those individuals. That is, the communications that Google and Facebook intercepted were **not** "anonymous."

28.     Moreover, as described more fully below, Tufts Medical Center bartered website users' "identifiable information" and the content of their communications with Tufts Medical Center to third parties in exchange for valuable services provided by those third parties, including website analytics and targeted advertising.

29.     Although the same policy later discussed "cookies" and "tracking pixels," the statements regarding those technologies did not negate Tufts Medical Center's deceptive promises that website users browse the website "anonymously" and that Tufts Medical Center did not provide identifiable information to third parties. Instead, the policy stated, concerning tracking pixels: "They [the tracking pixels] do not provide us with any personally identifiable information," again reinforcing the promise of anonymity when, in fact, the tracking pixels were designed to associate a website user's communications with Tufts Medical Center to the user's real-world identity.

30.     In short, healthcare consumers expected that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by Tufts Medical Center's deceptive statements on the Tufts Medical Center Website. The interceptions of website users' communications with Tufts Medical Center were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

### Third Parties Offering Tracking Technologies

31.     Plaintiff describes in this complaint various tracking technologies implemented on the Tufts Medical Center Website that caused the secret interception, recording, and transmission of the contents of Class Members' internet communications with Tufts Medical Center. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Tufts Medical Center and the purposes for which interceptions are made.

32.    Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

33.    Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

34.    Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

35.    Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

36.    Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

37.    Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

38.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

39.     Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

40.     Google maintains detailed profiles on individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

41.     Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

42.     One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

43.    Another way Google collects information to build its detailed profiles on individuals is through its "Doubleclick" and "Google Ads" tags. Doubleclick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired Doubleclick in 2007 and now operates it as an advertising division of Google. Google's advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through the advertising tags with particular individuals to serve targeted advertising on the individual and measure the efficacy of Google's advertising campaigns.

44.    In summary, with respect to Google, although Google Analytics and Doublclick/Google Ads tags are distinct products with distinct purposes (Google Analytics is used to analyze website user behavior, and Doubleclick/Google Ads tags are used to optimize and track the effectiveness of advertising), they both function similarly. They both intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and Doubleclick/Google Ads tags, and Google can and does use those intercepted communications for its own commercial purposes.

### Website Tracking Technologies on the Tufts Medical Center Website

45.    Tufts Medical Center injected hidden code into the Tufts Medical Center Website that permitted third parties to contemporaneously intercept healthcare consumers' communications with Tufts Medical Center. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and

Facebook. This included, for example, associating the content of the user's communications with Tufts Medical Center with the website user's Facebook profile.

46.    These tracking technologies transmitted to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Tufts Medical Center, the contents of those communications and identifying information about the Class Members. The contents intercepted include Personal Information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

47.    Tufts Medical Center has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48.    Before describing how such technologies work, it is important to first define some basic technological terms.

49.    A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50.    An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Tufts Medical Center, as of the time of this complaint, is 99.83.180.191. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51.    A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Tufts

13

Medical Center Website is https://www.tuftsmedicalcenter.org. URLs also often point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive URLs." The Tufts Medical Center Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communication made through a particular page on the Tufts Medical Center Website. For example, the Tufts Medical Center Website has a page specifically about the Tufts Medical Center Department of Obstetrics and Gynecology; that page's URL is https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview. That is, one call tell from the URL itself the substance of the communication between Tufts Medical Center and the healthcare consumer—that the consumer is requesting information about obstetrics and gynecology services.

52.     A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and Tufts Medical Center with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

53.     **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a

14

website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

54. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Tufts Medical Center) inserts into its website hidden code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

55. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

56. When the JavaScript code causes the user's web browser to retrieve a file from the third party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

15

57.     When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google or Facebook can then add the content of the user's communications with Tufts Medical Center to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

58.     The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of intercepting and transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

59.     The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and Tufts Medical Center contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

60.     The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup article (including attachments published with the article) singled out Tufts Medical Center as one of the nation's largest hospitals that used Meta Pixel in this fashion. The Markup Article triggered Congressional investigations and increased scrutiny of hospitals' data practices.[4] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

61.     Tufts Medical Center appears to have removed Meta Pixel from its website in mid-June 2022, around the same time as the Markup Article (although the article was published June 16, 2022, the Markup indicated that it contacted hospitals featured in the article prior to publication for their comments). Although it removed Meta Pixel, Tufts Medical Center continued after that time to inject other hidden tracking technologies into its website that intercepted healthcare consumers' communications with Tufts Medical Center in a similar fashion, including Google Analytics.

62.     Within a few months of the filing of the original complaint in this action, Tufts Medical Center appears to have removed from the Tufts Medical Center Website the remaining tracking technologies described in the original complaint. Then, in December 2023, Tufts Medical Center stopped using the domain name https://www.tuftsmedicalcenter.org/, causing requests to that

---

[3] See "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[4] See "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

domain name to proceed to a new website, https://www.tuftsmedicine.org/. Around that same time,

Tufts Medical Center began using several new tracking technologies, although those tracking

technologies appear to have better protections for patient privacy than the tracking technologies it

used during the class period. Also, in late 2023, Tufts Medical Center appears to have changed the

terms of its privacy policies to remove the language Plaintiff describes in this complaint. Accordingly,

although Plaintiff takes no position on whether Tufts Medical Center's current implementation of

tracking technologies is adequately disclosed or gives rise to any civil liability to website users, Plaintiff

limits her claims in this case to the tracking technologies Tufts Medical Center used during the class

period (defined below).

### Tufts Medical Center's Use of Tracking Technologies on the Tufts Medical Center Website

63.     During the class period, Tufts Medical Center used various tracking technologies

across the Tufts Medical Center Website. Tufts Medical Center injected several tracking technologies

into the code of all, or almost all, of the pages within the Tufts Medical Center Website. For example,

on nearly every page of the Tufts Medical Center Website, Tufts Medical Center injected hidden code

that loaded Google Analytics. It appears to have injected hidden Meta Pixel code into most pages on

the Tufts Medical Center Website before having removed Meta Pixel in mid-June 2022.

64.     Within a few months after the initial complaint was filed in this case, it appears Tufts

Medical Center significantly limited its use of Google Analytics and other tracking technologies. The

examples provided below of Tuft Medical Center's deployment of Google Analytics and other tracking

technologies on the Tufts Medical Center Website reflect such deployment around the time of the

original complaint in this action (or, as to Meta Pixel, prior to mid-June 2022). Tufts Medical Center

controls when and how it uses Google Analytics and other tracking technologies on its own website

and can change or remove tracking technologies at any time. Therefore, the examples provided below

may not reflect Tufts Medical Center's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

65.    The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

66.    Below is an image of the main landing page for the Tufts Medical Center Website:



67.     When a user loads the main landing page for the Tufts Medical Center Website, the webpage caused the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then caused the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

68.     The image below depicts the landing page for the Tufts Medical Center on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



69.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser

to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code caused the user's web browser to intercept and transmit to Google when a small file was loaded from Google's servers:

×  Headers   Payload   Preview   Response   Initiator   »

▼ Query String Parameters     view source     view URL-encoded

v: 1
_v: j99
aip: 1
a: 636516736
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/
ul: en-us
de: UTF-8
dt: Tufts Medical Center | Boston Hospital and Academic
Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4X
z: 1538772411

70.    Among the information intercepted and transmitted to Google contemporaneously with the communications between the website user and the Tufts Medical Center Website are:

(a)    The URL of the webpage visited (the text after the letters "dl," which includes the text "https://www.tuftsmedicalcenter.org"); and

(b)    The title of the webpage (after the letters "dt," which includes "Tufts Medical Center | Boston Hospital and Academic Medical Center").

