**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KAREN MCMANUS,<br><br>For herself and the Class,<br><br>v.<br><br>TUFTS MEDICAL CENTER, INC.,<br><br>Defendant. | **Case No. 1:25-cv-10008-ADB**<br><br>**Leave to File Granted on September 29, 2025 (Doc. No. 24)** |

**SECOND AMENDED COMPLAINT**

Plaintiff Karen McManus ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive healthcare communications between healthcare consumers and the defendant, Tufts Medical Center, Inc. ("Tufts Medical Center"), including but not limited to those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information").

2. Specifically, Tufts Medical Center intercepted communications between Plaintiff and other Class Members (defined below) and Tufts Medical Center through a website maintained by Tufts Medical Center (the "Tufts Medical Center Website"). Tufts Medical Center enabled Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly eavesdrop on healthcare consumers' communications with Tufts Medical Center by injecting hidden code into the Tufts Medical Center Website. Those third parties, including Google and Facebook, then associated the intercepted communications with the real-world identities of individuals known to Google and Facebook. Tufts Medical Center then subsequently used the

contents of the intercepted communication for marketing purposes, such as serving personalized advertisements, including advertisements on Google and Facebook's advertising platforms to healthcare consumers based on the contents of the secretly intercepted communications.

3. Tufts Medical Center intercepted the contents of patient communications on the Tufts Medical Center Website to disclose those communications to Google, Facebook, and other companies so that those third parties and Tufts Medical Center could then use the contents of the intercepted communications to advance Tufts Medical Center's marketing efforts. The tracking technologies advanced Tufts Medical Center's marketing efforts by enabling Tufts Medical Center to use Google and Facebook's advertising platforms to target the patients whose communications were intercepted with advertising and to optimize the Tufts Medical Center Website to more effectively market Tufts Medical Center to customers (i.e., patients). That is, Tufts Medical Center had an incentive, which it acted on, to disclose sensitive healthcare communications, including communications that reveal Private Information, to Google and Facebook to advance Tufts Medical Center's own marketing efforts.

4. As shown herein, Tufts Medical Center intercepted its patients' communications for the primary purpose of committing criminal and tortious acts, including acts that violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), and the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and the Massachusetts common law torts described below. In particular, HIPAA prohibits the (i) disclosure **<u>or</u>** (ii) use of Private Information without informed consent, including, specifically, the use of Private Information for marketing purposes. As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.,* ¶¶ 32, 35, 38-47, 52-59, 72-73, 75-76, 78-79, 90, 95-96, 99, 102-04, 106, 108-09, 112, 114, 116, 119, 121-22, 125-26, 128-30, 134, 136-39, 160, 162-66), Tufts Medical Center intercepted healthcare communications, including communications that reveal Private

Information, for the primary purpose of (i) disclosing the contents of those communications to third-party marketing companies; and (ii) subsequently using the intercepted communications to advance Tufts Medical Center's marketing of its services to patients, including later using the contents of the intercepted communications for Tufts Medical Center's targeting of advertisements to those patients through Google and Facebook's advertising platforms. Those acts violate HIPAA, the Massachusetts Right to Privacy Act, and Massachusetts tort law.

5. By intercepting healthcare communications for the primary purpose of disclosing those communications, including communications that reveal Private Information, to third parties for commercial gain, Tufts Medical Center acted knowingly and intentionally and put its business interests over the privacy of its patients.

6. Plaintiff's and Class Members' communications with Tufts Medical Center were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties without their knowledge or consent. Tufts Medical Center subsequently used the intercepted communications for marketing purposes, without the consumers' knowledge or consent. The intercepted communications included, among other things, requests for information on particular conditions and treatments, keyword searches, doctor searches, bill payments, medical records, appointment requests, and communications to access the Tufts Medical Center patient portals. Those interceptions enabled the third parties, such as Google and Facebook, to know that a specific patient was seeking confidential medical care from Tufts Medical Center. Recipients, such as Google and Facebook, subsequently sell the use of Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

7. Tufts Medical Center also used Facebook's and Google's advertising platforms, which enabled Tufts Medical Center to target advertisements to patients based on the healthcare

communications that Tufts Medical Center intercepted and disclosed to Facebook and Google. After the interceptions, Tufts Medical Center engaged in extensive targeted advertising on those platforms using the communications and Private Information it intercepted from Plaintiff and Class Members.

8. Tufts Medical Center did not disclose to Plaintiff and the Class Members that it intercepted and disclosed to third parties, such as Google and Facebook, the contents of individual communications with Tufts Medical Center, or that those third parties and Tufts Medical Center used the content of the intercepted communications for targeted advertising. Tufts Medical Center also did not seek or obtain consent for such interceptions, the disclosure of the intercepted communications, or the subsequent use of the intercepted communications for marketing. On the contrary, Tufts Medical Center deceptively told healthcare consumers, through its published online privacy policy, that any information collected about their activities on the Tufts Medical Center Website would be collected "anonymously" and would not be shared with third parties. In reality, Tufts Medical Center intercepted communications in a manner that permitted third parties such as Google and Facebook to ascertain the consumers' identity and then later use those intercepted communications for commercial purposes, including serving individualized advertising for Tufts Medical Center based on the contents of the individuals' communications with Tufts Medical Center.

9. Moreover, Tufts Medical Center knew of the privacy implications of deploying the tracking technologies throughout its website, including on pages like the patient portal and bill payment pages, the use of which reflected patient status. As detailed below, the functionality of the tracking technologies was well-known to businesses that deployed them, and Google and Facebook expressly directed Tufts Medical Center to obtain user consent for all tracking technologies and not to use tracking technologies on healthcare webpages. Notwithstanding this knowledge, Tufts Medical Center deployed the tracking technologies anyway, including on pages specifically designed for patients (including its patient portal). Indeed, Tufts Medical Center deployed the tracking technologies

for that very purpose: to disclose an individual's status as a Tufts Medical Center patient, and that patient's communications on its website, so that Tufts Medical Center and others could target those patients with advertising on Google and Facebook's advertising platforms.

10. Tufts Medical Center owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, Tufts Medical Center assumed legal and equitable duties to patients to protect and safeguard the communications and Private Information from unauthorized disclosure and use.

11. As described more fully below, Plaintiff and Class Members have suffered injury as a result of Tufts Medical Center's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed healthcare communications and Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their healthcare communications, including communications that reveal Private Information.

12. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review (Several other judges had likewise denied motions to dismiss in similar Massachusetts Wiretap Act cases against Massachusetts hospitals). The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, in a split decision, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those

cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

13. In light of the Supreme Judicial Court's decision, Plaintiff previously amended her complaint to assert new claims under the ECPA, the Massachusetts Right to Privacy Act, and several claims under common law.

14. The ECPA prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. As detailed in this complaint, Tufts Medical Center intercepted the electronic communications for the primary purpose of committing criminal and tortious acts, including the unauthorized disclosure and subsequent use of healthcare communications, including communications that reveal Private Information, in violation of HIPAA and in violation of Massachusetts law, as described below. In committing such criminal and tortious acts, Tufts Medical

Center's primary purpose was to use health information in violation of HIPAA and Massachusetts law, in order to serve its own financial self-interest in maximizing the effectiveness of its online marketing, including targeted advertising. The ECPA thus provides a private remedy for Tufts Medical Center's interception of electronic communications, enforceable against Tufts Medical Center.

15. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the Tufts Medical Center Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment on behalf of the Class (defined below).

## PARTIES

16. Plaintiff is a resident of Walpole, Massachusetts. Plaintiff is a patient of Tufts Medical Center. Plaintiff regularly used the Tufts Medical Center Website during the Class Period (defined below) to (i) obtain information about Tufts Medical Center doctors (including their credentials and backgrounds); (ii) search for information on particular medical procedures; and (iii) obtain and review her medical records through the website's patient portal, including reviewing information about her medications, obtaining test results, obtaining information about appointments, and reviewing letters from her physicians regarding her treatments.

17. As described below, Tufts Medical Center implemented tracking technologies that intercepted communications between Tufts Medical Center and healthcare consumers throughout the Tufts Medical Center Website. During the Class Period, Plaintiff visited specific pages on the Tufts Medical Center that were among the webpages on which Tufts Medical Center embedded code for various tracking technologies, including Meta Pixel, DoubleClick, Google Analytics, and LinkedIn Insight. The pages Plaintiff visited included:

(i) the Tufts Medical Center patient portal (*see* ¶¶ 131-39 for an explanation of how Tufts Medical Center deployed tracking technologies on its patient portal and how the intercepted communications were disclosed to and subsequently used by Tufts Medical Center, Google, Facebook, and other companies);

(ii) Tufts Medical Center's searchable doctor database (*see* ¶¶ 120-22, *infra* for an explanation of how Tufts Medical Center deployed tracking technologies on its searchable database of doctors and how the intercepted communications were disclosed to and subsequently used by Tufts Medical Center, Google, Facebook, and other companies); and

(iii) pages about specific medical procedures Plaintiff obtained (*see* ¶¶ 100-09, *infra* for an explanation of how Tufts Medical Center deployed tracking technologies on its pages about specific medical procedures and how the intercepted communications were disclosed to and subsequently used by Tufts Medical Center, Google, Facebook, and other companies).

18. Plaintiff was unaware of and did not consent to or authorize the disclosure or use by third parties or Tufts Medical Center of her website communications with Tufts Medical Center or any Private Information contained therein. She was also unaware of and did not consent to the use of her healthcare communications or Private Information by Tufts Medical Center for marketing purposes.

19. Defendant Tufts Medical Center, Inc. is a corporation that operates in Boston, Massachusetts, and the surrounding area. Its functions include providing healthcare services including at its main campus in Boston, Massachusetts. Tufts Medical Center maintains and controls the content of the Tufts Medical Center Website.