71.    The other information Google has intercepted includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Tufts Medical Center).

72.    Tufts Medical Center also has placed Doubleclick/Google Ads tags on most webpages on its website that intercepted similar information to Google Analytics, although, as discussed above, the primary purpose of these other tags—from the perspective of the website owner—is advertising instead of website analytics. The contents of the communication that Doubleclick/Google Ads tags intercept and transmit to Google, via hidden JavaScript code, however, is similar to Google Analytics. For example, below is the information that hidden Doubleclick/Google Ads code intercepted on the main landing page of the Tufts Medical Center Website (with highlighting added):

× Headers    Payload    Preview    Response    Initiator    »

▼ **Query String Parameters**    view source    view URL-encoded

    random: 1675737341044

    cv: 9

    fst: 1675737341044

    num: 1

    guid: ON

    resp: GooglemKTyoQhCsO

    nid: 375603260,466465925

    u_h: 1080

    u_w: 1920

    u_ah: 1050

    u_aw: 1920

    u_cd: 24

    u_his: 7

    u_tz: 0

    u_java: false

    u_nplug: 5

    u_nmime: 2

    sendb: 1

    ig: 1

    frm: 0

    url: https://www.tuftsmedicalcenter.org/

    tiba: Tufts Medical Center | Boston Hospital and Academic Medical Center

    hn: www.googleadservices.com

    rfmt: 3

    fmt: 4

That is, hidden Doubleclick/Google Ads code intercepts the URL visited, the name of the webpage visited, various information on the user's computer and browser configuration, and additional identifiers that can be used to confirm the identity of the individual whose communication with Tufts Medical Center is intercepted.

73.     Notably, when the hidden code for Google Analytics or Doubleclick/Google Ads causes the website user's web browser to intercept the contents of communications between the website user and the Tufts Medical Center Website and contemporaneously transmit those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address and/or other persistent identifiers

to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). That is, the technology was designed specifically so that the communications are not intercepted anonymously or only in the aggregate; instead, the interceptions are designed to be individualized and non-anonymous. After Google associates the website user's communications with Tufts Medical Center with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

74.    Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the Tufts Medical Center Website are the same.

75.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[5] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

76.    The same landing page for the Tufts Medical Center Website also included hidden Meta Pixel code before Tufts Medical Center removed Meta Pixel from its website in mid-June 2022. The hidden code caused the user's browser to load a JavaScript file called "fbevents.js." That

---

[5] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Tufts Medical Center Website. Below is an example of the contents of the communication between the website user and Tufts Medical Center, which the hidden Meta Pixel code intercepted and transmitted to Facebook:

X   Headers   Payload   Preview   Response   Initiator   Timing

▼ Form Data        view source      view URL-encoded

    id: 899431063472882
    ev: Microdata
    dl: https://www.tuftsmedicalcenter.org/
    rl:
    if: false
    ts: 1598876594129
    cd[DataLayer]: []
    cd[Meta]: {"title":"\n\tTufts Medical Center | Boston Hospita
    l and Academic Medical Center\n","meta:keywords":"Top hospit
    al boston, best boston hospital, Tufts Medical Center, tufts
    hospital, babesiosis, tick bite, parasite, infectious diseas
    e","meta:description":"Tufts Medical Center is a top Boston
    hospital focused on providing excellent patient care and tea
    ching future leaders. Find your doctor today."}
    cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.or
    g/ui/images/logo-tufts-medical-center-fb-share.png","og:imag
    e:secure_url":"https://www.tuftsmedicalcenter.org/ui/images/
    logo-tufts-medical-center-fb-share.png","og:image:type":"ima
    ge/png","og:image:width":"200","og:image:height":"200","og:t
    itle":"Tufts Medical Center | Boston Hospital and Academic M
    edical Center","og:description":"Tufts Medical Center is a t
    op Boston hospital focused on providing excellent patient ca
    re and teaching future leaders. Find your doctor today."}
    cd[Schema.org]: []
    cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.org/we
    b/20200831122257/http://schema.org\",\n\"@type\": \"LocalBus
    iness\",\n\"address\": {\n\"@type\": \"PostalAddress\",\n\"a
    ddressLocality\": \"Boston\",\n\"addressRegion\": \"MA\",\n
    \"postalCode\":\"02111\",\n\"streetAddress\": \"800 Washingt

77.     Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Tufts Medical Center Website, including the URL of the webpage visited and the title of the webpage, and

additionally, more detailed contents describing the webpage. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with Tufts Medical Center's advertising account with Facebook.

78.    Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and Tufts Medical Center to serve personalized advertising to the website user in the future.

79.    Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

80.    The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user. This allowed Facebook to track that individual across the Tufts Medical Center Website and further confirm that individual's real-world identity.

81.    Tufts Medical Center configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which Tufts Medical Center embedded Meta Pixel, Google Analytics, and

other tracking technologies. Her communications with Tufts Medical Center, including Private

Information, were intercepted similarly to the illustrative examples set forth below.

82.    The Tufts Medical Center Website contains numerous subpages for specific "Patient

Care and Services." For example, the Tufts Medical Center Website contains a page entitled

"Obstetrics and Gynecology," designed to inform the website user about OB/GYN services Tufts

Medical Center offers. By visiting this webpage, a user communicates that the user has some interest

in OB/GYN services (for example, the user may be pregnant or know someone who is). When the

user communicates with Tufts Medical Center by visiting this particular webpage, Tufts Medical

Center caused the secret interception and transmission of that communication to Google, Facebook,

and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:



83.     The graphic below presents the contents of the communication between the website

user and Tufts Medical Center that were secretly intercepted and transmitted to Google when the

above page loaded as a result of the Google Analytics JavaScript code that Tufts Medical Center

secretly injected into the website (with highlighting added):

```
▼ Query String Parameters      view source      view URL-encoded
    v: 1
    _v: j99
    aip: 1
    a: 1002877562
    t: pageview
    _s: 1
    dl: https://www.tuftsmedicalcenter.org/patient-care-serv
    ices/Departments-and-Services/Obstetrics-and-Gynecology/
    Overview
    ul: en-us
    de: UTF-8
    dt: Obstetrics & Gynecology | Tufts Medical Center
    sd: 24-bit
    sr: 1920x1080
    vp: 1339x979
    je: 0
    _u: QCCAgAABAAAAAAAAC~
    jid:
    gjid:
    cid: 815584837.1679685730
    tid: UA-5578028-1
    _gid: 1131827353.1679685730
    gtm: 45He33m0n71TTLN4K
    z: 704906163
```

84.     As reflected in the above screenshot, the code injected into the Tufts Medical Center

Website caused the user's browser to contemporaneously intercept and transmit to Google the fact

that the website user is visiting an "Obstetrics & Gynecology" webpage on the Tufts Medical Center

Website—information that Google retains and can use for its own commercial purposes, and because

Google retains it, can be accessible by third parties by subpoena or otherwise.