## JURISDICTION

20. Tufts Medical Center has invoked this Court's jurisdiction and asserted the existence of subject matter jurisdiction through its Notice of Removal, Doc. No. 1, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446 (i.e., federal question jurisdiction).

## FACTUAL ALLEGATIONS

### Tufts Medical Center and Its Website

21. Tufts Medical Center operates a hospital and full-service medical center in Boston, Massachusetts. Tufts Medical Center offers inpatient and outpatient care to residents near Boston and surrounding communities. Tufts Medical Center provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer care, post-COVID recovery, surgery, obstetrics and gynecology, and trauma care.

22. During the Class Period, Tufts Medical Center maintained the Tufts Medical Center Website for its hospital and outpatient facilities, found at https://www.tuftsmedicalcenter.org/. Through that website, healthcare consumers can obtain information about the services Tufts Medical Center provides, including information about doctors, services, and treatments provided by Tufts Medical Center for particular medical conditions.

23. The Tufts Medical Center Website is designed for communication with healthcare consumers. The website includes the following functions:

(a) The Tufts Medical Center Website provides general information about Tufts Medical Center.

(b) The Tufts Medical Center Website provides information about healthcare services provided at Tufts Medical Center, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Stroke Center," and "Psychiatry," among many others.

(c) The Tufts Medical Center Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, and location.

(d) The Tufts Medical Center Website permits healthcare consumers to access and pay bills online.

(e) The Tufts Medical Center Website lets healthcare consumers access their private medical information online through the myTuftsMed Patient Portal.

24. Certain pages of the Tufts Medical Center Website were designed specifically for patients. These pages included the Tufts Medical Center patient portal, a page permitting Tufts Medical Center patients to pay their bills, pages enabling patients to request appointments, and pages permitting patients to search for and contact particular Tufts Medical Center physicians.

25. Because the Tufts Medical Center Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the Tufts Medical Center Website**

26. Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the Tufts Medical Center Website.

27. Users of healthcare-related websites, such as the Tufts Medical Center Website, have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as Tufts Medical Center will not share their healthcare communications or Private Information with third parties without their consent.

28. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as Tufts Medical Center from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are

supported further by federal law, including HIPAA, which prohibits healthcare providers such as Tufts Medical Center from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

29. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including Tufts Medical Center, which reveal information about that individual's status as a Tufts Medical Center patient and personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

30. The expectations and understanding of users of the Tufts Medical Center Website were further informed by what Tufts Medical Center told them during the Class Period about how it handles their healthcare communications, including communications that reveal Private Information. (Tufts Medical Center changed its Website Privacy Policy after the Class Period; Plaintiff takes no position on the adequacy of Tufts Medical Center's current disclosures.)

31. During the Class Period, the Tufts Medical Center Website Privacy Policy began by promising, generally, that "Patients' and other visitors' privacy and security is a top priority at Tufts Medical Center." It then continued, near the outset of the policy, to state (emphasis added):

> All visitors use the Tufts Medical Center websites **anonymously**. **We do not collect any identifiable information unless you specifically provide us with that information** voluntarily through our forms such as request appointment forms, e-newsletter sign-ups, clinical trial enrollment, etc.… …. Tufts Medical Center does not and **will never sell or rent any identifiable information to third party vendors**.

32. These statements were false. As described more fully below, website users did not access the Tufts Medical Center anonymously. Instead, Tufts Medical Center injected hidden code into its website that intercepted and disclosed to Facebook, Google, and other third parties communications between website users and Tufts Medical Center and, critically, to associate those

intercepted communications with the real-world identities of those individuals for purposes of targeted advertising for Tufts Medical Center. That is, the communications that Google and Facebook intercepted were **not** "anonymous."

33. Moreover, as described more fully below, Tufts Medical Center bartered website users' "identifiable information" and the content of their communications with Tufts Medical Center to third parties in exchange for valuable services provided by those third parties, including website analytics and targeted advertising on behalf of Tufts Medical Center on Facebook and Google advertising platforms, using the intercepted communications to target such advertising.

34. Although the same policy later discussed "cookies" and "tracking pixels," the statements regarding those technologies did not negate Tufts Medical Center's deceptive promises that website users browse the website "anonymously" and that Tufts Medical Center did not provide identifiable information to third parties. Instead, the policy stated, concerning tracking pixels: "They [the tracking pixels] do not provide us with any personally identifiable information," again reinforcing the promise of anonymity when, in fact, the tracking pixels were designed to associate a website user's communications with Tufts Medical Center to the user's real-world identity.

35. In short, healthcare consumers expect their healthcare communications not to be shared with third parties without their consent, or that such communications will be used for targeted advertising—an understanding reinforced by Tufts Medical Center's deceptive statements on the Tufts Medical Center Website. The interceptions of website users' communications with Tufts Medical Center and the subsequent use of the intercepted communications to support targeted advertising were, therefore, truly secret and made without any consent from Plaintiff or the other Class Members.

**Third Parties Offering Tracking Technologies**

36. Plaintiff describes in this complaint various tracking technologies that Tufts Medical Center implemented on the Tufts Medical Center Website, which caused the secret interception, recording, and transmission of the contents of Class Members' communications with Tufts Medical Center. The next section presents a basic overview of how the technologies work, including how third parties intercept and record the contents of Class Members' internet communications with Tufts Medical Center and the purposes for which interceptions are made.

37. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

38. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers. Facebook is a "real identity" platform. This means that users are permitted only one account and must use the name they go by in everyday life. To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

39. Facebook derives most of its revenue from selling targeted advertising directed to users of its platforms, including Facebook and Instagram. Facebook tailors advertising to particular individuals by building extensive behavioral profiles for each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

40. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

41. Facebook states: "The Meta Pixel is a piece of code on your website that can help you better understand the effectiveness of your advertising and the actions people take on your site."[2] Among the key features of Meta Pixel, touted by Facebook, are:




42. Indeed, the express purpose of Meta Pixel is to track and disclose to Facebook a user's communications on a website, identify that individual user, and target that individual with advertising from the website owner (here, Tufts Medical Center). For example, Facebook tells website owners to "[i]nstall the Facebook pixel if you want to retarget your website visitors." Facebook explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when

[2] https://www.facebook.com/business/tools/meta-pixel.

they engage with your brand, including any of Your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[3]

43. Facebook receives and monetizes intercepted communications regardless of whether a website user has a Facebook account. Even for someone without an account with any Facebook platform (there are few such people; Facebook has over 2.9 billion users), Facebook still combines data it obtains through the Meta Pixel with other sources (including data obtained through data brokers) to identify the individual, and Facebook then sells the intercepted communications obtained through Meta Pixel, together with identifying information, to data brokers (i.e., companies that are in the business of collecting and compiling data on individuals from various sources then reselling that data to advertisers).

44. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

45. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[4]

46. The primary reason businesses such as Tufts Medical Center deploy Meta Pixel on their website is to maximize the effectiveness of the business's targeted advertising on Facebook's advertising platforms (including Facebook, Instagram, and other Facebook services). Facebook tells website owners like Tufts Medical Center that they can use the Meta Pixel to "[o]ptimize delivery of your ad campaigns," and after the Meta Pixel is deployed, business owners can better "reach [their customers] through future Meta ads by retargeting those who have interacted with your website."[5]

---

[3] https://www.facebook.com/business/goals/retargeting.
[4] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).
[5] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel.

47. Tufts Medical Center advertises through Facebook's advertising platforms (this is, in fact, the reason why businesses use Meta Pixel—to advance their advertising efforts on Facebook's advertising platforms). Tufts Medical Center has an incentive to share as much information as possible with Facebook through the tracking technologies, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Tufts Medical Center's advertising through Facebook platforms.

48. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through the Meta Pixel, Facebook directed Tufts Medical Center to "provide[] robust and sufficiently prominent notice to users regarding [Meta Pixel]," including, a "clear and prominent notice on each web page where our pixels are used that links to a clear explanation…that third parties, including Meta, may…collect or receive information from your websites…and use that information to…target and deliver ads." Facebook also directs businesses not to use Meta Pixel on any webpage that "that includes health…information."[6] Despite these warnings that expressly put Tufts Medical Center on notice about the operation of Meta Pixel and its implications for privacy, Tufts Medical Center ignored the directions and warnings and deployed Meta Pixel without website users' consent on pages that contain health information.

49. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

50. Google maintains detailed profiles on individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such

---

[6] https://www.facebook.com/legal/terms/businesstools.

as Gmail. Google maintains detailed profiles of individuals, whether or not they have a Google account.

51. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

52. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics, a marketing tool Google offers to website owners. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The intercepted communications analyzed through Google Analytics provide the website owner with insights about how users use the website, which the owner can use to improve the marketing of their business through the business's website. According to Google, Google Analytics is designed to "improve marketing ROI" and to "check the performance of [a business's] marketing." Google tells business owners like Tufts Medical Center that Google Analytics "works with Google's advertising and published products, so that" business owners "can use [Google Analytics] insights to deliver business results."[7]

53. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements. Furthermore, the website owner (here, Tufts Medical Center), after the interceptions, uses communications intercepted through Google Analytics to advance its own marketing objectives,

[7] https://marketingplatform.google.com/about/analytics/.

including by using the insights provided by Google Analytics to inform its website marketing to potential customers.

54. Google also tells business owners like Tufts Medical Center that after data is collected through Google Analytics, "in addition to using the data in [Google Analytics] reports, [business owners] can use the data in audiences for analyzing different groups of users and for exporting the data to advertising platforms like Google Ads so [the business] can run more data-driven advertisements."[8] By tying in Google Analytics with Google Ads, Tufts Medical Center could "share [it]s Analytics audiences with those products," thus advancing its targeted advertising efforts.[9] That is, Google Analytics data is used directly to facilitate "ads personalization," permitting Tufts Medical Center to target advertising based on the intercepted communications.[10]

55. Another way Google collects information to build its detailed profiles on individuals is through its "DoubleClick" and "Google Ads" tags. DoubleClick was previously an independent company, founded in 1997, and was a pioneer of online, dynamically targeted advertising. Google acquired DoubleClick in 2007 and now operates it as an advertising division of Google. Google's advertising tags operate much the same way as Meta Pixel in that the "tags" are implemented through JavaScript code and designed to track a user's actions on the website. Like Meta Pixel, Google then associates the data collected through the advertising tags with particular individuals to enable website owners such as Tufts Medical Center to serve targeted advertising directed to the individual and measure the efficacy of Tufts Medical Center's advertising campaigns through Google's advertising programs.