85.     As shown on the screen capture of the webpage itself, the Obstetrics and Gynecology webpage contains a button through which a healthcare consumer can "Request an Appointment." When an individual clicks that button, the individual communicates to Tufts Medical Center that the individual is seeking obstetrics and gynecology care and is a patient or prospective patient of Tufts Medical Center. When the user clicks that button, hidden Google Analytics code that Tufts Medical Center injected into its website permitted Google to intercept the communication. The contents of the communication that were intercepted via hidden Google Analytics code is depicted below:

×   Headers   Payload   Preview   Response   Initiator   Timing

▼ Query String Parameters        view source        view URL-encoded

v: 1
_v: j99
a: 406680217
t: event
ni: 0
_s: 1
dl: https://www.tuftsmedicalcenter.org/patient-care-services/D
epartments-and-Services/Obstetrics-and-Gynecology/Overview
ul: en-us
de: UTF-8
dt: Obstetrics & Gynecology | Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
ec: How can we help you today?
ea: REQUEST AN APPOINTMENT
el: /patient-care-services/Departments-and-Services/Obstetrics
-and-Gynecology/Overview
_u: SCCAAAABAAAAACAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5576028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLI4K
z: 1581668186

Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information. That is, Google intercepted the fact that the healthcare consumer has

clicked a "REQUEST AN APPOINTMENT" button on the Obstetrics & Gynecology webpage of

Tufts Medical Center, information Google can then use for its own commercial purposes.

86.    The same webpage contained hidden code that intercepted the user's communication

with Tufts Medical Center and transmitted the same information to Facebook before the removal of

Meta Pixel from the Tufts Medical Center Website in June 2022. The contents of the communication

intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:

Headers    Payload    Preview    Response    Initiator    Timing    >>

▼ Form Data    view source    view URL-encoded

    id: 899431063472882
    ev: Microdata
    dl: https://www.tuftsmedicalcenter.org/patient-care-service
    s/departments-and-services/obstetrics-and-gynecology/overv
    iew
    rl:
    if: false
    ts: 1598237810086
    cd[DataLayer]: []
    cd[Meta]: {"title":"\n\tObstetrics and Gynecology in Boston
    | Tufts Medical Center\n","meta:keywords":"obstetrics, gyn
    ecology, women, obgyn, gyn, ob, delivery, pregnancy, obgyn
    boston","meta:description":"Tufts Medical Center's Obstetr
    ics and Gynecology experts offer renowned care from checku
    ps and deliveries to surgery. Learn more and request an ap
    pointment today."}
    cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.
    org/ui/images/logo-tufts-medical-center-fb-share.png","og:
    image:secure_url":"https://www.tuftsmedicalcenter.org/ui/i
    mages/logo-tufts-medical-center-fb-share.png","og:image:ty
    pe":"image/png","og:image:width":"200","og:image:heigh
    t":"200","og:title":"Obstetrics and Gynecology in Boston |
    Tufts Medical Center","og:description":"Tufts Medical Cent
    er's Obstetrics and Gynecology experts offer renowned care
    from checkups and deliveries to surgery. Learn more and re
    quest an appointment today."}
    cd[Schema.org]: []

As depicted above, Tufts Medical Center aids the secret interception and transmission to Facebook

of the contents of the communication between the website user and Tufts Medical Center, including

that the user is visiting an "Obstetrics and Gynecology" webpage on the Tufts Medical Center Website, with further keywords describing the substance of the webpage, including "obgyn," "delivery," and "pregnancy," information that Facebook retains and can use for commercial purposes.

87.    The Tufts Medical Center Website contains dozens of similar pages on particular medical specialties and practices that Tufts Medical Center offers. For each such page, the Tufts Medical Center Website has aided Google and Facebook's secret interception of the contents of communications with Tufts Medical Center, similar to the above Obstetrics and Gynecology example, including whenever a healthcare consumer communicates through the "Request an Appointment" feature, which is included on each such page.

88.    When a user clicks the "Request an Appointment" button from any page on the website, the user is taken to a separate page to fill in information to request an appointment. If a user clicks the "Request an Appointment" button from the page for a particular specialty, that specialty will be pre-filled into the form on the Request-an-Appointment page. The screenshot below shows the Request-an-Appointment webpage after one clicks the Request-an-Appointment on the Obstetrics and Gynecology page discussed above:



89.     When a user visits the Request an Appointment page, regardless of how the user

arrives there, Tufts Medical Center has facilitated the interception and transmission to Google of that

appointment request via hidden Google Analytics code Tufts Medical Center has injected into its

website. The contents of the communication intercepted are depicted below (with highlighting added):

×  Headers   Payload   Preview   Response   Initiator   Timing

▼ Query String Parameters     view source     view URL-encoded

v: 1

_v: j99

aip: 1

a: 46354474

t: pageview

_s: 1

dl: https://www.tuftsmedicalcenter.org/RequestAppointment?dpt=
79657121-3b33-449f-87e3-af8862b087c6&p=

ul: en-us

de: UTF-8

dt: Request an Appointment at Tufts Medical Center

sd: 24-bit

sr: 1920x1080

vp: 1339x979

je: 0

_u: QCCAgAABAAAAAAAAC~

jid:

gjid:

cid: 815584837.1679685730

tid: UA-5578028-1

_gid: 1131827353.1679685730

gtm: 45He33m0n71TTLN4X

z: 235040303

Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information. That is, the intercepted communication reveals that the individual is requesting an appointment at Tufts Medical Center—information Google can then use for its own commercial purposes, including serving targeted advertising to that same individual.

90.     When a user fills out the form to request an appointment and submits it, Tufts Medical Center has also assisted in interception and transmission to Google of that communication via hidden Google Analytics code. The contents intercepted are depicted below (with highlighting added):

```
 ×   Headers   Payload   Preview   Response   initiator   Timing

▼ Query String Parameters      view source      view URL-encoded

        v: 1
       _v: j99
        a: 2061879966
        t: event
       ni: 0
       _s: 1
       dl: https://www.tuftsmedicalcenter.org/RequestAppointment?subm
           itted=1&dcFormReturn=1&formSuccess=1&specialty=OB%2fGYN
       ul: en-us
       de: UTF-8
       dt: Request an Appointment at Tufts Medical Center
       sd: 24-bit
       sr: 1920x1080
       vp: 1339x979
       je: 0
       ec: Request an Appointment
       ea: form submit - Validated
       el: OB/GYN
       _u: QCCAAAABAAAAACAAAC~
      jid:
     gjid:
      cid: 815584837.1679685730
      tid: UA-5578028-1
     _gid: 1131827353.1679685730
      gtm: 45He33m0n71TTLN4K
        z: 1387949042
```

As shown above, Google has intercepted the communication that the user has submitted a "form" to "Request an Appointment" for an "OB/GYN" doctor. Google can then use that information for its own purposes, including by serving targeted advertising on separate websites to the same individual.