---

[8] https://support.google.com/analytics/answer/14430645?hl=en&sjid=5860316122186797017-NA&visit_id=638953584132868414-3109291497&ref_topic=12270146&rd=1.

[9] https://support.google.com/analytics/topic/14277381?hl=en&ref_topic=9303474&sjid=5860316122186797017-NA.

[10] [GA4] Advanced settings to allow for ads personalization - Analytics Help.

56. Tufts Medical Center extensively used Google platforms to advertise, thus exploiting the information Tufts Medical Center intercepted and disclosed to Google through Google's tracking technologies, as reflected by the examples below of Tufts Medical Center's advertisements through Google's ad platform during the Class Period:
















57. Tufts Medical Center had an incentive to share as much information as possible with Google, including disclosing the identity of its patients, their treatments, and other sensitive information about them, to maximize the effectiveness of Tufts Medical Center's advertising through Google platforms, such as the advertising examples above.

58. Given the detailed content of communications that is intercepted, disclosed, and later used for targeted advertising through Google Analytics and DoubleClick, Google directed website

owners like Tufts Medical Center that they "must disclose [to users] the use of Google Analytics, and how it collects and processes data."[11] Tufts Medical Center did not do so.

59. In summary, both Google Analytics and DoubleClick/Google Ads intercept the content of communications between the website user and any webpage on which the code for either product is injected. Google can and does retain communications intercepted through both Google Analytics and DoubleClick/Google Ads tags, and Google can and does use those intercepted communications for its own commercial purposes, and Tufts Medical Center also uses the intercepted communications when it uses Google's advertising platforms for its own marketing (that is, in fact, the primary purpose of the tracking technologies).

**Website Tracking Technologies on the Tufts Medical Center Website**

60. Tufts Medical Center injected hidden code into the Tufts Medical Center Website that intercepted healthcare consumers' communications and disclosed them to third parties. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with Tufts Medical Center with the website user's Facebook profile.

61. Tufts Medical Center has used several tracking technologies on its website, including Google Analytics, DoubleClick, and Meta Pixel. The tracking technologies are implemented through similar means.

62. Before describing how such technologies work, it is important to first define some basic technological terms.

[11] https://marketingplatform.google.com/about/analytics/terms/us/.

63. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

64. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the Tufts Medical Center, as of the time of this complaint, is 99.83.180.191. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

65. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the Tufts Medical Center Website is https://www.tuftsmedicalcenter.org. URLs also often point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive URLs." Tufts Medical Center configured its website to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communication made through a particular page on the Tufts Medical Center Website. For example, the Tufts Medical Center Website has a page specifically about the Tufts Medical Center Department of Obstetrics and Gynecology; that page's URL is https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview. That is, one can tell from the URL itself the substance of the communication between Tufts Medical Center and the healthcare consumer—that the consumer is requesting information about obstetrics and gynecology services.

66. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and Tufts Medical Center with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

67. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

68. With those basic terms in mind, the tracking technologies described in this complaint—including Google Analytics, DoubleClick, Meta Pixel, and LinkedIn Insight—work as follows. In general terms, a website owner (here, Tufts Medical Center) inserts into its website hidden code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

69. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third party's website, such as a transparent single-pixel image file from

Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

70. When the JavaScript code causes the user's web browser to retrieve a file from the tracking technology vendor's website, the JavaScript code also causes the browser to communicate certain information to the vendor. That information includes, depending on the particular page visited, a combination of: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

71. The JavaScript code first acquires the content of the communications made through a particular webpage, and then, subsequently, connects to the tracking technology vendor's servers (for example, Google or Facebook servers) to disclose the content of the intercepted communications to the tracking technology vendor. Although the acquisition/interception and disclosure occur through the same JavaScript program, they are distinct events activated by different parts of the code for each tracking technology. Although distinct, sequential events, the interception and disclosure to the third party occur contemporaneously with the website communications between Class Members and Tufts Medical Center. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

72. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google or Facebook can then add the content of the user's communications with Tufts Medical Center to its collection of information it already has about the individual, which it can then use for targeted advertising purposes.

73. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the intercepted communications with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them. Tufts Medical Center can then use Facebook's advertising platform to target advertising to individuals who visited its website, based on the Tufts Medical Center communications intercepted and transmitted to Facebook.

74. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of intercepting and transmitting the content of the user's communications and the user's identity to a third party, such as Google or Facebook. The tracking technologies are detectable only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

75. The tracking technologies described in this complaint intercept and then transmit to third parties the contents of communications between healthcare consumers and Tufts Medical Center

contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

76. Google Analytics, DoubleClick, Meta Pixel, and other tracking technologies operate and continue to intercept communications even if a website user activates an "Incognito" or "Private Browsing" mode for a web browser, and even if the website user adjusts his or her browser settings to restrict the use of cookies.

77. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[12] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites and patient portals, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup article (including attachments published with the article) singled out Tufts Medical Center as one of the nation's largest hospitals that used Meta Pixel in this fashion. The Markup Article triggered Congressional investigations and increased scrutiny of hospitals' data practices.[13] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

78. Tufts Medical Center appears to have removed Meta Pixel from its website in mid-June 2022, around the same time as the Markup Article (although the article was published June 16, 2022, the Markup indicated that it contacted hospitals featured in the article prior to publication for their comments). Although it removed Meta Pixel, Tufts Medical Center continued after that time to

---

[12] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[13] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

inject other hidden tracking technologies into its website that intercepted healthcare consumers' communications with Tufts Medical Center in a similar fashion, including Google Analytics and DoubleClick.

79. Within a few months of the filing of the original complaint in this action, Tufts Medical Center appears to have removed from the Tufts Medical Center Website the remaining tracking technologies described in the original complaint. Then, in December 2023, Tufts Medical Center stopped using the domain name https://www.tuftsmedicalcenter.org/, causing requests to that domain name to proceed to a new website, https://www.tuftsmedicine.org/. Around that same time, Tufts Medical Center began using several new tracking technologies, although those tracking technologies appear to have better protections for patient privacy than the tracking technologies it used during the Class Period. Also, in late 2023, Tufts Medical Center appears to have changed the terms of its privacy policies to remove the language Plaintiff describes in this complaint. Accordingly, although Plaintiff takes no position on whether Tufts Medical Center's current implementation of tracking technologies is adequately disclosed or gives rise to any civil liability to website users, Plaintiff limits her claims in this case to the tracking technologies Tufts Medical Center used during the Class Period (defined below).

**Tufts Medical Center's Use of Tracking Technologies on the Tufts Medical Center Website**

80. During the Class Period, Tufts Medical Center used various tracking technologies across the Tufts Medical Center Website. For example, throughout the Tufts Medical Center Website, Tufts Medical Center injected hidden code that loaded Google Analytics. It appears to have injected hidden Meta Pixel code broadly throughout the Tufts Medical Center Website before having removed Meta Pixel in mid-June 2022. Tufts Medical Center deployed the tracking technologies on the specific webpages Plaintiff visited during the Class Period, as detailed below.

81. A few months after the initial complaint was filed in this case, Tufts Medical Center significantly limited its use of Google Analytics, DoubleClick, and other tracking technologies. The examples provided below of Tuft Medical Center's deployment of Google Analytics and other tracking technologies on the Tufts Medical Center Website reflect such deployment around the time of the original complaint in this action (or, as to Meta Pixel, prior to mid-June 2022). Tufts Medical Center controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect Tufts Medical Center's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

82. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

83. Below is an image of the main landing page for the Tufts Medical Center Website during the Class Period:




84. When a user loads the main landing page for the Tufts Medical Center Website, the webpage caused the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" stands for JavaScript). The website then caused the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

85. The image below depicts the landing page for the Tufts Medical Center on the left-hand side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




86. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code caused the user's web browser to intercept and transmit to Google when a small file was loaded from Google's servers:

× Headers Payload Preview Response Initiator »
▼ Query String Parameters view source view URL-encoded
v: 1
_v: j99
aip: 1
a: 636516736
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/
ul: en-us
de: UTF-8
dt: Tufts Medical Center | Boston Hospital and Academic Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 1538772411

87. Among the information Tufts Medical Center intercepted and transmitted to Google contemporaneously with the communications between the website user and the Tufts Medical Center Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "https://www.tuftsmedicalcenter.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Tufts Medical Center | Boston Hospital and Academic Medical Center").

88. The other information Tufts Medical Center intercepted and transmitted to Google includes data about the user's web browser configuration (including screen resolution, device

information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, Tufts Medical Center).

89. Tufts Medical Center also placed DoubleClick/Google Ads tags throughout its website that intercepted information similar to that of Google Analytics. The primary purpose of these other tags—from the perspective of the website owner—is targeted advertising on behalf of Tufts Medical Center. The contents of the communication that DoubleClick/Google Ads tags intercepted and transmitted to Google, via hidden JavaScript code, are similar to Google Analytics. For example, below is the information that hidden DoubleClick/Google Ads code intercepted on the main landing page of the Tufts Medical Center Website (with highlighting added):




That is, hidden DoubleClick/Google Ads code intercepted the URL visited, the name of the webpage visited, various information on the user's computer and browser configuration, and additional identifiers that can be used to confirm the identity of the individual whose communication with Tufts Medical Center is intercepted.