91.     Before mid-June 2022, Tufts Medical Center injected into its Request an Appointment page hidden Meta Pixel code that permitted Facebook to intercept communications on that page. The

34

contents of the communication intercepted and transmitted to Facebook when a healthcare consumer accesses the Request an Appointment page are depicted below:



Facebook can then use this intercepted communication for its own commercial purposes, including serving targeted advertising to the same individual based on the contents of the intercepted communication. Like Google Analytics, the hidden Meta Pixel code also intercepted the communication through which a user submitted the form to request an appointment.

92.     The Tufts Medical Center Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about themselves, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Tufts Medical Center. When individuals have used the search function, Tufts Medical Center has

aided in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."



93.    When a user performed this search on the Tufts Medical Center Website, and the results page then loads, the Google Analytics code was activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code has intercepted and transmitted to Google (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters    view source    view URL-encoded

v: 1
_v: j99
aip: 1
a: 979511353
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/search?q=pregnant&
parent_id=&type=page
ul: en-us
de: UTF-8
dt: Tufts Medical Center | SearchPage
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4X
z: 267185854

As reflected in the above screenshot, the hidden Google Analytics code caused the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes.

94.    The Tufts Medical Center Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to Tufts Medical Center that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:



95.    When a user visits the Find-A-Doctor page, hidden Google Analytics code intercepts the communication. Depicted below are the contents of the user's communication with the Tufts Medical Center Website intercepted and transmitted to Google via hidden Google Analytics Code, which intercepts that the user is searching for a Tufts Medical Center doctor (with highlighting added):

```
 ✕   Headers   Payload   Preview   Response   Initiator   Timing

 ▼ Query String Parameters      view source      view URL-encoded

    v: 1
    _v: j99
    aip: 1
    a: 407189896
    t: pageview
    _s: 1
    dl: https://www.tuftsmedicalcenter.org/PhysicianDirectory/
    Search
    ul: en-us
    de: UTF-8
    dt: Find A Doctor in Boston | Tufts Medical Center
    sd: 24-bit
    sr: 1920x1080
    vp: 1339x979
    je: 0
    _u: QCCAgAABAAAAAAAAC~
    jid:
    gjid:
    cid: 815584837.1679685730
    tid: UA-5578028-1
    _gid: 1131827353.1679685730
    gtm: 45He33m0n71TTLN4K
    z: 1577261897
```

That is, Google Analytics code permitted Google to intercept that the individual is looking to "Find a Doctor" at "Tufts Medical Center," information that Google can then use for its own commercial purposes. Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information.

96.     Before the removal of Meta Pixel in June 2022, communications on the Find-A-Doctor function were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Below is a

screenshot of the contents of the communication intercepted through Meta Pixel code on the same

Find-a-Doctor page (with highlighting added);

×  Headers   Payload   Preview   Response   Initiator   »

▼ Form Data    view source    view URL-encoded

  id: 899431063472882

  ev: Microdata

  dl: https://www.tuftsmedicalcenter.org/PhysicianDirecto
  ry/Search

  rl:

  if: false

  ts: 1598230640043

  cd[DataLayer]: []

  cd[Meta]: {"title":"\n\tFind A Doctor in Boston | Tufts
  Medical Center\n","meta:keywords":"Find a doctor bosto
  n, find a pediatrician boston, find a specialist bosto
  n","meta:description":"Are you looking for a doctor in
  Boston? Look no further than Tufts Medical Center and
  Floating Hospital for Children, hospitals that are hom
  e to expert doctors in a range of specialties. "}

  cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcen
  ter.org/ui/images/logo-tufts-medical-center-fb-share.p
  ng","og:image:secure_url":"https://www.tuftsmedicalcen
  ter.org/ui/images/logo-tufts-medical-center-fb-share.p
  ng","og:image:type":"image/png","og:image:width":"20
  0","og:image:height":"200","og:title":"Find A Doctor i
  n Boston","og:description":"Are you looking for a doct
  or in Boston? Look no further than Tufts Medical Cente
  r and Floating Hospital for Children, hospitals that a
  re home to expert doctors in a range of specialties.
  "}

97.     The Tufts Medical Center Website also contains a section permitting patients to pay

bills they received from Tufts Medical Center. The "Paying Your Bill" page of the Tufts Medical

Center Website is depicted below:



98.    When a user visits this page, the user communicates that the user is an individual who has received medical services from Tufts Medical Center. Tufts Medical Center has facilitated Google's interception of that communication with Tufts Medical Center via hidden Google Analytics code. The contents of the communication intercepted by and transmitted to Google are depicted below (with highlighting added):

✕   Headers   Payload   Preview   Response   Initiator   Timing

▼ Query String Parameters        view source        view URL-encoded

v: 1
_v: j99
aip: 1
a: 830328579
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/patient-care-services/
Billing-and-Insurance
ul: en-us
de: UTF-8
dt: Paying Your Bill at Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4X
z: 1328266876

As reflected in the above screenshot, hidden Google Analytics code intercepted that the user is visiting the "Paying Your Bill at Tufts Medical Center." Google retains such intercepted communications and may use them for its own commercial purposes. Tufts Medical Center also inserted hidden Doubleclick/Google Ads code into the same webpage that intercepted similar information.

99.     Before removing Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its bill payment webpage that permitted Facebook to intercept communications on the webpage. The content of the communications intercepted and transmitted to Facebook are depicted below (with highlighting added):

×   Headers   Payload   Preview   Response   Initiator   »

▼ Form Data        view source        view URL-encoded

    id: 899431063472882

    ev: Microdata

    dl: https://www.tuftsmedicalcenter.org/patient-care-servi
    ces/Billing-and-Insurance

    rl:

    if: false

    ts: 1599068031335

    cd[DataLayer]: []

    cd[Meta]: {"title":"\n\tPaying Your Bill at Tufts Medical
    Center\n","meta:keywords":"billing, insurance, payment,
    cost","meta:description":"Tufts Medical Center staff wan
    t to make billing and insurance as easy for you as possi
    ble. Learn about our process for medical payments."}

    cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcent
    er.org/ui/images/logo-tufts-medical-center-fb-share.pn
    g","og:image:secure_url":"https://www.tuftsmedicalcente
    r.org/ui/images/logo-tufts-medical-center-fb-share.pn
    g","og:image:type":"image/png","og:image:width":"200","o
    g:image:height":"200","og:title":"Paying Your Bill at Tu
    fts Medical Center","og:description":"Tufts Medical Cent
    er staff want to make billing and insurance as easy for
    you as possible. Learn about our process for medical pay
    ments."}

    cd[Schema.org]: []

    cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.or
    g/web/20200902173348/http://schema.org\",\n\"@type\":
    \"LocalBusiness\",\n\"address\": {\n\"@type\": \"PostalA
    ddress\",\n\"addressLocality\": \"Boston\",\n\"addressRe
    gion\": \"MA\",\n\"postalCode\":\"02111\",\n\"streetAddr

Facebook could then use the intercepted communications concerning bill payment for commercial purposes, including serving targeted advertising to the same individual based on the contents of the intercepted communication.