90. Notably, when the hidden code for Google Analytics or DoubleClick/Google Ads causes the website user's web browser to intercept the contents of communications between the website user and the Tufts Medical Center Website and contemporaneously transmit those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address and/or other persistent identifiers

to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). That is, the technology was designed specifically so that the communications are not intercepted anonymously or only in the aggregate; instead, the interceptions are designed to be individualized and non-anonymous. After Google associates the website user's communications with Tufts Medical Center with the identity of particular individuals known to Google, Google can use that information for commercial purposes, including serving personalized advertisements to that individual on other websites owned by Google on behalf of Tufts Medical Center or any other businesses that use Google's advertising platforms (many do).

91. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." Browser fingerprinting works by using scripts (such as the tracking technologies here) to gather many software and hardware attributes from a user's device and browser, such as their operating system, screen resolution, and other numeric codes that represent unique browser and computer settings. When combined, these data points create a distinct identifier—a "fingerprint"—that uniquely identifies a user across different browsing sessions and websites, similar to a real-world fingerprint.

92. Browser fingerprints allow tracking technology providers to track users across websites, and together with other data points such as IP address and unique user numbers, permit the tracking technology provider to know that a person browsing the Tufts Medical Center Website is the same person the identity of whom is known to that provider (i.e., Google or Facebook).

93. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[14] Browser fingerprints are personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

94. The same landing page for the Tufts Medical Center Website also included hidden Meta Pixel code before Tufts Medical Center removed Meta Pixel from its website in mid-June 2022. The hidden code caused the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the Tufts Medical Center Website. Below is an example of the contents of the communication between the website user and Tufts Medical Center, which the hidden Meta Pixel code intercepted and transmitted to Facebook:

[14] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

× Headers Payload Preview Response Initiator Timing »

▾ Form Data view source view URL-encoded

id: 899431063472882
ev: Microdata
dl: https://www.tuftsmedicalcenter.org/
rl:
if: false
ts: 1598876594129
cd[DataLayer]: []
cd[Meta]: {"title":"\n\tTufts Medical Center | Boston Hospital and Academic Medical Center\n","meta:keywords":"Top hospital boston, best boston hospital, Tufts Medical Center, tufts hospital, babesiosis, tick bite, parasite, infectious disease","meta:description":"Tufts Medical Center is a top Boston hospital focused on providing excellent patient care and teaching future leaders. Find your doctor today."}
cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:secure_url":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:type":"image/png","og:image:width":"200","og:image:height":"200","og:title":"Tufts Medical Center | Boston Hospital and Academic Medical Center","og:description":"Tufts Medical Center is a top Boston hospital focused on providing excellent patient care and teaching future leaders. Find your doctor today."}
cd[Schema.org]: []
cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.org/web/20200831122257/http://schema.org\",\n\"@type\": \"LocalBusiness\",\n\"address\": {\n\"@type\": \"PostalAddress\",\n\"addressLocality\": \"Boston\",\n\"addressRegion\": \"MA\",\n\"postalCode\":\"02111\",\n\"streetAddress\": \"800 Washingt

95. Similar to Google Analytics, Meta Pixel, which Tufts Medical Center placed on its website, caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Tufts Medical Center Website, including the URL of the webpage visited and the title of the webpage, and additionally, more detailed contents describing the webpage. The interception and transmission to Facebook also included information about the user's browser configuration and various codes to associate the communications with Tufts Medical Center's advertising account with Facebook.

96. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website with the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook and Tufts Medical Center then use the contents of communications between the website user and Tufts Medical Center for commercial and marketing purposes, including to serve personalized advertising to the website user in the future on Facebook's advertising platforms and to target advertising for Tufts Medical Center to the individual whose communications were intercepted.

97. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

98. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user—a numeric code that is unique to a particular individual (similar to an account number). This allowed Facebook to track that individual across the Tufts Medical Center Website and further confirm that individual's real-world identity.

99. Tufts Medical Center configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visited within the website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below serve to illustrate how the tracking technologies work and include both webpages Plaintiff visited and pages other Class Members visited (some of the particular pages Plaintiff visited are identified in paragraph 16 above). Plaintiff's healthcare communications with Tufts Medical Center, including communications that reveal Private

Information, were intercepted just like the examples set forth below. Google, Facebook, and Tufts Medical Center subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Tufts Medical Center over Google's platforms.

100. The Tufts Medical Center Website contains numerous subpages for specific "Patient Care and Services." For example, the Tufts Medical Center Website contains a page entitled "Obstetrics and Gynecology," designed to inform the website user about OB/GYN services Tufts Medical Center offers. By visiting this webpage, a user communicates that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicated with Tufts Medical Center by visiting this particular webpage, Tufts Medical Center secretly intercepted and transmitted that communication to Google, Facebook, and other third parties. Below is a screenshot of the Obstetrics and Gynecology webpage:




101. The graphic below presents the contents of the communication between the website user and Tufts Medical Center that Tufts Medical Center secretly intercepted and transmitted to Google when the above page loaded as a result of the Google Analytics JavaScript code that Tufts Medical Center secretly injected into the website (with highlighting added):

▾ Query String Parameters view source view URL-encoded

v: 1
_v: j99
aip: 1
a: 1002877562
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/patient-care-services/Departments-and-Services/Obstetrics-and-Gynecology/Overview
ul: en-us
de: UTF-8
dt: Obstetrics & Gynecology | Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 704906163

102. As reflected in the above screenshot, Tufts Medical Center Website injected hidden code on its webpage that intercepted and contemporaneously transmitted to Google the fact that the website user is visiting an "Obstetrics & Gynecology" webpage on the Tufts Medical Center Website—information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise. Google and Tufts Medical Center subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Tufts Medical Center over Google's platforms.

103. Indeed, Tufts Medical Center used Google's advertising platforms to target individuals with respect to particular medical conditions and treatments, as reflected in the advertisements below, which concern topics such as obesity, heart disease, and atrial fibrillation:










104. Given how Google Ads works, these advertisements would have been served to individuals who had shown an interest in particular treatments, such as people who had visited pages regarding those conditions and treatments on Tufts Medical Center's website, on which Tufts Medical Center deployed Google Analytics and DoubleClick tracking technologies to facilitate these kinds of advertisements targeted to such individuals. Indeed, the high degree of specificity with respect to particular conditions and treatments that Tufts Medical Center used in its advertisements on Google's advertising platforms confirms that such advertising would have been targeted to particular individuals whom Google knew to be interested in those conditions and treatments, including through the secret interceptions Tufts Medical Center made on communications of its own patients without their knowledge. Because Plaintiff visited webpages for specific conditions on the Tufts Medical Center Website during the Class Period, she was subject to the same types of interceptions, disclosures, and

misuse of her healthcare communications, including communications that revealed private information.

105. As shown on the screen capture of the webpage itself, the Obstetrics and Gynecology webpage contains a button through which a healthcare consumer can "Request an Appointment." When an individual clicks that button, the individual communicates to Tufts Medical Center that the individual is seeking obstetrics and gynecology care and is a patient or prospective patient of Tufts Medical Center. When the user clicks that button, hidden Google Analytics code that Tufts Medical Center injected into its website intercepts the communication. The contents of the communication that were intercepted via hidden Google Analytics code is depicted below:



106. Tufts Medical Center also inserted hidden DoubleClick/Google Ads code into the same webpage that intercepted similar information. That is, Google intercepted the fact that the healthcare consumer has "REQUEST[ED] AN APPOINTMENT" on the Obstetrics & Gynecology webpage of Tufts Medical Center. Google and Tufts Medical Center subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Tufts Medical Center over Google's platforms.

107. The same webpage contained hidden Meta Pixel code that Tufts Medical Center used to intercept the user's communication with Tufts Medical Center and to transmit the same information to Facebook before the removal of Meta Pixel from the Tufts Medical Center Website in June 2022. The contents of the communication intercepted by Facebook when a user visits the Obstetrics and Gynecology page are depicted below:

× Headers Payload Preview Response Initiator Timing »
▾ Form Data view source view URL-encoded
id: 899431063472882
ev: Microdata
dl: https://www.tuftsmedicalcenter.org/patient-care-services/departments-and-services/obstetrics-and-gynecology/overview
rl:
if: false
ts: 1598237810086
cd[DataLayer]: []
cd[Meta]: {"title":"\n\tObstetrics and Gynecology in Boston | Tufts Medical Center\n","meta:keywords":"obstetrics, gynecology, women, obgyn, gyn, ob, delivery, pregnancy, obgyn boston","meta:description":"Tufts Medical Center's Obstetrics and Gynecology experts offer renowned care from checkups and deliveries to surgery. Learn more and request an appointment today."}
cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:secure_url":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:type":"image/png","og:image:width":"200","og:image:height":"200","og:title":"Obstetrics and Gynecology in Boston | Tufts Medical Center","og:description":"Tufts Medical Center's Obstetrics and Gynecology experts offer renowned care from checkups and deliveries to surgery. Learn more and request an appointment today."}
cd[Schema.org]: []

108. As depicted above, Tufts Medical Center secretly intercepted and transmitted to Facebook of the contents of the communication between the website user and Tufts Medical Center, including that the user is visiting an "Obstetrics and Gynecology" webpage on the Tufts Medical Center Website, with further keywords describing the substance of the webpage, including "obgyn," "delivery," and "pregnancy," information that Facebook retains and can use for commercial purposes. Tufts Medical Center used Facebook's advertising platforms to target advertising for Tufts Medical Center to the individuals who communicated with Tufts Medical Center concerning that specialty (or any other specialty about which the user communicated with Tufts Medical Center). Facebook and

Tufts Medical Center subsequently used the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Tufts Medical Center over Facebook's platforms.