100.    Tufts Medical Center also had a feature on its website that permits patients to request their medical records through the website. By visiting this feature, a website user communicates to Tufts Medical Center that the user is a patient of Tufts Medical Center. Below is a screenshot of the webpage through which a patient may request medical records from Tufts Medical Center:



101.    When an individual would visit this page, hidden Google Analytics code that Tufts Medical Center injected into its website secretly intercepted the contents of the individual's communications with Tufts Medical Center. The contents intercepted and transmitted to Google are depicted below (with highlighting added):

✕  Headers  Payload  Preview  Response  Initiator  Timing

▼ Query String Parameters    view source    view URL-encoded

v: 1

_v: j99

aip: 1

a: 1201104250

t: pageview

_s: 1

dl: https://www.tuftsmedicalcenter.org/patient-care-services/
Patient-Rights/Request-Your-Medical-Record

ul: en-us

de: UTF-8

dt: Request Your Medical Record from Tufts Medical Center

sd: 24-bit

sr: 1920x1080

vp: 1339x979

je: 0

_u: QCCAgAABAAAAgAAAAC~

jid:

gjid:

cid: 815584837.1679685730

tid: UA-5578028-1

_gid: 1131827353.1679685730

gtm: 45He33m0n71TTLM4K

z: 1373719858

That is, the fact that the website user is requesting medical records from Tufts Medical Center is intercepted and transmitted to Google. Tufts Medical Center injected similar Doubleclick/Google Ads code into the same webpage, intercepting similar communications contents. Between the two tracking technologies, Google could retain and use the contents of the intercepted communications for its own commercial purposes.

102.    Before the removal of Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its medical records request form that

permitted Facebook to intercept communications on that form. The content of the communications

intercepted and transmitted to Facebook are depicted below (with highlighting added):

   ✕  Headers   Payload   Preview   Response   Initiator   Timing   »

▾ Form Data   view source   view URL-encoded
   id: 899431863472882
   ev: Microdata
   dl: https://www.tuftsmedicalcenter.org/patient-care-servic
   es/Patient-Rights/Request-Your-Medical-Record
   rl:
   if: false
   ts: 1595540398133
   cd[DataLayer]: []
   cd[Meta]: {"title":"\n\tRequest Your Medical Record from T
   ufts Medical Center\n","meta:keywords":"Patient rights, h
   ealth information, request your medical record","meta:des
   cription":"We make it easy to request your medical record
   from Tufts Medical Center. Learn about our process for re
   leasing your information to you."}
   cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcente
   r.org/ui/images/logo-tufts-medical-center-fb-share.pn
   g","og:image:secure_url":"https://www.tuftsmedicalcenter.
   org/ui/images/logo-tufts-medical-center-fb-share.png","o
   g:image:type":"image/png","og:image:width":"200","og:imag
   e:height":"200","og:title":"Request Your Medical Record f
   rom Tufts Medical Center","og:description":"We make it ea
   sy to request your medical record from Tufts Medical Cent
   er. Learn about our process for releasing your informatio
   n to you."}
   cd[Schema.org]: []
   cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.org/
   web/20200723213952/http://schema.org\",\n\"@type\": \"Loc
   alBusiness\",\n\"address\": {\n\"@type\": \"PostalAddress
   \",\n\"addressLocality\": \"Boston\",\n\"addressRegion\": ▾

Facebook could then use the intercepted communications concerning medical records for commercial

purposes, including serving targeted advertising to the same individual based on the contents of the

intercepted communication.

103.    In addition to Google and Facebook, Tufts Medical Center enabled communications between healthcare consumers and Tufts Medical Center to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a)    **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functioned similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with Tufts Medical Center through the Tufts Medical Center Website, including the URL and title of each page visited.

(b)    **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden Javascript code that Tufts Medical Center injected into some pages on the Tufts Medical Center Website caused the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Tufts Medical Center Website. LinkedIn could then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

(c)    **Marchex.io.** Marchex.io is known primarily for its call analytics but also offers website tracking. During the class period, Tufts Medical Center inserted Marchex.io pixels that analyzed activity on the Tufts Medical Center Website. Marchex operated through hidden code that intercepted communications between website users and Tufts Medical Center, including the identity of the user visiting the website, which is revealed through the user's IP address.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

104.    The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the Tufts Medical Center Website's operation. The Tufts Medical Center Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

105.    Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Tufts Medical

Center via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

106.    Moreover, even if Tufts Medical Center wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Tufts Medical Center (i) to keep secret from its website users the use of these non-anonymized tracking technologies; (ii) to falsely and deceptively claim that Tufts Medical Center does not share the communications with third parties when it does; or (iii) to claim that Tufts Medical Center maintains the privacy of those communications via anonymization when it does not.

### Tufts Medical Center Violated HIPAA and the FTC Act.

107.    Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[6]

108.    Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

109.    HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

---

[6] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

110.    The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[7]

111.    Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id*. Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

112.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

113.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and

---

[7] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

114.    "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

115.    An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[8]

116.    Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[9]

117.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

---

[8] *Guidance Regarding Methods for De-Identification of Protected Health Information, supra* n.7.
[9] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[10]

118.    In other words, the HHS has expressly stated that entities like Tufts Medical Center that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

119.    The HHS Bulletin discusses the harms that disclosure may cause patients:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

120.    Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

---

[10] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

121.    The HHS Bulletin went on to state:

Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

122.    Tufts Medical Center's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

123.    Tufts Medical Center is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

124.    Tufts Medical Center's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

125.    Tufts Medical Center improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, (c) appointment requests, and (d) patients' status as patients of Tufts Medical Center by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, medical records access, and the login page for patient portals).

126.    For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, medical procedures, and medical records, Tufts Medical Center permitted third parties to intercept information about Plaintiff's doctors, specific treatments connected to Plaintiff, and Plaintiff's patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

127.    Tufts Medical Center improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs

visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Tufts Medical Center disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

128.    Tufts Medical Center violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

129.    Tufts Medical Center further violated other HIPAA regulations as follows:

(d)    Tufts Medical Center failed to ensure the confidentiality and integrity of electronic PHI that Tufts Medical Center created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(e)    Tufts Medical Center failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(f)    Tufts Medical Center failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Tufts Medical Center in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(g)    Tufts Medical Center failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(h)    Tufts Medical Center failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(i)    Tufts Medical Center failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

130.    Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior

privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[11]

131.    Tufts Medical Center's undisclosed use of tracking technologies on their website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, Tufts Medical Center's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

132.    Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[12]

133.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising

---

[11] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[12] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

134.    The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

135.    For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[13]

136.    Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[14]

---

[13] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[14] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy,* https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule,* Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

**Tufts Medical Center Violated Industry Standards**

137.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

138.    The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

139.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

140.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

141.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[15]

142.    Tufts Medical Center, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Tufts Medical Center failed to keep confidential by sharing it with Facebook, Google, and other third parties

---

[15] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

without de-identifying the data or fully informing patients about the purposes for which access would be granted.