109. The Tufts Medical Center Website contains dozens of similar pages on particular medical specialties and practices that Tufts Medical Center offers. For each such page, Tufts Medical Center injected hidden code into its website that intercepted and disclosed to Google and Facebook the contents of communications with Tufts Medical Center, similar to the above Obstetrics and Gynecology example, including whenever a healthcare consumer communicates through the "Request an Appointment" feature, which is included on each such page. Plaintiff visited during the Class Period pages similar to the Obstetrics and Gynecology department example above concerning specific treatments and medical conditions, and her communications were intercepted in the same manner as the above example. Google, Facebook, and Tufts Medical Center then use the intercepted communications for commercial and marketing purposes, including targeted advertising by Tufts Medical Center.

110. When a user clicks the "Request an Appointment" button from any page on the website, the user is taken to a separate page to fill in information to request an appointment. If a user clicks the "Request an Appointment" button from the page for a particular specialty, that specialty will be pre-filled into the form on the Request-an-Appointment page. The screenshot below shows the Request-an-Appointment webpage after one clicks the Request-an-Appointment on the Obstetrics and Gynecology page discussed above:




111. When a user visits the Request an Appointment page, regardless of how the user arrives there, Tufts Medical Center intercepts and transmits to Google that appointment request via hidden Google Analytics code Tufts Medical Center has injected into its website. The contents of the communication intercepted are depicted below (with highlighting added):




112. Tufts Medical Center also inserted hidden DoubleClick/Google Ads code into the same webpage that intercepted similar information. That is, the intercepted communication reveals that the individual is requesting an appointment at Tufts Medical Center—information Google can then use for its own commercial purposes, including serving targeted advertising to that same individual, and Tufts Medical Center then uses Google's advertising platforms to target advertising for Tufts Medical Center based on the content of the intercepted communications relating to appointments.

113. When a user fills out the form to request an appointment and submits it, Tufts Medical Center also intercepts and transmits that communication to Google via hidden Google Analytics code. The contents intercepted are depicted below (with highlighting added):




114. As shown above, Google has intercepted the communication that the user has submitted a "form" to "Request an Appointment" for an "OB/GYN" doctor. Google can then use that information for its own purposes, including by serving targeted advertising on separate websites

to the same individual, and Tufts Medical Center uses Google's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications were intercepted, using the intercepted information (including the appointment request and department for which an appointment is requested). Google and Tufts Medical Center subsequently use the content of such intercepted communications for their own commercial and marketing purposes, including targeted advertising by Tufts Medical Center over Google's platforms.

115. Before mid-June 2022, Tufts Medical Center injected into its Request an Appointment page hidden Meta Pixel code that intercepted and transmitted to Facebook the communications on that page. The contents of the communication intercepted and transmitted to Facebook when a healthcare consumer accesses the Request an Appointment page are depicted below:



116. Facebook and Tufts Medical Center then use this intercepted communication for their own commercial purposes, including serving targeted advertising to the same individual based on the contents of the intercepted communication. Tufts Medical Center uses Facebook's advertising platforms to target advertising for Tufts Medical Center to individuals whose communications were intercepted. Like Google Analytics, the hidden Meta Pixel code also intercepted the communication through which a user submitted the form to request an appointment, and Facebook and Tufts Medical Center then use the content of the intercepted appointment request for marketing purposes, including targeted advertising.

117. The Tufts Medical Center Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal personal information about themselves, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Tufts Medical Center. When individuals have used the search function, Tufts Medical Center intercepts the contents of that search and transmits those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."




118. When a user performs this search on the Tufts Medical Center Website, and the results page then loads, the Google Analytics and DoubleClick code is activated, and Tufts Medical Center intercepts the user's precise search terms and transmits them to Google. Below is the portion of the communication Google Analytics code has intercepted and transmitted to Google (with highlighting added):




119. As reflected in the above screenshot, Tufts Medical Center, through the hidden Google Analytics code, intercepted the precise search terms entered by the user to be intercepted and transmitted to Google, which Google then uses for its own commercial purposes. Tufts Medical Center also uses the intercepted communications to advance its own marketing efforts, including targeted advertising based on the precise search terms the user has entered.

120. The Tufts Medical Center Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. Plaintiff used the "Find a Doctor" feature depicted below during the

Class Period. By using the "Find a Doctor" function, the user communicates to Tufts Medical Center that the user is a current or prospective patient. The screenshot below depicts the Find a Doctor page:




121. When a user visits the Find-A-Doctor page, hidden Google Analytics code intercepts the communication. Depicted below are the contents of the user's communication with the Tufts Medical Center Website intercepted and transmitted to Google via hidden Google Analytics Code, which intercepts that the user is searching for a Tufts Medical Center doctor (with highlighting added):

× Headers Payload Preview Response Initiator Timing
▼ Query String Parameters view source view URL-encoded
v: 1
_v: j99
aip: 1
a: 407189896
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/PhysicianDirectory/Search
ul: en-us
de: UTF-8
dt: Find A Doctor in Boston | Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAAAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 1577261897

That is, Tufts Medical Center, through Google Analytics code, intercepted the communication that the individual is looking to "Find a Doctor" at "Tufts Medical Center," information that both Google and Tufts Medical Center can then use for commercial purposes. Tufts Medical Center also inserted hidden DoubleClick/Google Ads code into the same webpage that intercepted similar information, which facilitates Tufts Medical Center's use of Google's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications were intercepted.

122. Before the removal of Meta Pixel in June 2022, communications on the Find-A-Doctor function were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel

code. Facebook then associates the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram). Tufts Medical Center later uses the intercepted communications for marketing purposes by using Facebook's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications were intercepted. Below is a screenshot of the contents of the communication intercepted through Meta Pixel code on the same Find-a-Doctor page (with highlighting added):


```
× Headers Payload Preview Response Initiator »

▾ Form Data    view source    view URL-encoded
  id: 899431063472882
  ev: Microdata
  dl: https://www.tuftsmedicalcenter.org/PhysicianDirectory/Search
  rl:
  if: false
  ts: 1598230640043
  cd[DataLayer]: []
  cd[Meta]: {"title":"\n\tFind A Doctor in Boston | Tufts Medical Center\n","meta:keywords":"Find a doctor boston, find a pediatrician boston, find a specialist boston","meta:description":"Are you looking for a doctor in Boston? Look no further than Tufts Medical Center and Floating Hospital for Children, hospitals that are home to expert doctors in a range of specialties. "}
  cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:secure_url":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:type":"image/png","og:image:width":"200","og:image:height":"200","og:title":"Find A Doctor in Boston","og:description":"Are you looking for a doctor in Boston? Look no further than Tufts Medical Center and Floating Hospital for Children, hospitals that are home to expert doctors in a range of specialties.
"}
```

123. The Tufts Medical Center Website also contains a section permitting patients to pay bills they received from Tufts Medical Center. The "Paying Your Bill" page of the Tufts Medical Center Website is depicted below:




124. When a user visits this page, the user communicates that the user is an individual who has received medical services from Tufts Medical Center. Tufts Medical Center intercepted and transmitted the contents of that communication to Google via hidden Google Analytics code. The contents of the communication intercepted by and transmitted to Google are depicted below (with highlighting added):




125. As reflected in the above screenshot, hidden Google Analytics code intercepted that the user is visiting the "Paying Your Bill at Tufts Medical Center." Google retains such intercepted communications and may use them for its own commercial purposes. Tufts Medical Center also inserted hidden DoubleClick/Google Ads code into the same webpage that intercepted similar information, which permits Tufts Medical Center's own targeted advertising through Google's platforms based on the content of intercepted communications.

126. Before removing Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its bill payment webpage that permitted

Facebook to intercept communications on the webpage. The content of the communications intercepted and transmitted to Facebook are depicted below (with highlighting added):




Facebook and Tufts Medical Center then use the intercepted communications concerning bill payment for commercial purposes, including serving targeted advertising to the same individual based on the

contents of the intercepted communication, Tufts Medical Center subsequently uses Facebook's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications it intercepted.

127. Tufts Medical Center also had a feature on its website that permits patients to request their medical records through the website. By visiting this feature, a website user communicates to Tufts Medical Center that the user is a patient of Tufts Medical Center. Below is a screenshot of the webpage through which a patient may request medical records from Tufts Medical Center:




128. When an individual would visit this page, hidden Google Analytics code that Tufts Medical Center injected into its website secretly intercepts the contents of the individual's communications with Tufts Medical Center. The contents intercepted and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

v: 1
_v: j99
aip: 1
a: 1201104250
t: pageview
_s: 1
dl: https://www.tuftsmedicalcenter.org/patient-care-services/Patient-Rights/Request-Your-Medical-Record
ul: en-us
de: UTF-8
dt: Request Your Medical Record from Tufts Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1339x979
je: 0
_u: QCCAgAABAAAAgAAAAC~
jid:
gjid:
cid: 815584837.1679685730
tid: UA-5578028-1
_gid: 1131827353.1679685730
gtm: 45He33m0n71TTLN4K
z: 1373719858

That is, the fact that the website user is requesting medical records from Tufts Medical Center is intercepted and transmitted to Google, revealing their status as a patient. Tufts Medical Center injected similar DoubleClick/Google Ads code into the same webpage, intercepting similar communication contents. Between the two tracking technologies, Google retains and uses the contents of the intercepted communications for its own commercial purposes, and Tufts Medical Center uses Google's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications were intercepted.