### Plaintiff and Class Members Suffered Harm from Tufts Medical Center's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information

143.     As a direct and proximate cause of Tufts Medical Center's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by Tufts Medical Center's conduct in the following ways:

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b)     Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c)     Tufts Medical Center denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Tufts Medical Center's services or would have demanded compensation for Tufts Medical Center's use of their Private Information if they had known of Tufts Medical Center's practices;

(d)     Tufts Medical Center eroded the essential confidential nature of the provider-patient relationship;

(e)     General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f)     Nominal damages for each independent violation;

(g)     Tufts Medical Center took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h)     Tufts Medical Center's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i)     Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

144.    Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the

Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.tuftsmedicalcenter.org between three years prior to the date of the filing of the initial complaint in this action and the date Tufts Medical Center removed from the Tufts Medical Center Website the tracking technologies described in the complaint.[16]

145.    This action is properly maintainable as a class action.

146.    The Class Members are so numerous that joinder of all members in a single lawsuit is

impractical.

147.    Common questions of law and fact exist for all Class Members, and those questions

predominate over any questions solely affecting individual members of the Class. Among the

predominant questions of law and fact common to the Class are:

(a)    Whether communications between Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were electronic communications under the ECPA;

(b)    Whether Tufts Medical Center inserted tracking technologies into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel;

(c)    Whether the tracking technologies inserted into the hidden code of the Tufts Medical Center Website are "electronic devices" as defined in the ECPA;

(d)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website;

(e)    Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f)    Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center installed an electronic device on their

---

[16] This precise date will be determined through discovery.

website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Tufts Medical Center;

(g)  Whether and to what extent Tufts Medical Center had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h)  Whether Tufts Medical Center had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i)  Whether the promises made in Tufts Medical Center's Website Privacy Policy either were or formed part of a contract between Tufts Medical Center and Plaintiff and Class Members;

(j)  Whether Tufts Medical Center's disclosure of Plaintiff's and Class Members' IHII and PHI breached Tufts Medical Center's promises set forth in its Website Privacy Policy, giving rise to liability for breach of contract;

(k)  If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

148.  Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Tufts Medical Center Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

149.  Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

150.  A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

151.  Tufts Medical Center has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

152.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

153.    The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

154.    An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were electronic communications under the ECPA.

155.    The tracking technologies inserted into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Tufts Medical Center Website; (ii) Class Members' web browsers used to access the Tufts Medical Center Website; (iii) Tufts Medical Center's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Tufts Medical Center Website.

156.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

157.    As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Tufts Medical Center configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Tufts Medical Center, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Tufts Medical Center), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputed by healthcare consumers. Tufts Medical Center also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as Tufts Medical Center patients, including pages through which patients could request appointments, pay bills, or request medical records.

158.    With respect to Plaintiff, the tracking technologies revealed information regarding the doctors and treatments for Plaintiff by configuring the tracking technologies to reveal the substance of communications regarding Plaintiff's doctors and treatments, including Plaintiff's status as a patient of particular doctors.

159.    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

160.    Additionally, through the above-described tracking technologies, after Tufts Medical Center intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their

past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

161.    Tufts Medical Center facilitated the interception of communications between the Class Members and Tufts Medical Center, and Tufts Medical Center disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

162.    The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

163.    Tufts Medical Center intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

164.    Because of Tufts Medical Center's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

165.    As alleged above, Tufts Medical Center violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

166.    HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

62

42 U.S.C. § 1320d-(6).

167.    Plaintiff's Private Information that Tufts Medical Center disclosed to third parties qualifies as IIHI, and Tufts Medical Center violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Tufts Medical Center used the intercepted electronic communications to increase its revenues.

168.    The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Tufts Medical Center specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

169.    Tufts Medical Center's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

170.    Tufts Medical Center's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Tufts Medical Center's use of the Facebook source code was for Tufts Medical Center's commercial advantage to increase revenue from existing patients and gain new patients.

171.    The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

172.    Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Tufts Medical Center's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

### (Violation of the Massachusetts Right to Privacy Act,
### M.G.L. c. 214 § 1B, on behalf of the Class)

173.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

174.    The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

175.    The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

176.    Tufts Medical Center had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

177.    Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

178.    Tufts Medical Center distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, Tufts Medical Center's conduct reflected a public disclosure of private facts.

179.    Additionally, Tufts Medical Center's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

180.     Tufts Medical Center's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

181.     Plaintiff and Class Members suffered injuries as a direct and proximate result of Tufts Medical Center's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

182.     Tufts Medical Center's acts or omissions violate the Massachusetts Right to Privacy Act.

183.     Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 143, *supra*), plus costs and attorneys' fees.

## COUNT III

### (Breach of Fiduciary Duty, on behalf of the Class)

184.     Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

185.     A fiduciary relationship existed between Tufts Medical Center, a healthcare provider, and Plaintiff, a Tufts Medical Center patient. Furthermore, Tufts Medical Center assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

186.     When possessing nonpublic medical information, medical providers such as Tufts Medical Center have a duty to keep such information completely confidential.

187.     Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Tufts Medical Center through its website, which included highly sensitive Private Information. Tufts Medical Center's policies bolstered that expectation, given Tufts Medical Center's

promises to Plaintiff that Tufts Medical Center would not disclose communications on the website to third parties.

188.    Contrary to its duties as a healthcare provider and its express promises of confidentiality, Tufts Medical Center installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

189.    These disclosures were made without Plaintiff's knowledge, consent, or authorization.

190.    Tufts Medical Center's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of Tufts Medical Center's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

191.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 143, *supra*).

## COUNT IV

### (Negligence, on behalf of the Class)

192.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

193.    Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Tufts Medical Center owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

194.    Tufts Medical Center breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

66

195. It was reasonably foreseeable that Tufts Medical Center's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

196. Tufts Medical Center's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between Tufts Medical Center and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

197. In addition, Tufts Medical Center had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

198. Tufts Medical Center's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

199. Tufts Medical Center's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

200. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 143, *supra*), plus costs and attorneys' fees.

## COUNT V

### (Breach of Confidence, on behalf of the Class)

201.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

202.    Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

203.    Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

204.    When possessing nonpublic medical information, medical providers such as Tufts Medical Center have a duty to keep such information completely confidential.

205.    Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Tufts Medical Center through its website, which included highly sensitive Private Information. Tufts Medical Center's policies bolstered that expectation, given Tufts Medical Center's promises to Plaintiff that Tufts Medical Center would not disclose communications on the website to third parties.