129. Before the removal of Meta Pixel from the Tufts Medical Center Website in June 2022, Tufts Medical Center injected hidden Meta Pixel code into its medical records request form that permitted Facebook to intercept communications on that form. The content of the communications intercepted and transmitted to Facebook is depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing »

▾ **Form Data** view source view URL-encoded


id: 899431063472882
ev: Microdata
dl: https://www.tuftsmedicalcenter.org/patient-care-services/Patient-Rights/Request-Your-Medical-Record
rl:
if: false
ts: 1595540398133
cd[DataLayer]: []
cd[Meta]: {"title":"\n\tRequest Your Medical Record from Tufts Medical Center\n","meta:keywords":"Patient rights, health information, request your medical record","meta:description":"We make it easy to request your medical record from Tufts Medical Center. Learn about our process for releasing your information to you."}
cd[OpenGraph]: {"og:image":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:secure_url":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:image:type":"image/png","og:image:width":"200","og:image:height":"200","og:title":"Request Your Medical Record from Tufts Medical Center","og:description":"We make it easy to request your medical record from Tufts Medical Center. Learn about our process for releasing your information to you."}
cd[Schema.org]: []
cd[JSON-LD]: ["{\n\"@context\": \"https://web.archive.org/web/20200723213952/http://schema.org\",\n\"@type\": \"LocalBusiness\",\n\"address\": {\n\"@type\": \"PostalAddress\",\n\"addressLocality\": \"Boston\",\n\"addressRegion\":

130. Facebook then uses the intercepted communications concerning medical records for commercial purposes, including serving targeted advertising to the same individual based on the contents of the intercepted communication. Tufts Medical Center uses Facebook's advertising platforms to target advertising for Tufts Medical Center to the individuals whose communications were intercepted.

131. Tufts Medical Center also maintained several patient portals during the Class Period. For most of the Class Period, patients accessed the patient portals by clicking on a "Patient Portals" button shown in the top right on all pages of the Tufts Medical Center Website, and in late December 2022 or early January 2023 the text on the button changed to "myTuftsMed" as depicted in the website captures shown above, reflecting the change, described in the next paragraph, to a single patient portal replacing the multiple patient portals that existed before.

132. During most of the Class Period, Tufts Medical Center made available different portals serving different patients, including portals for inpatient hospital patients, primary care patients for various locations, and portals for certain specialties, including portals specifically for cancer care, cardiology, and surgical specialties, among others. In approximately April 2022, Tufts Medical Center replaced those patient portals with a single "myTuftsMed" patient portal.

133. During the Class Period, the patient portals permitted a patient to obtain medical records, view details regarding upcoming visits and medical treatments, view laboratory reports, review medications, and review discharge instructions, among other tasks. The patient portals included several publicly accessible pages on the Tufts Medical Center Website that are used to navigate to and log into the patient portals, as well as dynamically generated pages accessed after a user logs into the patient portals (including pages regarding a patient's medical records and medications, which, of course, are dynamically generated and unique to the patient).

134. Prior to discovery, Plaintiff cannot know with certainty whether and to what extent Tufts Medical Center during any portion of the Class Period used tracking technologies within the dynamically generated pages accessed after a patient logs into the patient portal, although many hospitals did so before the publicity and public outrage during the summer of 2022 regarding hospitals using tracking technologies on their websites and patient portals. However, Tufts Medical Center did use the tracking technologies on pages to navigate to and access its patient portal. A website user, by accessing those pages, communicates that the user is a patient of Tufts Medical Center, and by deploying tracking technologies on those pages, Tufts Medical Center intercepted and disclosed to Google, Facebook, and other third parties the users' status as Tufts Medical Center patients.

135. During the Class Period, when a patient first clicked on the button to navigate to the patient portals, the website would bring the patient to a patient portal page. The patient portal page during most of the Class Period (until approximately April 2022) appeared as follows:




136. When a patient navigates to the above patient portals page, hidden code Tufts Medical Center deployed on its website intercepted that communication and disclosed its substance to Google, Facebook, and other third parties. The image below depicts the information that was intercepted and then transmitted to Google via DoubleClick code when a patient visited this patient portal page:

X Headers **Payload** Preview Response Initiator Timing Cookies

▾ **Query String Parameters** View source View URL-encoded

| | |
|---|---|
| random | 1600648935099 |
| cv | 9 |
| fst | 1600648935099 |
| num | 1 |
| guid | ON |
| resp | GooglemKTybQhCsO |
| u_h | 1080 |
| u_w | 1920 |
| u_ah | 1032 |
| u_aw | 1920 |
| u_cd | 24 |
| u_his | 5 |
| u_tz | 0 |
| u_java | false |
| u_nplug | 6 |
| u_nmime | 6 |
| sendb | 1 |
| ig | 1 |
| frm | 0 |
| url | https://www.tuftsmedicalcenter.org/myTuftsMedicalCenter |
| tiba | myTuftsMedicalCenter offers access to your online health records, upcoming appointments, lab results and more. |
| hn | www.googleadservices.com |
| rfmt | 3 |
| fmt | 4 |

As shown above, the tracking technologies intercepted and disclosed to Google that the user is visiting a "TuftsMedicalCenter" page that "offers access to online health records, upcoming appointments, lab results, and more," confirming an individual's status as a Tufts Medical Center patient, which Google and Tufts Medical Center later commercially exploit for marketing purposes, including through targeted advertising based on the content of the intercepted communication.

137. Tufts Medical Center also deployed Meta Pixel on the same patient portal webpage, which resulted in disclosure of the even more detailed information to Facebook. The intercepted content of the communication that was disclosed to Facebook is depicted below:

| | |
|---|---|
| id | 899431063472882 |
| ev | Microdata |
| dl | https://www.tuftsmedicalcenter.org/myTuftsMedicalCenter |
| rl | |
| if | false |
| ts | 1596869321740 |
| cd[DataLayer] | [] |
| cd[Meta] | {"title":"\n\tmyTuftsMedicalCenter offers access to your online health records, upcoming appointments, lab results and more.\n","meta:keywords":"Medical record, secure sign-on, health care account","meta:description":"Safe, secure 24/7 access to your Tufts Medical Center health record starts here."} |
| cd[OpenGraph] | {"og:image":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:imagesecure_url":"https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center-fb-share.png","og:imagetype":"image/png","og:imagewidth":"200","og:imageheight":"200","og:title":"myTuftsMedicalCenter offers access to your online health records, upcoming appointments, lab results and more.","og:description":"Safe, secure 24/7 access to your Tufts Medical Center health record starts here."} |
| cd[Schema.org] | [] |
| cd[JSON-LD] | ["{\n\"@context\": \"https://web.archive.org/web/20200808064824/http://schema.org\",\n\"@type\": \"LocalBusiness\",\n\"address\": {\n\"@type\": \"PostalAddress\",\n\"addressLocality\": \"Boston\",\n\"addressRegion\": \"MA\",\n\"postalCode\":\"02111\",\n\"streetAddress\": \"800 Washington Street\"\n},\n\"description\": \"Safe, secure 24/7 access to your Tufts Medical Center health record starts here.\",\n\"name\": \"myTuftsMedicalCenter offers access to your online health records, upcoming appointments, lab results and more.\",\n\"url\" : \"https://web.archive.org/web/20200808064824/https://www.tuftsmedicalcenter.org:443/myTuftsMedicalCenter\",\n\"logo\": \"https://web.archive.org/web/20200808064824/https://www.tuftsmedicalcenter.org/ui/images/logo-tufts-medical-center.png\",\n\"telephone\": ,\n\"openingHours\": \"\",\n\"geo\": {\n\"@type\": \"GeoCoordinates\",\n\"latitude\": \"42.349617\",\n\"longitude\": \"-71.063140\"\n},\n\"sameAs\" : []\n}\n"] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.23 |
| r | stable |
| a | tmgoogletagmanager |
| ec | 1 |
| o | 30 |
| fbp | fb.0.1596869321212.768106516 |
| it | 1596869319186 |
| coo | false |
| es | automatic |
| tm | 3 |
| rqm | formPOST |


That is, Meta Pixel code deployed by Tufts Medical Center intercepts and discloses to Facebook that the individual is accessing a page to access "Medical record[s]" through a "secure sign on" to a "health care account" at Tufts Medical Center, thus revealing an individual's status as a Tufts Medical Center patient. Both Facebook and Tufts Medical Center then subsequently use the intercepted communications for targeted advertising on Facebook's platform.

138. When Tufts Medical Center replaced its various patient portals with the single myTuftsMed patient portal near the end of the Class Period, Tufts Medical Center continued to use tracking technologies on the same page used to access that portal, intercepting communications in a similar fashion to the interceptions described above.

139. Plaintiff regularly used the Tufts Medical Center patient portal during the Class Period, and accordingly, her communications were intercepted and transmitted to Google and Facebook, which permitted Google, Facebook, and Tufts Medical Center to target her with advertising based on the disclosure of her status as a patient, in combination with the other interceptions of Plaintiff's communications described above, including interceptions regarding her specific conditions and doctors on the Tufts Medical Center Website.

140. In addition to Google and Facebook, Tufts Medical Center intercepted communications between healthcare consumers and Tufts Medical Center and transmitted the intercepted communications to various other companies without consumers' knowledge or consent. These additional third parties include:

(a) **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functioned similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with Tufts Medical Center through the Tufts Medical Center Website, including the URL and title of each page visited.

(b) **LinkedIn Insight.** LinkedIn Insight is a tracking technology similar to Meta Pixel designed to optimize advertising on LinkedIn. Similar to Meta Pixel, hidden JavaScript code that Tufts Medical Center injected into some pages on the Tufts Medical Center Website caused the user's browser to surreptitiously and contemporaneously intercept and transmit to LinkedIn information about the contents of the website user's communications with the Tufts Medical Center Website. LinkedIn and Tufts Medical Center could then use that information to better target advertising to LinkedIn users, the real-world identities of whom LinkedIn knows.

(c) **Marchex.io.** Marchex.io is known primarily for its call analytics but also offers website tracking. During the Class Period, Tufts Medical Center inserted Marchex.io pixels

> that analyzed activity on the Tufts Medical Center Website. Marchex operated through hidden code that intercepted communications between website users and Tufts Medical Center, including the identity of the user visiting the website, which is revealed through the user's IP address.