206.    In light of the special relationship between Tufts Medical Center and Plaintiff and Class Members, whereby Tufts Medical Center became a guardian of Plaintiff's and Class Members' Private Information, Tufts Medical Center became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third

parties; and (3) to maintain complete and accurate records of what patient information (and where) Tufts Medical Center did and does store and disclose.

207.    Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Tufts Medical Center installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Tufts Medical Center and the contents of those communications, including Private Information.

208.    Tufts Medical Center made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

209.    The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Tufts Medical Center's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of Tufts Medical Center's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

210.    Tufts Medical Center disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

211.    The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

212.    Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 143, *supra*), plus costs and attorneys' fees

## COUNT VI

### (Breach of Contract, on behalf of the Class)

213.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

214.    Tufts Medical Center required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Tufts Medical Center Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for Tufts Medical Center's provision of services through the Tufts Medical Center Website, including the provision of information and the use of the website to obtain medical services.

215.    In so doing, Plaintiff and Class Members entered into contracts with Tufts Medical Center (or, in the alternative, implied contracts) by which Tufts Medical Center agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Tufts Medical Center's contractual promises included that (i) patients could obtain information from the Tufts Medical Center Website "anonymously" and (ii) Tufts Medical Center would not share healthcare consumers' communications with third parties.

216.    Plaintiff and Class Members fully performed their obligations under the contract with Tufts Medical Center .

217.    Tufts Medical Center breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only anonymously and not to share information regarding website communications with third parties.

218.    As a direct and proximate result of Tufts Medical Center's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private

Information and have been denied the benefit of the bargain of their agreement with Tufts Medical Center.

219.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 143, *supra,* plus costs and attorneys' fees.

## COUNT VII

### (Unjust Enrichment, on behalf of the Class)

220.    Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

221.    This claim is pleaded in the alternative to Plaintiff's other causes of action.

222.    Tufts Medical Center benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

223.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

224.    Tufts Medical Center consciously collected and used this information for its own gain, providing Tufts Medical Center with economic, intangible, and other benefits, including substantial monetary compensation.

225.    Tufts Medical Center unjustly retained those benefits at the expense of Plaintiff and Class Members because Tufts Medical Center's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

226.    The benefits that Tufts Medical Center derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Tufts Medical Center to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

227.    Had Tufts Medical Center informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of Tufts Medical Center's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

228.    The Court should compel Tufts Medical Center to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Tufts Medical Center unjustly received and such other relief as the Court may deem just and proper.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.    Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b.    Awarding damages (including statutory damages) to Plaintiff and Class Members;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court finds just and proper.

## **CERTIFICATE OF SERVICE**

    I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 12, 2024

                                  */s/ Patrick J. Vallely*
                                  Patrick J. Vallely

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 12, 2024                    Respectfully submitted,

 

 

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON
JANUARY 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
Asst. Clerk

*25*

ML

# COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>       Defendant. | **SUPERIOR COURT OF DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV000930-BLS1 |

## <u>NOTICE OF FILING NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE THAT on January 2, 2025, Defendant Tufts Medical Center, Inc. ("Tufts MC") filed a Notice of Removal pursuant to 28 U.S.C. § 1441(c) in the United States District Court for the District of Massachusetts, thereby removing this action. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts, and filing copies thereof with the Clerk at the Suffolk County Superior Court, Tufts MC has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant 28 U.S.C. § 1146(d).

Dated: January 2, 2025

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
January 8, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Asst. Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on January 2, 2025 copies of the foregoing notice of removal were

served on the following by email at the addresses listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson
*One of the attorneys for defendant*

ML

# Exhibit 1

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 473 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 1 of 7

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN MCMANUS, on behalf of herself and all others similarly situated,<br><br>         Plaintiff,<br><br>   v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>         Defendant. | Case No. 1:25-cv-10008<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV00930]<br><br>DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(c) |

## NOTICE OF REMOVAL

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff Karen McManus:

Plaintiff's Amended Complaint includes a federal claim against Tufts Medical Center, Inc. ("Tufts MC") for violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511. Tufts MC therefore removes this case pursuant to federal question jurisdiction. 28 U.S.C. § 1331; 28 U.S.C. § 1441(c).

In support of removal, Tufts MC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).

## NATURE OF THE CASE

1.   Tufts MC is a Massachusetts non-profit charitable corporation that offers a full range of medical services and operates in Boston, Massachusetts and the surrounding area.

2.   On April 19, 2023, Plaintiff Karen McManus filed a complaint against Tufts MC, in the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, Case No. 2384CV00930.

3.   Plaintiff served Tufts MC with the Complaint, effective on April 26, 2023.

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 474 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 2 of 7

4.    Plaintiff's Complaint challenged Tufts MC's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See generally* Exhibit ("Ex.") 1, Complaint ("Compl."); *id.* at ¶¶ 108–15.

5.    On May 16, 2023, Tufts MC filed a notice of removal to the United States District Court, informing the court that it removed the case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See generally*, Ex. 7, Notice of Removal.

6.    Ultimately, on July 18, 2023, the case was remanded back to the Massachusetts Superior Court. *See* Ex. 16, Remand Order.

7.    Tufts MC then filed a motion to dismiss Plaintiff's Complaint, which was fully briefed thereafter. *See* Ex. 18, Motion to Dismiss; Ex. 19, Def. Mem. in Support of Motion to Dismiss; Ex. 21, Plaintiff Opposition to Motion to Dismiss; Ex. 23, Def. Reply in Support of Motion to Dismiss.

8.    On November 17, 2023, before any decision was made on Tufts MC's motion to dismiss, Tufts MC and Plaintiff (collectively, the "Parties") filed a "Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases." *See generally* Ex. 27.

9.    The Parties requested that all proceedings in this matter be stayed pending the completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1) because the issues in the appeals overlapped with the issues in this case regarding the interpretation of the Massachusetts Wiretap Act. *See generally id.*

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 475 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 3 of 7

10.     On January 24, 2024, the court granted the joint stipulation to stay all proceedings pending interlocutory appeal. *See* Ex. 28, Endorsement of Joint Stipulation and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases.

11.     On December 5, 2024, Plaintiff and Tufts MC filed separate notices, notifying the court that the Supreme Judicial Court issued its decision in *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). *See* Ex. 29, Plaintiff's Notice of Supreme Judicial Court Decision in *Vita v. New England Baptist Hospital*; Ex. 30, Defendant's Notice of Supreme Judicial Court Decision in *Vita v. New England Baptist Hospital*.

12.     In its notice, Tufts MC further explained that Plaintiff notified Defendant that she "intends to file an amended complaint in light of the SJC's decision in *Vita*, which is dispositive of Plaintiff's current sole Massachusetts Wiretap Act claim." *See* Ex. 30 at 1.

13.     On December 12, 2024, Plaintiff filed an Amended Complaint. *See generally* Ex. 31, Amended Complaint.

14.     The Amended Complaint includes a number of new claims against Tufts MC, including a claim for violation of the ECPA, 18 U.S.C. § 2511.