**The Secret Use of Website Tracking Technologies, Such as Meta Pixel and Google Analytics, Is Not Necessary**

141. Tufts Medical Center's secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the operation of the Tufts Medical Center Website. The Tufts Medical Center Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

142. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with Tufts Medical Center via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

143. Moreover, even if Tufts Medical Center wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for Tufts Medical Center (i) to keep secret from its website users the use of these non-anonymized tracking technologies; (ii) to falsely and deceptively claim that Tufts Medical Center does not share the communications with third parties when it does; or (iii) to claim that Tufts Medical Center maintains the privacy of those communications via anonymization when it does not.

**Tufts Medical Center Violated HIPAA and the FTC Act.**

144. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[15]

---

[15] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

145. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

146. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

147. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[16]

148. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514

[16] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

(emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

149. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

150. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

151. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

152. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment

data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[17]

153. The privacy rule also expressly provides that "a covered entity must obtain an authorization [from the patient] for any use or disclosure of protected health information for marketing…." 45 C.F.R. § 164.508(a)(3). That rule is directly implicated by tracking technologies in that a primary function of the tracking technologies is to permit both the tracking technology provider (for example, Google and Facebook) and the website owner (here, Tufts Medical Center) to use the contents of the intercepted communications for marketing purposes after the interception occurs.

154. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[18]

155. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[19]

---

[17] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.16.
[18] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.
[19] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

156. In other words, the HHS has expressly stated that entities like Tufts Medical Center that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

157. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

158. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

159. As reflected in the current version of the HHS Bulletin posted on the HHS website, a district court decision vacated a portion of the HHS Bulletin. However, the remainder of the HHS Bulletin has neither been vacated nor withdrawn, including the portions to which Plaintiff refers above. In any event, Plaintiff is not suing for violation of the HHS Bulletin as such; instead, the HHS Bulletin reflects a reasonable interpretation of HIPAA and the Privacy Rule which is relevant for its persuasive force, including for the observation that the use of tracking technologies on healthcare

provider website poses serious privacy implications and can lead to HIPAA violations, including on publicly accessible pages that disclose patient status.

160. Tufts Medical Center's provision of healthcare communications, including communications that reveal Private Information, to third parties such as Facebook and Google, and its later use of those communications and Private Information for marketing purposes without patient consent, violated the Privacy Rule.

161. Tufts Medical Center is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

162. Tufts Medical Center's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit Private Information to third parties, and those third parties and Tufts Medical Center then use those intercepted communications for marketing purposes, all without their authorization.

163. Tufts Medical Center improperly disclosed to third parties Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information regarding (a) patient symptoms and health conditions, (b) patients' doctors, (c) appointment requests, and (d) patients' status as patients of Tufts Medical Center by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, medical records access, and the pages used to access Tufts Medical Center patient portals).

164. For example, by using tracking technologies on the webpages Plaintiff visited—including the pages used to access the Tufts Medical Center patient portal and those containing information on doctors, medical procedures, and medical records, Tufts Medical Center permitted third parties to intercept information about Plaintiff's doctors, specific treatments connected to Plaintiff, and Plaintiff's status as a Tufts Medical Center patient, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

165. Tufts Medical Center knowingly and improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. Tufts Medical Center disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

166. Tufts Medical Center also knowingly and improperly used healthcare communications and Private Information for marketing purposes without patient authorization by using the intercepted communications for its own targeted advertising through third-party advertising platforms.

167. Tufts Medical Center violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

168. Tufts Medical Center further violated other HIPAA regulations as follows:

(d) Tufts Medical Center failed to ensure the confidentiality and integrity of electronic PHI that Tufts Medical Center created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(e) Tufts Medical Center failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(f) Tufts Medical Center failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Tufts Medical Center in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(g) Tufts Medical Center failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(h) Tufts Medical Center failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(i) Tufts Medical Center failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

169. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[20]

170. Tufts Medical Center's undisclosed use of tracking technologies on its website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, Tufts Medical Center's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

171. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[21]

[20] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[21] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

172. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

173. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

174. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[22]

175. In 2022, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[23]

---

[22] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[23] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-

**Tufts Medical Center Violated Industry Standards**

176. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

177. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

178. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

179. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purposes for which access would be granted.

180. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[24]

---

Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

[24] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

181. Tufts Medical Center, through the conduct described in this complaint, including the disclosure of healthcare communications to third-party technology and advertising companies and Tufts Medical Center's own subsequent use of intercepted communications for marketing purposes, violated the AMA Code of Medical Ethics by gathering and recording information about patients that Tufts Medical Center failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

**Plaintiff and Class Members Suffered Harm from Tufts Medical Center's Unlawful Interceptions and Disclosures of Plaintiff's and Class Members' Healthcare Communications and Private Information**

182. An economic market exists for consumers' personal data, including the data that Tufts Medical Center has collected and disclosed from Plaintiffs and Class Members.

183. In 2013, the Financial Times reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."

184. In 2015, TechCrunch reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name. That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.

185. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price." This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.

186. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because it is not generally available to third-party data marketing companies due to the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists to sell and purchase such private medical information.

187. Further, individuals can sell or monetize their own data if they choose. For example, Facebook has offered to pay individuals for their voice recordings and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smartphones.

188. Many other companies and apps, such as DataCoup, Nielsen Computer, Killi, and UpVoice, also offer consumers money in exchange for access to their personal data.

189. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Tufts Medical Center has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Members' property.

190. As a direct and proximate cause of Tufts Medical Center's unauthorized interceptions and disclosures of Plaintiff's and Class Members' healthcare communications, including communications that reveal Private Information, and its subsequent commercial exploitation of that information to support Tufts Medical Center's marketing, including targeted advertising derived from

the intercepted communications, Plaintiff and Class Members have been damaged by Tufts Medical Center's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) Tufts Medical Center denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used Tufts Medical Center's services or would have demanded compensation for Tufts Medical Center's use of their Private Information if they had known of Tufts Medical Center's practices;

(d) Tufts Medical Center eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Members' rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) Tufts Medical Center took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) Tufts Medical Center's actions violated the property rights Plaintiff and Class Members have in their healthcare communications and Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

## <u>Class Action Allegations</u>

191. Plaintiff brings this action under Fed. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.tuftsmedicalcenter.org between three years prior to the date of the filing of the initial complaint in this action and the date

Tufts Medical Center removed from the Tufts Medical Center Website the tracking technologies described in the complaint.[25]

192. This action is properly maintainable as a class action.

193. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

194. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were electronic communications under the ECPA;

(b) Whether Tufts Medical Center inserted tracking technologies into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the Tufts Medical Center Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and Tufts Medical Center;

(g) Whether and to what extent Tufts Medical Center had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether Tufts Medical Center had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

[25] This precise date will be determined through discovery.

(i) Whether the promises made in Tufts Medical Center's Website Privacy Policy either were or formed part of a contract between Tufts Medical Center and Plaintiff and Class Members;

(j) Whether Tufts Medical Center's disclosure of Plaintiff's and Class Members' healthcare communications, including communications that revealed Private Information, breached Tufts Medical Center's promises set forth in its Website Privacy Policy, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

195. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the Tufts Medical Center Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

196. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

197. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

198. Tufts Medical Center has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

### (Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)

199. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

200. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

201. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and Tufts Medical Center, through the Tufts Medical Center Website, were electronic communications under the ECPA.

202. The tracking technologies inserted into the hidden code of the Tufts Medical Center Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the Tufts Medical Center Website; (ii) Class Members' web browsers used to access the Tufts Medical Center Website; (iii) Tufts Medical Center's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the Tufts Medical Center Website.

203. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and then disclose to Google, Facebook, and other third parties the contents of communications between Tufts Medical Center and users of the Tufts Medical Center Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

204. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, Tufts Medical Center configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and Tufts Medical Center, including

by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and Tufts Medical Center), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers. Tufts Medical Center also used tracking technologies on pages that would confirm to third parties, such as Google and Facebook, the user's status as a Tufts Medical Center patient, including pages through which patients access Tufts Medical Center's patient portal, obtain information on doctors, request appointments, pay bills, or request medical records.

205. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors and treatments for Plaintiff by configuring the tracking technologies to reveal the substance of communications regarding Plaintiff's doctors and treatments, including Plaintiff's status as a patient of Tufts Medical Center by use of the tracking technologies on the pages used to navigate to the Tufts Medical Center patient portals.

206. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Tufts Medical Center intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

207. Additionally, through the above-described tracking technologies, after Tufts Medical Center intercepted communications, the intercepted information was, in turn, used by Tufts Medical Center and third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

208. Tufts Medical Center intercepted communications between the Class Members and Tufts Medical Center, and Tufts Medical Center disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception and the subsequent use of the intercepted communications for marketing purposes.

209. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

210. Tufts Medical Center was well aware of the restrictions imposed by HIPAA, and that the disclosure of PHI without written consent violated HIPAA. In Tufts Medical Center's HIPAA Notice of Privacy Practices (available on its website). Tufts Medical Center wrote during the Class Period: "Tufts Medicine is required by law to protect the privacy of health information that may reveal your identity, and to provide you with a copy of this notice, which describes the health information privacy practices of our hospital and our affiliated health care providers." It also recognized: "Tufts Medicine may not sell your health information or disclose such information in exchange for payment to a third party for purposes of marketing their products or services to you."[26]

211. Tufts Medical Center's primary purpose in deploying the tracking technologies was to engage in conduct (made impermissible by HIPAA and the Massachusetts tort causes of action set forth in this complaint (including the Massachusetts Right to Privacy Act). As detailed in and supported by the factual allegations throughout this complaint (*see, e.g.*, ¶¶ 32, 35, 38-47, 52-59, 72-73, 75-76, 78-79, 90, 95-96, 99, 102-04, 106, 108-09, 112, 114, 116, 119, 121-22, 125-26, 128-30, 134, 136-39, 160, 162-66), Tufts Medical Center knowingly and intentionally intercepted the contents of

---

[26] https://web.archive.org/web/20220324031406/https://www.tuftsmedicalcenter.org/patient-care-services/Patient-Rights/HIPAA.