## **BASIS FOR REMOVAL**

15.     Tufts MC removes this case pursuant to federal question jurisdiction. 28 U.S.C. § 1441(c). The statute permits the removal of the entire action when the civil action includes "(A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and (B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute." *Id.* "[T]he entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B)." *Id.*

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 476 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 4 of 7

16.    This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331.

17.    This case is removable to this Court because Plaintiff asserted a claim under a law of the United States, specifically the ECPA, 18 U.S.C. § 2511. *See* Exhibit 31 at 60; *id.* ¶ 159 ("By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2411(1)(a).").

18.    Because this matter is an action arising under federal law of which this Court has original jurisdiction, as authorized by 28 U.S.C. § 1331, it is subject to removal under 28 U.S.C. § 1441(c).

19.    Accordingly, this action is removable to this Court under 28 U.S.C. § 1441(c) and § 1331.

20.    By removing this action, Tufts MC does not waive any defenses available to it.

21.    By removing this action, Tufts MC does not admit any of the allegations in Plaintiff's Amended complaint.

**PROCEDURAL REQUIREMENTS FOR REMOVAL**

22.    Tufts MC likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

23.    Tufts MC timely removes this case. It is filing this Notice of Removal within thirty (30) days of its receipt of the Amended Complaint by "service." 28 U.S.C. § 1446.

24.    Tufts MC files this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB   Document 11   Filed 01/29/25   Page 477 of 485
Case 1:25-cv-10008   Document 1   Filed 01/02/25   Page 5 of 7

Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

25.    Tufts MC has attached a copy of "all process, pleadings, orders, and other documents" currently on file in the state court, including Plaintiff's Amended Complaint.

26.    Upon filing this notice, Tufts MC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## **CONCLUSION**

As set forth above, Plaintiff's Amended Complaint includes a claim against Tufts MC that arises under the laws of the United States. Plaintiff's Amended Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1441(c).

**WHEREFORE, Tufts MC respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.**

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930
Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 478 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 6 of 7

Dated: January 2, 2025

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

Date Filed 1/2/2025 5:35 PM
Superior Court - Suffolk
Docket Number 2384CV00930

Case 1:25-cv-10008-ADB    Document 11    Filed 01/29/25    Page 479 of 485
Case 1:25-cv-10008    Document 1    Filed 01/02/25    Page 7 of 7

## CERTIFICATE OF SERVICE

I hereby certify that, on January 2, 2025 copies of the foregoing were filed using the Court's

CM/ECF service which will provide service copies to the Plaintiff's counsel of record listed below.

Edward F. Haber
Michelle H. Blauner
Patrick J. Valley
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvalley@shulaw.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson
*One of the attorneys for defendant*

| **NOTICE TO APPEAR FOR**<br>**BLS Rule 16 Litigation Control**<br>**Conference** | DOCKET NUMBER<br>**2384CV00930** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| CASE NAME:<br>**Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc.** | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
|---|---|

| TO:  **Michelle H Blauner, Esq.**<br>**Shapiro Haber and Urmy LLP**<br>**One Boston Place**<br>**Boston, MA 02108** | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |
|---|---|

The Court will hear the following event:

### BLS Rule 16 Litigation Control Conference

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

Event Type: Virtual

**Session/ Courtroom Location:**
*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.**
**zoomgov.com/j/1618887367**



Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case.  Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED<br>01/06/2025 | ASSOCIATE JUSTICE<br>**Hon. Peter B Krupp** | **John E. Powers III, Acting Clerk of Court** |
|---|---|---|

Date/Time Printed: 01-06-2025 13:14:55                                                                                      SCV132i 05/2024

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV00930 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc. | John E. Powers III, Acting Clerk of Court Suffolk County Civil |
|---|---|

| TO: Patrick Vallely, Esq. Shapiro Haber and Urmy LLP One Boston Place Suite 2600 Boston, MA 02108 | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |
|---|---|

The Court will hear the following event:

### BLS Rule 16 Litigation Control Conference

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**
*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
  **Meeting ID: 161 888 7367**
  **Meeting URL: https://www.**
  **zoomgov.com/j/1618887367**



Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
    a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
    b. Phased discovery as to certain subjects areas;
    c. Limitations on the number of discovery events;
    d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case.  Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED 01/06/2025 | ASSOCIATE JUSTICE Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |
|---|---|---|

Date/Time Printed: 01-06-2025 13:14:55                                                                 SCV132l 05/2024

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV00930 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc. | John E. Powers III, Acting Clerk of Court Suffolk County Civil |
|---|---|

| TO: Edward F Haber, Esq. Shapiro Haber and Urmy LLP One Boston Place Suite 2600 Boston, MA 02108 | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |
|---|---|

The Court will hear the following event:

### BLS Rule 16 Litigation Control Conference

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**
*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
   **Meeting ID: 161 888 7367**
**Meeting URL: https://www. zoomgov.com/j/1618887367**



Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
    a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
    b. Phased discovery as to certain subjects areas;
    c. Limitations on the number of discovery events;
    d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED 01/06/2025 | ASSOCIATE JUSTICE Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |
|---|---|---|

Date/Time Printed: 01-06-2025 13:14:55                                                                                     SCV132I 05/2024

| NOTICE TO APPEAR FOR<br>**BLS Rule 16 Litigation Control<br>Conference** | DOCKET NUMBER<br>**2384CV00930** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| CASE NAME:<br>**Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc.** | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
|---|---|

| TO:  **James Hefferan Rollinson, Esq.**<br>**Baker and Hostetler LLP**<br>**Key Tower**<br>**127 Public Square Suite 2000**<br>**Cleveland, OH 44114-1214** | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |
|---|---|

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**
*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.**
**zoomgov.com/j/1618887367**



Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case.  Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED<br>01/06/2025 | ASSOCIATE JUSTICE<br>**Hon. Peter B Krupp** | **John E. Powers III, Acting Clerk of Court** |
|---|---|---|

Date/Time Printed: 01-06-2025 13:14:55

SCV132I 05/2024

| NOTICE TO APPEAR FOR **BLS Rule 16 Litigation Control Conference** | DOCKET NUMBER **2384CV00930** | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|

| CASE NAME: **Mcmanus, For Herself And The Class, Karen vs. Tufts Medical Center, Inc.** | John E. Powers III, Acting Clerk of Court Suffolk County Civil |
|---|---|
| TO: **File Copy** | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |

The Court will hear the following event:

### BLS Rule 16 Litigation Control Conference

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**
*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www. zoomgov.com/j/1618887367**



Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
    a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
    b. Phased discovery as to certain subjects areas;
    c. Limitations on the number of discovery events;
    d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case.  Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED 01/06/2025 | ASSOCIATE JUSTICE **Hon. Peter B Krupp** | **John E. Powers III, Acting Clerk of Court** |
|---|---|---|

Date/Time Printed: 01-06-2025 13:14:55

SCV132I 05/2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 29, 2025, a copy of the foregoing certified record was filed using the Court's CM/ECF service which will provide service copies to the Plaintiff's counsels of record.

/s/ James H. Rollinson
*One of the attorneys for defendant*