Plaintiff's and Class Members' electronic communications for the primary purpose of committing a criminal and/or tortious acts in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA, the FTC Act, and the Massachusetts Right to Privacy Act.

212. Before engaging in such criminal and tortious acts, Tufts Medical Center was warned not to use tracking technology on webpages with health information without informed consent, which Tufts Medical Center did not obtain. In committing such criminal and tortious acts, Tufts Medical Center was motivated by its own financial self-interest in maximizing the effectiveness of its online marketing. Tufts Medical Center's financial motivations demonstrate that its purpose was to commit a criminal or tortious act, as Tufts Medical Center had an incentive, which it acted on, to disclose sensitive patient communications and Private Information to Google and Facebook and later to use the same intercepted communications for marketing purposes, in order to advance its own marketing on Google and Facebook's advertising platforms.

213. As alleged above, Tufts Medical Center violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

214. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

215. The sensitive healthcare communications and Private Information of Plaintiff and Class Members that Tufts Medical Center disclosed to third parties, which both Tufts Medical Center and the third parties later used for marketing purposes, qualify as IIHI, and Tufts Medical Center

violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). Tufts Medical Center used the intercepted electronic communications to increase its revenues.

216. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. Tufts Medical Center specifically used tracking technologies to intercept, disclose, and later use for marketing purposes, Plaintiff's and Class Members' Private Information.

217. Tufts Medical Center's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

218. Tufts Medical Center's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Tufts Medical Center's use of the Facebook source code was for Tufts Medical Center's commercial advantage to increase revenue from existing patients and gain new patients through, among other things, targeted advertising.

219. The same acts that are criminal violations under HIPAA—including the disclosure and subsequent marketing use of Private Information and private communications without consent—are likewise tortious acts under Massachusetts law, as detailed in the other counts of this complaint. Accordingly, Tufts Medical Center additionally intercepted communications for the purpose of committing acts that are tortious under Massachusetts law (*see* ¶¶ 222-61, *infra*, which explains how the acts described in this complaint are tortious acts that give rise to liability, and how Tufts Medical Center intercepted communications for the primary purpose of performing those acts that are tortious under Massachusetts law).

220. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

221. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of Tufts Medical Center's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

### (Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)

222. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

223. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

224. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

225. Tufts Medical Center had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' healthcare communications, including but not limited to communications that reveal Private Information.

226. Plaintiff and Class Members did not authorize Tufts Medical Center to disclose their healthcare communications or Private Information with Tufts Medical Center to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment, nor did Plaintiff or Class Members authorize Tufts Medical Center to later commercially exploit the improperly

disclosed communications for marketing purposes, including targeted advertising to Tufts Medical Center patients.

227. Tufts Medical Center disclosed Plaintiff's and Class Members' healthcare communications to unauthorized third parties in order to market its own services and increase profits, and those third parties can and did provide to or permit the use of the same information by numerous other third parties (including advertisers and data brokers). Therefore, Tufts Medical Center's conduct reflected a public disclosure of private facts.

228. Additionally, Tufts Medical Center's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Members' private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive because of both the disclosure of communications and the later use of those communications for marketing purposes, including targeted advertising to the individual based on the content of the intercepted communication.

229. Tufts Medical Center's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

230. Plaintiff and Class Members suffered injuries as a direct and proximate result of Tufts Medical Center's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

231. Tufts Medical Center's acts or omissions violate the Massachusetts Right to Privacy Act.

232. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 182-90, *supra*), plus costs and attorneys' fees.

## COUNT III

**(Breach of Fiduciary Duty, on behalf of the Class)**

233. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

234. A fiduciary relationship existed between Tufts Medical Center, a healthcare provider, and Plaintiff, a Tufts Medical Center patient. Furthermore, apart from and in addition to the physician-patient relationship, Tufts Medical Center assumed the role of a fiduciary when Plaintiff reposed her confidence in Tufts Medical Center by entrusting to Tufts Medical Center sensitive communications made through the Tufts Medical Center Website, which included but were not limited to her Private Information.

235. When possessing nonpublic medical information, medical providers such as Tufts Medical Center have a duty to keep such information completely confidential.

236. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Tufts Medical Center through its website, including communications that revealed Private Information and other private communications. Tufts Medical Center's policies bolstered that expectation, given Tufts Medical Center's promises to Plaintiff that Tufts Medical Center would not disclose communications on the website to third parties.

237. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Tufts Medical Center installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' healthcare communications and Private Information.

238. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

239. Tufts Medical Center's secret and unauthorized disclosures of Plaintiff's healthcare communications and Private Information and subsequent use of those communications for marketing purposes constituted a breach of Tufts Medical Center's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

240. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 182-90, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

241. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

242. Upon accepting, storing, and controlling the healthcare communications, including communications that revealed Private Information, of Plaintiff and the Class, Tufts Medical Center owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information and private communications.

243. Tufts Medical Center breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' healthcare communications and Private Information from unauthorized disclosure.

244. It was reasonably foreseeable that Tufts Medical Center's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' healthcare communications and Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

245. Tufts Medical Center's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' healthcare communications and Private Information arose due to the special relationship between Tufts Medical Center and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

246. In addition, Tufts Medical Center's duty is informed by state law (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

247. Tufts Medical Center's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their healthcare communications and Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' healthcare communications and Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

248. Tufts Medical Center's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' healthcare communications and Private Information constituted negligence at common law.

249. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 182-90, *supra*), plus costs and attorneys' fees.

**<u>COUNT V</u>**

**(Breach of Confidence, on behalf of the Class)**

250. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

251. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

252. Medical providers also have a duty to maintain the confidentiality of Plaintiff's Private Information under HIPAA and its implementing regulations.

253. When possessing nonpublic communications and medical information, medical providers such as Tufts Medical Center have a duty to keep such information completely confidential.

254. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to Tufts Medical Center through its website, which included highly sensitive Private Information. Tufts Medical Center's policies bolstered that expectation, given Tufts Medical Center's promises to Plaintiff that Tufts Medical Center would not disclose communications on the website to third parties.

255. In light of the special relationship between Tufts Medical Center and Plaintiff and Class Members, whereby Tufts Medical Center became a guardian of Plaintiff's and Class Members' healthcare communications and Private Information, Tufts Medical Center became a fiduciary by its undertaking and guardianship of the healthcare communications and Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' healthcare communications and Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their healthcare communications and Private

Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Tufts Medical Center did and does store and disclose.

256. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Tufts Medical Center installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with Tufts Medical Center and the contents of those communications, including but not limited to Private Information.

257. Tufts Medical Center made these disclosures for its own commercial purposes, including the later use of the disclosed information for Tufts Medical Center's own marketing and targeted advertising on Google and Facebook platforms, without Plaintiff's or Class Members' knowledge, consent, or authorization.

258. The unauthorized disclosures and subsequent marketing use of Plaintiff's and Class Members' communications, including communications that reveal Private Information, were intentionally caused by Tufts Medical Center's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' communications, including Private Information, occurred because of Tufts Medical Center's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

259. Tufts Medical Center disclosed Plaintiff's and Class Members' communications, including communications that reveal Private Information, to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

260. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

261. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraphs 182-90, *supra*), plus costs and attorneys' fees.

**COUNT VI**

**(Breach of Contract, on behalf of the Class)**

262. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

263. Tufts Medical Center required Plaintiff and Class Members to provide their personal information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the Tufts Medical Center Website as a condition of receiving healthcare services. Plaintiff's and Class Members' provision of such personal information provided consideration for Tufts Medical Center's provision of services through the Tufts Medical Center Website, including the provision of information and the use of the website to obtain medical services.

264. In so doing, Plaintiff and Class Members entered into contracts with Tufts Medical Center (or, in the alternative, implied contracts) by which Tufts Medical Center agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. Tufts Medical Center's contractual promises included that (i) patients could obtain information from the Tufts Medical Center Website "anonymously" and (ii) Tufts Medical Center would not share healthcare consumers' communications with third parties.

265. Plaintiff and Class Members fully performed their obligations under the contract with Tufts Medical Center.

266. Tufts Medical Center breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only anonymously and not to share information regarding website communications with third parties.

267. As a direct and proximate result of Tufts Medical Center's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their healthcare communications and Private Information and have been denied the benefit of the bargain of their agreement with Tufts Medical Center.

268. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraphs 182-90, *supra,* plus costs and attorneys' fees.

## COUNT VII

### (Unjust Enrichment, on behalf of the Class)

269. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

270. This claim is pleaded in the alternative to Plaintiff's other causes of action.

271. Tufts Medical Center benefits from using the content of Plaintiff's and Class Members' communications with Tufts Medical Center, including communications that reveal Private Information, and unjustly retained those benefits at Plaintiff's and Class Members' expense.

272. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable healthcare communications and Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

273. Tufts Medical Center consciously collected and used this information for its own gain, providing Tufts Medical Center with economic, intangible, and other benefits, including substantial monetary compensation.

274. Tufts Medical Center unjustly retained those benefits at the expense of Plaintiff and Class Members because Tufts Medical Center's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

275. The benefits that Tufts Medical Center derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Tufts Medical Center to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

276. Had Tufts Medical Center informed Plaintiff that it collected and shared Plaintiff's communications, including communications that reveal Private Information, with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her healthcare communications or Private Information or would have demanded compensation for such usage. Now knowing of Tufts Medical Center's practices, Plaintiff demands compensation for the unauthorized use of their healthcare communications and Private Information.

277. The Court should compel Tufts Medical Center to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that Tufts Medical Center unjustly received and such other relief as the Court may deem just and proper.

## **<u>Prayers for Relief</u>**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 20, 2025

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

*/s/ Patrick J. Vallely*
Patrick J. Vallely